UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

Civil Action No.

03 12589 GAO

| | | |
|---|---|---|
| M²CONSULTING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE _Bowler_ |
| | ) | |
| v. | ) | |
| | ) | |
| MRO SOFTWARE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff, M²Consulting, Inc., by its attorneys, alleges for its
Complaint as follows:

### I.    THE PARTIES

1.    Plaintiff, M²Consulting, Inc. ("M²Consulting"), is a corporation
incorporated under the laws of the State of Georgia, maintaining its principal
place of business at 43 Jefferson Parkway, Newnan, GA 30263-5813.

2.    Upon information and belief, Defendant, MRO Software, Inc.
("MRO"), is a corporation incorporated under the laws of the Commonwealth of
Massachusetts, maintaining its principal place of business at 100 Crosby
Drive, Bedford, MA 01730.

### II.    JURISDICTION AND VENUE

3.    This Court has jurisdiction over the subject matter of this action

pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds
$75,000, exclusive of interest and costs, and there is complete diversity of
citizenship of the parties.

4.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a),
because the wrongful conduct set forth in this Complaint took place in
Bedford, Massachusetts, and other places within the District of Massachusetts.

### III.  STATEMENT OF FACTS

#### Internet Hosting

5.    M²Consulting is a small, five and one half-year-old company in the
business of office building facility and equipment maintenance and operations
consulting.  In providing these services, M²Consulting employs Maximo, a
Computerized Maintenance Management System ("CMMS") software manufactured by
MRO.

6.    M²Consulting is authorized by MRO to serve as a third-party
provider to "host" the Maximo software via the Internet.

7.    "Internet hosting" of the Maximo software program allows licensees
to use the Maximo software via the Internet without having to load the Maximo
software program on their computer or network server, without having to
purchase the necessary computer software or hardware to run Maximo, and
without having to employ information technology personnel to assist the
licensee in running this sophisticated software.  Internet application hosting
also allows licensees access to M²Consulting's trouble-shooting experts to

assist in any problems encountered by users on a 24-hour-a-day, seven-day-a-week basis.

8.    Through extensive research and development and the expenditure of considerable time, effort and money, M²Consulting has developed commercially valuable trade secrets, consisting of confidential and proprietary scientific, technical, and business information concerning the development and deployment of a computing infrastructure which M²Consulting uses to host Maximo via the Internet. This information includes network infrastructure, system user administration, database template architecture, rapid deployment processes, non-standard software installation, and pricing methodologies.

9.    This information is of great commercial value to M²Consulting since it is not generally known to, and is not readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use.

10.    As a result of M²Consulting's development of this unique proprietary information, M²Consulting has been able to attract large corporate clients such as AT&T, Johnson Controls, Delta and others.  These large corporate clients have hired M²Consulting because M²Consulting's competitors have not determined how to deploy these services or can deploy these services only in a much slower and less competitive fashion.

11.    M²Consulting carefully guards this information, informing clients, prospective clients, business partners and prospective business partners that

information they receive from M²Consulting is confidential and proprietary. M²Consulting requires clients, prospective clients, business partners and prospective business partners to agree not to disclose confidential and proprietary information obtained from M²Consulting.

### M²Consulting's Relationship with MRO

12.    In the summer of 1999, M²Consulting met with MRO, then known as PSDI, proposing that M²Consulting provide Internet hosting of Maximo, thus allowing customers access to and use of Maximo via the Internet.  These meetings took place in Massachusetts.

13.    In March 2000, M²Consulting and MRO signed an agreement authorizing M²Consulting to provide Internet hosting of Maximo (the "2000 Internet Hosting Agreement").  The 2000 Internet Hosting Agreement provided that MRO would be paid 20 percent of M²Consulting's revenues received from customers using M²Consulting's Maximo Internet hosting services, excluding customers that already owned a license to use Maximo.

14.    Following the execution of the 2000 Internet Hosting Agreement, and separate and apart from the 2000 Internet Hosting Agreement MRO, orally agreed with and made repeated representations to M²Consulting that MRO would affirmatively market M²Consulting's Maximo Internet hosting capabilities through the use of MRO's North American sales force.

