UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| M2 CONSULTING, INC.<br><br>              Plaintiff,<br><br>v.<br><br>MRO SOFTWARE, INC.<br><br>              Defendant. | C.A. No. 03-12589-GAO |

**ANSWER, COUNTERCLAIM AND DEMAND FOR JURY TRIAL**

The defendant MRO Software, Inc. ("MRO"), by its attorneys, answers the Complaint in the above-captioned action as follows:

1. MRO is without knowledge as to plaintiff's place of incorporation. MRO admits that plaintiff has correctly identified its place of business.

2. Admitted.

3. Admitted.

4. MRO admits that this Court has venue under the express grant of exclusive jurisdiction and venue set forth in Section 10(h) of the Hosting Affiliate Agreement entered into between MRO and M2 on November 4, 2002. This agreement was the second of two Hosting Agreements entered into between MRO and the plaintiff, and is referred to as the "2002 Agreement." The earlier agreement, discussed below, is referred to as the "2000 Agreement"). MRO denies that it engaged in any "wrongful conduct" in Massachusetts.

5. Upon information and belief, MRO admits the allegations contained in the first sentence of this paragraph. As to the second sentence, MRO states that it has

terminated the 2002 Agreement, and therefore any use of MRO's software program MAXIMO by M2 (except to support existing customers, as discussed in paragraph 6, below) is unauthorized and illegal.

6. Denied. Section 9(e) of the 2002 Agreement provided that M2's rights immediately ceased upon the termination of the 2002 Agreement, except "for 24 months or until the termination of existing agreements with [M2's] customers, whichever occurs first, solely to support any existing Customers at the time of the termination . . .." On October 21, 2003, MRO provided M2 with formal notice of breach by reason of nonpayment of monies owed under the 2002 Agreement. Pursuant to Section 9(d) of the 2002 Agreement, M2 had 90 days to cure the breach, which it failed to do, resulting in termination for cause under Section 9(d). In addition, on October 21, 2003, MRO provided M2 with notice of termination under the at-will termination provision, which was effective 90 days after written notice. Thus, in the alternative, MRO's right to serve as a third-party provider of the Maximo software was terminated on January 19, 2004.

As noted in the Counterclaims, below, despite MRO's termination of the 2002 Agreement both for cause and under the at-will provision, M2 continues to illegally hold itself out as a distributor of MRO's Maximo software, including by marketing itself on its Internet web site (www.m2consulting.com) as a "Consulting partner with MRO Software . . . [able to] bring the full benefits of Maximo to [users]."

7. MRO admits the definition of Internet hosting, but denies that M2 has any right to perform Internet hosting following termination of the 2002 Agreement.

8. MRO is without information sufficient to allow it to admit or deny the allegations.

2

9. MRO is without information sufficient to allow it to admit or deny the allegations.

10. MRO is without information sufficient to allow it to admit or deny the allegations.

11. MRO is without information sufficient to allow it to admit or deny the allegations.

12. Admitted.

13. MRO admits that on March 22, 2000, MRO and M2 entered into an agreement titled "Agreement Between M2 Consulting, Inc. and PSDI for MAXIMO Application" (the "2000 Agreement"). MRO states that the Agreement speaks for itself. However, MRO notes that the 2000 Agreement provides that nothing in the 2000 Agreement precludes MRO (then known as "PSDI") from providing Application Hosting of MAXIMO itself, or through other third parties. Thus, M2 did not have exclusive rights to application hosting of MAXIMO under the 2000 Agreement. The 2000 Agreement was an "at-will" agreement, providing for termination by either party, without cause, on three months' written notice.

14. Denied. MRO told M2 that it would refer prospective customers to M2 that were not interested in licensing the MAXIMO software directly from MRO, at the discretion of MRO. MRO had no legal obligation to refer customers to M2. MRO never represented that it would "affirmatively market" M2's MAXIMO hosting services, and MRO repeatedly told M2 that MRO would itself be entering the application hosting business and offering MAXIMO via Internet hosting.

