UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| M2 CONSULTING, INC.,<br><br>               Plaintiff,<br><br>v.<br><br>MRO SOFTWARE, INC., and<br>CRAIG NEWFIELD,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)   Case No. 03-12589-GAO<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AMENDED COMPLAINT

### I. Introduction

1.      This case arises from the Defendants' election to abandon what started out as a mutually beneficial business relationship in favor of an attempt to misappropriate Plaintiff's trade secrets and confidential business information, terminate the relationship and use the stolen information to both wrongfully and illegally compete with the Plaintiff and to interfere with its advantageous business relationships.

### II. The Parties

2.      Plaintiff, M2 Consulting, Inc. ("M2"), is a corporation incorporated under the laws of the State of Georgia, maintaining its principal place of business at 43 Jefferson Parkway, Newnan, GA 30263-5813.

3.      The Defendant, MRO Software, Inc. ("MRO"), is a corporation incorporated under the laws of the Commonwealth of Massachusetts, maintaining its principal place of business at 100 Crosby Drive, Bedford, MA 01730.

4.     The Defendant, Craig Newfield is, upon information and belief, an individual and a resident of the Commonwealth of Massachusetts. He is employed as MRO's Vice President and General Counsel.

## III. Jurisdiction And Venue

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship of the parties.

6.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a), because the wrongful conduct set forth in this Amended Complaint took place in Bedford, Massachusetts, and other places within the Commonwealth of Massachusetts.

## IV.     FACTS

*Background*

7.     M2 is currently a small, six and one half-year-old company in the business of office building facility and equipment maintenance and operations consulting. In providing these services, M2 employs Maximo ("Maximo"), a Computerized Maintenance Management System software manufactured by MRO.

8.     In a series of agreements, MRO authorized M2 to serve as a third-party provider to "host" the Maximo software via the Internet.

9.     "Internet hosting" of the Maximo software program allows licensees to use the Maximo software via the Internet without having to load the Maximo software program on their computer or network server, without having to purchase the necessary computer software or hardware to run Maximo, and without having to employ information technology personnel to assist the licensee in running this sophisticated software. Internet application hosting also allows

licensees access to M2's trouble-shooting experts to assist in any problems encountered by users on a 24-hour-a-day, seven-day-a-week basis.

10.     Through extensive research and development and the expenditure of considerable time, effort, and money, M2 has developed commercially valuable trade secrets, consisting of confidential and proprietary scientific, technical, and business information concerning the development and deployment of a computing infrastructure which M2 uses to host Maximo via the Internet. This information includes network infrastructure, system user administration, database template architecture, rapid deployment processes, non-standard software installation, and pricing methodologies. This information is of great commercial value to M2 since it is not generally known to, and is not readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use.

11.     M2 carefully guards this information, informing clients, prospective clients, business partners and prospective business partners that information they receive from M2 is confidential and proprietary. M2 requires clients, prospective clients, business partners and prospective business partners to agree not to disclose confidential and proprietary information obtained from M2.

12.     As a result of M2's development of this unique proprietary information, M2 has been able to attract large corporate clients such as AT&T, Johnson Controls, and Delta Airlines. These large corporate clients have hired M2 because M2's competitors cannot competitively deploy these services.

*MRO's Discovery of M2's Internet Hosting Expertise*

13.     In the summer of 1999, M2 met with MRO, then known as PSDI, to discuss a business relationship where M2 would provide Internet hosting of Maximo. The proposed

venture would allow customers access to and use of Maximo via the Internet. These meetings took place in Massachusetts.

14.    MRO was very interested in partnering with M2. The discussions between MRO and M2's representatives quickly grew more detailed. MRO realized that M2 had developed a unique expertise in the internet hosting business, and that it possessed a business model which produced uniquely profitable results. MRO also realized that M2's ability to provide internet hosting of Maximo would produce an attractive option for potential Maximo customers, with the concomitant expansion of MRO's customer base and business. MRO found this opportunity to expand both the scope and breadth of Maximo's appeal extremely attractive.

15.    In March 2000, M2 and MRO signed an agreement authorizing M2 to provide Internet hosting of Maximo (the "2000 Internet Hosting Agreement"). The 2000 Internet Hosting Agreement provided that MRO would be paid 20 percent of M2's revenues received from customers using M2's Maximo internet hosting services, excluding customers that already owned a license to use Maximo.

16.    From the outset of these initial discussions and continuing through the negotiations which resulted in the signing of the 2000 Internet Hosting Agreement, M2 informed MRO that the information it would be receiving about M2's business model and technical expertise was confidential and proprietary. M2 informed MRO that MRO could not disclose this information to third parties or use it to compete with M2 in any way. MRO's representatives agreed.

