UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

|  |  |
|---|---|
| $M^2$ CONSULTING, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>)<br>MRO SOFTWARE, INC., )<br>)<br>Defendant. )<br>) | Case No. 03-12589-GAO |

## PLAINTIFF'S OPPOSITION TO DEFENDANT/PLAINTIFF-IN-COUNTERCLAIM'S MOTION TO COMPEL DISCOVERY

### INTRODUCTION

In an attempt to divert the attention of the Plaintiffs and this Court from its own glaring discovery deficiencies, the Defendant, MRO Software, Inc. ("MRO") has moved to compel the Plaintiff, M2 Consulting, Inc. ("M2") to supplement its existing detailed and voluminous discovery response. M2 opposes the Motion of the Defendant, MRO Software, Inc. to Compel Discovery ("MRO's Motion to Compel") on the grounds that: (1) its request for a sworn response to MRO's Interrogatories is moot; (2) its answers to MRO's Interrogatories and MRO's Document Requests are appropriate and sufficiently detailed, and it has produced all documents responsive to MRO's legitimate requests; and (3) its objections to MRO Interrogatories are proper. Because it lacks a proper basis upon which to move to compel, MRO's Motion to Compel should be denied. In further support of this Opposition, Plaintiff relies upon and incorporates herein by reference the Affidavit of Mark S. Resnick, filed simultaneously herewith

## BACKGROUND

*Factual Background*

The relationship between M2 and MRO dates back to the summer of 1999, when the parties first began negotiating a strategic partnership by and through which MRO would use M2's web hosting expertise to host MRO's MAXIMO facilities management software ("MAXIMO") for MRO customers uninterested in purchasing and deploying that software directly. The relationship culminated in the signing of an agreement in March 2000, authorizing M2 to provide Internet hosting of MAXIMO (the "2000 Internet Hosting Agreement"). From the outset of these initial discussions and continuing through the negotiations which resulted in the signing of the 2000 Internet Hosting Agreement, M2 informed MRO that the information it would be receiving information about M2's business model and technical expertise was confidential and proprietary. M2 informed MRO that MRO could not disclose this information to third parties or use it to compete with M2 in any way. MRO's representatives agreed. The parties also agreed that M2 would develop MAXIMO related processes, procedures, and business models and this information would belong to M2.

M2's web hosting expertise was primarily associated with its business model, it processes, and its deployment methodologies. It was also recognized that the level of interaction between these parties meant that MRO personnel would be exposed to and receive this information with great regularity, and since the parties utilized email extensively, that much of this information would be transmitted by email, frequently in small batches, in connection with the integration of the two companies' complementary capabilities. This is in fact what occurred, and information flowed back and forth between these parties for more than five years as the relationship developed and changed.

*Procedural Background*

Since the complaint in this action was filed on December 22, 2003, both sides have served extensive document requests and interrogatories.[1] M2 has responded to MRO's document requests with an extensive document production far in excess of the documents which MRO has produced in response to M2's requests. M2 has also responded to MRO's interrogatories with either sufficiently detailed responses, or appropriate objections. In response, MRO has lodged a seemingly endless series of complaints and objections, coupled with demands for the production of documents or information to which it is not entitled, or for which it has not served appropriate requests. The context of these repeated requests and demands for information by MRO, its unwillingness to accept M2's extensive production of information, and its refusal to negotiate these discovery issues reasonably leads to the inescapable conclusion the MRO has, apparently for tactical reasons, engineered the filing of the Defendant's Motion solely to harass and intimidate M2, or to inappropriately attempt to create a record of lack of cooperation on M2's part, where none exists.

*MRO's Document Requests*

MRO served its Request for Production on August 6, 2004. M2 responded in writing on September 13, 2004. It did not object to *any* of MRO's document requests. Exh. A. On that same date, M2 produced approximately 1800 pages of documents responsive to MRO's requests. MRO took the position that M2's initial document production was insufficient. Discovery conferences followed and on October 6, 2004, M2 produced a CD containing 1000 email documents which, in light of the position taken by MRO's counsel, M2 viewed as potentially responsive to MRO's requests. M2 informed MRO that with the exception of clearly privileged

---

[1] A true and accurate copy of M2's Response to MRO Document Request is attached hereto as Exhibit "A", and a true and accurate copy of M2's Responses to MRO's First set of Interrogatories is attached hereto as Exhibit "B".

