UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

M2 CONSULTING, INC.

           Plaintiff,

v.

MRO SOFTWARE, INC.

           Defendant.

C.A. No. 03-12589-GAO

**MRO SOFTWARE, INC.'S VERIFIED FIRST AMENDED COUNTERCLAIM**

1.      Defendant/Plaintiff-in-Counterclaim MRO Software, Inc. ("MRO") seeks preliminary and permanent injunctive relief and damages arising out of the plaintiff/Defendant-in-Counterclaim M2 Consulting, Inc.'s ("M2") ongoing infringements of plaintiff's copyrights, as well as damages on account of M2's violations of the Lanham Act (which include false advertising and trademark infringement) and breaches of contract.

**FACTUAL BACKGROUND**

1.      MRO is a Massachusetts corporation with a principal place of business in Bedford, Massachusetts. MRO's flagship product is MAXIMO, a software product which provides businesses worldwide with asset and facilities management, work management, materials management and purchasing capabilities. Software with these capabilities is referred to as "Enterprise Asset Management" ("EAM") software, or alternatively Computerized Maintenance Management System ("CMMS") software. In this Amended Counterclaim, the term "EAM/CMMS software" will be used to describe software with the functionality provided by MAXIMO.

2.      MRO is one of the world's leading providers of EAM/CMMS software. MRO has approximately 900 employees, 10,000 customers and over 260,000 end users. License revenues from MAXIMO exceeded $52 million in MRO's most recent fiscal year, and together with revenues from support and services operations related to MAXIMO, MRO's total revenues were over $185 million.  MRO's customers include General Motors, General Electric, Coca Cola, International Paper, Alcoa, DuPont, ExxonMobil, Boeing, Walt Disney World, the U.S. Departments of Commerce, Defense, Energy, State and Treasury, and the U. S. General Services Administration.

3.      Pursuant to 17 U.S.C. § 410, the U.S. Copyright Office has issued a Certificate of Registration for version 5.2 of MAXIMO.   A copy of the registration certificate is attached as Exhibit 1.

4.      M2 Consulting, Inc. is a Georgia corporation with a principal place of business in Newnan, Georgia.  M2 is a former distributor (via online access over the Internet) of MRO's MAXIMO software product.   On information and belief, M2 has never had more than 10 employees, and has never had annual revenues exceeding $1 million a year.

**THE 2000 AND 2002 HOSTING AGREEMENTS**

5.      MRO and M2 entered into the first of two agreements on March 22, 2000 (the "2000 Agreement").  A copy of the 2000 Agreement is attached as Exhibit 2.  The 2000 Agreement permitted M2 to license MAXIMO to customers who preferred a "hosted" service, in exchange for a 20% royalty payment on hosting revenues earned by M2.  Under this arrangement M2 acted as an "application service provider," or "ASP" for the MAXIMO software.  As an ASP, M2 was not licensed to physically install MAXIMO

at customer sites; rather, M2 was permitted to provide M2's customers with remote access, over the Internet, to a copy of MAXIMO that remained physically resident on M2's computer servers.  Use of MAXIMO in this manner appealed to smaller customers who sought to, in effect, "outsource" the information technology responsibilities for running MAXIMO.  Because most customers want to install MAXIMO directly on their own computers, "hosted" MAXIMO has always been an extremely small part of MRO's business (less than .05% of its revenues).  Companies that are interested in having MAXIMO hosted by an ASP are often smaller companies that cannot afford to maintain the hardware or who don't have the staff and expertise to install, operate and maintain MAXIMO themselves.

6.      The 2000 Agreement was subject to "at will" termination by either party upon three months written notice.  (Ex. 2, page 3, par. 3).

7.      Following execution of the 2000 Agreement M2 began marketing its hosting service of MAXIMO under the name "MANTIS for MAXIMO".

8.      MRO and M2 superseded the 2000 Agreement in 2002, when they entered into a Hosting Affiliate Agreement on November 4, 2002 (the "2002 Agreement" or the "Agreement", attached as Exhibit 3 (pertinent parts only)).  Again, this Agreement and the license granted therein gave M2 only the right to provide customers with remote access over the Internet while the MAXIMO software remained physically resident on M2's computer servers.  In exchange for this license, M2 agreed to pay MRO a 50% royalty on M2's MAXIMO hosting revenues.

