UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| M2 CONSULTING, INC.<br><br>      Plaintiff,<br><br>v.<br><br>MRO SOFTWARE, INC.<br><br>      Defendant. | C.A. No. 03-12589-GAO |

**MRO SOFTWARE, INC.'S EMERGENCY MOTION FOR EXPEDITED
DISCOVERY INTO ISSUES RELATED TO COPYRIGHT INFRINGMENT**

**Introduction**

Defendant and Plaintiff-in-Counterclaim MRO Software, Inc. ("MRO") respectfully submits this emergency motion for limited, expedited discovery to obtain evidence of copyright infringement by Plaintiff and Defendant-in-Counterclaim M2 Software, Inc. ("M2"), as alleged in MRO's Verified Amended Counterclaim ("Amended Counterclaim").[1]  Such infringement is a critical aspect of M2's unauthorized and unlawful conduct, on which MRO expects to base a forthcoming request for a preliminary injunction.  If MRO is not able to obtain the discovery described herein on an expedited basis, it will severely inhibit the company's ability to present this Court with a fully developed evidentiary record when it appears before it to demonstrate the justification and need for the injunction.

In support of this motion MRO has filed herewith the **Affidavit Of James Battle In Support Of MRO Software, Inc.'s Motion For Expedited Discovery**.

---

[1]  The Amended Counterclaim is being filed with MRO's Motion for Leave to Amend Counterclaim, both of which are being filed contemporaneously with this motion.

The discovery MRO seeks is well within the scope of Rule 26, and can be conducted without significant hardship or disruption to M2's business. MRO seeks an order that M2 (i) identify its computer equipment that contains MRO's software and related computer files, (ii) permit MRO to conduct an inspection of such computer equipment to determine whether (and to what extent) MRO's program files may have been unlawfully copied, and finally, (iii) at MRO's election, produce for deposition the M2 individual most knowledgeable about the operation of MRO's software on its equipment.

A form of Proposed Order is attached at Tab A.

**Factual Background**

MRO is the developer and vendor of one of the world's most successful computer programs for facilities and asset management. MRO's software, MAXIMO, is sold to many of the largest organizations in the world, including General Motors, General Electric, Coca Cola, International Paper, Alcoa, DuPont, ExxonMobil, Boeing, Walt Disney World, the U.S. Departments of Commerce, Defense, Energy, State and Treasury, and the U. S. General Services Administration. (Amended Counterclaim, pars. 1 - 2). It is this MAXIMO software – which is an integrated system comprised of hundreds of separate program files – that is at the center of this case.

On March 22, 2000, MRO granted M2 limited rights to use the MAXIMO software. Under two agreements (the "2000 Agreement" and the "2002 Agreement"; Amended Counterclaim Exhibits 2 and 3) M2 was authorized to provide M2's customers with remote access, over the Internet, to copies of MAXIMO that physically resided on M2's computer servers. Under this form of delivery, M2 is referred to as an "application

service provider," or the "host" of the software. This form of software delivery is convenient for companies that do not want to license the MAXIMO software and install it on their own computers. By having the software "hosted" by M2, the customer can minimize the cost of maintenance, since any software problems are resolved by M2. (Battle Aff., pars. 4 - 7).

Both Agreements permitted MRO to unilaterally terminate M2 as an application service provider. The 2000 Agreement permitted termination by either party for any reason on 90 days' written notice. (Amended Counterclaim, par. 6 and Ex. 3). It was later superceded in its entirety by the 2002 Agreement, which permitted termination for cause (if uncured) on 30 days' notice, and termination for convenience on 90 days' written notice. (Amended Counterclaim, par. 8 and Ex. 4). Upon termination of the 2002 Agreement (whether for cause or convenience), M2's rights hereunder ceased, with one limited exception: M2 was permitted to continue to use MAXIMO software "for 24 months or until the termination of existing agreements with [M2's] customers, whichever occurs first, *solely to support any existing Customers at the time of the termination . . . .*" (2002 Agreement, Section 9(e); Amended Counterclaim, Ex. 3)(emphasis added).

