UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| M² CONSULTING, INC., | ) |
| Plaintiff, | ) ) ) ) |
| v. | ) Case No. 03-12589-GAO ) ) |
| MRO SOFTWARE, INC., | ) ) |
| Defendant. | ) ) |

## PLAINTIFF'S MOTION TO COMPEL MRO TO PRODUCE DOCUMENTS

### INTRODUCTION

The plaintiff, M2 Consulting Inc. ("M2") moves for an order, pursuant to Fed. R. Civ. P. 37(a) and Local Rule 37.1 compelling the defendant, MRO Software, Inc. ("MRO") to: (1) complete its search for documents responsive to M2's document requests and certify to M2 in writing that it search is complete; (2) permit M2 to inspect its e-mail server or servers to verify that no additional responsive electronic documents exist; and (3) produce all documents currently withheld on the grounds that these materials require an "attorneys eyes only" designation. In further support of this Motion, M2 relies upon and incorporates herein by reference the Affidavit of Mark S. Resnick, filed simultaneously herewith.

### BACKGROUND

*Factual Background*

The relationship between M2 and MRO dates back to the summer of 1999, when the parties first began negotiating a strategic partnership by and through which MRO would use

## CERTIFICATE OF SERVICE

I, Mark S. Resnick, hereby certify that Plaintiff's Opposition to Defendant/Plaintiff-in-Counterclaim's Motion to Compel Discovery was served upon the Defendant, by mailing this opposition, first class mail and by telecopier to Lee Gesmer, Esq., Gesmer Updegrove LLC, 40 Broad Street, Boston, MA 02109, on April 6, 2005.

M2's web hosting expertise to host MRO's MAXIMO facilities management software ("MAXIMO") for MRO customers uninterested in purchasing and deploying that software directly. The relationship culminated in the signing of an agreement in March 2000, authorizing M2 to provide Internet hosting of MAXIMO (the "2000 Internet Hosting Agreement"). M2's pioneering web hosting expertise was primarily associated with its business model, it processes, and its deployment methodologies. It was also recognized that the level of interaction between these parties meant that MRO personnel would be exposed to and receive this information with great regularity, and since the parties utilized email extensively, that much of this information would be transmitted by email, frequently in small batches, in connection with the integration of the two companies' complementary capabilities. This is in fact what occurred, and information flowed back and forth between these parties for more than five years as the relationship developed and changed.

*The Confidentiality Stipulation*

In response to MRO's professed confidentiality concerns, the parties began discussing confidentiality stipulations very early in the case. There were also some discussions regarding an attorneys eyes only provision (an "AEO Provision") in the confidentiality stipulation. Those discussions were relatively academic, since at that time and MRO had not apparently identified any specific documents which might require it. MRO's concern was based on the anticipated exchange of highly confidential technical documents.[1] The fact that MRO raised these concerns very early in the case indicates that it was considering inserting an attorneys eyes only issue into

---

[1] Most of what in fact was exchanged, with the exception of the MAXIMO software itself, was business process information. The concern of MRO's counsel at this stage reflected its lack of understanding of the actual relationship and the types of information actually exchanged.

Respectfully submitted.

M2 Consulting, Inc.
By its Attorneys
Fee, Rosse & Lanz, P.C.

By: _____
Michael C. Fee, Esq. (BBO NO. 552796)
Mark S. Resnick, Esq. (BBO NO. 559885)
Fee, Rosse & Lanz, P.C.
321 Boston Post Road
Sudbury, MA  01776
(978) 440-7000


Counsel:

John M. Teitler
Teitler & Teitler
1114 Avenue of the Americas
New York, NY 10036
Tel. (212) 997-4400


April 6, 2005


### Local Rules 7.1 and 37.1 Certificate of Compliance

Counsel for M2 Consulting, Inc. hereby certifies that, on March 18, 2005, pursuant to Rule 7.1(A)(2) of the Local Rules, he (1) has conferred with counsel for M2 Consulting, Inc. regarding the attached Motion, and (2) has attempted in good faith to resolve ~~or narrow~~ the issues presented.

