1           All right?

2           MR. BRATTEN: All right. Moving on, your Honor, with
3  respect to interrogatory number 6. This is again, it's similar
4  to the interrogatory number 9 and it, MRO is simply trying to
5  understand the claims against it, and M2 has alleged that MRO
6  has been unjustly enriched because it has essentially
7  misappropriated its trade secrets, the trade secrets that MRO
8  alleges have only been described in extremely, extremely
9  minimal detail here. As you can in numbers 1-6 there, I mean,
10 it's essentially described as Maximo application hosting
11 processors, procedures, configurations services, pricing and
12 marketing.

13          THE COURT: Yeah, I can read it.

14          MR. BRATTEN: That simply doesn't allow my client to
15 understand the claim, to identify the documents which M2 also
16 relies on.

17          THE COURT: I'll hear you.

18          MR. RESNICK: Yes, your Honor. Part of our, our
19 document production in this case included a 39,000 email DVD in
20 PST searchable format, which was literally all of the universe
21 of documents relevant to this case that we have. I've
22 explained to opposing counsel on a number of occasions the same
23 relationship that pertains to the fraud here was that people
24 from both sides trading information back and forth on a daily
25 basis, and I have further explained that our trade secrets in

1  this case are not technical data in the sense of a particular
2  piece of computer code or a particular diagram at issue.
3           THE COURT:  Morse code or something?
4           MR. RESNICK:  Correct.  This is business information.
5  What we're claiming is that through this daily interaction with
6  us over two years, they've learned a lot about our business,
7  our proprietary business information.  My client's strength is
8  that it has figured out how to web host as a business in a
9  superior way.  The close connection and interaction between--
10          THE COURT:  Tell me exactly what web host means.
11          MR. RESNICK:  Yes, absolutely, your Honor.
12          MRO makes a piece of software called Maximo.  It's a
13 facilities management software for, if you have a huge
14 apartment building, as I understand it, to keep track of all of
15 the different issues, real estate taxes, maintenance and it
16 coordinates it all in a very useful way.  MRO sells that
17 software directly to its customers, and they can buy it but
18 then they have to both load it into their own computer systems
19 and maintain it and learn how to use it.  What happened here
20 was that M2 has a model where we'll take the MRO software, we
21 will put it on the internet and a client needing this software
22 can use it on the internet through my client, through M2, so
23 they don't have to invest in the technical infrastructure to
24 buy it and maintain it and learn how to use it.  They simply go
25 onto the internet and use it through us.

1   THE COURT: For a price?

2   MR. RESNICK: For a price and we pay to host it.
3   Now, initially, as I'm sure you'll learn over the next few
4   months, this was a good idea. Everyone thought this was a
5   great idea. In order to set that up, there was a lot of
6   communication back and forth and MRO learned a lot about our
7   priority business processes, which is what we have described in
8   this answer in sort of categorical terms, like application
9   hosting processes. Now that information is not trick code.
10  MRO is a software manufacturer. They know what we mean when we
11  say hosting configurations. These are two technical parties
12  talking back and forth to each other, and once again, I've
13  said, as I told opposing counsel, there's not a packet of
14  information that I can point to that says this was our
15  confidential information. What was in place here was an
16  agreement that we're going to be exchanging confidential
17  information about each other's businesses back and forth here
18  and you can't use it. Therefore, my only response that I can
19  make here is to identify it by category and to say these are
20  the categories of information that we believe are propriety to
21  us which we believe you then took and set up your own web
22  hosting model after you told us you didn't want to do it with
23  us anymore. The specific information can be gleaned at this
24  stage, and once again as easily by MRO as by M2 as they now
25  have the same database we do and it's computer searchable. So

1  you know, we could search here and pull off every scrap of
2  email that might be talking about an application hosting
3  procedure or process.
4        THE COURT:  Is that not provided in the 39,000?
5        MR. RESNICK:  It all is.
6        THE COURT:  It's all there?
7        MR. RESNICK:  Yes, it is.  And if it isn't in the
8  documents, then what's involved here once again is if we depose
9  our witnesses who can describe, but again only in somewhat
10 general terms--
11       THE COURT:  What is the state of discovery?
12       MR. RESNICK:  At the moment, your Honor--
13       THE COURT:  I received this motion, I'm just looking
14 at it, the referral, because I think it's just sent to me for
15 this motion but not for all pretrial - can you pull this
16 document out just to see whether or not we had it for all
17 pretrial management as well?  So motion to extend the time to
18 complete discovery until June 30th, that's your present close of
19 discovery?
20       MR. RESNICK:  Yes, it is, your Honor.
21       THE COURT:  Do you think you're going to be able to
22 meet that?  Are you comfortable with that?
23       MR. RESNICK:  I believe so, although there is a
24 possibility here, I've been informed there's going to be a
25 motion to amend counterclaim and that may open up the need to

1  do more discovery I suppose on MRO's part though.  My brother
2  can speak more into that.
3       THE COURT:  Any talk of settlement?
4       MR. RESNICK:  Well--
5       THE COURT:  This, I mean, getting off the track here
6  for a moment and, I mean, it just sounds to me as if this might
7  be the kind of case that you could work out a business
8  arrangement and a settlement in a mediation.  The only reason I
9  say it at this point is before you spend a lot of money and go
10 through a lot of tortuous discovery that sometimes sitting down
11 at a court-sponsored mediation, I mean, remember, and this is
12 something to tell your client, the only thing that can be
13 resolved at a mediation is a business attractive solution, that
14 it's not exactly what you always get from the jury, you know,
15 with damages, you may get this or that, but a business solution
16 is something else.  Sometimes you work out an agreement, future
17 business, this or that.  Change the terms a little bit,
18 something to think about.  If you just go away from here today
19 with that notion that it's something that you should address
20 together outside, and then if you think it's worth talking to
21 the clients about, and since it's not my case for trial, since
22 I've begun to look at it, I'd be available and you can request
23 me as a mediator.  I have a very good batting average.
24      MR. RESNICK:  I am very open to that.  I agree.  I
25 think that's a good idea.

1           THE COURT: I mean--

2           MR. RESNICK: We have made some settlement attempts
3   so far. They have stalled unfortunately but particularly here
4   where the road in this case appears to be lengthening rather
5   than shortening, there may be good reason to explore that.

6           THE COURT: I say it particularly where I see
7   software in terms of, I do a lot of IP work, and I've had a
8   number of software infringement cases. By the time the case is
9   litigated and gets to the jury, the software is obsolete and
10  everybody is oh, yes, this is a damages issue, but everybody is
11  moving on. So, sometimes it's better to sit down and see if -
12  so that's an aside.

13          As to number 6, I'm satisfied at this time, so move
14  on. We do have a return of the grand jury. When the
15  foreperson comes down, I'll just ask you to recess for five
16  minutes. It's very brief. It's a quick magisterial
17  proceeding.

18          MR. BRATTEN: So, just so I understand, your Honor,
19  number six?

20          THE COURT: I'm satisfied.

21          MR. BRATTEN: With respect to 17, it's fairly well
22  tied to number 6. We were seeking any technical information
23  which Mr. Resnick just spoke to. The confusing part about M2's
24  response to number 17 is that despite what Mr. Resnick just
25  said, nowhere in that response does it say that there is no