UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| M2 CONSULTING, INC.<br><br>                Plaintiff,<br><br>v.<br><br>MRO SOFTWARE, INC.<br><br>                Defendant. | C.A. No. 03-12589-GAO |

**MRO SOFTWARE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Defendant and Plaintiff-in-Counterclaim MRO Software, Inc. ("MRO") respectfully submits this memorandum of law in support of its motion for a preliminary injunction against Plaintiff and Defendant-in-Counterclaim M2 Consulting, Inc. ("M2").

The underlying facts clearly establish that, without authorization, M2 is currently making unlawful copies of MRO's MAXIMO software in violation of the Copyright Act, 17 U.S.C. §§ 101 et seq. Under a hosting agreement between the parties entered into in 2002, M2 was authorized to host the MAXIMO software over the Internet for remote customers. When MRO terminated this hosting agreement, effective November 23, 2003, M2 was permitted to continue using its software to service its customers as they existed at the time of termination, but only for a period of two years. This two year sunset period expired on November 23, 2005. For two years M2 has known of the impending expiration of its right to use MRO's MAXIMO software. However, M2 failed to discontinue its reliance on MAXIMO and continues to host it for its

434275.4

customers. MRO now seeks to enjoin M2 from making illegal copies of its software, which M2 is doing on a daily basis as part of its hosting operations.

Under the modified preliminary injunction standard applicable to copyright infringement claims, if a likelihood of success has been demonstrated, it is presumed that the moving party has suffered irreparable harm and that an injunction will serve the public interest. Accordingly, MRO must show a likelihood of success on its infringement claim and that the balance of the potential hardships weighs in its favor.

The evidence below establishes an overwhelming likelihood of success on MRO's copyright infringement claim. First, MRO has a registered copyright on the MAXIMO software being used by M2. Second, although M2 was authorized to use the MAXIMO software for a limited purpose under a hosting agreement, that right was extinguished on November 23, 2005, two years after termination of the Agreement. Lastly, each time M2 or its customers use the MAXIMO software parts of the software program are copied, in violation of the Copyright Act. As explained in the Affidavit of James Battle, MRO's Vice President of Product Development, M2 has made, installed and is running a separate and distinct copy of the server portion of the MAXIMO software for each of its approximately 27 customers, and every time the software is accessed (either by M2 itself, the corporate customers or the approximately 260 individual end users employed by those customers) the computers copy parts of MAXIMO. It is technically impossible for M2 or its customers to use the MAXIMO software without creating copies of the software's its protected elements on the computer's temporary or "random access memory." The federal courts have routinely held that an unauthorized user's access of the protected elements of a software program in this manner creates a "copy" under the Copyright Act, and constitutes infringement.

It is well established in this Circuit that where a strong likelihood of success is demonstrated in connection with a copyright infringement claim, an injunction should issue even if the non-moving party will bear the relatively greater hardship. The First Circuit has held that, under these circumstances, it would be unjust to deny injunctive relief based on economic harm to the likely copyright infringer. Here, the high likelihood that MRO will succeed in establishing copyright infringement militates strongly in favor of issuance of an injunction.

In support of its motion MRO has filed herewith the Affidavits of James Battle, Craig Newfield and Lee Gesmer.

MRO respectfully requests that the Court issue an injunction in the form attached to its motion at Tab A.

## FACTUAL BACKGROUND

MRO is the developer and vendor of one of the world's most successful computer programs for facilities and asset management. MRO's software, MAXIMO, is sold to many of the largest organizations in the world, including General Motors, General Electric, Coca Cola, International Paper, Alcoa, DuPont, ExxonMobil, Boeing, Walt Disney World, the U.S. Departments of Commerce, Defense, Energy, State and Treasury, and the U. S. General Services Administration. (MRO's Verified First Amended Counterclaim ("Amended Counterclaim"), pars. 1-2). It is this MAXIMO software – which is an integrated system comprised of thousands of separate program files – that is at the center of this case.