15.    In order to incentivize members of MRO's North American sales force to market M²Consulting's Maximo Internet hosting services, MRO agreed

4

with and made repeated representations to M²Consulting that MRO would pay

commissions to its North American sales force for successful sales of

M²Consulting's Maximo Internet hosting services.

16.    Since MRO was to receive 20 percent of all customer revenue paid

to M²Consulting for Maximo Internet hosting services, such sales would result

in revenues to both M²Consulting and MRO.

17.    These representations were made to M²Consulting by various

officers and employees of MRO, including but not limited to:

a.    Chip Drapeau, MRO President and Chief Executive Officer.

b.    Ted Williams, MRO Executive Vice President of Worldwide Sales.

c.    Robert Parker, MRO Senior Vice President for North American Sales.

d.    Andrew Moore, MRO Vice President of Alliances.

e.    Ray Miciek, MRO Regional Sales Manager in Atlanta.

18.    In the Fall of 2000, M²Consulting Chief Executive Officer Rick

Bevington met with MRO's Moore and other MRO employees at MRO's offices in

Bedford, Massachusetts.  During this meeting, the parties discussed and

planned the marketing effort that would be made by MRO's sales force to

promote M²Consulting's Maximo Internet hosting capabilities.

19.    In this meeting, Drapeau represented to Bevington that MRO was

committed to this sales effort and personally represented that the sales

effort would occur.  Drapeau stated that he would remain personally involved

to ensure that the sales effort would be carried out.

20.    In 2000, subsequent to the execution of the 2000 Internet Hosting Agreement, MRO's Moore and Miciek and various MRO sales representatives and other employees met with M²Consulting's Bevington and other M²Consulting employees. During these meetings, Moore and Miciek outlined the marketing efforts that would be made by MRO's sales force to promote M²Consulting's Maximo Internet hosting capabilities.

21.    In October 2001, MRO senior executives Drapeau and Parker met with Bevington and an M²Consulting director. During this meeting,  Drapeau and Parker confirmed MRO's commitment to instruct its North American sales force to market affirmatively M²Consulting's Maximo Internet hosting capabilities. Drapeau and Parker agreed that as part of this sales effort, MRO would pay commissions to compensate members of its sales force for sales of M²Consulting's Maximo Internet hosting services.

22.    MRO employees were assigned to work with M²Consulting in the implementation of this sales program. These employees worked with M²Consulting, meeting and speaking on a weekly basis throughout the relevant periods described in this Complaint, developing market profiles, commission calculators, sales forecasts, and other data in preparation for launching the sales initiative. Throughout this period, MRO employees, including Miciek, Moore, Parker, Williams and Drapeau, repeatedly told M²Consulting that the sales initiative was to be announced to the North American sales force imminently. Various of these conversations occurred in Massachusetts.

23.   During this period MRO explicitly and unconditionally stated in written correspondence to Bevington that M²Consulting services were to be marketed by MRO's sales force and that MRO's sales force was to be compensated by MRO for such sales.

24.   In the Summer of 2002, MRO informed M²Consulting that in order to fund the commissions that were to be paid to the MRO sales force, there would have to be an increase in the percentage of revenues paid to MRO for M²Consulting's Maximo Internet hosting services. MRO informed M²Consulting that the fee, which was then 20 percent of revenues, would have to be increased two and one-half times to 50 percent of revenues. MRO told M²Consulting that once this issue was resolved the sales initiative would be announced immediately. This announcement was to be made from MRO's offices in Bedford, Massachusetts.

25.   Statements were made by MRO to M²Consulting throughout the summer of 2002. In these conversations, MRO unconditionally told Bevington that once the increased fee arrangement was put in place, the sales initiative would be immediately announced to MRO's North American sales force. This announcement was to be made from MRO's offices in Bedford, Massachusetts.

26.   In August 2002, MRO's Parker and Williams told Bevington and others from M²Consulting unconditionally that once the new fee was put in place, the above-described sales initiative and commission structure would be immediately announced to and implemented with regard to the North American

sales force.  This was to occur at MRO's offices in Bedford, Massachusetts.