15. Denied.

3

16. MRO admits that the intent of the 2000 Agreement and the 2002 Agreement was to produce revenues for M2 and MRO. However, M2 has failed to pay MRO any monies under the 2000 or the 2002 Agreement.

17. MRO denies the allegations as stated in this paragraph of the Complaint. At no time did MRO make "representations" to plaintiff on which plaintiff could legally rely. MRO encouraged its sales force to refer to plaintiff companies that needed Internet hosting services, and which were not appropriate customers for the direct purchase of MAXIMO software from MRO. Plaintiff was made aware of the fact that MRO encouraged its sales force to refer prospective customers to plaintiff. At the same time, both the 2000 and 2002 Agreements were non-exclusive, and plaintiff was repeatedly told that MRO itself expected to provide hosting services directly to MRO's customers in the future. Therefore, M2 could not expect to rely on business referrals from MRO after MRO began providing this service.

18. Denied.

19. Denied.

20. Denied.

21. Denied. MRO instructed parts of its sales force to refer to M2 customers who would not purchase a full license to MAXIMO from MRO, but instead were interested only in hosting services. However, MRO did not make any "commitment" to "instruct its North American sales force to market affirmatively" M2's services. At all times relevant to this suit MRO told M2 that referring customers to M2 was a less desirable and less profitable alternative to selling the MAXIMO software directly, and therefore MRO could not make any "commitment" to M2. Moreover, MRO repeatedly

4

told M2 that MRO would itself be hosting MAXIMO at some point in the future, and that M2 needed to prepare for this event, which would have the effect of ending most or all referrals to M2.

    22.    Denied.

    23.    Denied.

    24.    MRO admits that it told M2 that the commission schedule in the 2000 Agreement did not provide sufficient revenues to MRO to pay a competitive commission to MRO's sales force, and that the commission would have to increase from 20% to 50% to provide sufficient funds to pay a commission to MRO's sale force. However, MRO denies that it told M2 that once the commission was increased a "sales initiative" would be announced by MRO.

    25.    Denied.

    26.    Denied.

    27.    Denied.

    28.    MRO denies that the 2002 Agreement was signed based on the "representations" alleged by M2. MRO admits that the 2002 Agreement was signed on November 4, 2002, and states that the Agreement speaks for itself.

    29.    Denied. The 2002 Agreement was intended to govern all obligations of the parties with respect to the sale of MAXIMO hosting services by M2, and MRO's obligation to refer prospective customers to M2. The 2002 Agreement contains an Integration Clause (Section 10(k)), which provides that the 2002 Agreement "constitute[s] the complete and entire statement of all terms, conditions and

representations of the agreement between [MRO] and [M2] with respect to its subject matters and supersedes all prior writings or understandings."

30. MRO admits the allegations in this paragraph of the Complaint, but states that M2 made changes and revisions to the 2002 Agreement before the parties signed it.

31. Denied.

32. Denied.

33. Denied.

34. Denied.

35. Denied.

36. Denied.

37. MRO is without information sufficient to admit or deny the allegations regarding a third party's alleged interest in purchasing M2. However, MRO denies that M2 forbore from any opportunities based on representations by MRO. Moreover, MRO notes that all of the drafts of the 2002 Agreement (which was negotiated from May 1, 2002, until its execution on November 4, 2002) contained a provision that permitted either party to terminate at-will. MRO's first draft of the 2002 Agreement permitted termination at-will, upon as little as 30 days' written notice. M2 negotiated an increase in the at-will termination provision to 90 days' written notice, which was included in the final version of the 2002 Agreement. Given MRO's warning that MRO intended to provide hosting services directly, and the provision permitting MRO to terminate at-will on 90 days' notice, M2 could not reasonably relied upon the 2002 Agreement or any oral representations by MRO in deciding not to sell M2 to a third party.