17.    Once the 2000 Internet Hosting Agreement was signed, both M2 and MRO assembled project teams to coordinate M2's internet hosting of Maximo, the financial integration of the operations, and the distribution of technical responsibilities.

*MRO's Marketing and Promotional Commitment*

18.    As both parties had recognized from the outset, aggressive marketing support for M2's internet hosting of Maximo was critical to maximizing the value of the partnership for both parties. It was also recognized that M2 was too small to implement the type of nationally coordinated marketing and promotional effort needed to tap the large market for M2's Maximo services. In contrast, MRO had and has a large national sales force which could easily be incentivized and deployed to support the partnership's goals. In recognition of these facts, MRO committed, very early in the relationship, to undertake the necessary national marketing and promotional effort needed to assure the success of the venture. M2 agreed to use its more modest contacts to do the same, and in the event M2 contacts generated a client that wanted to purchase Maximo directly from MRO rather than purchase M2's Maximo hosting services for the internet, M2 would direct that client to MRO. Following the execution of the 2000 Internet Hosting Agreement, and separate and apart from the 2000 Internet Hosting Agreement MRO, orally agreed with and made repeated representations to M2 that MRO would aggressively market M2's Maximo Internet hosting capabilities through the use of MRO's North American sales force (the "Marketing Agreement").

19.    MRO represented to M2 that in order to incentivize members of MRO's North American sales force to market M2's Maximo Internet hosting services, MRO would pay commissions to its North American sales force for successful sales of M2's Maximo internet hosting services. This arrangement was consistent with the structure of the relationship because MRO was to receive 20 percent of all customer revenue paid to M2 for Maximo internet hosting services. Any sales generated through these efforts would therefore result in revenues to both M2 and MRO.

20.    MRO made these representations to M2 through various officers and employees of MRO, including but not limited to: (a) Chip Drapeau ("Drapeau"), MRO President and Chief Executive Officer; (b) Ted Williams ("Williams"), MRO Executive Vice President of Worldwide Sales; (c) Robert Parker ("Parker"), MRO Senior Vice President for North American Sales; (d) Andrew Moore ("Moore"), MRO Vice President of Alliances; (e) Ray Miciek ("Miciek"), MRO Regional Sales Manager in Atlanta; and (f) Jason Kasper ("Kasper"), Sales Executive.

21.    In the Fall of 2000, M2's Chief Executive Officer Rick Bevington ("Bevington") met with MRO's Moore and other MRO employees at MRO's offices in Bedford, Massachusetts. During this meeting, the MRO executives discussed and planned with Bevington the marketing effort that would be made by MRO's sales force to promote M2's Maximo Internet hosting capabilities.

22.    In this meeting, Moore told Bevington that MRO was committed to this sales effort. Moore stated that the sales effort would occur. Moore assured Bevington that he would remain personally involved to ensure that the sales effort would be carried out.

23.    In 2000, following the execution of the 2000 Internet Hosting Agreement, MRO's Kasper and Miciek and various MRO sales representatives and other employees met with M2's Bevington and other M2 employees. During these meetings, Kasper and Miciek outlined the marketing efforts that would be made by MRO's sales force to promote M2's Maximo internet hosting capabilities.

*MRO's Scheme*

24.    Upon information and belief, MRO's recognition of M2's superior business model and its potential for generating significant profits gave rise, at or about this time, to a plan by MRO to steal this model and expertise from M2, and to use it to obtain all the benefits of the

venture, without M2.

25.    MRO's scheme consisted of the following components. First, it would continue to appear to cooperate and coordinate with M2, consistent with its obligations under the 2000 Internet Hosting Agreement, and in the process place its personnel to learn as much as possible about M2's business model, trade secrets, and proprietary information. Second, it would begin to develop its own model and business plans to enter the internet hosting business for Maximo. Third, until such time as it commenced its own internet hosting operations for Maximo, it would continue to cause M2 to believe that MRO would partner with M2 and that MRO would honor its commitments to promote M2's Maximo hosting services, but MRO would instead use a series of pretexts for not implementing the marketing promotion effort which was essential to the success of the partnership. When MRO determined that the time was optimal for its entry into the internet hosting business, it would terminate its relationship with M2 and enter this business on its own. Finally and once MRO's own internet hosting of Maximo was operational, it would attempt to prevent M2 from competing with it in this business by, *inter alia*, claiming that M2 had no right to use certain versions of Maximo, and by tortiously interfering with M2's relationship with its existing Maximo clients. If necessary, MRO would also tortiously interfere with M2's advantageous business relationships with prospective Maximo clients.