-3-

documents, it was willing to produce all potentially responsive documents, and that it would do so.[2]

At the same time, MRO produced documents which were purportedly responsive to M2's document requests. MRO did not identify its production as incomplete. MRO's production included hard copy prints outs of email communications between the parties, in "text file" format. (Resnick Aff. ¶ 3) MRO's document production was glaringly incomplete. Its initial production included few documents and almost no email. *Id.* It indicated that MRO had made at best a cursory search for responsive material. M2 brought these deficiencies to MRO's attention, and has continued to do for a many months. *Id.* MRO made supplemental document productions on November 17 and 23, 2004, but its production remains incomplete. On January 18, 2004, M2's counsel wrote to MRO's counsel outlining 34 separate areas where MRO's production was incomplete.[3] *Id.* MRO responded promising to look into the deficiencies, but to date MRO has neither made a supplemental production nor informed M2 that its search is complete and no responsive documents exist. *Id.*

M2's counsel engaged in discussions with MRO's counsel to address MRO's concerns about M2's production throughout the fall of 2004, and agreed to produce the certain categories of email communications requested by MRO. During a discovery conference on October 13, 2004, both sides agreed to make supplemental document productions. M2 also informed MRO that subject to several document categories where it would double check for any additional documents (the "Verification Categories"), its production was complete. It implemented an extensive document location and segregation process, and located all email potentially

---

[2] This position reflects M2's confidence that the documentary record in this action solidly supports its claims.

[3] A true and accurate copy of this correspondence is attached hereto as Exhibit "C".

responsive to MRO's clarified requests. M2 produced all these electronic documents on a DVD. (Resnick Aff. ¶ 4)  This DVD contained approximate 39,000 separate emails, in text format – the same format MRO used to produce hard copies of email to M2. *Id.*  Unlike MRO's email production however, M2's use of the DVD format permitted its production to be electronically searched by MRO. MRO's production was hard copy only, and hard to reviewed by hand. The production of the DVD and CD brought M2's total document production to more than 42,000 pages of material. *Id.*  M2 later informed MRO that it had checked the Verification Categories and that its production was complete.

On several occasions, M2's counsel discussed with MRO's counsel the exchange of privileged document logs, describing by type and privilege all documents withheld from production pursuant to the assertion of any privilege. (Resnick Aff. ¶ 5) MRO's counsel stated that MRO did not want to compile or exchange privilege logs. *Id.* M2's counsel agreed with MRO's request that privilege logs not be exchanged. *Id.*

Notwithstanding M2's extensive production, MRO continued to complain that it was not extensive enough. (Resnick Aff. ¶ 6)  In September, 2004, M2's counsel had an extensive discovery conference with MRO's counsel regarding document production issues. *Id.*  MRO's counsel complained that M2's document production was not sufficiently extensive, notwithstanding the fact that M2 had by that time produced more documents than MRO. MRO's counsel also complained that the text format email production appeared to have omitted certain email attachments, and that the format was difficult for his office information technology systems to use. *Id.* M2 responded by requesting that MRO identify the missing attachments, and offered to produce the email documents from the M2 DVD in hard copy. *Id.*  MRO complained that a hard copy production would also be cumbersome for its counsel to work with. MRO's

counsel requested that M2 duplicate its email production, but that this time it utilize a "PST format", which would work better with MRO's counsel's computer system. (Resnick Aff. ¶ 7) In an effort to address MRO's concerns, M2 duplicated its email production, verified the attachments, and produced to MRO another CD on November 16, 2004, and another DVD on November 24, 2004, both with the same emails it produced earlier, this time formatted in PST format. *Id.*