9.      The 2002 Agreement had a term of three years.  However, either party could terminate the Agreement for convenience, with or without cause, upon 90 days' written notice to the other party.  (Exhibit 3; 2002 Agreement, Section 9(c)).

10.     In addition, the 2002 Agreement provided for termination for cause if either party breached any obligation, and the party failed to cure the breach after receiving 30 days' notice of breach and demand for a cure. (Exhibit 3; 2002 Agreement, Section 9(d)).

11.     Despite the fact that M2 was required under the Agreement to pay MRO a royalty as described above, and M2 received hosting revenues after entering into the 2002 Agreement, M2 has paid MRO less than 5% of the royalties that are due under the 2002 Agreement.

12.     MRO sent M2 a letter dated October 24, 2003 (the "Termination Letter") which terminated the 2002 Agreement on two grounds: (1) in 30 days "for cause" based on M2's failure to make payments under the Agreement; and (2) alternatively, in 90 days "without cause."  A copy of the Termination Letter is attached as Exhibit 4.

13.     M2 failed to make any payments in response to the Termination Letter, and therefore the 2002 Agreement terminated for cause on November 23, 2003.

14.     To the extent there is any dispute over MRO's termination of the Agreement *for cause*, the 2002 Agreement terminated *without cause, for convenience*, on January 22, 2004, 90 days after the Termination Letter was sent.

15.     Upon termination of the 2002 Agreement M2's rights under the Agreement immediately ceased, with one limited exception: M2 was permitted to continue to use MAXIMO software "for 24 months or until the termination of existing

agreements with [M2's] customers, whichever occurs first, **solely to support any existing Customers at the time of the termination . . ..**"   (Exhibit 3; 2002 Agreement, Section 9(e))(emphasis added).  Following termination of the 2002 Agreement M2 did *not* have the right to continue to market and demonstrate MAXIMO, or enter into new agreements to host MAXIMO, following termination of the Agreement.  Following termination of the 2002 Agreement M2 did *not* have the right to make additional copies of MAXIMO, except to the extent such copies were necessary to support existing customers at the time of the termination, and any additional copies of MAXIMO made by M2 beyond this limited post-termination authorization constituted both a breach of the 2002 Agreement and an infringement of MRO's copyright rights in MAXIMO.

16.    Notwithstanding termination of the 2002 Agreement and M2's limited right only to support *existing customers* for 24 months, discovery in this case has revealed that M2 has blatantly defied the termination provisions of the Agreement, and illegally continued to market MAXIMO in a variety of ways, including over the Internet and by direct written solicitations, and to sell MAXIMO to new customers.

**FOLLOWING TERMINATION OF THE 2002 AGREEMENT M2 HAS CONTINUED TO MARKET MAXIMO ON ITS INTERNET WEB SITE**

17.    M2 maintains an Internet web site at the address *www.m2consulting.com* (the "M2 Website").  The M2 Website is nothing more than a thinly veiled effort to continue to market MAXIMO to new customers without specifically naming the product, but rather identifying it only as "leading EAM Software".  Among other things, the M2 web site contains the following content:

a.    The home page of the M2 Website states that "M2 Consulting . . . provides a **leading EAM software** in a hosted environment."

(*http://www.m2consulting.com*).  (Emphasis added).  A copy of this page is attached as Exhibit 5.

However, a computerized search of the M2 Website shows that no EAM vendor is identified on the site.  Instead, M2 refers only to its ability "to bring the full benefits of a Leading EAM Software to the user without the need for additional IT resources or infrastructure investment by ***letting users access the system across a datalink, usually the Internet.***" (*http://www.m2consulting.com /mantis.asp*).  (Exhibit 6, emphasis added).