MRO gave M2 written notice under both termination provisions on October 24, 2003. (Amended Counterclaim, Ex. 4). By its own terms, the 2002 Agreement necessarily terminated -- either "for cause," on November 23, 2003, or "for convenience," on January 22, 2004. (Amended Counterclaim, pars. 9 and 10 and Ex. 3). Following termination of the 2002 Agreement more than a year ago, M2's rights regarding the sole copy of MAXIMO it had licensed from MRO changed dramatically. As described above, the terms of the 2002 Agreement expressly provided that M2 could only use MAXIMO

3

to service then-existing customers under then-existing hosting agreements, and for no more than two years. M2 did *not* have the right to continue to market and demonstrate MAXIMO, or enter into new agreements to host MAXIMO, following the termination.

### M2's Discovery Production

M2 initiated the instant suit, asserting a variety of claims against MRO in connection with the 2002 Agreement. During the course of discovery, M2 produced tens of thousands of pages of documents to MRO, including approximately 40,000 emails. These documents have revealed that MRO has substantial counterclaims against M2, even beyond breach of contract counterclaims MRO originally asserted for M2's failure to pay royalties under the two Agreements. Among other things, the discovery revealed that (i) M2 continued to aggressively market MAXIMO following termination of the 2002 Agreement; and (ii) M2 provided MAXIMO to new customers.[2]

The evidence of M2's continued marketing of MAXIMO is overwhelming. For example:

- M2 sent out numerous proposals to potential customers following termination, offering to provide MAXIMO on a hosted basis. (Amended Counterclaim, par. 19 and Exs. 8, 9).

- M2 stated in its proposals that "M2 is the only third-party Application Service Provider that is certified by MRO Software to provide Maximo in a Hosted Environment." At the time, M2 had no authority to sell MAXIMO at all, nor has it ever had any "certification" from MRO. (Amended Counterclaim, par. 20).

- M2 also stated in its proposals that "M2 provides all front-line support and offers the only turnkey, fully functional Maximo® System in a Hosted Environment."

---

[2] For purposes of this motion, MRO focuses on evidence of continued sales by M2 after January 22, 2004, the date that MRO's termination of M2 took effect *for convenience*. However, MRO reserves the right to argue trademark misappropriation, false advertising and copyright violations for illegal conduct by M2 between November 23, 2003 (date termination for cause became effective) and January 22, 2004 (the date of termination for convenience).

4

>This statement also is false, since MRO itself has been providing turnkey, fully functional MAXIMO in a hosted environment since March 2003. (Amended Counterclaim, par. 20).

- As of the date that this motion was filed, M2 continued to provide a live demo of the MAXIMO software on M2's website. M2's marketing of MAXIMO on its web site is discussed in detail in the Amended Counterclaim at par. 17.

In addition to continuing to *market* MAXIMO following termination of its rights to do so, M2 has continued to *sell* MAXIMO services as well. As detailed in the Amended Counterclaim, M2's discovery production reveals that M2 provided MAXIMO to Hyatt Regency Huntington Beach Resort and Spa ("Hyatt") and Brooks Range Contract Services, Inc. ("Brooks Range"), *after* both the November 23, 2004 and January 22, 2004 termination dates. In addition to these two documented deals (Amended Counterclaim, pars. 24 - 29 and Exs. 8, 9, 11 and 12), M2 has sent at least nine additional proposals to new potential customers following termination of the 2002 Agreement, (Amended Counterclaim, par. 19), raising the possibility of additional prohibited transactions with new customers.

## Evidence of Unauthorized Copying

M2's document production strongly suggests that the company has not only continued to offer new customers access to the MAXIMO software, but that it has also engaged in substantial unauthorized copying of the MAXIMO program files it had licensed from MRO. This is a by-product of the fact that M2 almost certainly copied at least parts of the MAXIMO program, so they could be modified to serve the specific needs of individual customers.