_____
Mark S. Resnick

the discovery process at a very early stage. M2 initially refused to agree to an AEO Provision, because MRO was unable to articulate a substantive reason for it.

MRO refused to produce any documents without a confidentiality stipulation in place. The level of MRO's concern seemed to indicate that it was anticipating procuring a large volume of responsive documents. On September 13, 2004, the parties executed and filed a confidentiality stipulation (the "Confidentiality Stipulation"). The purpose was to address the parties' confidentiality concerns, and to assure that documents produced in discovery would only be used in connection with case.[2] The Confidentiality Stipulation was sufficient to protect the parties' confidentiality concerns, and MRO sent its initial document production to M2 on that date. Surprisingly, MRO produced relatively few documents, approximately 1100 pages.

On September 13, 2004, MRO's counsel also informed M2's counsel that it had identified a pricing model, one 54 page document (the "Pricing Model") and several versions and/or drafts of that document, which MRO believed required an attorneys eyes only protection. In response to this renewed request from MRO, M2 began discussing an appropriate AEO Provision which would apply to the Pricing Model. As negotiations progressed, MRO's position gradually changed from a request for an AEO designation for the Pricing Model, to an insistence upon an amendment to the Confidentiality Stipulation to provide for an AEO designation which could be invoked by either side at will for almost any document. M2's counsel immediately identified this proposition as unworkable, but considered proposals from MRO to determine whether an agreement could be reached.

Counsel for MRO and M2 reviewed and discussed an amendment to the Confidentiality Stipulation to include an AEO Provision, but it soon became apparent that such a provision was

---

[2] A true and accurate copy of the Confidentiality Stipulation is attached hereto as Exhibit "A".

-3-

unreasonable and unwarranted. Its continued piecemeal supplemental document productions have rendered MRO's discovery efforts difficult, and the discovery record in this case clearly indicates the MRO has failed to make an appropriately diligent search for responsive documents. Under these circumstances, M2 is entitled to an award of reasonable expenses incurred in obtaining the order sought by this Motion.

## CONCLUSION

The reasons set forth above, M2 requests this Court issue and order: (1) compelling MRO to complete its document search and to certify in writing to M2's counsel that the search for responsive material is complete, and that any responsive materials located have been produced subject any reservations or privilege to be set forth on the appropriate privilege log, and that this process be completed no later than April 30, 2005; (2) permitting an M2 representative to inspect MRO's e-mail servers for documents responsive to M2's document requests, that this representative be permitted to identify all such documents which are potentially responsive and that this process is the completed no later than April 30, 2005; and (3) compelling MRO to produce any documents withheld pursuant to a claim that they require an attorney's eyes only agreement from M2's counsel no later than April 30, 2005. A proposed Order is attached for the convenience of the Court.

## Request For Hearing

M2 requests, pursuant to Local Rule 7.1(D) that the Court schedule this Motion for oral argument at its convenience.

entirely unworkable. Drafts produced by MRO's counsel rendered the use of documents so designated in depositions and at trial questionable, and raised the possibility that portions of depositions might be designated attorneys eyes only and consequently become awkward to review or use. The position of MRO's counsel raised significant concerns that MRO would begin to arbitrarily designate a large volume of documents as attorneys eyes only.

Throughout this process, MRO's counsel failed to articulate any substantive reason why MRO required an attorneys eyes only designation. The most that MRO ever was able to say on the subject was that, essentially, it did not trust M2's executives to comply with the Confidentiality Stipulation already in place in this case, notwithstanding the fact that they could point to no instance in which MRO could even assert that any produced documents had been improperly accessed, referenced, or used by any M2 executives who may have seen them. During a discovery conference on March 18, 2005, counsel were unable to agree on the AEO Provision, and MRO continued to insist that the entire Confidentiality Stipulation be amended to accommodate its view and permit it to arbitrarily designate any documents as attorneys eyes only.[3]

Since then, MRO's sporadic document production effort has continued. It also began taking the position that it had uncovered other documents in its most recent attempt at production that it now claims it will not produce unless M2 agrees to the AEO designation. MRO has been unable to articulate any valid reason whatsoever that the Pricing Model or any other documents need AEO protection. The only stated reason was MRO's professed discomfort at showing the documents to M2's personnel. Concerns about the expanding number of documents that MRO now indicates it is withholding absent M2's agreement to the AEO Provision has caused M2 to

---

[3] In an effort to resolve the issue, M2 did agree to an AEO designation for the Pricing Model, but a stipulation pertaining to that document has not been finalized.

wants, or MRO simply withholds the documents. This is not a negotiation, it is an attempt by MRO to control discovery by fiat. It should not be permitted under these circumstances.