On November 4, 2002, the parties entered into a hosting agreement ("Agreement") pursuant to which MRO granted M2 limited rights to use its MAXIMO software. (A copy of the Agreement is attached at Tab A; *see* Affidavit of Craig Newfield in Support of MRO's Motion for Preliminary Injunction ("Newfield Aff."), par. 2). Under the Agreement, M2 was authorized

to provide M2's customers with remote access, over the Internet, to copies of MAXIMO that physically resided on M2's computer servers. Under this form of delivery, M2 is referred to as an "application service provider," or the "host" of the software. This form of software delivery is convenient for companies that do not want to license the MAXIMO software and install and maintain it on their own computer systems. By having the software "hosted" by M2, the customer can minimize the costs associated with implementation and maintenance.

Under Paragraph 5 of the Agreement, M2 was required to pay MRO certain royalties "[f]or Customers who contract with [M2] for access to the hosted version of the [MAXIMO software]" and these royalties were to be paid by M2 "within thirty (30) days following the receipt of net fees." (Agreement, par. 5(c) and (e), Tab A). Pursuant to Exhibit A to the Agreement, M2 agreed to pay MRO "50% of the net monthly fees received by [M2]".[1] (Agreement, Ex. A, par. 4, Tab A).

M2 has admitted that it owes MRO unpaid royalties under the Agreement. M2 provided MRO with monthly Software Activity Reports ("Activity Reports") from November 2002 through June 2004, with the exception of February 2003). Copies of the November 2002, December 2002 and October 2003 reports are attached at Tab B. These Activity Reports list, among other things, M2's hosting customers, and the net monthly and cumulative royalties owed to MRO. (Tab B). According to M2's own Activity Reports, under the Agreement, M2 owed

---

[1] Exhibit A to the Agreement specifies that M2 is required to pay MRO "50% of the net monthly fees received by [M2]" with respect to all new customers, while M2 must pay MRO "20% of the net monthly fees received by [M2]" for M2's existing customers as of November 4, 2002. (Agreement, Ex. A, par. 4, Tab B).

MRO $81,632.75 in royalties for the period of November 2002 through October 2003.[2] (Tab B).[3]

On November 4, 2003, MRO sent an invoice to M2 including this amount and other amounts owed by M2 to MRO. (See November 4, 2003 email from MRO's Sales Manager, Ray Miciek, to M2's CEO, Rick Bevington, with attachments (M2's Activity Reports and an invoice for M2's unpaid royalties), attached at Tab C). Further, Thomas R. Bevington, M2's founder and CEO, testified during his deposition that M2's Activity Reports showed how much money M2 owed MRO under the Agreement and admitted that these royalties were never paid. (See Excerpts from the Deposition Transcript of Thomas R. Bevington ("Bevington Tr."), at 215-217, Tab D).

The Agreement provides MRO with two ways to terminate. It permitted termination for cause (if uncured) upon 30 days' notice, and termination for convenience upon 90 days' written notice. Specifically, the Agreement states as follows:

> (c) **Termination for Convenience**. Either party may terminate this Agreement for any reason, with or without cause, upon 90 days' written notice to the other party.
>
> (d) **Termination for Cause**. Either party will have just cause to terminate this Agreement, without judicial or administrative notice or resolution, immediately upon notice to the other party, if the other party or any of its employees breaches any obligation under this Agreement and such party

---

[2] Tab B Consists of M2's Activity Reports for the months of November 2002 ($5,785.50 owed to MRO for the month), December 2002 ($5,808 owed to MRO for the month) and October 2003 ($70,039.25 owed to MRO for the year to date). In approximately November 2002, M2 made one payment to MRO under the Agreement, for $5,785.50 – the amount admitted by M2 as being owed in its November 2002 Activity Report for that month.

[3] MRO has calculated that the total royalties owed by M2, for the entire three year period, are approximately $440,000. (Newfield Aff., par. 5).

    fails to cure the breach to the notifying party's satisfaction within 30 days after it demands a cure.