27.    In Fall 2002, Bevington had various conversations with MRO employees, including Drapeau, Williams and other MRO employees, concerning MRO's representations that MRO would imminently commence this sales effort. These conversations took place in Massachusetts, including at MRO's offices and at the Marriott Long Wharf hotel in Boston, Massachusetts.

28.    Based upon these representations, M²Consulting agreed to the increased fee arrangement.  On November 4, 2002, MRO and M²Consulting signed an agreement providing that MRO would be paid 50 percent of revenues received by M²Consulting from M²Consulting's Internet hosting services for new clients, excluding customers that already owned a license to use Maximo  (the "2002 Internet Hosting Agreement").

29.    The 2002 Internet Hosting Agreement was not intended to govern the respective obligations of the parties in the sales initiative upon which MRO and M²Consulting had agreed.    The 2002 Internet Hosting Agreement was extended into for the sole purpose of providing a fee increase to fund sales commissions for that sales effort.

30.    The 2002 Internet Hosting Agreement was agreed to in discussions between Bevington and MRO in Massachusetts, and drafted by MRO's Nancy Gilroy in Massachusetts.

31.    Throughout the period from 1999 through November 2002, the internal discussions at MRO with respect to the above-described sales

initiative were conducted in Massachusetts and decisions concerning the above-described sales initiatives were made by MRO executives in Massachusetts.

32.    Through the period from 1999 through November 2002, M²Consulting corresponded by mail, telephone, fax and e-mail with MRO employees in Massachusetts and in other locations concerning the above-described sales initiative.

### M²Consulting's Sharing of Confidential Information

33.    Throughout the time period described herein, M²Consulting shared proprietary information concerning the development and implementation of M²Consulting's Maximo Internet hosting services, including but not limited to confidential and proprietary scientific, technical, and business information concerning the development and deployment of a computing infrastructure which M²Consulting uses to host Maximo via the Internet.  This information includes network infrastructure; system user administration; database template architecture; rapid deployment processes; non-standard software installation; and pricing methodologies.

34.    Prior to sharing this information, M²Consulting  informed MRO of the proprietary and confidential nature of this information.

35.    Prior to M²Consulting's sharing of this information, MRO agreed not to disclose this information to third parties.

36.    Prior to M²Consulting's sharing of this information, MRO agreed not to use this information for purposes other than the joint efforts being

engaged in by M²Consulting and MRO to promote and sell M²Consulting's Maximo Internet hosting services.

### M²Consulting's Lost Sale Opportunity

37.    During the late Summer-early Fall of 2002, a third party competitor of MRO indicated an interest in and pursued the purchase of M²Consulting. M²Consulting forbore from pursuing the opportunity to sell M²Consulting to the third party based upon MRO's agreement and repeated representations to market affirmatively M²Consulting's Maximo Internet hosting capabilities through MRO's North American sales force. M²Consulting would not have forebore from the opportunity to sell M²Consulting to this third party absent MRO's agreement and repeated representations to market affirmatively M²Consulting's Maximo Internet hosting capabilities through MRO's North American sales force.

### MRO's Failure to Fulfill Its Repeated Promise to Market M²Consulting's Maximo Internet Hosting Services

38.    Despite MRO's repeated promises to the contrary, following the execution of the 2002 Internet Hosting Agreement, MRO failed to instruct MRO's North American sales force to market M²Consulting's Maximo Internet hosting services. Indeed, MRO failed to even inform its North American sales force of any initiative to market M²Consulting's Maximo Internet hosting services.

39.    M²Consulting continually requested that the sales initiative be announced. MRO continued to represent to M²Consulting that the announcement of the sales initiative was imminent. These representations include, but are

not limited to, the following instances.

40.    In the period from February to April of 2003, M²Consulting principals, board members and investors spoke with MRO's Parker and were assured by Parker that the announcement to the sales force was imminent.