38. Denied.

6

39. Denied.

40. Denied.

41. Denied.

42. Denied.

43. Denied.

44. Denied.

45. Denied.

46. MRO admits that in or about June 2003, it informed M2 that MRO would provide its own MAXIMO Internet hosting services, as had been discussed with M2 for the prior two years. MRO denies the remaining allegations in this paragraph of the Complaint. Moreover, MRO notes that the 2002 Agreement does not provide M2 with any exclusivity rights, nor does it state that MRO would not compete with M2. MRO further notes that under the 2000 Agreement, MRO had the express right to provide MAXIMO Internet hosting services in competition with M2. MRO further states that at all times during M2's business relationship with MRO, M2 was at risk that MRO would provide its own MAXIMO Internet hosting service which would compete with M2.

47. Denied.

48. Denied. Moreover, MRO states that any reliance or forbearance by M2 was unreasonable since M2 had been warned that MRO intended to provide its own MAXIMO hosting service, and since the 2002 Agreement was an at-will agreement that could be terminated without cause on 90 days' notice.

49. MRO is without knowledge sufficient to admit or deny the expenditures alleged by M2 in this paragraph of the complaint, but it denies that any representations

were made upon which M2 could have reasonably based such expenditures, and it further denies that any such reliance was reasonable given the possibility of MRO entering the hosting market and the at-will termination provision in the 2002 Agreement.

50. Denied.

51. MRO repeats its answers to the preceding paragraphs, and incorporates them herein by reference.

52. Denied.

53. Denied.

54. Denied.

55. Denied. Even assuming the representations M2 alleges to be true, M2 could not have reasonably relied upon them knowing that M2 did not have exclusive rights to offer MAXIMO via the Internet, MRO intended to offer MAXIMO via the Internet itself, and the 2002 Agreement was terminable at-will on 90 days' notice.

56. Denied. It would not have been reasonable for M2 to spend more than $1 million on the items described in this paragraph of the complaint given the at-will termination and non-exclusivity provisions in the 2000 Agreement and the 2002 Agreement and given the fact that M2 had been told that MRO intended to provide Internet hosting services to MRO customers.

57. Denied.

58. Denied.

59. MRO repeats its answers to the preceding paragraphs, and incorporates them herein by reference.

60. MRO is without knowledge or information sufficient to admit or deny the allegations.

61. MRO is without knowledge or information sufficient to admit or deny M2's experience as a pioneer in the field of Internet application service hosting but denies that M2 gained this alleged experience by hosting MAXIMO via the Internet.

62. MRO is without knowledge or information sufficient to admit or deny the allegations.

63. MRO is without knowledge or information sufficient to admit or deny the allegations.

64. Denied.

65. Denied.

66. Denied.

67. Denied.

68. MRO admits that it is offering MAXIMO via Internet hosting, but states that it has repeatedly told M2 that it would do so.

69. Denied.

70. Denied.

71. Denied.

72. Denied.

73. Denied.

74. MRO repeats its answers to the preceding paragraphs, and incorporates them herein by reference.

75. Admitted.

76. Denied.

77. Denied.

78. Denied.

79. Denied.

80. Denied.

81. Denied.

82. MRO repeats its answers to the preceding paragraphs, and incorporates them herein by reference.

83. Denied.

84. Denied.

85. Denied.

86. Denied.

87. Denied.

88. Denied.

89. Denied.

90. Denied.

91. Denied.

92.

## Affirmative Defenses

1. The Integration Clause of the 2002 Agreement, paragraph 10(k), bars plaintiff's claim.

2. Plaintiff has failed to state facts sufficient to constitute any cause of action against MRO.

3. Plaintiff has failed to state fraud with particularity, as required by Fed. R. Civ. P. 9(b).

4. Plaintiff's claims are barred by the doctrines of estoppel, laches and waiver.

5. Recovery by plaintiff is barred, in whole or in part, in that, on information and belief, plaintiff failed to minimize its damages (if any have been suffered).

WHEREFORE, defendant MRO Software, Inc., asks that the Court:

1. Dismiss the Complaint, with plaintiff recovering nothing thereby from MRO;
2. Award MRO its attorneys' fees;
3. Award MRO its cost of suit; and
4. Award such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS

1. MRO is a Massachusetts corporation with a principal place of business in Bedford, Massachusetts. MRO develops and markets the MAXIMO software product, which provides businesses with strategic asset management, work management, materials management and purchasing capabilities.