*Initial Results*

26.    Within weeks of the execution of the 2000 Internet Hosting Agreement, M2's experience and dedication began to pay off. M2 quickly integrated its operations with MRO and began developing and closing on leads for Maximo Internet Hosting.

27.    Initial results were very promising. In early 2000, M2 generated its first customer for the venture, the New Orleans Convention Center. This customer was developed by M2 with

no assistance from MRO. This customer ultimately decided that it wanted to purchase Maximo, and M2, consistent with its obligations under the Marketing Agreement, referred that software sale to MRO.

28.    In 2000, M2 generated approximately five new Maximo customers on its own, with no sales support from MRO. In 2001, it generated approximately five more new Maximo customers the same way.

29.    Between the fall of 2000 and the fall of 2001, M2 and MRO addressed, in addition to business, technical and billing issues, the structure and mechanism which would compensate MRO sales force for business they generated for M2's Maximo internet hosting capabilities. MRO did not put an interim commission structure in place which provided for commissions to be paid to its sales force for these types of sales. While M2 and MRO were negotiating this issue, MRO sales people received no commission for sales of M2's Maximo capabilities. Consequently, MRO's sales force did little to generate sales for the venture. On rare occasions, when an MRO sales person would determine that a potential software purchase customer was virtually certain to decide not to use Maximo, the prospect would be turned over to M2 as potential lead. Because the potential prospect had already been heavily pitched by MRO's sales force, these leads were, by the time they reached M2, low quality and unlikely to result in business for M2. Nevertheless, M2 followed these leads and worked diligently to turn them into hosting clients. Despite the odds against successful development of these leads, M2 was able to turn some of them into hosting customers for Maximo.

30.    While MRO pursued integration and coordination of M2's technical and business operations, and obtained access to an increasing volume of M2's trade secrets and proprietary business information, it astutely avoided commencement of the marketing and promotional effort

called for under the Marketing Agreement. When M2 began to question the delay, a meeting of senior MRO and M2 executives was scheduled.

31.    In October 2001, MRO senior executives Drapeau and Parker met with Bevington and an M2 director. During this meeting,  Drapeau and Parker confirmed MRO's commitment to instruct its North American sales force to market affirmatively M2's Maximo Internet hosting capabilities. Drapeau and Parker also confirmed that as part of this sales effort, MRO would pay commissions to compensate members of its sales force for sales of M2's Maximo Internet hosting services.

32.    MRO employees were assigned to work with M2 in the implementation of this sales program. These employees worked with M2, meeting and speaking on a weekly basis, developing market profiles, commission calculators, sales forecasts, and other data in preparation for launching the sales initiative. Throughout this period, MRO employees, including Miciek, Parker, Williams and Drapeau, repeatedly told M2 that the sales initiative and its announcement to the North American sales force was imminent. Many of these conversations occurred in Massachusetts.

33.    During this period MRO also unconditionally stated in written correspondence to Bevington that M2 services were to be marketed by MRO's sales force and that MRO's sales force was to be compensated by MRO for such sales.

34.    By the Summer of 2002, M2 was growing impatient with MRO's unending excuses as to why the promised sales initiative had not materialized. Realizing both that it was not yet ready to enter the internet hosting business and that M2 might begin to suspect an ulterior motive for its failure to commence the sales effort, MRO searched for and found a pretext to delay the sales initiative yet again.

35.    MRO informed M2 that in order to fund the commissions that were to be paid to the MRO sales force, there would have to be an increase in the percentage of revenues paid to MRO for M2's Maximo Internet hosting services. MRO informed M2 that the fee, which was then 20 percent of revenues, would have to be increased two and one-half times to 50 percent of revenues. MRO told M2 that once this issue was resolved the sales initiative would be announced immediately. This announcement was to be made from MRO's offices in Bedford, Massachusetts.

36.    Statements were made by MRO to M2 throughout the summer of 2002. In these conversations, MRO unconditionally told Bevington that once the increased fee arrangement was put in place, the sales initiative would be immediately announced to MRO's North American sales force. This announcement was to be made from MRO's offices in Bedford, Massachusetts.

37.    In August 2002, MRO's Parker and Williams told Bevington and others from M2 that once the new agreement was put in place, the above-described sales initiative and commission structure would be immediately announced to and implemented with regard to the North American sales force. This was to occur at MRO's offices in Bedford, Massachusetts.

38.    In Fall 2002, Bevington had conversations with MRO employees, including Drapeau, Williams and other MRO employees, concerning MRO's representations that MRO would imminently commence this sales effort. These conversations took place in Massachusetts, some occurring at MRO's offices and at the Marriott Long Wharf hotel in Boston, Massachusetts.