Notwithstanding M2's substantial effort to address its concerns and to produce all responsive non-privileged documents, MRO continued to complain throughout the fall of 2004, and make satisfaction of its document requests a moving target which M2 could never hit. In most instances, M2 had actually produced the documents which MRO claimed never to have seen. For example, MRO complained that it had not seen documents relating to a possible sale of M2 to Indus International ("Indus"), when in fact those documents were part of M2's initial production on September 13, 2004.[4] In November, 2004, counsel for M2 and MRO had another discovery conference, where MRO's counsel once again inquired about the confidential and proprietary business information M2 claimed had been misappropriated. (Resnick Aff. ¶ 8) M2's counsel explained that the information at issue was not highly technical data or computer code, but rather business process information, including but not limited to application hosting processes, application configurations, pricing models, and marketing strategies. *Id.* M2's counsel specifically stated that no technical documents had been produced responsive to this request, because no such documents existed. *Id.* M2's counsel went on to explain that the types of information which M2 claimed had been misappropriated were contained in the email interaction between the parties' employees, was therefore contained in the documents already

---

[4] True and accurate copies of documents relating to the possible Indus sale are attached hereto as Exhibit "D".

produced. *Id.* Following this explanation by M2's counsel, MRO's counsel claimed to understand both the nature of M2's claims, and the documentation which had been produced in support. *Id.*

Although counsel for the parties had numerous discussions regarding document production issues and MRO's dissatisfaction with M2's interrogatory responses, MRO did not agree to narrow or meaningfully clarify its requests. (Resnick Aff. ¶ 9) During one such conference, M2's responses to Interrogatories 9, 10, 17, 18, 22, and 25 were discussed. (Resnick Aff. ¶ 10) Contrary to the unsupported assertion in MRO's papers, M2's counsel never "admitted" that the responses were deficient.[5] *Id.* Rather, counsel for both sides discussed MRO's belief that they were deficient and M2's counsel agreed only to consider whether, in light of the discussion, there was any way in which M2 could address MRO's objections. *Id.*

MRO served 25 interrogatories on M2 on October 25, 2004. (Resnick Aff. ¶ 11) In its response, M2 answered 14 of these interrogatories and objected to 11.[6] In December 2004, counsel for the parties had a discovery conference. *Id.* MRO's counsel requested that M2 supplement virtually every response and that it waive its objections, taking the positions that none of M2's objections were appropriate, and virtually every answer was deficient in some way. *Id.* MRO's counsel threatened that unless M2 answered the vast majority of the interrogatories to its satisfaction, it would move to compel. *Id.* M2 offered a compromise, and agreed to investigate the possibility, in light of certain clarifications provided by MRO's counsel supplementation of its responses to Interrogatory Nos. 9, 10, 17, 18, 22, and/or 25 would be

---

[5] It should be noted that this statement, and others regarding the progress of discovery negotiations, is unsupported in MRO's papers by affidavit or documentary proof.

[6] M2 responded to the interrogatories to which it did not object either with direct answers, Rule 33(d) responses, or by objecting and responding with waiver of and subject to its objections.

possible. *Id.* M2's counsel informed counsel for MRO that M2's CEO, Rick Bevington ("Mr. Bevington") was recuperating from surgery, and that since he was the contact for coordinating the information sources needed to produce this potential supplementation, any response regarding potential supplemental responses would take some time. *Id.* MRO's counsel agreed that no specific deadline would be set for receipt of M2's decision regarding potential supplemental responses. *Id.* MRO's counsel took a far different position in the letters it began sending to M2's counsel in December, 2004. In these letters, MRO's counsel implied that M2 had committed to provide supplemental discovery responses and within a time certain, and began threatening to move to compel if M2 did not produce the supplemental responses shortly. MRO's counsel did not request discovery conferences to discuss its concerns at this juncture, electing instead to simply send correspondence periodically threatening to move to compel.

At the same time that MRO was threatening to move to compel, M2 was pressing MRO to finish its document production and to make its witnesses available for depositions. (Resnick Aff. ¶ 12) MRO evaded producing these witnesses, and then, on December 20, 2004, took the position that until it was satisfied with M2's interrogatory and document responses, it would not produce its witnesses for deposition.[7] On January 18, 2004, M2's counsel wrote to counsel for MRO outlining deficiencies in MRO's document production. (Resnick Aff. ¶ 13) MRO eventually responded on January 27th by indicating that it was searching for the documents but that the references to responses in the email notwithstanding, the documents simply might not exist. *Id.*

---

[7] A true and accurate copy of this email correspondence is attached hereto as Exhibit "E".