A review of the site shows that the "Leading EAM Software" M2 is promoting and selling actually is MAXIMO.

b.     All of the M2 Website pages contain a static vertical bar, on the left side of each page, which contains links to pages labled "Quickstart for MAXIMO" and "Customized Demo."  The "Quickstart" link (attached as Exhibit 5) is a shameless advertisement for M2's offering of MAXIMO, despite the fact that M2 has no right to offer MAXIMO to new customers.  For example, the "Quickstart" page advertises M2's "unique" ability to "combine[] unique customer information with data from its library, together with ***Maximo application defaults*** to ensure an effective Work Management System."  The web page goes on to list and describe the modules of MAXIMO, and to inform prospective customers that if the customer provides a "Legacy System Database" M2 will provide "Grooming & Conversion of Tables into ***Maximo® 5.x Format.***"  This page on the M2 Website also refers to "MAXIMO application defaults" and "MAXIMO security levels," leaving no question that the product M2 is offering is MAXIMO.  (Exhibit 6, emphasis added).

c.     The "Customized Demo" page (*http://www.m2consulting. com/cstm_demo.asp*), shows that M2 is promoting and marketing an online customized demo of version 5.2 of MAXIMO (the most recent version of MAXIMO).  If a prospective customer of M2 clicks on the "online demo" hyperlink in the middle of this page, it is taken to the opening screen of MAXIMO 5.2, where it is prompted for a user name and password (to be provided by M2), thereby enabling the prospective customer to take a "test drive" of MAXIMO.  A printout of some of the screen displays that are generated when a user clicks on the "online demo" hyperlink and subsequently interacts with the demonstration, is attached as Exhibit 7.

18.    M2's continued marketing of MAXIMO on the M2 Website is a violation of the 2002 Agreement, since upon termination all of M2's rights to host MAXIMO for new customers ceased.  Moreover, because M2 is advertising and promoting a product is has no right to sell, it is in violation of MRO's rights under the Lanham Act.  Lastly, the software demonstration of MAXIMO contained on the M2 Website is an unauthorized reproduction of the MAXIMO software program, and therefore M2's use of the software constitutes an infringement of MRO's copyright rights in MAXIMO.

### FOLLOWING TERMINATION OF THE 2002 AGREEMENT
### M2 HAS CONTINUED TO SEND SALES PROPOSALS TO NEW CUSTOMERS

19.    M2's marketing of MAXIMO following termination of its rights under the 2002 Agreement has not been limited to its marketing on the M2 Website.  Discovery has revealed that following termination M2 made numerous sales proposals (the "Proposals") to new customers, explicitly offering to provide Internet hosting of the MAXIMO software.  Not only was M2 barred from making these Proposals by reason of termination of the 2002 Agreement, but in these proposals M2 misrepresents the nature of its relationship with MRO even *preceding* termination.  Documents produced by M2 show that it made the following proposals *after* its right to host MAXIMO for new customers was terminated for cause on November 23, 2003 and for convenience on January 22, 2004:

- On February 10, 2004, M2 submitted a Proposal to host MAXIMO to the **Hyatt Regency Huntington Beach Resort and Spa**.

- On March 9, 2004, M2 submitted a Proposal to host MAXIMO to ASA of Macon, Georgia.   On information and belief "ASA" is Atlantic Southeast Airlines, a wholly owned subsidiary of Delta.

- On March 22, 2004, M2 submitted a Proposal to host MAXIMO to One Source.

- On March 24, 2004, M2 submitted a Proposal to host MAXIMO to the Ernest N. Morial Convention Center.

- On April 21, 2004 M2 submitted a Proposal to host MAXIMO to Washington International Group.

- On June 25, 2004, M2 submitted a Proposal to host MAXIMO to **Brooks Range Contract Services, Inc.**

- On July 1, 2004, M2 submitted a Proposal to host MAXIMO to Johnson Controls, Ltd.

- On July 15, 2004, M2 submitted a Proposal to host MAXIMO to the Washington Convention Center.

- On August 2, 2004, M2 submitted a Proposal to host MAXIMO to Gas Recovery Systems, LLC.

- On August 6, 2004, M2 submitted a Proposal to host MAXIMO to the Carnegie Museums of Pittsburgh.

- On August 6, 2044, M2 submitted a Proposal to host MAXIMO to North American Energy Services.