The affidavit of MRO Vice President of Product Development James Battle, which accompanies this motion, speaks to this matter in more detail. In short, Mr. Battle states that all or virtually all implementations of MAXIMO require customer-specific

5

configurations to some of the program's thousands of files. For example, a customer might want a new field to track information that is specific to it, or require that information be displayed on screen in a special way to conform to company forms and practices. This kind of customization, which has occurred in every one of the dozens of MAXIMO installations with which Mr. Battle is familiar, requires modification of a class of files in the MAXIMO software called "JSP Files." Simply, JSP Files are the mini-programs MAXIMO uses to create the screens that customers see when they use MAXIMO. If any of M2's customers required a configuration of the MAXIMO system to conform to their specific needs, M2 must necessarily have copied at least some of these MAXIMO files to modify them, and thereby accomplish this customer-specific configuration. As Mr. Battle explains, each unique user configuration would require its own separate set of 822 JSP Files. M2's document production provides evidence of at least two, and perhaps many more, new customers after the termination of the 2002 Agreement. If, as has always been the case during Mr. Battle's 12 year tenure at MRO, these customers require the type of system configuration described above, M2 could only have accomplished that by copying literally hundreds of the MAXIMO system's JSP Files. (Battle Aff., pars. 10 - 26).

## ARGUMENT

MRO seeks limited, expedited discovery to more clearly establish the violations of the Copyright Act that are alleged in the Amended Counterclaim and strongly suggested by M2's document production. This discovery goes to the heart of the

copyright infringement counterclaim on which MRO intends to base a motion for a preliminary injunction.[3]

While documents produced by M2 thus far speak directly to the issue of M2's continued marketing and sale of MAXIMO services in breach of the 2002 Agreement, the evidence they provide of unauthorized copying in violation of Title 17 is more inferential. This is because M2 does not license and distribute MAXIMO to its customers on CD-ROMs or other tangible media. If it did, evidence that it was providing MAXIMO to newfound customers such as Hyatt and Brooks Range would, by itself, evidence unlawful copying in violation of the Copyright Act. However, because M2 operates as an application service provider, the company is instead providing its customers with access to MAXIMO software that resides on M2's own computer servers. Additional discovery is consequently important to unequivocally demonstrate that M2 is not simply providing those customers with access to the single copy of MAXIMO it had licensed from MRO. By physically examining the M2 computer servers that "host" the MAXIMO software, MRO can efficiently look for the most likely direct evidence that M2 has violated the Copyright Act by copying the MAXIMO software (or parts of it) on its own equipment, without license or authorization.

The specific relief MRO seeks herein is tailored to this narrow task and is authorized by Fed. R. Civ. P. 34(a)(rule permits "entry upon designated land or other property in the possession or control of the party upon whom the request is served for the

---

[3] MRO expects to bring its motion for injunctive relief on multiple grounds. For example, MRO has also asserted a counterclaim for false advertising under the Lanham Act, based on M2's continued marketing and sale of its MAXIMO hosting services without the permission of MRO. Such a claim could also serve as a basis for MRO's prayer for preliminary injunctive relief.

7

purpose of inspection and measuring, surveying, photographing, testing, or sampling the property or any designated object or operation thereon, within the scope of Rule 26(b)"). As set forth in the proposed order, attached, MRO asks that the Court Order as follows:

1. M2 shall, within 10 days of the entry of the Order, provide to MRO an architectural diagram ("Diagram") describing the logical layout of all M2 computer servers or related equipment that contain MAXIMO program files (including all JSP Files), MAXIMO database files, application server files, or other files related to the provision of MAXIMO services to M2 customers or prospects.  The Diagram should describe the types of MAXIMO-related files that reside on the identified equipment.  M2 shall certify, under the pains and penalties of perjury, that the Diagram is complete and accurate, to the best knowledge of the company.

2. M2 shall reasonably cooperate with MRO in performing the inspection, and shall make the equipment available on two consecutive business days no more than 10 days after M2 provides MRO with the Diagram, from no later than 9:00 a.m. to no earlier than 5:00 p.m.  MRO personnel, accompanied by counsel for MRO, shall be permitted to physically access the equipment referenced in the Diagram, and inspect such equipment for the purpose of determining (i) what MAXIMO files exist on the identified computer equipment, and what MAXIMO files, if any, have been copied; and (ii) what customers and prospects are being provided access to MAXIMO by M2.  In conducting the inspection, MRO shall be permitted to fully examine all data on the designated servers, including, without limitation, file structure, directories, file content, and metadata (such as access dates).