*The provision as suggested by MRO is unworkable.*

One of the reasons M2 has not agreed to the AEO designation is its inherent unworkability in a case of this type. The mechanics of handling AEO designated documents becomes complex when depositions are scheduled. Can the documents be shown to a deposition witness? If they are, can they then be shown to other deposition witnesses if that testimony is inquired about later? Can they be used in hearings or in court? If the documents are used in a deposition, what portion of the deposition transcript becomes controlled by the AEO designation? Can a party that does not like certain testimony designate an entire transcript attorneys eyes only? These issues require complex mechanical constraints which render the discovery process substantially more cumbersome and awkward than it was intended to be. It provides an environment fertile with potential discovery disputes, and it increases the costs and time required by both the parties and the Court. This level of difficulty is inappropriate where as here, there is no reason for the requested protection. The fact the MRO does not trust M2 does not justify MRO's insistence, particularly where this is a typical commercial case.

IV.   MRO Should Be Awarded Its Expenses.

Rule 37 of the Federal Rules of Civil Procedure specifically provides for an award of expenses against a party whose conduct necessitates a discovery motion. Under the circumstances, MRO's insistence upon modification of the Confidentiality Stipulation to include an attorneys eyes only provision, after having already agreed to the entry of a Confidentiality Stipulation which does not contain such a provision, and its the election to withhold substantial volumes of documents pending M2's agreement to amend the Confidentiality Stipulation was

-12-

request that the parties now exchange privileged document lists.

*M2's Document Requests*

M2 served its Request for Production on August 6, 2004. MRO responded in writing on September 7, 2004. On September 13, 2004, MRO produced documents which were purportedly responsive to M2's document requests. MRO did not identify its production at that time as incomplete. MRO's production included hard copy prints outs of a small volume of email communications between the parties, in "text file" format. (Resnick Aff. ¶ 3) This initial MRO document production was glaringly incomplete. It included few documents and almost no email. *Id.* It indicated that MRO had made at best a cursory search for responsive material. M2 brought these deficiencies to MRO's attention, and has continued to do for a many months. *Id.* MRO made supplemental document productions on November 17 and 23, 2004, but its production remained incomplete. *Id.* Neither supplemental production included a substantial amount of email. On March 24, 2005, MRO made yet another supplemental production of approximately 400 pages of additional documents. (Resnick Aff. ¶ 5) This production also did not contain a substantial volume of email, nor was it materially responsive to the document production issues M2's counsel had raised in an earlier letter to MRO's counsel. *Id.* To date, MRO has not confirmed to M2 that its search is complete and that no additional responsive documents exist. (Resnick Aff. ¶ 3)

From the outset, MRO has produced documents sporadically, in increments, and only when pressured by M2's counsel. MRO has astutely avoided informing M2 that its search for responsive documents is complete, preferring instead to simply announce periodically supplemental productions with no explanation. In discovery conferences with M2's counsel, MRO's counsel has equivocated when asked whether the production is complete. (Resnick Aff.

document production, and will permit the parties to proceed productively with the discovery of this case.

III. MRO Should Be Ordered To Produce Responsive Documents Without An Attorneys Eyes Only Designation.

There is simply no reason for an attorneys eyes only designation in this case. MRO has yet to articulate any substantive reason for this request. It bases its position solely on the claim that it does not trust M2. That assertion is simply an insufficient reason to hold a large volume of responsive documents hostage to its insistence upon an AEO Provision. Discovery in commercial cases is, almost by definition, an uncomfortable process for the producing party. The document requests are almost always sensitive to some degree. There is undoubtedly some level of distrust between the parties. This case is no exception to those general circumstances, but the rules of civil procedure do not allow a party to withhold documents simply because it does not trust the other side. Given the level of distrust in this case, the parties agreed to, negotiated, and signed the existing Confidentiality Stipulation. It is more than adequate to protect MRO's confidentiality concerns.