(Agreement, par. 9, Tab A).  Upon termination (whether for cause or convenience), M2's rights under the Agreement ceased, with one limited exception: M2 was permitted to continue to use the MAXIMO software "for 24 months or until the termination of existing agreements with [M2's] customers, whichever occurs first, solely to support any existing Customers at the time of the termination . . .."  (Agreement, par. 9(e), Tab A) (emphasis added).

  On October 24, 2003, MRO gave M2 written notice that it was terminating the Agreement both "for cause" and "for convenience".  (A copy of MRO's October 24, 2003 Termination Letter is attached as Tab E; Newfield Aff., par. 3).  MRO's October 24, 2003 termination letter ("Termination Letter") provided notice that the Agreement would terminate "for cause" on November 23, 2003, if M2 failed to cure its breach within 30 days.  MRO's Termination Letter provided notice to M2 that the Agreement was also being terminated "for convenience," which would become effective on January 22, 2004. (Termination Letter, Tab E).  Since M2 failed to pay any royalties in response to this notice, the Agreement terminated "for cause" on November 23, 2003.[4]

  As the two year anniversary of the termination of the Agreement neared, MRO sent M2 two letters seeking written assurances that M2 would comply with the Agreement upon the expiration of the two year sunset period.  (See Affidavit of Lee Gesmer in Support of MRO's Motion for Preliminary Injunction ("Gesmer Aff."), pars. 2-3, and October 26, 2005 and November 18, 2005 letters to M2 attached thereto as Exhibits A and B, respectively).  M2 failed to respond to either of these letters.  (Gesmer Aff., pars. 2-3).  Additionally, despite the fact that

---

[4] To the extent the Agreement did not terminate "for cause" on November 23, 2003, it was terminated "for convenience" on January 22, 2004.

the two year anniversary of the termination of the Agreement has passed, M2 is still using MRO's MAXIMO software to service approximately 27 corporate customers. This continuing use of the software is illegal, and should be immediately enjoined.

M2 has made, installed and is running a separate and distinct copy of the server portion of the Maximo software for each of its 27 customers, (Affidavit of James Battle in Support of MRO's Motion for Preliminary Injunction ("Battle Aff."), pars. 16-17). Furthermore, every time M2 or one of its customers accesses or uses MRO's MAXIMO software, an additional copy of a portion of MAXIMO is created. This occurs without exception each time the MAXIMO software is accessed or used. (Battle Aff., pars. 9-17). When the MAXIMO software is used in the ordinary course, the user's computer must copy the software from its hard drive into its temporary memory or random access memory ("RAM"), before the software can be accessed by the user. (Battle Aff., pars. 9-13). Moreover, each time MAXIMO is used remotely via the Internet for any purpose, MAXIMO HTML pages and program code are copied and distributed over the Internet to the customer, creating another copy of the software at the user's remote location. (Battle Aff., pars. 14-15).

MRO has registered MAXIMO Version 5 with the U.S. Copyright Office pursuant to 17 U.S.C. §§ 408 and 409. A true copy of the copyright registration certificate is attached to MRO's Amended Counterclaim as Exhibit 1. (Amended Counterclaim, Ex. 1).

## LEGAL ARGUMENT

### I. MRO IS ENTITLED TO AN ORDER ENJOINING M2 FROM ITS INFRINGEMENT OF MRO'S COPYRIGHT ON ITS MAXIMO SOFTWARE

Under the four-part test used to determine whether a preliminary injunction should issue, the moving party must establish that: "(1) it has a substantial likelihood of success on the merits, (2) there exists, absent the injunction, a significant risk of irreparable harm, (3) the balance of

hardships tilts in its favor, and (4) granting the injunction will not negatively affect the public interest." *Tec Engineering Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542, 544 (1st Cir. 1996).