41.    In April 2003, MRO's Miciek told M²Consulting that MRO's Marketing Department, located in Bedford, Massachusetts, was preparing a webcast to be released that month to MRO's North American sales force from MRO's offices in Bedford, Massachusetts.  The webcast would announce the sales initiative to market M²Consulting's Maximo Internet hosting services, and include an announcement regarding the payment of sales commissions by MRO for successful sales of M²Consulting's Maximo Internet hosting services.  The announcement and implementation of the sales initiative were to take place from MRO's offices in Bedford, Massachusetts.

42.    When the sales initiative was not announced in April, MRO offered various excuses for the delay of the announcement in April.  MRO told M²Consulting that the announcement would be released from MRO's offices in Bedford, Massachusetts on May 9, 2003, and then later stated that the announcement would be released from MRO's offices in Bedford, Massachusetts on May 23, 2003.

43.    MRO never informed its North American sales force of M²Consulting's Maximo Internet hosting services.

44.    MRO never instructed its North American sales force to market

M²Consulting's Maximo Internet hosting services.

45.    MRO never informed its North American sales force that MRO would pay its sales force commissions for successful sales of M²Consulting's Maximo Internet hosting services.

### MRO's Announcement of Its Own Maximo Internet Hosting Business

46.    On June 17, 2003, MRO's Parker informed M²Consulting's Bevington that MRO would not instruct its North American sales force to market M²Consulting's Maximo Internet hosting services or otherwise inform its North American sales force of M²Consulting's Maximo Internet hosting services. Parker further informed Bevington that MRO had commenced its own Maximo Internet hosting services that would compete with M²Consulting's Maximo Internet hosting services.  MRO's own Maximo Internet hosting services are operated from MRO's offices in Bedford, Massachusetts.

47.    On or before July 15, 2003, MRO announced to its sales force, its customers, and prospective customers that it was offering its own Maximo Internet hosting services.  This announcement was distributed by MRO from its offices in Bedford, Massachusetts.

### M²Consulting's Reasonable Reliance Upon MRO's Repeated Promises

48.    Commencing in 2000, following the execution of the 2000 Internet Hosting Agreement and continuing through the Spring 2003, M²Consulting took actions, and forbore from taking other actions, in reliance upon MRO's repeated representations that MRO would affirmatively market M²Consulting's

Maximo Internet hosting capabilities and services through the use of MRO's

North American sales force and that MRO would pay members of the sales force a

commission for successful sales of M²Consulting's Maximo Internet hosting

services.

     49.   M²Consulting's actions, and forbearance from other actions, in

reliance upon these representations included, but were not limited to:

a.    Expending hundreds of thousands of dollars in the creation and
completion of a computer infra-structure which greatly expanded
M²Consulting's ability to provide Maximo Internet hosting services
to new customers located by MRO's North American sales force.
M²Consulting would not have expended these sums, created this
infra-structure or expanded its servicing capabilities, absent
MRO's agreement with and repeated representations to M²Consulting
that MRO would affirmatively market M²Consulting's Maximo Internet
hosting capabilities through MRO's North American sales force.

b.    Expending hundreds of thousands of dollars expanding its workforce
to work with MRO and to provide support to customers located by
MRO's North American sales force.  M²Consulting would not have
expended these sums or expanded its workforce absent MRO's
agreement with and repeated representations to M²Consulting that
MRO would affirmatively market M²Consulting's Maximo Internet
hosting capabilities through MRO's North American sales force.

c.    Expending hundreds of thousands of dollars developing and
deploying marketing related materials and hiring marketing related
personnel.  M²Consulting would not have expended these sums absent
MRO's agreement with and repeated representations to M²Consulting
that MRO would affirmatively market M²Consulting's Maximo Internet
hosting capabilities through MRO's North American sales force.

d.    Sharing confidential and proprietary business information with
MRO.  M²Consulting would not have disclosed this confidential and
proprietary business information to MRO absent MRO's agreement
with and repeated representations to M²Consulting that MRO would
affirmatively market M²Consulting's Maximo Internet hosting
capabilities through MRO's North American sales force.

e.   Forbearing from the opportunity to sell M²Consulting to interested third parties during the period in which MRO agreed with and made repeated representations to M²Consulting that MRO would affirmatively market M²Consulting's Maximo Internet hosting capabilities through MRO's North American sales force. M²Consulting would not have forbore from the opportunity to sell M²Consulting to interested third parties absent MRO's agreement with and repeated representations to M²Consulting that MRO would affirmatively market M²Consulting's Maximo Internet hosting capabilities through MRO's North American sales force.