2. M2 Consulting, Inc. is a Georgia corporation with a principal place of business in Newnan, Georgia. MRO and M2 entered into a Hosting Affiliate Agreement on November 4, 2002 (the "2002 Agreement"). Pursuant to the Agreement, MRO granted M2 the right to act as an application service provider for MAXIMO. As an application service provider, M2 was not permitted to license MAXIMO for installation

at customer sites; rather, M2 was permitted to provide M2's customers access, over the Internet, to a copy of MAXIMO installed on M2's computers.

3. The 2002 Agreement had a term of three years. However, either party could terminate the agreement for any reason, with or without cause, upon 90 days' written notice to the other party. (2002 Agreement, Section 9(c)).

4. The 2002 Agreement also provided for termination for cause if either party breached any obligation, and such party failed to cure the breach after receiving 30 days' notice of breach and demand for a cure. (2002 Agreement, Section 9(d)).

5. MRO provided M2 with written notice of termination both for cause and without cause by letter dated October 24, 2003 (the "Breach Letter"). The "without cause" termination was based on M2's failure to make over $100,000 in payments under the 2002 Agreement.

6. M2 failed to make any payments in response to the Breach Letter, and therefore the agreement terminated on November 24, 2003.

7. To the extent there is any dispute over MRO's termination for cause, the 2002 Agreement terminated without cause on January 19, 2004.

8. Upon termination of the 2002 Agreement (either for cause or without cause), M2's rights immediately ceased, except "for 24 months or until the termination of existing agreements with [M2's] customers, whichever occurs first, solely to support any existing Customers at the time of the termination . . . ." (2002 Agreement, Section 9(e)).

9. Notwithstanding termination of the 2002 Agreement, M2's Internet website continues to hold M2 out as a "Consulting partner with MRO Software . . . [able to] bring the full benefits of Maximo to [users]."

12

10. In addition to the 2002 Agreement, on March 22, 2000, MRO and M2 entered into an agreement titled "Agreement Between M2 Consulting, Inc. and PSDI for MAXIMO Application" (the "2000 Agreement"). Under the 2000 Agreement, M2 was contractually obligated to make payments to MRO. As was the case with the 2002 Agreement, under the 2000 Agreement M2 sold access to the MAXIMO software over the Internet, as an application service provider.

11. Under the 2000 Agreement, M2 was obligated to make payments to MRO, based on M2's sales of access to MAXIMO over the Internet.

12. M2 failed to make any payments to MRO under the 2000 Agreement. Upon information and belief, at least $68,000 is owed to MRO under the 2000 Agreement. MRO has demanded payments of these monies, and M2 has refused payment.

**Count I – Breach of Contract**

MRO hereby repeats, realleges and reincorporates the allegations of the preceding Paragraphs 1-12, inclusive, and further asserts:

13. M2's conduct, as described above, constitutes a material breach of the 2000 Agreement and the 2002 Agreement, causing damage to MRO in an amount to be proved at trial.

**Request for Relief**

WHEREFORE, MRO respectfully requests that the Court enter judgment as follows:

    1. On Count I of the Counterclaim, awarding MRO damages for breach of contract;

2. On Count I of the Counterclaim, ordering M2 to cease holding itself out as a "partner" of MRO, or as having any authority to offer the MAXIMO software except to support customers of M2 prior to termination of the 2002 Agreement;

3. Awarding MRO its reasonable attorney's fees, costs and expenses; and

5. Awarding MRO such other and further relief as the Court deems just.

**MRO DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.**

                Respectfully Submitted,

                Lee T. Gesmer (BBO No. 190260)
                Lucash, Gesmer & Updegrove, LLP
                40 Broad Street
                Boston, MA 02109
                (617) 350-6800

Dated: February 20, 2004

**CERTIFICATE OF SERVICE**

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail / ~~by hand.~~

Date 2/29/04

14