39.    In reasonable reliance upon these representations, M2 agreed to the increased fee arrangement. On November 4, 2002, MRO and M2 signed an agreement providing that MRO would be paid 50 percent of revenues received by M2 from M2's Internet hosting services for

new clients, excluding customers that already owned a license to use Maximo (the "2002 Internet Hosting Agreement"). The 2002 Internet Hosting Agreement was negotiated during discussions between Bevington and MRO in Massachusetts, and drafted by MRO's Nancy Gilroy in Massachusetts. The 2002 Internet Hosting Agreement was extended by both parties for the sole purpose of providing a fee increase to fund sales commissions for that sales effort.

40.    From 1999 through November 2002, the internal discussions at MRO with respect to the Marketing Agreement and its associated sales initiative were conducted in Massachusetts and decisions concerning the above-described sales initiatives were made by MRO executives in Massachusetts. M2 corresponded by mail, telephone, fax and e-mail with MRO employees in Massachusetts and in other locations concerning the above-described sales initiative.

*M2's Sharing of Confidential Information*

41.    Throughout their partnership, M2 shared proprietary information concerning the development and implementation of M2's Maximo Internet hosting services. This information included, but was not limited to confidential and proprietary scientific and technical information. It also consisted of a large volume of proprietary business information associated with the development and deployment of the computing infrastructure which M2 used to host Maximo via the Internet, including information about M2's network infrastructure, system user administration, database template architecture, rapid deployment processes, non-standard software installation, and pricing methodologies.

42.    Prior to sharing this information, M2 informed MRO of the proprietary and confidential nature of this information. MRO agreed not to disclose this information to third parties.

43.    Prior to M2's sharing of this information, MRO agreed not to use this information

for purposes other than the joint efforts being engaged in by M2 and MRO to promote and sell M2's Maximo internet hosting services.

*M2's Lost Sale Opportunity*

44.     During the late summer and early fall of 2002, a third party competitor of MRO expressed an interest in and pursued the purchase of M2.  M2 evaluated the offer based on a variety of criteria, which included the relative profit potential of selling the business.  It compared the benefits of the sale with its projected sales, revenue and profit projections, all of which included reasonable assumptions based on its agreements with MRO and the anticipated revenue that would result from that relationship after MRO commenced its marketing and promotional campaign.

45.     M2 ultimately decided not to sell its business to the third party, based upon MRO's agreement and repeated representations that it would market M2's Maximo Internet hosting capabilities through MRO's North American sales force.  M2 would have sold its business to this third party absent MRO's agreement and repeated representations to market affirmatively M2's Maximo Internet hosting capabilities through MRO's North American sales force.

*M2's Reasonable Reliance Upon MRO's Repeated Promises*

46.     Commencing in 2000, following the execution of the 2000 Internet Hosting Agreement and continuing through the Spring 2003, M2 took actions, and forbore from taking other actions, in reliance upon MRO's repeated representations that MRO would affirmatively market M2's Maximo Internet hosting capabilities and services through the use of MRO's North American sales force and that MRO would pay members of the sales force a commission for successful sales of M2's Maximo Internet hosting services.

47.    M2's actions, and forbearance from other actions, in reliance upon these representations included, but were not limited to:

a.    Expending hundreds of thousands of dollars in the creation and completion of a computer infra-structure which greatly expanded M2's ability to provide Maximo Internet hosting services to new customers located by MRO's North American sales force. M2 would not have expended these sums, created this infra-structure or expanded its servicing capabilities, absent MRO's agreement with and repeated representations to M2 that MRO would affirmatively market M2's Maximo Internet hosting capabilities through MRO's North American sales force.

b.    Expending hundreds of thousands of dollars expanding its workforce to work with MRO and to provide support to customers located by MRO's North American sales force. M2 would not have expended these sums or expanded its workforce absent MRO's agreement with and repeated representations to M2 that MRO would affirmatively market M2's Maximo Internet hosting capabilities through MRO's North American sales force.

c.    Expending hundreds of thousands of dollars developing and deploying marketing related materials and hiring marketing related personnel. M2 would not have expended these sums absent MRO's agreement with and repeated representations to M2 that MRO would affirmatively market M2's Maximo Internet hosting capabilities through MRO's North American sales force.

d.    Sharing confidential and proprietary business information with MRO. M2 would not have disclosed this confidential and proprietary business information to MRO absent MRO's agreement with and repeated representations to M2 that MRO would affirmatively market M2's Maximo Internet hosting capabilities through MRO's North American sales force.

e.    Forbearing from the opportunity to sell M2 to interested third parties during the period in which MRO agreed with and made repeated representations to M2 that MRO would affirmatively market M2's Maximo Internet hosting capabilities through MRO's North American sales force. M2 would not have forbore from the opportunity to sell M2 to interested third parties absent MRO's agreement with and repeated representations to M2 that MRO would affirmatively market M2's Maximo Internet hosting capabilities through MRO's North American sales force.