## ARGUMENT

M2 Has Produced All Responsive Documents

M2 has produced more than 42,000 pages of documents in this case, the majority in searchable electronic format. It objected to none of MRO's document requests, and it has withheld virtually nothing. MRO has known since November, 2004 that M2's document production is complete. MRO's counsel requested that the parties not prepare or exchange privileged document lists, and it therefore cannot now complain that it does know what M2 has withheld on privilege grounds. Even if it now seeks description of those documents, that issue could have been easily resolved with a request to M2's counsel rather than the filing of the instant Motion to Compel. To the extent that MRO complains that M2 has not identified documents relating to certain categories of discovery, that issue can only be explained by either MRO's inability to interpret what it has been given, or to the fact that no such documents exist. Given the fact that M2 has informed MRO that its production is complete, MRO's Motion to Compel, to the extent it seeks production of documents on the grounds that it has not seen anything relating to certain categories of requested material, is specious because it seeks to compel the production of non-existent material.

*M2's Production Contains The Proprietary Information At Issue In This Case*

M2 has identified the confidential and proprietary information which it claims MRO has misappropriated by category, and in response to MRO Interrogatory No. 6. The identified categories include: (1) MAXIMO Application Hosting Processes; (2) MAXIMO Application Hosting Procedures; (3) MAXIMO Application Hosting Configurations; (4) MAXIMO Application Hosting Services; (5) MAXIMO Application Hosting Pricing; (6) MAXIMO Application Hosting Marketing information. Exh. B at 4. M2 believes these categories of

information to be proprietary because it created that information. These categories of information were communicated by M2 staff to MRO staff innumerable times over the course of the relationship. All transmittals between $M^2$ and MRO were marked "Confidential".

Notwithstanding the nature of the transmission of M2's confidential and propriety information to MRO, and the explanation of its counsel that this information was not, and practically could not be provided in designated packets at designated times, MRO continues to profess its lack of understanding of the nature of M2's misappropriation claims. The position is disingenuous. MRO understands that the documentary evidence of misappropriated trade secret information has already been produced. M2's counsel has identified the categories of this information specifically to MRO, both in writing and verbally, on multiple occasions. *Id.* MRO continues to press for the production of specifically designated trade secrete documents, when it has been told, and has acknowledged, that such a specific set of documents does not exist.

It is also disingenuous for MRO to request that M2 designate each and every document it considers to contain this information. The information has been identified in detail by category, and the documents containing it have been produced. The retrieval of this information is as easily available to MRO and to M2, and therefore M2 need not be put to the burden and expense of producing the type of identification MRO requests.

*M2 Has Produced Damages Documentation*

In its papers, MRO complains that M2 has not produced any documents regarding its damages. That assertion is simply incorrect. For example, part of M2's damages claim relates to its decision to terminate negotiations with Indus, a company interested in purchasing M2. This decision was made in reliance upon MRO's promises to promote M2 as its web hosting partner for MAXIMO. M2 has produced multiple documents regarding its negotiations with Indus,

including a term sheet, correspondence, email, due diligence lists, and copies of business cards of Ernst & Young personnel involved in the deal. Exh. D.

### M2's Interrogatory Responses Are Appropriate

The portion of M2's Motion to Compel directed at interrogatory issues focuses either on responses which MRO claims lack sufficient detail, or on M2's objections. Interrogatory No. 6 seeks a description of the proprietary information which M2 claims was misappropriated. M2's response lists six separate categories of information which it claims as misappropriated proprietary information. Exh. B. The response describes not only the information by type, but also the reasons for M2's assertion that it was proprietary. *Id.* MRO states in its Motion to Compel that the description is in "superficial detail" and that it is useless to MRO. MRO does not bother to explain why it cannot use the information provided, nor does it address the fact that using M2's response, the information can electronically searched throughout almost all of M2's production. The descriptions provided use terminology well know to software professionals, and MRO, as a software manufacturer, is well aware of what is included in those categorical descriptions.