Copies of the February 10, 2004 Proposal to the Hyatt Regency Huntington Beach Resort and Spa and the June 25, 2005 Proposal to Brooks Range Contract Services, Inc. (bolded above) are attached as Exhibits 8 and 9, respectively. The remaining Proposals are substantially identical to the Proposals to the Hyatt Regency and to Brooks Range.

20.    Not only was M2 not authorized to offer licenses of MAXIMO following termination, but M2's Proposals to these companies contained serious misrepresentations. Each of the Proposals states that "M2 is the ***only third-party Application Service Provider that is certified by MRO Software to provide Maximo*** in a Hosted Environment. M2 provides all front-line support and offers the ***only turnkey, fully functional Maximo® System in a Hosted Environment***." (Exhibit 8 (p. 5) and Exhibit 9 (p. 6), emphasis added). These statements were false both before and after the 2002

Agreement was terminated by MRO.  At no time did MRO "certify" M2 to provide MAXIMO in a hosted environment.  MRO never gave M2 an exclusive to provide MAXIMO in a hosted environment -- on the contrary, MRO entered into a hosting agreement with IBM as early as November 2002, a development of which M2 was aware. And, MRO itself began providing "turnkey" hosted MAXIMO in March 2003.

21.    Upon information and belief, M2 continues to submit Proposals and undertake sales activities in which it makes the same or similar false and misleading statement to prospective customers as are contained in the Proposals identified above. On January 20, 2005, MRO's counsel asked counsel for M2 to update M2's discovery and provide proposals entered into after August 2004, the cut-off date M2 used in responding to MRO's document request.  M2's attorney never responded to this request.  (Exhibit 10).

## FOLLOWING TERMINATION OF THE 2002 AGREEMENT
## M2 HAS SOLD MAXIMO TO NEW CUSTOMERS, THEREBY INFRINGING
## MRO'S COPYRIGHT IN MAXIMO

22.    M2 has produced approximately 40,000 emails in electronic form in discovery in this case.  Ongoing review of these documents has revealed that not only has M2 continued to market MAXIMO on its web site and to send sales proposals to prospective customers, but that since termination of its rights to sell MAXIMO, M2 has continued to supply MAXIMO to new customers.

23.    Documents produced by M2 show that M2 began providing MAXIMO to the Hyatt Regency Huntington Beach Resort and Spa ("Hyatt") and Brooks Range Contract Services, Inc. ("Brooks Range") following termination of the 2002 Agreement on January 22, 2004.  On information and belief, M2 illegally made copies of MAXIMO 5.2 in order to provide hosting services to these customers.

### HYATT REGENCY HUNTINGTON BEACH RESORT AND SPA

24.     With respect to the Hyatt Regency, M2's documents show that:

- On January 30, 2004, an employee of Syclo (a company that makes handheld computers that operate with MAXIMO), asked Mr. Bevington, in connection with the proposed Hyatt sale, "assume you will still have the Maximo license title?"  Mr. Bevington responded, "We still have our MAXIMO license and various agreements in effect with MRO."  In fact, by that date M2's license to supply MAXIMO to new customers had been terminated, and M2 had no right to license MAXIMO to new customers, and therefore this statement was false.

- M2's President, Rick Bevington, met with Hyatt on February 4, 2004, to present a price proposal for Hyatt Huntington Beach "retroactive" to January 1, 2004.

- M2 submitted a sales proposal to Hyatt on February 10, 2004.  In an email that date, Steve Platt, an employee of M2, stated that M2 would send a signed copy of the contract "this afternoon."  M2 has not produced a signed copy of an agreement with Hyatt.

- M2's document production shows that Hyatt has full access to MAXIMO over the Internet at the address:

  *http://hyatt.m2mantis.com/maximo/jsp/common/system/login.jsp*

  An email dated July 7, 2004 provides Robert Romero at Hyatt with both this web site address and a user name and password for this web site.  This web site address, which MRO's investigation shows was still "live" in early March 2005, shows the MAXIMO 5.2 opening screen, stating "Welcome to MAXIMO."

Copies of these documents are attached as Exhibit 11.  The sales proposal to Hyatt is

Exhibit 8.