3. During or prior to the inspection, M2 shall provide MRO with all requested login IDs and passwords, including without limitation, those to the servers, MAXIMO system(s), any MAXIMO-related databases, or the application server administration console.  M2 shall be permitted to observe, but shall in no way interfere with, MROs inspection of the equipment.

4. MRO shall be permitted to preserve information obtained through the inspection process by (i) copying files from the M2 equipment onto an MRO laptop computer brought for such purpose; (ii) creating and downloading "screen shots" onto such laptop, or (iii) creating log, audit, directory or similar reports and downloading them onto the laptop.  Within 10 business days of the conclusion of the inspection, MRO shall provide to M2 a complete copy of all information downloaded onto the laptop during that inspection process.

5. MRO shall take reasonable steps to minimize disruption to M2's business, and/or to the ability of M2 customers to access the MAXIMO system; provided, however, that MRO may take (or request M2 to take) any steps necessary to complete the inspection as otherwise set forth in the Court's order.

8

6. No later than 10 days following completion of the inspection MRO may issue a Rule 30(b)(6) deposition notice, requiring M2 to designate and produce for deposition the individual(s) at M2 most knowledgeable about M2's hosting of MAXIMO on or after November 23, 2003. M2 shall make such individual(s) available for deposition no more than 10 days after receipt of such notice.

M2 cannot reasonably challenge the propriety or necessity of the proposed expedited discovery. First, it is MRO that will be doing most of the work. MRO personnel are performing the inspection, and any deposition would obviously be conducted by MRO counsel. M2's role in the inspection is simply to facilitate (by providing passwords and some indication of the equipment layout) MRO's own efforts. This is not a situation where the party seeking the discovery foists on the other party an enormous technical burden.

Second, the inspection will be completed quickly (no more than two business days) and with a minimum of disruption to M2's business. As Mr. Battle stated in his affidavit, "Based upon my [twelve years of] experience and my knowledge of Maximo, I believe that such discovery can be conducted without materially disrupting M2's ability to service its customers or M2's customers' ability to access their data through Maximo." (Battle Aff., par. 26). Practical concerns regarding M2's ability to maintain its business during the inspection are thus adequately addressed.

Third, the discovery request is narrowly tailored to finding MAXIMO-related files and determining their use. Given the nature of MRO's copyright infringement counterclaim (as well as its other counterclaims), information regarding the copying and potential misuse of MAXIMO program files on M2's computer equipment is highly relevant to the issues in this case. M2's document production thus far shows that M2 continues to use MAXIMO to attract and service new customers. And Mr. Battle's affidavit explains how serving those new customers makes it very likely that M2 is, in

9

fact, engaged in wholesale copying of the MAXIMO program.  Clearly, the discovery MRO seeks is "reasonably calculated to lead to the discovery of admissible evidence," as contemplated by the Rules.

And lastly, the need for rapidity is evident.  To the extent MRO is ultimately successful in showing that M2 has engaged in copyright infringement and that MRO is entitled to an injunction, the speed with which this discovery is obtained will speak directly to the effectiveness of the preliminary injunction as a remedy.  To fully preserve MRO's right to injunctive relief in this case means to provide it with a means to obtaining the discovery quickly enough to minimize the irreparable harm to which it is being subjected.  And in copyright infringement situations, such as the one presented here, the existence of irreparable harm is so evident that the law presumes it.

For these reasons, the Court should enter the discovery order is the form attached hereto.

                                            Respectfully Submitted,

                                            /s/ Kurt Bratten
                                            Lee T. Gesmer (BBO No. 190260)
                                            Kurt Bratten (BBO No. 644730)
                                            Gesmer Updegrove LLP
                                            40 Broad Street
                                            Boston, MA 02109
                                            Kurt.Bratten@gesmer.com
                                            (617) 350-6800

Dated: March 25, 2005

**Local Rule 7.1 Certificate of Compliance**

  Counsel for the Defendant hereby certifies that, pursuant to Rule 7.1(A)(2) of the Local Federal Rules of Civil Procedure, he (1) has conferred with counsel for the Plaintiff regarding the attached Motion, and (2) has attempted in good faith to resolve or narrow the issues presented.

                 /s/ Kurt Bratten
                 Kurt Bratten