MRO's other attempt to justify its insistence on this provision, that some of the withheld documents are simply "too sensitive" to produce is also insufficient. M2 is incapable of evaluating the sensitivity of the documents, because MRO refuses to produce them. It is therefore left only with MRO's subjective assessment that the sensitivity of the documents requires the requested designation. That does not permit M2 to conduct a meaningful negotiation. As it has done with many other discover issues in this case, MRO simply asserts the position and refuses to budge. In this instance, M2 is left to either agree to MRO's insistence that the confidentiality stipulation be amended to provide MRO with the AEO designation it

¶ 6) During a discovery conference on March 18, 2005, MRO's counsel started that he "believed" that all responsive documents would be produced after MRO's most recent supplemental production was delivered to M2's counsel, but then qualified that statement by stating that "when our client finds potentially responsive documents, we produce them to you as soon as we get them". *Id.* Those representations and others like them notwithstanding, in each case following written insistence by M2 on the production of additional material, additional responsive documents have been located, and belatedly produced.

On January 18, 2005, M2's counsel wrote to counsel for MRO detailing 34 separate categories where MRO's document production was deficient (the "January 18th Letter").[4] (Resnick Aff. ¶ 4)   MRO's counsel did not respond to this letter for more than six weeks. On February 28 2005, MRO's counsel wrote to counsel for M2 informing him that, predictably, additional responsive documents had been located and that a response to the specific document categories set forth in the January 18 letter would be forthcoming.[5] MRO's counsel promised that the supplemental production would be made "shortly". On March 18, 2005, M2's counsel wrote to MRO's counsel protesting the delay, and inquiring when the production might be expected. In a discussion with MRO's counsel the previous day, M2's counsel had been informed that M2 could expect the documents "within a few days". These documents were finally produced to M2's counsel on March 24, 2205, more than *seven months* after service of M2's document request. (Resnick Aff. ¶ 5)

---

[4] A true and accurate copy of this letter is attached hereto as Exhibit "B".

[5] As of this date, MRO's counsel has still not delivered the promised detailed response.

document, e-mail, or other material which documents any compliance with this directive, or which were documents the excess capacity which it references.

MRO has taken the position that it does not believe that it has non-privileged e-mail responsive to M2's requests. Given the fact that MRO has had difficulty locating responsive documents in hard copy, given the fact that it continues to make sporadic, piecemeal supplemental productions, given the fact that it has been able to locate additional documents only when M2's counsel, through detailed written explanation, has directed to MRO's counsel where to look, it is probable that a substantial volume of non-privileged responsive e-mail exists which has not been produced. In light of MRO's dismal document production history, and its apparent difficulty in locating responsive documents, it is appropriate at this juncture to permit M2 to designate a representative, have that representative execute the existing Confidentiality Stipulation, and permit that representative to conduct a search of the MRO e-mail server or servers that track and/or record and/or archive email flowing through MRO's IT system, to verify that no responsive un-produced e-mail exists.

M2's representative could work, while accompanied by an appropriate MRO representative, to conduct this search and identify either by file or by hard copy print out the specific documents which he or she believed to be responsive to M2's document requests. Those materials could then be reviewed by MRO's counsel and a specific dialogue could be conducted to determine whether MRO would agree to voluntarily produce that information. In the event that MRO challenged the production of that information, the parties could resolve any disputes through the motion to compel process. It is both reasonable and equitable that the Court order MRO to permit this inspection. It will also remove any doubt regarding the adequacy of MRO's