However, copyright infringement claims are subject to a modified preliminary injunction standard whereby it is presumed that the moving party has suffered irreparable harm and that an injunction will serve the public interest if a likelihood of success on the merits has been demonstrated. *See, Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611-612 (1st Cir. 1988). This leaves only the first and third factors for consideration: likelihood of success on the merits and balancing of the hardships. The two are related, in the sense that the balancing must take into account the strength of the plaintiff's case. In other words, the greater the likelihood of plaintiff's success on the merits, the less consideration will be given to the harm that the injunction will cause the defendant. Conversely, if the plaintiff has made only a minimally sufficient showing that it is likely to succeed, greater consideration will be given to the harm that the defendant will suffer if the injunction is issued. *Id.*, 843 F.2d at 612-613.

As MRO demonstrates in this memorandum, it has an overwhelming likelihood of success in establishing copyright infringement since M2 is clearly making copies of its software without authorization. No weight should therefore be given to any monetary harm that might be experienced by M2 if enjoined from copying MRO's MAXIMO software. This is particularly true in the circumstances of this case, where the Agreement expressly gave M2 two years to migrate its business to another system.

### A. MRO Has a Substantial Likelihood of Success on the Merits Since M2 is Clearly Infringing MRO's Copyright by Making Copies of Its MAXIMO Software

Likelihood of success on the merits of a copyright infringement claim is demonstrated by showing ownership of a valid copyright and the defendant's unauthorized copying of the work. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). These conditions are satisfied here.

First, MRO owns a valid copyright on Version 5 of its MAXIMO software, which is demonstrated by the Copyright Registration Certificate from the U.S. Copyright Office pursuant to 17 U.S.C. §§ 408 and 409. (Amended Counterclaim, Ex. 1). *Saenger Organization, Inc. v. Nationwide Ins. Licensing Associates, Inc.*, 119 F.3d 55, 59 (1st Cir. 1997) ("In judicial proceedings, a certificate of copyright registration constitutes *prima facie* evidence of copyrightability and shifts the burden to the defendant to demonstrate why the copyright is not valid.") (citation omitted).

Second, it is plainly obvious that, without authorization, M2 has made numerous copies of MRO's MAXIMO software and it will continue to do so unless enjoined by this Court.

As an initial matter, M2's authorization to use the MAXIMO software under the Agreement expired on November 23, 2005. With its October 24, 2003 Termination Letter, MRO terminated the Agreement "for cause" and "for convenience". Upon termination, M2's rights under the Agreement ceased, except that M2 was permitted to continue using the MAXIMO software "for 24 months or until the termination of existing agreements with [M2's] customers, whichever occurs first, solely to support any existing Customers at the time of the termination . . . .." (Agreement, par. 9(e), Tab A). Thus, M2 retained authorization to use the MAXIMO

software to service its customers as they existed at the time of termination only, for a period ending two years from the termination date, or November 23, 2005.[5]

MRO properly terminated the Agreement "for cause," effective November 23, 2003, based on M2's failure to cure its breach of its royalty payment obligations. Under Paragraph 9(d) of the Agreement, MRO was permitted to terminate the Agreement "for cause" based on M2's failure to cure that breach within 30 days of receipt of notice. MRO complied with this provision by providing M2 with adequate notice and a 30-day cure period, and it is undisputed that M2 failed to remedy its breach. M2's own monthly Activity Reports show that, as of October 24, 2003, M2 owed MRO approximately $81,000 in unpaid royalties under the Agreement. (Activity Reports, Tab B). During his deposition, M2's founder and CEO admitted that M2's Activity Reports showed how much money M2 owed MRO under the Agreement and that these royalties were never paid. (Bevington Tr., at 215-217, Tab D). Since M2 was clearly in breach of the Agreement for nonpayment of royalties, as of October 24, 2003, and it failed to cure its breaches of the Agreement as demanded in the Termination Letter, MRO's termination of the Agreement was effective as of November 23, 2003.[6] In fact, M2 has continued to provide MAXIMO to its customers during the two year sunset period, and has failed to pay MRO any royalties whatsoever during those two years. Thus, M2 has had use of the MAXIMO software for three full years (November 2002 - November 2005). During that time M2 has received

---

[5] In fact, discovery has shown that M2 went beyond this limited post-termination license and provided MAXIMO to new customers. *See* Amended Counterclaim, Exs. 8, 9, 11 and 12.