50.   M²Consulting's conduct in reliance upon these representations was reasonable and was foreseeable by and known to MRO throughout the relevant period described herein.

## COUNT 1
### (Promissory Estoppel)

51.   M²Consulting repeats the preceding allegations and incorporates them herein by reference.

52.   MRO agreed with and made repeated representations to M²Consulting that MRO would affirmatively market M²Consulting's Maximo Internet hosting capabilities through MRO's North American sales force.

53.   In order to incentivize members of MRO's North American sales force to market M²Consulting's Maximo Internet hosting services, MRO agreed with and made repeated representations to M²Consulting that it would pay commissions to members of MRO's North American sales force for successful sales of M²Consulting's Maximo Internet hosting services.

54.   M²Consulting relied on MRO's promises and such reliance was reasonable.

55. MRO knew, reasonably expected, or should have reasonably expected that M²Consulting would rely on these promises.

56. As a result of M²Consulting's reasonable reliance on MRO's promises, M²Consulting took actions and forbore from other actions to its detriment, including but not limited to (1) the 2002 Internet Hosting Agreement; (2) expending more than $1,000,000 in furtherance of the parties' joint efforts and in preparation for the sales initiative and the resultant work therefrom; (3) sharing confidential and proprietary business information with MRO; and (4) forbearing from the opportunity to sell M²Consulting to an interested third party during this period.

57. M²Consulting's actions and forbearance from action in reliance upon MRO's promises were at all times reasonable and foreseeable by and known to MRO.

58. As a direct result of MRO's failure to perform the promises made to M²Consulting, M²Consulting has suffered damages in an amount to be determined at trial, but in no event less than $8,000,000, and the circumstances are such that injustice can be avoided only by an award of such damages to M²Consulting.

COUNT TWO
(Unjust Enrichment)

59. M²Consulting repeats the preceding allegations and incorporates them herein by reference.

60. Through extensive research and development, and the expenditure of

large amounts of time, effort and money, M²Consulting has developed

commercially valuable trade secrets, consisting of confidential and

proprietary scientific, technical, and business information concerning the

development, employment and maintenance of a computing infrastructure which

M²Consulting uses to host Maximo via the Internet.  These include network

infrastructure; system user administration; database template architecture;

rapid deployment processes; non-standard software installation; and pricing

methodologies.

61.    This information was derived by M²Consulting's experience as a

pioneer in the field of Internet application service hosting and in particular

the hosting of Maximo via the Internet.

62.    This information is of great commercial value to M²Consulting and

is not generally known to, and is not readily ascertainable through proper

means by other persons who can obtain economic value from its disclosure or

use.

63.    M²Consulting carefully guards this information, and informs

clients and prospective clients that certain information which they receive

from M²Consulting is confidential and proprietary.  M²Consulting requires

clients and prospective clients to agree not to disclose such information.

64.    MRO was told that the information that it was being provided was

proprietary and confidential and owned by M²Consulting.

65.    MRO acknowledged and agreed that the information provided to it

was proprietary to M²Consulting and would be kept confidential.

66.    MRO, which knows the valuable nature of this information, is using or will use the information to compete with M²Consulting to M²Consulting's detriment.

67.    MRO has obtained this information through improper means, including falsely representing to M²Consulting that MRO intended to pursue a joint sales venture with M²Consulting.

68.    MRO now seeks to become a competitor of M²Consulting in the field of Internet application services by providing, and in particular hosting, Maximo via the Internet.

69.    As a result of the actions set forth above, M²Consulting has conferred a benefit upon MRO.

70.    MRO has knowledge of the benefit.

71.    MRO has accepted and retained the benefit conferred.

72.    MRO's continued possession and use of this information is causing irreparable damage to M²Consulting, and will continue to do so unless MRO is restrained by this Court.  Thus, M²Consulting is without an adequate remedy at law.