M2's conduct in reliance upon these representations was reasonable and was foreseeable by and known to MRO throughout the relevant period described herein.

*MRO's Breach of the Marketing Agreement and Its Failure to Fulfill Its Marketing and*

*Promotional Commitment*

48.    Despite MRO's repeated promises to the contrary, both before and following the execution of the 2002 Internet Hosting Agreement, MRO failed to instruct MRO's North American sales force to market M2's Maximo Internet hosting services. MRO failed to even inform its North American sales force of any initiative to market M2's Maximo Internet hosting services.

49.    M2 continually requested that the sales initiative be announced. MRO continued to represent to M2 that the announcement of the sales initiative was imminent, when in fact MRO had no intention of commencing it. These representations include, but are not limited to, the following instances.

50.    In the period from February to April of 2003, M2 principals, board members and investors spoke with MRO's Parker and were assured by Parker that the announcement to the sales force was imminent.

51.    In April 2003, MRO's Miciek told M2 that MRO's Marketing Department, located in Bedford, Massachusetts, was preparing a webcast to be released that month to MRO's North American sales force from MRO's offices in Bedford, Massachusetts. The webcast would announce the sales initiative to market M2's Maximo Internet hosting services, and include an announcement regarding the payment of sales commissions by MRO for successful sales of M2's Maximo Internet hosting services. The announcement and implementation of the sales initiative were to take place from MRO's offices in Bedford, Massachusetts.

52.    When the sales initiative was not announced in April, MRO offered still more excuses for the delay. MRO told M2 that the announcement would be released from MRO's offices in Bedford, Massachusetts on May 9, 2003, and then later stated that the announcement

would be released from MRO's offices in Bedford, Massachusetts on May 23, 2003.

53.    MRO never informed its North American sales force of M2's Maximo Internet hosting services.

54.    MRO never instructed its North American sales force to market M2's Maximo Internet hosting services.

55.    MRO never informed its North American sales force that MRO would pay its sales force commissions for successful sales of M2's Maximo Internet hosting services.

*MRO's Announcement of Its Own Maximo Internet Hosting Business*

56.    Consistent with its scheme, MRO developed its plans for entry into the internet hosting business for Maximo throughout its relationship with M2. By June, 2003, MRO, armed with its knowledge of M2's trade secrets and confidential and proprietary business information, was ready to commence its internet hosting operations.

57.    On June 17, 2003, MRO's Parker informed M2's Bevington that MRO would not instruct its North American sales force to market M2's Maximo Internet hosting services or otherwise inform its North American sales force of M2's Maximo Internet hosting services. Parker further informed Bevington that MRO had commenced its own Maximo Internet hosting services that would compete with M2's Maximo internet hosting services.

58.    MRO's Maximo internet hosting services are operated from MRO's offices in Bedford, Massachusetts. It maintains information about this service on its web site. MRO's web hosting service utilizes a rapid implementation program which is directly reflective, and upon information and belief, based upon M2's "Quick Start" process. MRO has, upon information and belief been marketing its service both nationally and in Europe, and it has begun attracting customers.

59.     On or before July 15, 2003, MRO announced to its sales force, its customers, and prospective customers that it was offering its own Maximo Internet hosting services. This announcement was distributed by MRO from its offices in Bedford, Massachusetts.

*MRO Wrongful Effort to Prevent M2 From Competing*

60.     In 2004, MRO gradually became aware that M2 was continuing to provide services to its Maximo customers. It also became aware that M2's consulting expertise continued to remain valuable in the marketplace, and that Maximo clients were seeking out and utilizing those services.

61.     When MRO became aware that M2 was providing consulting services for Maximo to the Georgia Building Authority (the "GBA"), it contacted M2 and demanded that it stop doing so, alleging that certain provisions of the 2002 Hosting Agreement prevented it from competing with MRO. MRO took this position notwithstanding its awareness that M2 had commenced legal proceedings which included allegations that M2's execution of the 2002 Hosting Agreement was in reliance upon a variety of material MRO misrepresentations.

62.     M2 denied that the agreement governed or restricted in any way M2's ability to consult with, or host, customers, like the GBA, who had purchased software licenses directly from MRO.

63.     MRO also took the position that M2's licenses did not cover version 5.x of the Maximo software, notwithstanding M2's production to MRO of e-mail correspondence between MRO's Scott Peluso and M2's Jeff Foley, dated between October 29 and November 12, 2002, in which MRO's Manager of Internet Support Services modified the active serial number of M2's Maximo 5.x license, thus establishing that, contrary to its assertions, M2 was and is in possession of this software pursuant to a valid MRO license. Nothing in the 2002 Internet Hosting

Agreement limited M2's ability to provide hosting and consulting services to customers that had purchased licenses directly from MRO. In fact, Paragraph 4 of the 2002 Hosting Agreement specifically acknowledge M2's right to host customers who purchase software products from MRO, without having to pay any fees to MRO for such services.