Similarly, M2's response to Interrogatory No. 8, is also sufficiently detailed. It lists, by name, period employed, and salary all personnel which M2 claims were added to its payroll in reliance upon MRO's representations. The response provides, literally, all the detail requested, yet is still the subject of MRO's demand for supplementation in the instant motion.

Finally, M2's response to Interrogatory No. 1, seeking identification of people with relevant knowledge sets forth the six people known to it to have material knowledge. It does not list the MRO personnel involved in the transaction, because that information is not requested. Inexplicably, MRO moves to compel a supplemental response, without any basis. It asserts, self-

servingly, that the response is "vague" and "incomplete" and "piecemeal" and claims that the answer fails to set forth a complete list. M2's response is its complete list. The fact that MRO does not like the answer does not convert it into an unacceptable one.

*M2's Objections are Appropriate*

M2 has objected to Interrogatory Nos. 3, 4, 5, 9, 13, 15, 16, 21, 22, 23, and 25, less than half of MRO's interrogatories. These objections were necessary because the subject interrogatories sought information which was either privileged or entirely irrelevant, or because the Interrogatories themselves were so poorly worded as to make a meaningful response impossible. To date, MRO has not provided M2 with revised Interrogatories or any meaningful written clarification or narrowing of their scope. Under the circumstances, M2 was left with no choice but to stand by its objections. The specific interrogatories are addressed, by category of information sought, below.

*Irrelevant Corporate Information*

Interrogatories 3, 4, and 5 ask M2 to identify its officers and directors, shareholders, and investors, respectively. These requests are outside the scope of Rule 26, because the information they seek is entirely irrelevant to any facts, claims, or defenses at issue in this case. M2's claims relate to the theft of proprietary business information and MRO's breach of certain agreements. MRO's counterclaim asserts M2's failure to pay monies owed under one of the agreements. Nothing in the case makes relevant information about MRO's "investors" or shareholders. That information would not make more probative any relevant facts, nor would information about each officer or director of M2 from 1999 through the present. This case does not involve issues of corporate control, lack of accountability, failure of M2's chain of command, or any similar issues. MRO fails to articulate any viable basis for production of this information, claiming only

that this information is "basic corporate information". There are vast amounts of "basic corporate information" in this case, but that characterization does not make the information relevant. Absent some cognizable theory of relevance, this information is irrelevant and M2 is under no obligation to produce it.

Interrogatory No. 13 seeks the identification of every "potential" customer to whom M2 has marketed MAXIMO hosting services since November 24, 2003. This request is clearly overbroad, since it seeks the identity of "potential" customers. First, MRO fails to define the term "potential customers". Taken literally, any entity in the world that might need facility management software is a "potential" M2 customer. Second, M2's website, which is accessible via the Internet worldwide, lists "Quickstart for MAXIMO" as a service. Any entity accessing the website might then be considered a "potential customer" to whom M2 "marketed" MAXIMO. A response to this Interrogatory, as worded, is therefore impossible due to its over breadth and its failure to define key terms. It is not M2's obligation to rewrite poorly drafted interrogatories in an attempt to discern what MRO really meant. Interrogatory No. 13 is meaningless as drafted, and M2 has no obligation to answer it. Moreover, M2's marketing of MAXIMO is irrelevant to MRO's counterclaim for money owed, nor does it provide any relevant facts going to M2's claims that MRO failed to keep its promises in this case. The relevancy objection to this interrogatory however is no impediment to MRO, since it admits in its Motion to Compel that *M2 has produced documents relating to this exact issue.* See MRO Motion to Compel at 3 ("M2 has produced ... emails ... between M2 and its prospective or actual customers relating to MRO's MAXIMO product ...").

Interrogatory No. 15 seeks identification of M2's employees going back to 1999, by number and categorized by numbers employed by grouping of positions. This interrogatory also

seeks irrelevant information. The numbers of M2 employees employed in, for example, "sales engineering" positions has no relevance to any facts or legal claims in this case. MRO fails to articulate how that information might be relevant. The request therefore seeks information not likely to lead to the discovery of admissible information. The interrogatory is also indecipherable. MRO does not explain what it means by the term "census of employee positions", nor does it define the examples it provides "(e.g. number engaged in development, sales, pre-sales, sales engineering, support)". M2 does not necessarily define its employees pursuant to such categories, even if MRO had defined what types of job descriptions it considered to be, for example "support" positions. Absent some reasonable degree of specificity, M2 could not answer the Interrogatory even if it sought relevant information.