25.     On information and belief, M2 entered into an agreement to provide Hyatt

with MAXIMO Version 5.2, and Hyatt is an active user of MAXIMO Version 5.2 at this

time.  On information and belief, M2 created a separate version of MAXIMO in order to

provide hosting services to Hyatt.  Hyatt's use of MAXIMO constitutes a breach of the

2002 Agreement and M2's copying of MAXIMO constitutes an infringement of MRO's copyright rights in MAXIMO.

### BROOKS RANGE CONTRACT SERVICES, INC.

26.     On information and belief Brooks Range is a wholly owned subsidiary of K'oyitl'ots'ina Ltd. ("KCORP").  KCORP is incorporated in the State of Alaska pursuant to provisions of the Alaska Native Claims Settlement Act, and is a Small Disadvantaged Business Enterprise.

27.     M2's documents show that Brooks Range entered into a business relationship with the General Services Administration (the "GSA"), and that one element of this business relationship was for Brooks Range to provide hosted MAXIMO to the GSA.  It is not uncommon for facilities management companies such as Brooks Range to provide MAXIMO as part of a bundle of services, and Brooks Range's business relationship with the GSA fits this business model.

28.     M2's document production further shows that M2's first contact with Brooks Range was in late April 2004, following termination of the 2002 Agreement. M2's email correspondence shows that M2 provided Brooks Range with a live demo of MAXIMO on or about May 3, 2004, that M2 sent Brooks Range a contract proposal for MAXIMO on June 25, 2004, and that the contract was executed on or about July 7, 2004. Further correspondence states that "MAXIMO [web hosted] will go live on Wednesday," July 28, 2004.  Copies of these documents are attached as Exhibit 12.  The contact proposal is Exhibit 9.  A copy of the executed agreement between M2 and Brooks Range was not produced to MRO in discovery.

29.     On information and belief, M2 entered into an agreement to provide Brooks Range with MAXIMO Version 5.2, and Brooks Range and the GSA are users of MAXIMO Version 5.2.  On information and belief M2 created a separate copy of MAXIMO in order to provide hosting services to Brooks Range.  M2's creation of a copy of MAXIMO in order to provide hosting services to Brooks Range's constitutes a breach of the 2002 Agreement and an infringement of MRO's copyright rights in MAXIMO.

30.     On information and belief, in addition to Hyatt and Brooks Range, following termination of the 2002 Agreement M2 provided MAXIMO to North American Energy Services and Gas Recovery Systems, Inc.

31.     On information and belief M2 is providing MAXIMO to new customers through intermediaries such as Johnson Controls, Inc. ("JCI"), CB Richard Ellis and Affiliated Building Services.  These companies, which manage commercial real estate, operate in the same model as Brooks Range, described above.  That is, they have agreements with M2, and they utilize their relationship to provide MAXIMO to their customers (as compared with M2 entering directly into an agreement with the end user). Documents produced by M2 indicate that JCI added Clemson University as a customer after the 2002 Agreement was terminated.  Adding additional customers through JCI, or other intermediaries who have agreements with M2, is a violation of the 2002 Agreement, and therefore is a breach of the 2002 Agreement.  If M2 has created additional copies of MAXIMO in order to effectuate these sales its actions also constitute an infringement of MRO's copyright rights.

### M2's CREATION OF COPIES OF MAXIMO IN ORDER TO PROVIDE HOSTING SERVICES TO HYATT AND BROOKS RANGE

32.     Because of the way MAXIMO is designed, it is highly likely that M2 has made additional copies of the software for each customer to whom it provided hosted MAXIMO following termination of the 2002 Agreement, thereby engaging in copyright infringement with respect to each illegal copy.

33.     More specifically, because of the way the "web architected" version of MAXIMO being illegally offered by M2 is designed, customers subscribing to MAXIMO from M2 can access the program directly from an ordinary Internet Explorer web browser, without the need for specialized software.  MAXIMO offers this web-architected capability through the use of specialized programs called "JavaServer Pages" or "JSP files."  The JSP files instruct MAXIMO how to create screens for the user.

34.     Typically, an installation of MAXIMO is customized for each customer. For example, a customer may want additional fields added, so the system can track information that is specific to it.  Or, a customer may want the layout of a screen modified, to conform to its own specialized reporting requirements.  M2 has the ability to provide this customization for each customer.