## ARGUMENT

I.  MRO Should Be Ordered To Complete Its Document Production And To Certify Completion To M2's Counsel.

MRO's approach to its document production obligations in this case has been extremely cavalier. In response to M2's initial request, it produced very few documents. Supplemental productions by MRO have been sporadic, with a small number of documents being released at each supplemental production. As late as March 24, 2005, more than seven months after service of the initial request, MRO is still making supplemental productions of documents responsive to M2's document requests. MRO's sporadic production of documents is a fact, and it leads to the inescapable conclusion that either: (1) MRO either cannot effectively search its organization for responsive documents; or (2) that it has failed to make a sufficiently diligent search to locate and produce responsive documents; or (3) that it is using sporadic production only after being pressured as a discovery tactic to impede M2's discovery of favorable documents. If MRO had made a sufficiently diligent search, all of the documents which were subsequently located and supplementally produced would have been produced within the first few months of its receipt of M2's document request. While M2 realizes that parties may occasionally locate responsive documents which evaded their initial search efforts, it is unusual for a party this far into the discovery process to continue to locate and make 400+ page supplemental productions of documents.

These facts support an inference that this is an intentional discovery tactic employed by MRO to delay and frustrate M2's discovery effort. Subsequent piecemeal productions of documents make it difficult for M2 to evaluate the state of the documentary evidence, make it

response, would have been ignored, and it is unlikely that in each case the response came in non-electronic format. The examples are many:

- An MRO document, MRO 01715, from Mr. Drapeau, MRO's Chief Executive Officer, to Ted Williams, its Executive Vice President of Worldwide Sales, regarding MRO's hosting intentions was sent to a series of MRO executives specifically states "[P]lease make sure this is communicated to Ray and his team ... TODAY and all of sales as soon as practical" has not apparently produced a single e-mail response. This is suspicious, given the fact that Mr. Drapeau was MRO's CEO, and his directive to other MRO executives must not only have been complied with, but also either documented in e-mail or in some other form;

- On July 7, 2003, Bill Sawyer, MRO's Chief Operating Officer, sent an e-mail to other executives regarding statements made by Mr. Bevington at a meeting regarding Mr. Bevington's interpretation of MRO's obligations to M2, and reflecting Mr. Sawyer's disagreement with that interpretation - no documents memorialize a response from any MRO personnel to Mr. Sawyer's e-mail;

- Ted Williams, a former MRO executive, has thus far produced very few pieces of e-mail, which is inconsistent with the central role he played in this relationship for significant period of time;

- Chip Drapeau has produced almost no documents at all, and he too was central in the relationship, and had direct discussions with M2 personnel regarding MRO's commitment;

- A specific document, MRO 01735, specifically states "tell M2 to take a hike until we use of our capacity", but MRO's production is devoid of any response,

difficult to finalize decisions regarding witness depositions, and render difficult decisions regarding potentially available additional avenues of discovery which M2 is entitled to pursue.

Under the circumstances, it is not only within the discretion of the court to order MRO to complete its search for responsive documents, but also clearly appropriate. Fed. R. Civ. P. 37(a)(2). Unless and until MRO, under threat of sanctions for violating a court order, conducts an appropriately diligent search, the discovery record in this case indicates that it is very likely to continue to make supplemental productions of documents, only when prodded by M2's counsel, at incremental time periods throughout this case. This method of producing documents is prejudicial to M2's discovery effort, and should no longer be tolerated by the Court.

II.  MRO Should Be Compelled To Permit M2 Representatives To Inspect Its E-Mail Server Or Servers To Verify That No Additional Responsive Documents Exist In Electronic Form.

One of the most striking problems in MRO's document production is the absence of any substantial volume of e-mail between the parties in this case. MRO's failure to produce responsive the e-mail is particularly suspicious, where M2, in searching for documents responsive to MRO's requests, has produced thousands of separate e-mails arising from the interaction of the parties during the course of their relationship. It is inconceivable, given the volume of e-mail on M2's side of the transaction, that a roughly equivalent volume of e-mail is not to be found on MRO's side.[6]

More suspicious still, MRO has failed to produce e-mail even in situations where it's senior executives have sent e-mail to multiple individuals requesting responses. It is inconceivable that MRO's executives, when e-mailing other MRO employees and requesting a

---

[6] For example, the Produced Email contained more than 1700 emails from MRO to M2. MRO should have corresponding copies of these materials in its systems. It has produced few if any. Similarly, M2's production contains more than 2200 emails which were sent by M2 to MRO, and MRO should have a corresponding number on its side. MRO's production does not include a comparable number of these electronic documents.

-8-