[6] To the extent that M2 claims MRO's termination "for cause" was ineffective, its Termination Letter also terminated the Agreement "for convenience," as of January 22, 2003. Accordingly, even if MRO's termination "for cause" was not effective, the Agreement nonetheless terminated on January 22, 2003. This point is essentially moot because, to the extent the Agreement was not terminated "for cause" on November 23, 2003, the end of the two year sunset provision that allowed M2 to continue using the MAXIMO software would only change two months: from November 23, 2005, to January 22, 2006.

almost $1.7 million in revenues from its customers, and accrued hundreds of thousands of dollars in unpaid royalties owed to MRO, which are the subject of MRO's counterclaim for breach of contract. (Newfield Aff., par. 7).

As the two year anniversary of the termination of the Agreement approached, MRO twice sought assurances that M2 would comply with the Agreement and cease using MAXIMO on November 23, 2005. (Gesmer Aff., pars. 2-3, Exs. A and B). However, M2 failed to respond or provide MRO with any assurances that it would cease using the MAXIMO software on November 23, 2005 and it has informed MRO's counsel that it will not discontinue hosting MAXIMO for its customers. (Gesmer Aff., pars. 2-4).

Now that M2 no longer has authorization to use the MAXIMO software, it makes an illegal copy every time it, or one of its customers or individual end users, accesses the software. As explained in the Affidavit of James Battle, MRO's Vice President of Product Development, an illegal copy of certain protected elements of MAXIMO is created, without exception, each time the software is used in any manner. (Battle Aff., pars. 9-17). The copy is created because any computer used to access the software is required to make a copy of MAXIMO from its permanent storage into its temporary or "random access" memory ("RAM"), before MAXIMO can be accessed by the user. (Battle Aff., pars. 9-13). As further described in Mr. Battle's Affidavit, each time MAXIMO is used remotely via the Internet for any purpose – which is the only way MAXIMO is accessed by M2's customers or individual end users – the MAXIMO software is copied and distributed over the Internet to the individual user. (Battle Aff., pars. 14-15, 17). M2's own Activity Reports show that M2 has 27 active customers. For each of these 27 customers, M2 has made, installed and is running a separate and distinct copy of the server portion of the MAXIMO software. (Battle Aff., pars. 16-17). According to M2's own Activity

Reports, M2's 27 customers represent approximately 260 individual users capable of accessing the MAXIMO software, and therefore additional illegal copies of MAXIMO are likely being created on a daily basis. (Battle Aff., pars. 16-17).

The question of whether software use of this nature constitutes copyright infringement has been squarely answered in the affirmative by numerous courts. In the factually similar case of *Stenograph L.L.C. v. Bossard Associates, Inc.*, the D.C. Circuit Court recognized multiple ways in which merely accessing, or using, software generates a copy for purposes of copyright infringement. Specifically, the D.C. Circuit Court held as follows:

> As an analytical matter, there are two different ways to describe the impermissible "copying" that occurred in this case. First, it can be concluded, quite simply, that copying occurred when appellants installed and used the software for the principal purposes for which it was intended. Alternatively, following a line of analysis adopted by a number of courts, it can be concluded that appellants copied the software when it was booted up for use for its principal purposes, and thereby loaded into RAM [or random access memory].

144 F.3d 96, 100 (D.C. Cir. 1998). The Court concluded that "if someone loads validly copyrighted software onto his or her own computer without the owner's permission, and then uses the software for the principal purposes for which it was designed, there can be no real doubt that the protected elements of the software have been copied and the copyright infringed." *Id.*, at 100. The *Stenograph* Court found that merely loading the "protected elements" of a software program onto a computer creates a copy and constitutes infringement. *Id.*, at 100-102. It is clear that every time the MAXIMO software is used, certain of its protected elements are loaded into the accessing computer's memory when the program is executed. (Battle Aff., pars. 9-17). Mr. Battle's Affidavit establishes that this copying occurs each time that MAXIMO is used or accessed, and in addition that MAXIMO is further copied and distributed via the Internet every

time M2 provides its customers and their individual end users with hosted access to the software. (Battle Aff., pars. 15-17).