73.    The circumstances are such that it would be inequitable for MRO to retain the benefit without paying the fair value of the benefit.

### COUNT THREE
(Unfair Trade Practices M.G.L. ch. 93A, §§ 2, 11)

74.    M²Consulting repeats the preceding allegations and incorporates

17

them herein by reference.

75.    MRO is engaged in the conduct of trade or commerce in the
Commonwealth of Massachusetts.

76.    MRO's conduct described above constitutes an unfair act or
practice.

77.    MRO's conduct occurred primarily and substantially within the
Commonwealth of Massachusetts.

78.    As a result of MRO's conduct, M²Consulting suffered a loss of
$8,000,000.00.

79.    Said loss was reasonably foreseeable as a result of MRO's conduct.

80.    MRO's conduct was wilful and intentional and MRO is entitled to an
award of double or treble damages.

81.    Based upon MRO's conduct, M²Consulting is entitled to an award of
attorneys' fees.

## COUNT FOUR
### (Fraud)

82.    M²Consulting repeats the preceding allegations and incorporates
them herein by reference.

83.    MRO made false promises and misrepresentations to M²Consulting
that MRO would affirmatively market M²Consulting's Maximo Internet hosting
capabilities through MRO's North American sales force.

84.    MRO made false promises and misrepresentations to M²Consulting
that MRO would pay commissions to members of MRO's North American sales force

for successful sales of M²Consulting's Maximo Internet hosting services.

85.    MRO had no intention to keep these promises at the time they were made.

86.    MRO knew that these misrepresentations were false.

87.    M²Consulting relied on MRO's promises and representations and such reliance was reasonable.

88.    MRO knew, reasonably expected, or should have reasonably expected that M²Consulting would rely on these promises.

89.    As a result of M²Consulting's reasonable reliance on MRO's promises and representations, M²Consulting took actions and forbore from other actions to its detriment, including but not limited to (1) the 2002 Internet Hosting Agreement; (2) expending more than $1,000,000 in furtherance of the parties' joint efforts and in preparation for the sales initiative and the resultant work therefrom; (3) sharing confidential and proprietary business information with MRO; and (4) forbearing from the opportunity to sell M²Consulting to an interested third party during this period.

90.    M²Consulting's actions and forbearance from action in reliance upon MRO's promises were at all times reasonable and foreseeable by and known to MRO.

91.    As a direct result of MRO's misrepresentations and MRO's failure to perform the promises made to M²Consulting, M²Consulting has suffered damages in an amount to be determined at trial, but in no event less than

$8,000,000, and the circumstances are such that injustice can be avoided only by an award of such damages to M²Consulting.

WHEREFORE, Plaintiff demands judgment on all counts as follows:

1.    MRO be required, jointly and severally, to account for and pay over to M²Consulting all damages and interest suffered by M²Consulting and all benefits wrongfully derived by MRO as a result of its wrongful conduct, including but not limited to actual damages in an amount not less than $8,000,000, suffered by M²Consulting as to its present and future business and property interests as a result of the wrongful conduct set forth above together with MRO's unjust enrichment as a result of the conduct complained of and double or triple damages therefor.

2.    MRO be required to pay the costs of this action together with M²Consulting's reasonable attorneys' fees and disbursements incurred herein pursuant to Mass. § M.G.L. ch. 93A, §§2 and 11.

3.    M²Consulting be granted such other and further relief as this Court deems just and equitable.

> M2 Consulting, Inc.
> By its Attornyes
> Fee Craig & Feeney, PC
>
> By: _____
> Michael C. Fee, Esq. (BBO NO. 552796)
> Fee, Craig & Feeney, P.C.
> 321 Boston Post Road
> Sudbury, MA  01776
> (978) 440-7000

Of Counsel:

John M. Teitler (by MCF)

John M. Teitler
Teitler & Teitler
1114 Avenue of the Americas
New York, NY 10036
Tel. (212) 997-4400
(Pro Hac Vice Admission Motion Pending)