64.    When its attempt to wrongfully invoke the terms of the 2002 Internet Hosting Agreement did not have the desired effect, MRO elected to disrupt a long-standing relationship which M2 had with Grubb & Ellis Management Services, Inc. ("G&E"). M2 had performed consulting and Maximo implementation work for G&E at several locations for four years. In September, 2004, M2 had entered into an agreement with G&E to assess two hosting operations managed by G&E that utilized Maximo and other software products. M2 assessed the operations, interviewed employees, documented processes, and made recommendations in a report delivered to G&E in October 2004. As a direct result of this engagement, G&E requested a proposal whereby M2 would undertake certain hosting responsibilities for G&E, thus enabling it to take advantage of M2's managed services support and consulting expertise. As is common in this industry, receipt of M2's proposal was time sensitive, as was G&E's schedule for evaluating proposals for the services. Any obstacle to the prompt evaluation of a proposal would result in that proposal not being considered by G&E.

65.    In early November, Craig Newfield ("Newfield"), MRO Vice President and General Counsel, spoke to Michael Groppi, G&E's Vice-President and National Director of Engineering and Facility Resources. During that conversation he conveyed false and disparaging information regarding M2. He made numerous false statements, including but not limited to: (i) M2 had no right to possess Maximo 5.x; (ii) M2 had no right to perform hosting services involving Maximo software products; (iii) M2 was prohibited from consulting or contracting

with new customers using Maximo software products; and (iv) M2's claims in the instant litigation were without merit. Newfield's statements to Mr. Groppi were false and disparaging, and were made with the specific intent to destroy M2's prospective business relations with G&E.

66.     Concurrently therewith, MRO personnel informed G&E that it should choose MRO to implement hosting services, instead of M2.

67.     Newfield's statements to G&E achieved their desired result. G&E contacted M2 and informed it that in order for its proposal to be considered, clarification of the situation with MRO would need to be obtained in writing and provided to G&E. M2's counsel promptly wrote to counsel for MRO, but MRO's response was, predictably, to contest M2's position. Because M2 was unable to obtain the necessary clarification from MRO, its proposal was not considered by G&E, and a contract which M2 would have been in a strong position to obtain was lost.

68.     Newfield's statements destroyed M2's relationship with G&E, since G&E now considered M2's ability to perform Maximo hosting services to be fatally compromised.

69.     M2 estimates the value of this lost opportunity to be in excess of $700,000.

COUNT I
(Misrepresentation)

70.     M2 repeats the preceding allegations and incorporates them herein by reference.

71.     MRO repeatedly and falsely represented to M2 that it was committed to a successful business relationship with M2, and that it would honor its commitments to M2. MRO repeatedly and falsely represented to M2 that it would implement a nationwide marketing and promotional effort in support of M2's Internet hosting capabilities for Maximo, and that it would do so through the use of its North American sales force. MRO repeatedly and falsely represented to M2 that it would incentivize its North American sales force to aggressively market and promote M2's Maximo capabilities by implementing a commission structure which would

compensate that sales force for the successful generation of business which utilized M2's Maximo capabilities.

72.    MRO made these representations to M2 with knowledge that they were false.

73.    After the false representations were made, M2 continue to rely on those representations. MRO knew what such reliance but failed to correct the false representations, knowing they were false.

74.    The representations alleged here and were made by, 4, or on behalf of MRO with knowledge of their falsity.

75.    In reliance upon these false representations, M2 expended considerable time and money in developing its Maximo Internet hosting capabilities, and it otherwise fulfilling its commitments under its agreement with MRO, and it forbore from taking advantage of other opportunities in reliance upon those representation.

76.    M2's reliance on MRO's representations was reasonable and justifiable.

77.    In furtherance of its sscheme and artifice to defraud, MRO actively withheld and concealed information that would have revealed the falsity of the representations in time for M2 to prevent a severe damage which it has incurred.

78.    As a result of its justifiable reliance on MRO's false representations, M2 has been damaged.

## COUNT II

### (Negligent Misrepresentation)

79.    M2 repeats the preceding allegations and incorporates them herein by reference.

80.    At the time the false representations were made, MRO knew or should have known, among other things, that it did not intend to commence the marketing or promotion of

M2's Internet hosting capabilities for Maximo through its North American sales force.