Interrogatory No. 16 suffers from the same infirmities as Interrogatory No. 15. It seeks identification of M2 employees who have been "responsible for promotion, sales, marketing, or technical support of M2's promotion of M2's MAXIMO solution". As worded, the interrogatory is indecipherable. M2 does not assign employees to be responsible for marketing or technical support of its promotion of MAXIMO. M2 did not market its promotion, it simply undertook promotional efforts. The promotional efforts themselves did not require sales support. This information does not go to any of the claims or defenses in this case. MRO does not claim that M2 failed to promote MAXIMO, it claims, essentially, that it was not required to promote M2's capabilities the way M2 claims it was. The information sought here is then simply irrelevant.

*Requests for Attorney Work Product and Attorney-Client Privileged Information*

MRO's interrogatories request information which requires M2 to interpret certain factual issues and to make legal conclusions regarding those facts. As such, they seek information protected by the work product doctrine. Interrogatory 9 asks M2 to identify "every fraudulent

statement, false promise or misrepresentation made by MRO to M2". The determination of whether a particular statement is fraudulent requires a legal conclusion as to whether the circumstances attending the subject statement meet the legal criteria to be considered fraudulent. That is a determination of counsel, based on counsel's opinion and mental impressions, and counsel's interpretation of the evidence. It clearly represents the work product of M2's counsel, and as such, M2 is not obligated to produce it. A narrowed request, seeking identification of statements which M2 asserts were made with knowledge of their falsity might remove the infirmity with this interrogatory, but MRO has not agreed to narrow it.

Interrogatory No. 21 asks M2 to "explain any defenses" it intends to assert to MRO's claims for money owed. This, on its face, seeks the work product of M2's counsel. The request for an "explanation" is vague. As written, it is impossible for M2 to determine whether this seeks a recitation of facts in support of M2's defenses, and explanation of the legal doctrines associated with M2's affirmative defenses, or the opinions of M2's counsel as to why certain legal defenses apply. Although a clarification might remove the deficiecies of this interrogatory, MRO has provided none. As worded, it clearly seeks attorney work product, and M2's objections are appropriate.

Similarly, Interrogatory 22 seeks attorney-client privileged information. It asks M2 to identify each person it has interviewed or from whom it has obtained written or recorded statements, and it seeks identification of the statements obtained. This interrogatory seeks information regarding interviews conducted by M2's counsel, of M2 personnel, in connection with this case. Those communications are privileged. The interrogatory is not limited to communications with non-parties, or to communications with third parties for which the privilege would not apply. The objection is therefore appropriate in all respects.

Interrogatory No. 23 asks M2 to state whether it is aware of any statements made by MRO or its agents "in the nature of an admission" which M2 intends to rely upon at trial. This also calls for the work product of M2's counsel. It seeks the opinion of M2's counsel as to what statements might be legally considered to be legal admissions, and it further asks M2's counsel to identify, at this relatively early stage in the case and before it would otherwise be required, which statements it will rely upon at trial. The interrogatory is inappropriate. M2's counsel is not, under any cognizable theory, required to interpret evidence for MRO and to opine as to what statements might constitute legal admissions. MRO must make those determinations for itself, as its own counsel reviews the evidence in this case. M2 is also not required to identify evidentiary decisions about trial evidence, even if one could reasonably assume any such decisions had been made at this juncture. M2's objection is appropriate.

Interrogatory No. 25 seeks in effect, expert damages testimony to a level of detail that is inappropriate at this stage of the case. M2 has already described in its Amended Complaint the types of damages its has suffered. Those damages arise from its loss of the benefit of its agreement with MRO, and its opportunity to sell its business to Indus. Because MRO never lived up to its commitments, M2's loss of benefit damages will require testimony, projecting revenue based on a variety of market and performance criteria. That information will depend in part on information obtained from MRO, information which MRO has not yet produced. This interrogatory, as worded, can therefore only seek the opinion of M2's counsel, evaluating the damages evidence to date, and projecting its damages based on that information. As such, it seeks information protected by the attorney-client privilege and work product doctrine. MRO is well aware that M2 has not designated any experts at this time.