35.     Because of the way the MAXIMO system has been designed, an application service provider must separately copy and store a complete set of JSP files for every uniquely configured customer.  This is because, for any particular customer, the MAXIMO system looks for all the JSP files in a single location.  The files unique to that customer must accompany the remaining, unmodified JSP files in a single set.

36.     While it is theoretically possible for an application service provider such as M2 to set up MAXIMO so that several customers can share a single installation, due to

13

the need to customize MAXIMO for each user it would be very complex and time-consuming to do so. Therefore, on information and belief, M2 has copied the source code to MAXIMO for new customers such as Hyatt and Brooks Range.

37. By copying MAXIMO for new customers obtained by M2 after termination of the 2002 Agreement, M2 has breached the 2002 Agreement and violated MRO's copyright rights in MAXIMO.

38. Even if M2 has not created new, wholesale versions of MAXIMO in order to provide hosting services to new customers, the mere use of the program for new customers results in copyright infringement. MAXIMO is designed so that the "client" computer (such as the computer operated by Hyatt or Brooks Range) retrieves from M2's computer servers computer program files that exist and run in memory in the client computer's Random Access Memory ("RAM"). This verbatim copying of MAXIMO files from M2 to client computers and the display of MAXIMO screens on client computers constitutes a second form of copyright infringement by M2.

## COUNT I – BREACH OF THE 2000 AGREEMENT

39. MRO hereby repeats and realleges the allegations of Paragraphs 1- 38.

40. The 2000 Agreement constitutes a valid, binding and enforceable contract between MRO and M2.

41. MRO has performed in full under the 2000 Agreement.

42. M2 breached the 2000 Agreement by failing to make payments to MRO that are owing and due under that agreement.

## COUNT II – BREACH OF THE 2002 AGREEMENT

43. MRO hereby repeats and realleges the allegations of Paragraphs 1- 42.

14

44.     The 2002 Agreement constitutes a valid, binding and enforceable contract between MRO and M2.

45.     MRO has performed in full under the 2002 Agreement.

46.     M2 has breached the 2002 Agreement by failing to make payments to MRO that are owing and due under that agreement, and by continuing to market and license MAXIMO ASP services to new customers following termination of the Agreement.

### COUNT III – FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(A)

47.     MRO repeats and realleges the allegations of Paragraphs 1- 46.

48.     M2's contractual right to sell MAXIMO to new users was terminated at the time the 2002 Agreement was terminated.  M2's continued marketing of MAXIMO, following termination of its rights, suggests that M2 is an authorized vendor of MAXIMO, and therefore is a violation of the Lanham Act.

49.     M2's statement in its Proposals to customers, following termination of M2's rights to offer MAXIMO to new customers, that M2 is "**the only third-party Application Service Provider that is certified by MRO Software to provide Maximo in a Hosted Environment**" is a false statement of fact.  Not only is M2 not "certified" to provide hosted MAXIMO,  but it has no right to provide MAXIMO, except under the limited post-termination rights set forth in the 2002 Agreement.

50.     M2's statement in its Proposals to customers that M2 "**offers the only turnkey, fully functional Maximo® System in a Hosted Environment**" also is a false statement of fact since both IBM and MRO itself offer turnkey, fully functional MAXIMO in a hosted environment.

51.     M2's false and misleading statements have actually deceived or have the capacity to deceive a substantial portion of the intended audience; the deception is material in that it is likely to influence purchasing decisions; there is a likelihood of injury to MRO; and the Proposals containing the false and misleading statements traveled in interstate commerce.

### COUNT IV – TRADEMARK INFRINGEMENT IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(A)(1)(A)

52.     MRO repeats and realleges the allegations of Paragraphs 1- 51.

53.     MRO owns the entire right, title and interest in and to the trademark "MAXIMO", U.S. Registration Number 1,378,985, as well as the common law rights to this trademark and the goodwill of the business with which this mark has been used.  The MAXIMO trademark was registered with the United States Patent and Trademark Office on January 21, 1986 and was granted incontestable status on January 6, 1992.  This registration is in full force and effect under the Lanham Act of 1946, Title 15 of the United States Code, Section 1051 *et seq.*

54.     MRO has utilized great care and has incurred substantial expense in the provision and promotion of its software and related services that utilize the MAXIMO trademark.  As a result of these activities, MAXIMO has come to represent the highest standard of quality in EAM/CMMS software, as indicated by extensive consumer demand and industry recognition.