As set forth below, the *Stenograph* Court also found that loading the protected elements of a software program into a computer's RAM constitutes copyright infringement:

> It is also evident that copying of [the software] occurred through the loading of the software into the random access memories of Bossard's computers while the software was in use. Courts that have addressed the issue agree that the loading of software from some permanent storage medium, such as a floppy disk or a computer's hard drive, to the computer's random access memory ("RAM") when the software is "booted up" causes a copy to be made. *See MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir.1993) (defendant's "loading of copyrighted software into RAM creates a 'copy' of that software in violation of the Copyright Act"); *Triad Systems Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1335 (9th Cir.1995); *Advanced Computer Servs. v. MAI Systems Corp.*, 845 F.Supp. 356, 363 (E.D.Va.1994); 2 NIMMER § 8.08[A][1], at 8-113 to 8-114 (describing trend recognizing that reproduction of program in RAM constitutes "copy")

*Id.*, 144 F.3d at 101-102. *See also Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Inc.*, 421 F.3d 1307, 1311 (Fed.Cir. 2005) (absent a defense, activating a computer system which automatically copies a copyrighted software program into the computer's random access memory constitutes copyright infringement). This form of copying is obviously occurring each time M2 uses MAXIMO. As Mr. Battle points out in his Affidavit, without exception, any computer used to access the software makes a copy of MAXIMO from its hard drive into its temporary memory, or RAM, before the software is capable of being accessed by the user. (Battle Aff., pars. 9-13). These copies of MAXIMO include the elements protected by MRO's copyright registration. (Battle Aff., pars. 6-10). Since M2 is continuing to use MRO's software, without authorization, it is illegally copying MAXIMO every time it, or one of its approximately 27 customers (comprised of approximately 260 individual end users), accesses the software.

Accordingly, MRO has demonstrated an exceedingly high likelihood of success on its copyright infringement claim.

### B. MRO Need Not Prove Irreparable Harm Where the Underlying Claim is One of Copyright Infringement

It is well settled in this Circuit that, in the context of a copyright infringement claim, irreparable harm is presumed once a likelihood of success on the merits has been demonstrated. Specifically, one of the "general rules" set forth by the First Circuit is as follows:

> First, as the district court correctly noted, irreparable harm is usually presumed if likelihood of success on the copyright [infringement] claim has been shown. [] ***There is, therefore, no need actually to prove irreparable harm when seeking an injunction against copyright infringement***.

*Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611-612 (1st Cir. 1988) (citations omitted; emphasis added); *AccuSoft Corp. v. Mattel, Inc.*, 117 F.Supp.2d 99, 102 (D.Mass. 2000) ("In the copyright context, irreparable harm is presumed if the copyright holder has shown a likelihood of success on its infringement claim. [] Because [the moving party] has established a likelihood of success on the merits of at least part of its infringement claim, this Court presumes that it will suffer irreparable harm if an injunction does not issue.") (citations omitted).

Accordingly, as long as MRO demonstrates a likelihood of success on the merits, it must be presumed that MRO will suffer irreparable harm if an injunction is not entered.

### C. The Balancing of the Hardships Weighs Strongly in Favor of MRO

In addressing the "questionable relevance of the 'balance of the hardships' factor to the determination of whether a likely [copyright] infringer should be preliminarily enjoined", the First Circuit has set forth the following rules:

> Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense "merits little equitable consideration." . . . ***Such considerations***

> *apply even to a business which is exclusively based on an infringing activity and which would be virtually destroyed by a preliminary injunction.* It would be incongruous to hold that the more an enterprise relies on copyright infringement for survival, the more likely it will be able to defeat the copyright owner's efforts to have that activity immediately halted. *We see little reason why an entity should be allowed to establish and continue an enterprise based solely on what is in all likelihood copyright infringement, simply because that is its only business*. . . .
>
> If a strong likelihood of success is demonstrated, then the court should issue the injunction even if the defendant will incur the relatively greater burden; a probable infringer simply should not be allowed to continue to profit from its continuing illegality at the copyright owner's expense.