81.    After the false representations were made, M2 continue to rely on those representations.  MRO knew of such reliance but failed to correct the false representations when it knew or should have known with the exercise of reasonable care that they were false.

82.    The representations alleged here and were made by, for and or on behalf of MRO and MRO knew or should have known with the exercise of reasonable care that they were false.

83.    In reliance on the false representations, MRO M2 expended considerable time and money in developing its Maximo Internet hosting capabilities, and it otherwise fulfilling its commitments under its agreement with MRO, and it forbore from taking advantage of other opportunities in reliance upon those representations.

84.    M2's reliance on these representations was reasonable and justifiable.

85.    As a result of its justifiable reliance on MRO's representations, M2 has suffered damage.

## COUNT III

### (Breach of Contract)

86.    M2 repeats the preceding allegations and incorporates them herein by reference.

87.    The Marketing Agreement between MRO and M2  is a valid and enforceable contract.

88.    By failing to instruct its North American Sales Force to market, sell and promote M2's internet hosting capabilities for Maximo, MRO breached this agreement.

89.    As a result of MRO's breach, M2 has been damaged.

<u>COUNT IV</u>

(Breach of the Implied Covenant of Good Faith and Fair Dealing)

90.     M2 repeats the preceding allegations and incorporates them herein by reference.

91.     The marketing agreement is a valid and enforceable agreement to which M2 adhered.

92.     MRO, as a signatory to that agreement, is bound by the implied covenant of good faith and fair dealing.

93.     By and through the conduct described herein, MRO has violated that covenant.

94.     As a direct and proximate result of MRO's actions, M2 has suffered and continues to suffer damages.

<u>COUNT V</u>

(Promissory Estoppel)

95.     M2 repeats the preceding allegations and incorporates them herein by reference.

96.     MRO agreed with and made repeated representations to M2 that MRO would affirmatively market M2's Maximo Internet hosting capabilities through MRO's North American sales force.

97.     In order to incentivize members of MRO's North American sales force to market M2's Maximo internet hosting services, MRO agreed with and made repeated representations to M2 that it would pay commissions to members of MRO's North American sales force for successful sales of M2's Maximo Internet hosting services.

98.     M2 relied on MRO's promises and such reliance was reasonable.

99.     MRO knew, reasonably expected, or should have reasonably expected that M2 would rely on these promises.

100.    As a result of M2's reasonable reliance on MRO's promises, M2 took actions and forbore from other actions to its detriment, including but not limited to (1) the 2002 Internet Hosting Agreement; (2) expending more than $1,000,000 in furtherance of the parties' joint efforts and in preparation for the sales initiative and the resultant work therefrom; (3) sharing confidential and proprietary business information with MRO; and (4) forbearing from the opportunity to sell M2 to an interested third party during this period.

101.    M2's actions and forbearance from action in reliance upon MRO's promises were at all times reasonable and foreseeable by and known to MRO.

102.    As a direct result of MRO's failure to perform the promises made to M2, M2 has suffered damages in an amount to be determined at trial, but in no event less than $8,000,000.

COUNT VI

(Injunctive Relief )

103.    M2 repeats the preceding allegations and incorporates them herein by reference.

104.    MRO and Newfield continue to tortiously interfere with M2's contractual and advantageous business relations.  They have already succeeded in disrupting M2's proposal process with G&E, thereby depriving M2 of a valuable potential contract, and they persist in their efforts to prevent M2 from providing services to the GBA.

105.    The above referenced conduct tortiously interferes with M2's advantageous contractual and business relations, and disparages M2 and its capabilities and business in the marketplace.

106.    M2 will succeed on the merits of its claims against the defendants.

107.    M2 has, and will continue to suffer irreparable injury in the absence of immediate injunctive relief in the form of an order prohibiting the defendants from continuing to engage in

any of the above referenced conduct.

## COUNT VII

### (Unjust Enrichment)

108.    M2 repeats the preceding allegations and incorporates them herein by reference.

109.    Through extensive research and development, and the expenditure of large amounts of time, effort and money, M2 has developed commercially valuable trade secrets, consisting of confidential and proprietary scientific, technical, and business information concerning the development, employment and maintenance of a computing infrastructure which M2 uses to host Maximo via the Internet. These include network infrastructure; system user administration; database template architecture; rapid deployment processes; non-standard software installation; and pricing methodologies.

110.    This information was derived by M2's experience as a pioneer in the field of Internet application service hosting and in particular the hosting of Maximo via the Internet.

111.    This information is of great commercial value to M2 and is not generally known to, and is not readily ascertainable through proper means by other persons who can obtain economic value from its disclosure or use.

112.    M2 carefully guards this information, and informs clients and prospective clients that certain information which they receive from M2 is confidential and proprietary. M2 requires clients and prospective clients to agree not to disclose such information.