*Rule 33(d) Responses*

M2's invocation of Rule 33(d) and response to Interrogatory Nos. 8, 12, 14, 17 and 20, is entirely appropriate. In response to MRO's document requests, M2 has produced virtually all of the records which it maintained in the ordinary course of its business relating to the facts and circumstances of this case. In its papers, MRO does not complain that the majority of the documentation produced by M2 is in the form of e-mail, apparently because it recognizes the fact that most of the written communication between the parties was accomplished electronically through e-mail. It is therefore not surprising that the volume of that e-mail communication is extensive, or that M2's production of potentially responsive e-mail contained approximately 39,000 separate e-mail documents. In recognition of the volume produced, M2 initially produced that material on a CD, and later on a DVD in both text file and PST file formats, both of which are easily searchable electronically, with standard search engines contained in common office IT programs, including Microsoft Outlook. There can be no dispute that Rule 33(d) provides M2 with the option of producing its business records. That rule does not burden M2 with the obligation to specify which specific records contain the information responsive to that particular interrogatory. It is well recognized that where the answer can be as easily derived from the business records by one party as the other, the producing party need not designate which business records are responsive to a particular interrogatory.

Throughout its Motion to Compel, MRO takes a logically inconsistent position. On one hand it complains that M2's document production and its interrogatory responses are not sufficiently detailed, or that certain categories of documents appear to be missing from M2's production. On the other, it complains that M2's document production is too voluminous, and that therefore M2's burden should be elevated to the point where it is required to do what Rule

-17-

33(d) does not require, derive the information from business records and response to MRO's interrogatories. MRO is partially correct, M2's document production has been extensive. It has produced the business records from which the answers to the subject interrogatories can be derived. MRO has the capability to search for any of the responsive information sought in the subject interrogatories. MRO should not be permitted to use M2's good faith discovery efforts against it, by now claiming that its document production is too voluminous, and that it simply can't find the information in the production. M2 has produced all responsive documents, and has informed MRO that its document production is complete. Its invocation of Rule 33(d) and response to these interrogatories is appropriate. Under the circumstances, M2 should not be required to do MRO's work for it, nor should the court interpret rule 33(d) as having a higher standard for M2 than for any other litigant in similar circumstances.

*M2 Has Provided Sworn Response In Response To The Interrogatories*

During a discovery conference in December, M2's counsel informed MRO's counsel that not only would M2 provide a sworn response to its interrogatory responses, but also provided assurances that the responses would not change. (Resnick Aff. ¶ 14) Mr. Bevington's surgery and schedule following his recuperation did not permit the execution of that response until February 15, 2005, at which time it was provided to MRO. That issue is therefore moot and need not be considered. With the exception of sending a written request for the sworn verification of the answers, MRO's counsel did not seek to address the issue further. It was unnecessary to include it in MRO's Motion to Compel.

## CONCLUSION

WHEREFORE, M2 respectfully requests that MRO's Motion to Compel be denied.

> M2 Consulting, Inc.
> By its Attorneys
> Fee, Rosse & Lanz, P.C.
>
> By: _____
> Michael C. Fee, Esq. (BBO NO. 552796)
> Mark S. Resnick, Esq. (BBO NO. 559885)
> Fee, Rosse & Lanz, P.C.
> 321 Boston Post Road
> Sudbury, MA 01776
> (978) 440-7000

Counsel:

John M. Teitler
Teitler & Teitler
1114 Avenue of the Americas
New York, NY 10036
Tel. (212) 997-4400

February 16, 2005

## CERTIFICATE OF SERVICE

I, Mark S. Resnick, hereby certify that Plaintiff's Opposition to Defendant/Plaintiff-in-Counterclaim's Motion to Compel Discovery was served upon the Defendant, by mailing this opposition, first class mail and by telecopier to Lee Gesmer, Esq., Gesmer Updegrove LLC, 40 Broad Street, Boston, MA 02109, on February 16, 2005.

_____