55.     Through the distribution, advertising and sale of its software products and related services under the MAXIMO trademark, MRO has created substantial goodwill in association with this mark.

56.    MRO terminated the 2002 Agreement for cause effective November 23, 2003, and for convenience effective January 22, 2004.  M2's deliberate, intentional and unauthorized use of the MAXIMO trademark on its web site and in sales Proposals following termination of the 2002 Agreement falsely suggests to the public that MRO has continued to authorize M2's sale of MAXIMO.

57.    M2's deliberate continued use of MAXIMO following termination of the 2002 Agreement will cause potential purchasers to be misled into believing that M2 is distributing products "vouched for" or sponsored by MRO.  The risk of confusion in these circumstances is even greater than it would be in the case of a random infringer who had no prior relationship with MRO.  Because M2 once possessed authorization to use the MAXIMO trademark, M2 became associated with MRO and MAXIMO in the market for EAM/CMMS software.  The unauthorized use of a trademark by a former licensee is very likely to confuse and defraud the public.

58.    By its actions, M2 falsely or misleadingly promoted MAXIMO in a manner likely to cause confusion, or to cause mistake, or to deceive as to MRO's affiliation, connection, or association with M2, or as to the involvement of MRO in sponsoring or approving M2's promotion of MAXIMO.

59.    MRO has been or is likely to be injured as a result of M2's actions, either by direct diversion of sales or by a lessening of goodwill associated with its products and services.

60.    M2's deliberate, intentional and unauthorized use of the MAXIMO trademark in connection with its Internet software hosting services and in interstate commerce constitutes trademark infringement in violation of 15 USC §1125(a).

## COUNT V – COPYRIGHT INFRINGEMENT

61.     MRO repeats and realleges the allegations of Paragraphs 1- 60.

62.     MRO has obtained a Copyright Registration Certificate for MAXIMO version 5.1 from the U.S. Copyright Office pursuant to 17 U.S.C. §§ 408 and 409.   A true copy of the copyright registration certificate is attached as Exhibit 1.

63.     M2's copying of MAXIMO following termination of the 2002 Agreement, as described above, constitutes copyright infringement in violation of MRO's exclusive right of reproduction pursuant to 17 U.S.C. §§ 106, 501.

64.     By its actions, M2 has willfully infringed, and continues to infringe, on MRO's copyrights in and relating to the MAXIMO software.

65.     The acts of M2 were done willfully and intentionally for the purposes of infringing upon MRO's copyrights in the MAXIMO software and with the intent to sell illegal and unauthorized access to the MAXIMO software.

66.     As a result, MRO has suffered and will continue to suffer irreparable harm and injury, including but not limited to, loss of competitive advantage, loss of business reputation, loss of sales and profits and economic damage.

## COUNT VI – UNFAIR COMPETITION AND TRADE PRACTICES

67.     MRO repeats and realleges the allegations of Paragraphs 1- 66.

68.     M2 knew, or should have known, of the superior rights of MRO in its MAXIMO trademark.

69.     M2 knew, or should have known, that its misuse of MRO's MAXIMO trademark following termination of the 2002 Agreement would harm MRO.  The repeated and continuous unauthorized use of MRO's trademark, misrepresentations

regarding M2's "certification" by MRO and its false statements to prospective customers M2 it "offers the only turnkey, fully functional MAXIMO . . . in a Hosted Environment" constitute unfair competition.

70.     As a result of the unfair competition in which M2 has engaged, MRO has suffered, and will continue to suffer, irreparable harm and injury, including but not limited to, loss of competitive advantage, loss of business reputation and goodwill, and loss of profits.

71.     M2's unfair actions were knowing and willful.

72.     M2 has, without the consent of MRO, affixed, applied, annexed or used "MAXIMO" in connection with the sale of Internet hosting services for the purpose of deceiving the public audience regarding the origin, sponsorship or approval of its services.  As a result, M2 has engaged in acts of unfair competition in violation of federal and state law.