*Concrete Machinery Co., Inc.*, 843 F.2d at 612-613 (emphasis added; citations omitted); *Accusoft Corp. v. Palo*, 923 F.Supp. 290, 295 (D.Mass. 1996) ("If the moving party can show a strong likelihood of success, then this Court may issue an injunction even if the nonmovant will incur the relatively greater burden."). Accordingly, the Court should enjoin M2's unlawful conduct if it determines that MRO has shown a strong likelihood of success on its infringement claim.

Almost certainly, M2 will argue that it should not be enjoined from illegally copying MRO's software due to the economic harm it will suffer (Gesmer Aff., par. 4). Indeed, M2's counsel recently informed counsel for MRO that M2 will continue using, and copying, MRO's software despite the expiration of the two year sunset provision under the Agreement because of M2's economic dependence on its monthly revenues from M2's MAXIMO subscribers. (Gesmer Aff., par. 4). However, as the First Circuit observed in *Concrete Machinery*, "[i]t would be incongruous to hold that the more an enterprise relies on copyright infringement for survival, the more likely it will be able to defeat the copyright owner's efforts to have that activity immediately halted." *Id.*, 843 F.2d at 612. In this case, such a result would be particularly inequitable since M2 has been on notice for two years that its authorization to use MRO's software would end on November 23, 2005. (Amended Counterclaim). In fact, this is the deal

434275.4                                    15

that M2 negotiated and agreed to when it entered into the Agreement in 2002, and therefore it should be presumed to be reasonable. This two year sunset period provided M2 with ample time to plan for the end of its authorized use of MAXIMO, to migrate its users to another software platform, or to take any other action that would mitigate the harm it might suffer if an injunction were granted. It is worth noting that, based on M2's own Activity Reports, M2 has received well almost $1.7 million in fees from its customers during this period, which should mitigate any harm that M2 would now suffer if its illegal use of MAXIMO were to be halted. (Newfield Aff., par. 7). M2's reliance on its unlawful use of MRO's software is patently unreasonable and any resulting harm entirely avoidable. Consideration of M2's reliance argument would only serve to reward its unlawful acts.

Based on the weight of the evidence, MRO has shown a strong likelihood, approaching a certainty, that it will succeed on its copyright infringement claim. Consequently, the Court should enjoin M2 from its unlawful copying of MRO's software.

### D. Public Interest

Where a likelihood of success has been demonstrated with respect to a copyright infringement claim, it is presumed that the public interest will not be adversely impacted by the issuance of a preliminary injunction:

> the issue of public policy rarely is a genuine issue if the copyright owner has established a likelihood of success: Since Congress has elected to grant certain exclusive rights to the owner of a copyright, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work.

*Concrete Machinery Co., Inc.*, 843 F.2d at 612 (citations omitted). MRO has shown a strong likelihood of success on the merits of its copyright infringement claim.

However, it is worth noting that MRO has not directly granted any rights to use or access MAXIMO to M2's customers and their employees, and therefore there are potentially 27 presumably innocent companies and 260 presumably innocent individuals that are unwittingly contributing to copyright infringement due to M2's illegal conduct. As the owner and proprietor of MAXIMO, MRO is uniquely and fully capable (and stands ready, willing and able) to provide MAXIMO to all of M2's customers, without the least disruption in service or injury to these third parties. Therefore, the injunction sought by MRO is not adverse to the public interest and this factor must be resolved in favor of MRO.

## CONCLUSION

For these reasons, the Court should enter the preliminary injunction in the form submitted herewith.

Respectfully Submitted,

/s/ Lee T. Gesmer_____
Lee T. Gesmer (BBO No. 190260)
Kurt Bratten (BBO No. 644730)
Gesmer Updegrove LLP
40 Broad Street
Boston, MA 02109
Kurt.Bratten@gesmer.com
(617) 350-6800

Dated: December 30, 2005