113.    MRO was told that the information that it was being provided was proprietary and confidential and owned by M2.

114.    MRO acknowledged and agreed that the information provided to it was proprietary to M2 and would be kept confidential.

115.    MRO, which knows the valuable nature of this information, is using or will use the information to compete with M2 to M2's detriment.

116.    MRO has obtained this information through improper means, including falsely representing to M2 that MRO intended to pursue a joint sales venture with M2.

117.    MRO now seeks to become a competitor of M2 in the field of Internet application services by providing, and in particular hosting, Maximo via the Internet.

118.    As a result of the actions set forth above, M2 has conferred a benefit upon MRO.

119.    MRO has knowledge of the benefit.

120.    MRO has accepted and retained the benefit conferred.

121.    MRO's continued possession and use of this information is causing irreparable damage to M2, and will continue to do so unless MRO is restrained by this Court.  Thus, M2 is without an adequate remedy at law.

122.    The circumstances are such that it would be inequitable for MRO to retain the benefit without paying the fair value of the benefit.

<u>COUNT VIII</u>
(M.G.L. ch. 93A, §§ 2, 11)

123.    M2 repeats the preceding allegations and incorporates them herein by reference.

124.    MRO is engaged in the conduct of trade or commerce in the Commonwealth of Massachusetts.

125.    MRO's conduct described above constitutes an unfair act or practice.

126.    MRO's conduct occurred primarily and substantially within the Commonwealth of Massachusetts.

127.    As a result of MRO's conduct, M2 suffered a loss of $8,000,000.00.

128.    Said loss was reasonably foreseeable as a result of MRO's conduct.

129.     MRO's conduct was willful and intentional and MRO is entitled to an award of double or treble damages.

130.     Based upon MRO's conduct, M2 is entitled to an award of attorneys' fees.

## COUNT IX

(Intentional Interference with Advantageous Business Relations)

131.     M2 repeats the preceding allegations and incorporates them herein by reference.

132.     M2 had a business relationship, contract of economic benefit, or contemplated business relationship or contemplated contract of economic benefit with the GBA and G&E.

133.     MRO had knowledge of M2's business relationship, contract of economic benefit, or contemplated business relationship or contemplated contract of economic benefit with GBA and G&E.

134.     By contacting these entities to contest the validity of M2's and Maximo license, by falsely representing the status of M2's legal rights to provide consulting services to third parties that either all in or will all in their Maximo licenses, and by making statements which disparage and to in the marketplace, MRO and Newfield have intentionally and maliciously interfered with M2's business relationships or contemplated contracts of economic benefit.

135.     As a direct result of the defendants conduct, M2 has lost advantage which it otherwise would have had, and has been damaged.

## COUNT X

(Declaratory Judgment)

136.     M2 repeats the preceding allegations and incorporates them herein by reference.

137.     An actual dispute has arisen between M2 and MRO regarding the terms of the 2000 and 2002 Internet Hosting Agreements and M2's Maximo License regarding whether M2

may provide Maximo internet hosting services or Maximo consulting services under the present circumstances. Pursuant to M.G.L. c. 231A, M2 is entitled to a declaration that these agreements: (1) do not prevent it from providing Maximo internet hosting for clients who own their Maximo licenses; (2) do not prevent M2 from providing Maximo consulting services to clients who own their Maximo licenses; and (3) do not prohibit M2 from using the versions of Maximo is currently has in its possession.

## **PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff demands judgment on all counts as follows:

1.      For a preliminary and permanent injunction restraining and enjoining the defendants from making any statements to any individuals or entities not directly associated with the instant litigation which in any way contest M2's rights to provide consulting services associated with Maximo software, or which in any way disparage M2, its capabilities generally, and its rights and abilities to provide Maximo Internet hosting services and Maximo consulting services in particular;

2.      Judgment on counts I, II, III, IV, V, VII, VIII, IX and X in an amount to be determined at trial;

3.      Award and to its attorneys fees and costs pursuant to Mass. § M.G.L. ch. 93A, §§2 and 11; and

4.      Grant such other or additional relief as the court deems just and proper under the circumstances.

M2, Inc.
By its Attorneys
Fee Rosse & Lanz, PC

By: _____

Michael C. Fee, Esq. (BBO NO. 552796)
Mark S. Resnick, Esq. (BBO NO. 559885)
Fee, Rosse & Lanz, P.C.
321 Boston Post Road
Sudbury, MA  01776
(978) 440-7000

Counsel:

John M. Teitler
Teitler & Teitler
1114 Avenue of the Americas
New York, NY 10036
Tel. (212) 997-4400

Dated:  December 9, 2004