## PRAYER FOR RELIEF

WHEREFORE, MRO respectfully requests that the Court enter judgment as follows:

A.     Declaring that M2 Consulting, Inc. has violated 17 U.S.C. §106 by infringing plaintiffs' copyright in MAXIMO.

B.     Granting against M2 Consulting, Inc. and its agents, servants, officers, employees, and all those acting under its control and/or on its behalf and/or in concert with it, preliminary and permanent injunctive relief as follows:

(i)     enjoining M2 from making copies of MAXIMO in any format, electronic or otherwise, on a permanent or temporary basis, other

than to support existing users of M2's MAXIMO hosting services as of November 23, 2003 for a period of 24 months following that date;

(ii)    enjoining M2 from delivering copies of MAXIMO to any third party, whether for sale or license or otherwise, and whether hosted over the Internet or otherwise, other than to support existing users of M2's MAXIMO hosting services as of November 23, 2003, for a period of 24 months following that date;

(iii)   ordering M2 to rescind any authorization to any third party enabling them to access MAXIMO that was granted after November 23, 2003;

(iv)    ordering M2 to destroy all copies of MAXIMO in its custody, possession or control that were created after November 23, 2003, other than those necessary to support existing users of M2's MAXIMO hosting services as of November 23, 2003, for a period of 24 months following that date;

(v)     to cease and desist from any further licensing access to MAXIMO, other than to support existing users of M2's MAXIMO hosting services as of November 23, 2003, for a period of 24 months following that date.

C.      Granting against M2 Consulting, Inc. and its agents, servants, officers, employees, and all those acting under its control and/or on its behalf and/or in concert with it, preliminary and permanent injunctive relief enjoining them from -

20

(i) advertising or promoting the sale, in any form, any version of MAXIMO;

(ii) claiming, in the context of sales proposals or otherwise, that its Internet hosting services are in any way endorsed, sponsored, authorized, certified or approved by MRO; or

(iii) using MRO's "MAXIMO" trademark in connection with its Internet hosting services, except as may be necessary to continue support for customers of M2's MAXIMO hosting services when the 2002 Agreement was terminated, as permitted by the 2002 Agreement.

D.  Ordering M2 to produce within ten (10) days after issuance of a preliminary injunction order, a report in writing and under oath setting forth in detail the manner and form in which M2 has complied with the relief ordered herein.

E.  Ordering that M2 be required to pay MRO:

(i) under the Copyright Law, the greater of MRO's actual or statutory damages (enhanced for willful infringement), plus recovery of its costs and reasonable attorneys' fees pursuant to 17 U.S.C. §§ 501-502; 504 - 505;

(ii) damages for the injuries cause by M2 for breach of contract, under the Lanham Act and for unfair competition, including, under the Lanham Act, a finding that M2's violative acts are "malicious," "fraudulent," "deliberate," or "willful,"  and therefore that M2's

21

acts constitute an "exceptional case" justifying an award of

attorney's fees under 15 U.S.C. § 1117(a); and

(iii)    their costs, disbursements and attorneys' fees under applicable

common law.

F.    Ordering such other and further relief as is just and proper.

**MRO DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.**

Respectfully Submitted,


/s/ Kurt Bratten
Lee T. Gesmer (BBO No. 190260)
Kurt Bratten (BBO No. 644730)
Gesmer Updegrove LLP
40 Broad Street
Boston, MA 02109
Kurt.Bratten@gesmer.com
(617) 350-6800

Dated: March 23, 2005

**VERIFICATION**

Craig Newfield deposes and says that he is the Vice President and General Counsel of MRO Software, Inc., that he has read the foregoing MRO Software Inc.'s Verified First Amended Counterclaim and is familiar with the contents thereof; and that the facts set forth in the Verified Counterclaim are true by his own personal knowledge and the business records of MRO Software, Inc. or are, as to matters not within his knowledge, based upon information and belief.

Signed under the pains and penalties of perjury this 23rd day of March 2005.

/s/ Craig Newfield
Craig Newfield