## MRO Software, Inc. MAXIMO Hosting Affiliate Agreement

**Between**
**And**

| | |
|---|---|
| **MRO Software, Inc.** | **Hosting Affiliate** M2 Consutling, Inc. |
| | **Address:** 57-B Jefferson Pkwy |
| 100 Crosby Drive | Newnan, GA 30263 |
| Bedford, MA 01730 | |
| Phone:            (781) 280-2000 | **Phone:** 770-253-1183 |
| Fax: (7810280-2210 | **Fax:** 770-253-6228 |

1. **APPOINTMENT.**

a) **Subscription License Grant.** Subject to the terms and conditions hereof, during the term hereof, MROI hereby grants to Hosting Affiliate the non-exclusive right and license (i) to access and execute the Product on Hosting Affiliate's Application Server only with Supported Browsers through the Internet, and (ii) to act as an application service provider ("ASP") with respect to the Products and transmit Customer data from the Product to Customers remotely through the Internet. Hosting Affiliate shall provide its Customer's with the right and license to access and use the Product for their internal purposes only, pursuant to a Customer ASP Agreement (defined below). All rights not expressly granted to Hosting Affiliate or Customer herein are expressly reserved by MROI.

b) **No Indirect Channel.** Hosting Affiliate may not exercise its rights hereunder through any third party agent(s), representative(s), distributor(s) or other person(s). Hosting Affiliate must install and use the Products on premises owned by Hosting Affiliate or at that of any acceptable co-location data center partner, and may not subcontract or outsource its operations without MROI's prior written consent.

c) **Reservation.** Hosting Affiliate must market the Products under the trademark "MAXIMO" (or other marks designated by MROI), and Hosting Affiliate shall not market the Products under any other name.

2. **DEFINITIONS.**

a) **"Agreement Date"** means the date set forth underneath MROI's signature below.

b) **"Customer ASP Agreement"** means a written, shrink-wrap or click-wrap agreement that provides a Customer with the right and license to remotely access and use the Product as hosted by Hosting Affiliate on Hosting Affiliate's Application Server for its internal purposes only, under terms substantially similar to those specified in Exhibit B.

c) **"Enhancements"** means the fixes, updates, upgrades and localized, translated or new versions of the Products that MROI may periodically release during the Term. Enhancements are provided at no additional charge.

d) **"Products"** means (i) the computer programs and related documentation described in Exhibit A that MROI markets, maintains and supports as of the date of this Agreement and (ii) all Enhancements.

e) **"Customer"** means the ultimate end-users who are authorized to access and use the Product on Hosting Affiliate's Application Server within the Territory (as specified in the applicable royalty reports).

f) **"Territory"** means the geographic area(s) identified in Exhibit A.

g) **"Hosting Affiliate's Application Server"** means the computer(s) dedicated by Hosting Affiliate for the purpose of hosting the Product for access over the Internet.

h) **"Supported Browsers"** means Microsoft Internet Explorer, version 5.0 and higher.

3. **RESELLER'S OBLIGATIONS**

a) **Best Efforts.** Hosting Affiliate will use its best efforts throughout the Territory to (i) promote, solicit and obtain

**MROI, Inc.**

Signature _Nancy M Guray_

Printed Name _Nancy M Gilroy_

Title _VP, Contracts_

Agreement Date _9/23/02_
_11/4/02_

**Hosting Affiliate:**

Signature _____

Printed Name _T.R. Bevington_

Title _President / CEO_

Date _11-4-02_        Rev. 7/22/02

Customers for the Products, and (ii) host and provide ASP services to Customers in accordance with the highest industry standards and fulfill all of its obligations under all Customer ASP Agreements, and (iii) develop the good will and reputation of MROI.

b) **Internal Copy.** MROI will provide Hosting Affiliate with a single copy of the Products at no charge (the "Internal Copy"). Subject to this Agreement, MROI grants Hosting Affiliate a non-exclusive and non-transferable license to use the Internal Copy solely to provide Customers with access to a hosted version of the Product and remotely conduct Customer demonstrations within the Territory. MROI will periodically offer updates to the Internal Copy as new versions become commercially available. Hosting Affiliate will not sub-license, assign or otherwise transfer the Internal Copy to any person without MROI's prior approval. Hosting Affiliate will only provide hosting services to those Customers who have agreed to be bound by the terms and conditions as defined in Article 1 (a) and have paid the appropriate Fees. Hosting Affiliate will only conduct Product demonstrations via remote access to Hosting Affiliate's Application Server and under circumstances where Hosting Affiliate is in direct control of the demonstration, and where all confidential information and materials related to the Products are removed from the prospective Customer's premises at the end of each business day.

c) **Promotional Literature.** Hosting Affiliate will use the brochures and other promotional literature describing the Products that MROI may provide to Hosting Affiliate in the English language (the "Promotional Literature"). Hosting Affiliate may reproduce the Promotional Literature for distribution within the Territory.

d) **Prices.** Hosting Affiliate will pay the agreed upon prices as defined in Exhibit A.

4. **MROI'S OBLIGATIONS**

a) **Marketing Materials.** MROI will provide Hosting Affiliate, at no additional charge, with the initial quantity of Promotional Literature that MROI deems appropriate for Hosting Affiliate to promote the Products and solicit Customers.

b) **Enhancements.** MROI will offer Hosting Affiliate the Enhancements within a reasonable time from when they become generally available. This will not be interpreted to require MROI to (i) develop and release Enhancements or (ii) customize the Enhancements to satisfy the particular requirements of Customers. MROI may, at its discretion, release certain Enhancements as separately-priced options or upgrades. MROI will consider using Hosting Affiliate as a Beta Client.

5. **SALES PROCESS.**

a) **Notification.** When Hosting Affiliate or MROI locates a prospective Application Hosting Customer, the locating party will be responsible for notifying the other party.

Hosting Affiliate will be responsible for closing the sale. If Hosting Affiliate requires assistance in closing the sale, MROI shall, within reason, provide resources at no cost to Hosting Affiliate.

b) **Contracting.** Hosting Affiliate will ensure that all customers using the hosted version of the Product agree to be bound by the terms and conditions as defined in Article 1 (a). For Customers who wish to purchase a perpetual license, MROI will contract directly with each Customer, using such forms and processes as MROI sees fit. If a prospective Customer requests a change in the terms contained in MROI's standard agreements, MROI will attempt in good faith to reach terms with each acceptable, bona fide prospective Customer referred by Hosting Affiliate.

c) **Fees.** For Customers who actually purchase a perpetual license as a result of Hosting Affiliate's referral, MROI will pay Hosting Affiliate a referral fee as set forth on Exhibit A for each Customer. For Customers who contract with Hosting Affiliate for access to the hosted version of the Product, Hosting Affiliate will pay MROI the license fees set forth in Exhibit A.

d) **Exclusions.** MROI will not be obligated to pay Hosting Affiliate with respect to any Customer who signs a contract after the expiration of six months from Hosting Affiliate's referral. MROI will not be obligated to pay Hosting Affiliate any fees with respect to Customers that MROI had a prior business contact or relationship with; MROI must notify Hosting Affiliate of this exclusion within 30 days following Hosting Affiliate's written referral.

e) **Payment.** Both parties agree that any fees owed shall be paid within thirty (30) days following the receipt of net fees.

6. **NO WARRANTY, SUPPORT OR LIABILITY.**

a) **Limited Pass-Through Performance Warranty.** MROI grants the following limited performance warranty to Hosting Affiliate for purposes of pass-through to Customers. For a period of ninety (90) days after the purchase by the Customer of the right and license to access and use a Product, MROI warrants to Hosting Affiliate that such Product shall conform to, and operate substantially in accordance with the documentation provided to Hosting Affiliate by MROI. RESELLER'S SOLE AND EXCLUSIVE REMEDY AND MROI'S SOLE AND EXCLUSIVE LIABILITY FOR BREACH OF THIS WARRANTY SHALL BE THE REPAIR OR REPLACEMENT OF DEFECTIVE OR NON-CONFORMING SOFTWARE PRODUCT UNITS OR CANCELLATION OF ANY UNUSED PORTION OF THE CONTRACT. MROI shall have no liability or obligation to any Customer of any kind or nature, and Hosting Affiliate shall indemnify MROI from and against any and all Customer claims, including without limitation all claims arising under all Customer ASP Agreements.

b) **Disclaimer.** ALL WARRANTIES, CONDITIONS, REPRESENTATIONS, INDEMNITIES AND GUARANTEES WITH RESPECT TO THE PRODUCTS, WHETHER EXPRESS OR IMPLIED, ARISING BY LAW, CUSTOM, PRIOR ORAL OR WRITTEN STATEMENTS BY MROI OR OTHERWISE (INCLUDING, BUT NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE OR USE OR AGAINST INFRINGEMENT) ARE HEREBY OVERRIDDEN, EXCLUDED AND DISCLAIMED.

c) **Support.** Hosting Affiliate shall (a) on an ongoing basis monitor and take advantage of the technical and support-related resources made available by MROI on-line, and (b) promptly install and/or apply all Enhancements, corrections, bug fixes, updates and upgrades which may be made available by MROI from time to time, and (c) maintain the Products hosted by Hosting Affiliate at the highest release level made generally available by MROI, and provide all Customers with commercially reasonable telephone support, functional assistance, advice, workarounds and maintenance. MROI shall provide Hosting Affiliate with all escalation technical support to rectify MAXIMO software related issues. MROI shall have no liability or obligation to any Customer of any kind or nature, and Hosting Affiliate shall indemnify MROI from and against any and all Customer claims, including without limitation all claims arising under all Customer ASP Agreements.

d) UNDER NO CIRCUMSTANCES WILL MROI, ITS LICENSORS, AGENTS, RESELLERS OR RELATED COMPANIES BE LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, PUNITIVE OR INCIDENTAL DAMAGES OR LOST PROFITS, WHETHER FORESEEABLE OR UNFORESEEABLE, BASED ON CLAIMS OF AGENTS OR ITS CUSTOMERS (INCLUDING, BUT NOT LIMITED TO, CLAIMS FOR LOSS OF DATA, GOODWILL, USE OF MONEY OR USE OF THE SOFTWARE, INTERRUPTION IN USE OR AVAILABILITY OF DATA, STOPPAGE OF OTHER WORK OR IMPAIRMENT OF OTHER ASSETS), ARISING OUT OF BREACH OR FAILURE OF EXPRESS OR IMPLIED WARRANTY, MISREPRESENTATION, NEGLIGENCE, STRICT LIABILITY IN TORT OR OTHERWISE. IN NO EVENT WILL THE AGGREGATE LIABILITY WHICH MROI, ITS LICENSORS AND RELATED COMPANIES MAY INCUR IN ANY ACTION OR PROCEEDING EXCEED THE TOTAL AMOUNT ACTUALLY PAID TO MROI BY AGENT FOR THE SPECIFIC ITEM THAT DIRECTLY CAUSED THE DAMAGE. THIS SECTION WILL NOT APPLY ONLY WHEN AND TO THE EXTENT THAT APPLICABLE LAW SPECIFICALLY REQUIRES LIABILITY, DESPITE THE FOREGOING EXCLUSION AND LIMITATION.

7. **INFORMATION.**

a) **Confidentiality.** Hosting Affiliate acknowledges that the Products and associated documentation, manuals, technical and functional specifications, and MROI's technical, financial, marketing, strategic and operational plans and strategies incorporate confidential and proprietary information developed or acquired by or licensed to MROI (the "Information"). Hosting Affiliate will take all reasonable precautions necessary to safeguard the confidentiality of the Information, including without limitation (i) those taken by Hosting Affiliate to protect its own confidential information and (ii) those which MROI may reasonably request from time to time. Hosting Affiliate will not allow the removal or defacement of any confidentiality or proprietary notice placed on the Products or other items of Information. MROI mutually agrees to take all reasonable precautions necessary to safeguard the confidentiality of Hosting Affiliate's proprietary and confidential information including Hosting Affiliate's platform.

b) **Ownership.** All patents, copyrights, trade secrets and other proprietary rights in or related to the Products and Information are and will remain the exclusive property of MROI or its licensors, whether or not specifically recognized or perfected under the laws of the Territory. Hosting Affiliate will not take any action that jeopardizes MROI's or its licensors' proprietary rights or acquire any right in the Products or Information, except the limited rights specified in this Agreement. Unless otherwise agreed, MROI or its licensor will own all rights in any copy, portion, and extract, translation, selection, compilation and derivation of the Products, Promotional Literature or any improvement or development thereof and all applications developed using the Products.

c) **Use.** Hosting Affiliate will use the Products and Information solely to perform its hosting and ASP services and marketing activities pursuant to this Agreement. Except as specifically authorized under this Agreement, Hosting Affiliate will not copy the Products or items of Information without MROI's prior approval. Hosting Affiliate will not translate, modify, adapt, decompile, disassemble or reverse engineer the Products, except as and to the extent specifically authorized by applicable law. Hosting Affiliate's use of the Products shall be limited to use for development in support of the hosting arrangement defined in this Agreement.

d) **Disclosure.** Hosting Affiliate will not disclose, in whole or in part, the Products or any other item that MROI designates as confidential to any person, except to (i) Customers as and to the extent contemplated under this Agreement and (ii) those of Hosting Affiliate's employees who require access to perform its obligations under this Agreement and have executed a confidentiality agreement protecting the Products and Information as required hereunder.

e) **Unauthorized Use or Disclosure.** Hosting Affiliate acknowledges that any unauthorized use or disclosure of

the Products or any other item of Information may cause irreparable damage to MROI or its licensors. If an unauthorized use or disclosure occurs, Hosting Affiliate will promptly notify MROI and take, at Hosting Affiliate's expense, all steps which are necessary to recover the Product or Information and to prevent its subsequent unauthorized use or dissemination, including availing itself of actions for seizure and injunctive relief. If Hosting Affiliate fails to take these steps in a timely and adequate manner, MROI may take them in its own or Hosting Affiliate's name.

8. **MARKS.**

a) **Ownership.** All trademarks, service marks, trade names, logos or other words or symbols identifying the Products or MROI's business (the "Marks") are and will remain the exclusive property of MROI or its licensors, whether or not specifically recognized or perfected under the laws of the Territory. Hosting Affiliate will not acquire any right in the Marks, except for the limited right to market and promote the Products and Hosting Affiliate's services as provided in Sections 1, 3 and 8(b) of this Agreement. Hosting Affiliate will not register, directly or indirectly, any trademark, service mark, trade name, company name or other proprietary or commercial right that is identical or confusingly similar to the Marks or that constitute translations thereof into the language(s) spoken within the Territory.

b) **Use.** Hosting Affiliate will use the Marks exclusively to advertise and promote the Products within the Territory. All advertisements and promotional materials will (i) clearly identify MROI as the owner of the Marks, (ii) conform to MROI's then-current trademark and logo guidelines and (iii) otherwise comply with any local notice or marking requirement contemplated under the laws of the Territory.

9. **TERM AND TERMINATION.**

a) **Term.** This Agreement will become effective, as of the Agreement date, for a three (3) year period upon its execution by MROI and Hosting Affiliate unless terminated as defined below and in Exhibit A.

b) **Renewal.** Upon the expiration of the initial term specified in Paragraph 9(a), this Agreement may be renewed for subsequent terms of 24 months, but only if the parties expressly agree to do so at least 30 days before the expiration date. Either party may withhold its consent to an extension entirely in its discretion, with or without cause and without any liability as a result.

c) **Termination for Convenience.** Either party may terminate this Agreement for any reason, with or without cause, upon 90 days' written notice to the other party.

d) **Termination for Cause.** Either party will have just cause to terminate this Agreement, without judicial or administrative notice or resolution, immediately upon notice to the other party, if the other party or any of its

employees breaches any obligation under this Agreement and such party fails to cure the breach to the notifying party's satisfaction within 30 days after it demands a cure.

e) **Termination Obligations.** Upon the expiration or termination of this Agreement, all rights granted to Hosting Affiliate hereunder will immediately cease, and Hosting Affiliate will (i) promptly pay any Fees owed; (ii) promptly comply with the termination obligations specified below and (iii) otherwise cooperate with MROI to terminate relations in an orderly manner. MROI agrees to extend Hosting Affiliate's rights under the terms of this Agreement, for 24 months or until the termination of existing agreements with Hosting Affiliate's customers, whichever occurs first, solely to support any existing Customers at the time of termination; thereafter, the obligations defined below shall be enforced. Notwithstanding the foregoing, in the event that MROI terminates this Agreement for convenience, Hosting Affiliate shall be granted the right to use such Products from MROI at MROI's then current reseller discount, to continue to support its existing Customers.

i) **Products.** Except as defined in section 9 (e), Hosting Affiliate will purge from its computer systems, storage media and other files and, at MROI's option, destroy or deliver to MROI or its designee all Products within Hosting Affiliate's possession or control, including, but not limited to, all source code.

ii) **Materials.** The Parties will, at their individual option, destroy or deliver to each other or each other's designee all items within each other's possession or control that contain any Information or bear a Mark.

f) **Disclaimer.** Upon the expiration of this Agreement or its termination by either party for any reason, Hosting Affiliate will not be entitled under local law or otherwise to receive any indemnity or payment from MROI as a result of such expiration or termination, whether for actual, consequential, indirect, special or incidental damages, costs or expenses, whether foreseeable or unforeseeable (including, but not limited to, labor claims and loss of profits, investments or good will), any right to which Hosting Affiliate hereby waives and disclaims.

g) **Survival.** The provisions of Sections 6, 7, 8 & 9 will survive the expiration or termination of this Agreement.

10. **MICSELANEOUS**

a) **U.S. Export Restrictions.** Hosting Affiliate acknowledges that the Products and all related technical information, documents and materials are subject to export controls under the U.S. Export Administration Regulations. Hosting Affiliate will not export, re-export, divert or transfer, directly or indirectly, any such item or direct products thereof to Cuba, Libya, North Korea or any country that is embargoed by Executive order, unless Hosting Affiliate has obtained the prior written authorization of MROI and the U.S. Commerce Department. Upon notice to Hosting Affiliate, MROI may

modify this list to conform to changes in the U.S. Export Administration Regulations.

b) **Compliance With Laws.**

 i) **Local Compliance.** Hosting Affiliate will, at its expense, obtain and maintain the governmental authorizations, registrations and filings that may be required under the laws of the Territory to execute or perform this Agreement. Hosting Affiliate will otherwise comply with all laws, regulations and other legal requirements within the Territory that apply to this Agreement, including tax and foreign exchange legislation. Hosting Affiliate will promptly notify MROI of any change in these laws, regulations or other legal requirements that may affect the importation of the Products or Hosting Affiliate's performance of this Agreement.

 ii) **Unlawful Payments.** Hosting Affiliate will not use any payment or other benefit derived from MROI to offer, promise or pay any money, gift or any other thing of value to any person for the purpose of influencing official actions or decisions affecting this Agreement, while knowing or having reason to know that any portion of this money, gift or thing will, directly or indirectly, be given, offered or promised to (i) an employee, officer or other person acting in an official capacity for any government or its instrumentalities or (ii) any political party, party official or candidate for political office.

c) **Independent Parties.** Hosting Affiliate and MROI are independent parties. Nothing in this Agreement will be construed to make either party an agent, employee, franchisee, joint venture or legal representative of the other party. Hosting Affiliate will neither have nor represent itself to have any authority to bind MROI to any obligation.

d) **Notices.** Any notice, approval or other communication required or permitted under this Agreement will be given in the English language and will be sent in writing by telex, telefax, courier or certified mail, postage prepaid, to the address specified on page one or to any other address that may be designated by prior notice. Any notice or other communication delivered by telex or telefax (with answerback) will be deemed to have been received the 1st day after it is sent. Any notice or other communication sent by courier will be deemed to have been received on the 3rd day after its date of posting. Any notice or other communication sent by certified mail will be deemed to have been received on the 7th business day after its date of posting. Notices to MROI must be sent to the attention of its General Counsel.

e) **Assignment.** Hosting Affiliate may not delegate, sub-contract or otherwise transfer this Agreement or any of its rights or obligations without the MROI's prior written approval. Prior approval shall not be required upon a change of ownership provided such new owner is not a competitor of MROI. For the purpose of this Agreement, a "Competitor" shall be defined as an entity in the EAM, e-commerce or IT asset management market sector.

f) **Waiver, Amendment, Modification.** Any waiver, amendment or other modification of this Agreement will not be effective unless in writing and signed by the party against whom enforcement is sought.

g) **Language.** This Agreement will be interpreted and performed in the English language.

h) **Legal Actions.** All actions arising under or in connection with this Agreement shall be conducted in the appropriate state or federal courts in Massachusetts, and each party hereby irrevocably consents to exclusive jurisdiction and venue in Massachusetts, and waives its right to pursue legal action under this Agreement in any other jurisdiction. Nothing in this Agreement will restrict, prevent, hinder or delay MROI from seeking interim or permanent injunctive relief against Hosting Affiliate, in the courts having jurisdiction over the Hosting Affiliate.

i) **Equitable Relief.** The covenants and agreements of Hosting Affiliate under this Agreement, including without limitation those specified in Sections 1, 7, 8, 9(e) and 10(e), are of a special and unique character, and Hosting Affiliate acknowledges that money damages alone will not reasonably or adequately compensate MROI for any breach of such covenants and agreements. Therefore, the parties expressly agree that in the event of the breach or threatened breach of any such covenants and agreements which MROI may have, at law, in equity, or otherwise (such as its right to recover monetary damages), MROI shall be entitled to injunctive or other equitable relief compelling specific performance of, and other compliance with, such covenants and agreements.

j) **Governing Law.** This Agreement will be governed by and interpreted in accordance with the laws of the Commonwealth of Massachusetts, excluding its conflict of law principles. MROI and Hosting Affiliate exclude the United Nations Convention on Contracts for the International Sale of Goods from this Agreement and from all transactions hereunder.

k) **Entire Agreement.** This Agreement and its Exhibits constitute the complete and entire statement of all terms, conditions and representations of the agreement between MROI and Hosting Affiliate with respect to its subject matter and supersedes all prior writings or understandings.

| Exhibit A: | Business Term | | |
|---|---|---|---|
| Exhibit B: | Customer ASP Agreement | | |
| Exhibit C: | Referral | Registration | Form |

## Exhibit A

### to MRO Software, Inc. Hosting Affiliate Agreement

### between MRO Software Inc. and M2 Consulting, Inc.

**Dated:** ~~9/23/02~~ 11-4-02    

### B u s i n e s s   T e r m s

1. **Term:**  Three (3) years_from execution.

2. **Products:**  MAXIMO version 4.X and 5.X plus any enhancements or new versions which may be provided by MROI from time to time.

3. **Territory:**  North America (unless otherwise agreed upon in writing)

4. **Fees:**  For Customer's using the Product(s) on a hosted basis, Hosting Affiliate agrees to pay MROI 50% of the net monthly fees received by Hosting Affiliate (on a monthly basis).  For existing Customer's as of the date of this Agreement, Hosting Affiliate agrees to continue to pay MROI 20% of the net monthly fees received by Hosting Affiliate (on a monthly basis).

   For Customer's who purchase the Product(s) directly from MROI, there will be no fees owed to MROI for such hosting services.

   MROI agrees to pay a 5% referral fee to Hosting Affiliate for referrals which result in sales to MROI(as further defined in the Agreement).  The information on Exhibit C must be completed and accepted in order for such fees to be paid to Hosting Affiliate.

   Hosting Affiliate agrees to pay all fees due (for it's current end-user base) upon signing this Agreement

5. **Payment Terms:**  NET 30 from receipt of fees paid.

6. **Lead Registration**  Hosting Affiliate will provide MROI a report of all potential clients as they become known to Hosting Affiliate.  In the event of conflict between MROI's and Hosting Affiliates potential clients, MROI will respond to Hosting Affiliate within five (5) business days.

7. **Program Fee:**  None

---

**MRO Software, Inc.**

By: *Nancy M Gilroy*

*Nancy M Gilroy*
(Name and Title) *VP, contracts*

Date: *9/23/02*

(Hosting Affiliate)

By: _____

*T.R. Bevington, President*
(Name and Title)

Date: *11/4/02*

---

EXHIBIT B



*Facility Operations Maintenance Solutions*

## Mantis<sup>SM</sup> for MAXIMO® Application Hosting Agreement

This Application Hosting Agreement ("Agreement"), is made and entered into as of this _____ day of **October, 2001** ("Effective Date"), by and between **M² Consulting, Inc.** ("Company"), a Georgia corporation with a principal place of business at **57-B Jefferson Parkway, Newnan, GA 30263**, and _____ _____. ("Customer"), a _____ corporation with a principal place of business at _____, with reference to the following facts and premises:

**BACKGROUND**

Company provides specialized software developed by third parties ("Developer") for use, and provides related services, in the field of Enterprise Asset Management and Facility Operations and Maintenance. Subject to the terms set forth below, Customer desires to obtain the right to use certain of the specialized software provided by Company and to retain Company to provide certain related services, and Company desires to grant Customer the right to use certain of the specialized software licensed by Company and to provide certain related services to Customer, as more fully described herein.

NOW, THEREFORE, in consideration of the above premises and the mutual agreements set forth below, the parties agree as follows:

1.    **Definitions.**

Defined terms, indicated by the use of initial capitalization, will have the meaning ascribed to them in context on first usage herein.

Licensed Software:    MAXIMO®, SQL, CITRIX®, Windows 2000 Advanced Server Edition

Customer Data:    Data used by Customer on the MAXIMO® application.

Hosting Fee:    Monthly fee paid by Customer to Company for the services rendered as set forth in Exhibit A.

2.    **Hosted Environment.**

2.1    General:  For the term of this Agreement, Company, either directly or through the use of third parties retained by Company, will provide Customer with commercially reasonable access to an on-line, real-time, secure, web-driven application service provider environment ("Hosted Environment"), through which Customer will be able to access the software products, programs, documentation and related files and materials listed on the attached Exhibit A (collectively, "Software"), and, to the extent applicable, access any output generated by the Software in accordance with the published specifications of the Software.  Except as expressly provided in this Agreement and any exhibits attached hereto, Customer will have no right to access or obtain copies of the Software other than through the Hosted Environment.

*57-B Jefferson Parkway, Newnan, Georgia 30263*
*Tel. 770-253-1183    Fax 770-253-6228    email: m2c@m2consulting.com*

2.2     <u>Limitations on Use and Access</u>:  The Hosted Environment will be accessible by the number of authorized users of Customer designated in Exhibit A ("Authorized Users").  Company will administer all passwords necessary to allow the authorized number of Users of Customer to access the Hosted Environment and the Software in accordance with the provisions of this Section 2 and Section 4 below. Customer represents, warrants and covenants that Authorized Users will access the Hosted Environment solely in connection with Customer's exercise of the rights and licenses granted to it hereunder.

2.3     <u>Hosted Equipment; Client Computer</u>:  Company, at its sole expense, either directly or through the use of third parties retained by Company, will provide such server hardware, server-resident computer software, telecommunications or other network communications, and other equipment (collectively, "Hosted Equipment") linking the Hosted Environment to the World Wide Web as are commercially reasonable and necessary to provide Customer with access to the Hosted Environment.  As between the parties, the Hosted Equipment will at all times be the property of Company.  Customer, at its sole expense, will be responsible for providing each Authorized User with access to the World Wide Web and a client personal computer, including browser software, telecommunications, data connections, and other equipment, that meets the minimum specifications set forth in the attached Exhibit B, which specifications may be modified by Company if Company, in its sole discretion, modifies or upgrades the Hosted Equipment or Hosted Environment ("Client Computer").

2.4     <u>Maintenance of Hosted Environment and Software</u>:  In order to provide Customer with commercially reasonable access to the Hosted Environment, Company will periodically schedule the complete or partial shutdown of the Hosted Equipment for maintenance, bug fixes, or other reasons ("Scheduled Maintenance").  Company will provide Customer with at least twenty-four (24) hours notice of any Scheduled Maintenance.  The occurrence of any Scheduled Maintenance will not limit or affect Customer's obligation to pay Company any of the fees set forth in Exhibit A.

2.5     <u>Hosted Technical Support</u>:  For the term of this Agreement, Company, either directly or through the use of third parties retained by Company, will provide to Customer the technical support services relating to the Hosted Environment set forth in the attached Exhibit C ("Hosted Technical Support").  Company will have no obligation to provide technical support services beyond the scope of the Hosted Technical Support.

2.6     <u>Service Interruptions</u>:  Customer will promptly notify Company via telephone or e-mail of any unexpected or unscheduled interruption in the ability of Authorized Users to access the Hosted Environment ("Service Interruption").  An "Interruption Period" will mean a period of time commencing on Company's receipt of a notification from Customer of any unexpected or unscheduled interruption in the ability of Authorized Users to access the Hosted Environment and continuing until such time as such access is restored.  Company will use commercially reasonable efforts to remedy any Service Interruption within four (4) hours of Company's receipt of such notification from Customer and, in any event, as soon as reasonably possible.  If the aggregate duration of any Interruption Periods exceeds forty-eight (48) hours in any given calendar month or, alternatively, if the aggregate duration of any Interruption Periods exceeds sixty (60) hours during any three (3) consecutive calendar months, then Customer will have the right to terminate this Agreement without obligation to pay the Fees associated with the remainder of the term as defined in Exhibit A upon written notice to Company.

3.      **Software Support Services.**

The Company will provide to Customer the maintenance and technical support services relating to the Software set forth in the attached Exhibit C and in the manner specified in and according to Exhibit C. Company will have no obligation to provide any other services relating to the support of the Software beyond the scope of the Software Support Services.

Mantis^SM for MAXIMO® Application Hosting Agreement                              October 19, 2001

4.        **Grant of Limited License; Restrictions.**

4.1        Grant of License:  Subject to the terms of this Agreement, and in consideration of Customer's obligations hereunder, including without limitation payment of the fee set forth in Exhibit A, the Company hereby grants to Customer a nonexclusive, non-transferable, non-assignable, revocable license, without the right to sublicense or assign, to access the Hosted Environment and to use and display the Software solely in connection with Customer's internal business operations in the United States ("Software License").  The Software may incorporate or include certain software developed and licensed to the Company by third parties, in which case Company hereby grants to Customer to the maximum extent possible the rights that Company is permitted to grant under the license between Company and the applicable third party.

4.2        Reservation of Rights:  The Company reserves all rights not expressly granted to Customer herein, and no other rights and licenses are granted or will be deemed to be granted hereunder. Customer does not have the right to assign, transfer or sublicense to any third party any of the rights or licenses granted herein without the Company's prior written consent.

4.3        Restrictions on Use:  Customer represents, warrants and covenants that Customer will not distribute, transmit, display, disclose, divulge, reveal, report, publish or transfer the Software to any third party or reproduce or create derivative works based upon the Software or any portion thereof.  Customer further represents, warrants and covenants that neither Customer nor any of its employees subcontractors or other personnel will attempt to reverse engineer, reverse assemble, disassemble, decompile, or otherwise attempt to discover the source code of the Software.

4.4        Ownership:  Customer stipulates and agrees that Company is and will remain the exclusive owner of all rights, licenses and interests in and to the Software.

5.        **Customer Data.**

5.1        Customer Data.  In connection with Customer's use of the Software hereunder, Customer will provide to Company via the Hosting Environment the data set forth on the attached Schedule A ("Customer Data").  Customer will be solely responsible for the accuracy of data.  Customer will be responsible for providing Company with updated and modified Customer Data as necessary and appropriate, the accuracy of which will be promptly confirmed by Customer in accordance with the preceding sentence.

5.2        Grant of License to Company.  Customer hereby grants to Company a non-exclusive, perpetual, royalty-free, irrevocable, worldwide license to use, record, reproduce, transmit, distribute, display and create derivative works based upon Customer Data in connection with Customer's use of Software hereunder and the performance of Company's obligations hereunder.

5.3        Maintenance of Customer Data.  Notwithstanding the provisions of Section 5.1, Company will use commercially reasonable efforts to prevent the loss of or damage to Customer Data in its possession and will maintain commercially reasonable back-up procedures and copies to facilitate the reconstruction of any Customer Data that may be lost or damaged by Company.  Company will promptly notify Customer of any loss of or damage to Customer Data.  Upon request of Customer, Company will, at Customer's sole cost and expense, use best efforts to reconstruct any Customer Data that has been lost or damaged by Company.

6.        **Fees; Expenses; Terms of Payment.**

6.1        <u>Hosting Fee</u>:  Customer will pay the Hosting Fee ("Fee") set forth in Exhibit A.  The Fee set forth in Exhibit A is nonrefundable and will not be deemed a credit against any other fees due hereunder. Customer will pay the monthly Fee set forth in Exhibit A within thirty (30) days of its receipt of an invoice therefore

6.2        <u>Expenses</u>:  Customer will be responsible, and agrees to reimburse Company, for all reasonable travel and living expenses approved in advance by Customer in writing and incurred by Company in providing Hosted Technical Support and Consulting Services hereunder, including without limitation airfare, hotel accommodations and per diem meal expenses. Company will invoice Customer separately for any travel and living expenses under this paragraph, and Customer agrees to reimburse Company for such expenses within thirty (30) days of its receipt of such invoice.

6.3        <u>Taxes</u>:  In addition to all other amounts specified in this Agreement, Customer will be responsible for, and agrees to pay, all applicable state, local, federal and governmental taxes, duties or charges that may be levied upon either party in connection with this Agreement, except for taxes based on Company's net income.

6.4        <u>Payment; Late Charges</u>:  All payments due to Company hereunder will be paid in United States dollars.  Customer may not withhold any amounts due hereunder.  Company reserves the right to (i) deny Customer access to the Hosted Environment and Software, (ii) discontinue the provision of Software Support Services, and/or (iii) assert appropriate liens, until all amounts due are paid in full. Company further reserves the right to charge Customer interest on any unpaid balance at the rate of one and one-half percent (1.5%) per month, or at the maximum rate permitted by law if such maximum rate is less than one and one-half percent (1.5%) per month.  Customer agrees to pay any costs of collection (including reasonable legal and professional fees) incurred in collecting any amounts due hereunder.

7.        **Term and Termination.**

7.1        <u>Term</u>:  This Agreement will be effective as of the Effective Date and remain in full force and effect as long as Customer is current with the payment of all amounts due to Company hereunder, unless terminated earlier by the parties as provided herein.  Customer agrees to a minimum Term of twenty-four (24) months and agrees to pay in full in the event of termination by Customer.  In the event Customer terminates the Agreement prior to the expiration of the then current term for reasons other than material and uncured breach by Company, Customer will incur termination penalties ("Early Termination Fees"), equal to seventy-five percent (75%) of the total monthly recurring charges for the remainder of the term of the hosting service contract.

7.2        <u>Termination</u>:

7.2.1        Notwithstanding any provision herein to the contrary, Company will have the right, in addition to any other rights and remedies available to Company, to terminate this Agreement effective immediately upon written notice to Customer in the event of any breach by the Customer of any of the provisions of Sections 4 and 8.

7.2.2        Notwithstanding any provision herein to the contrary, each party will have the right, in addition to any other rights and remedies available to the party, to terminate this agreement by written notice to the other party if:

(a)    the other party breaches any material provision of this Agreement and, in the case of a breach capable of remedy, fails to cure such breach within thirty (30) days of the receipt by the breaching party of notice specifying the breach and requiring its remedy;

(b)    the other party (i) becomes insolvent, (ii) makes a general assignment for the benefit of creditors, (iii) suffers or permits the appointment of a receiver for its business and assets, (iv) becomes subject to any proceeding under the bankruptcy or insolvency law, whether domestic or foreign, and such proceeding is not dismissed within sixty (60) days, or (v) has liquidated, voluntarily or otherwise.

7.3      Effect of Termination:  Upon any expiration or termination of this Agreement, the licenses granted to Customer hereunder will immediately terminate, and at a party's request and option, the other party will either promptly return and provide to the requesting party all documents, copies, disks and other material of any kind containing any Proprietary Information of the requesting party [other than Customer Data] or destroy all such documents, copies, disks and other material of any kind. An officer of the other party will certify to the requesting party that the other party has complied with the terms of the preceding sentence respecting Proprietary Information.  The expiration or termination of this Agreement for any reason will not relieve Customer of its obligation to pay any amount due and owing prior to the date of expiration or termination and will not affect any other rights or liabilities of the parties which may have accrued prior to the date of expiration or termination.

7.4      Survival:  In addition to such other surviving obligations as are expressly identified elsewhere in this Agreement, the provisions of Section 8 will survive any expiration or termination of this Agreement.

8.      **Confidentiality.**

8.1      Proprietary Information:  "Proprietary Information" will mean all of the information, data and software furnished by one party to the other in connection with this Agreement, whether in oral, written, graphic or machine-readable form, including without limitation object code, source code, software tool specifications, functions and features, integration and shared data block specifications, financial statements, corporate and stock information, file layouts, marketing strategies, business, product or acquisition plans, current business relationships or strategies and customer lists.  Notwithstanding the foregoing, and excepting any proprietary financial information, "Proprietary Information" will not include information which:  (i) may be publicly disclosed by the party disclosing the information either prior to or subsequent to the receipt of such information by the receiving party; (ii) is or becomes generally known in the trade through no fault of the receiving party; (iii) may be lawfully disclosed to the receiving party by a third person to this Agreement who has lawfully acquired the Proprietary Information; or (iv) was independently developed by the receiving party; provided, however, that the receiving party hereby stipulates and agrees that, if it seeks to disclose, display, divulge, reveal, report, publish or transfer, for any purpose whatsoever, any Proprietary Information, such receiving party will bear the burden of proving that any such information was independently developed or is or became publicly available without any such breach.  Without limiting the generality of the foregoing, the parties stipulate and agree that "Proprietary Information" will specifically include: (i) the Software; (ii) the Hosted Environment; [and (iii) any Customer Data provided by Customer to Company hereunder].  A party's failure to mark any Proprietary Information as confidential, protected or proprietary will not affect its status as Proprietary Information under this Agreement.

8.2      Treatment of Proprietary Information:  Each party acknowledges that, in performing its obligations and exercising its rights hereunder, a party may acquire the Proprietary Information of the other party.  As a material inducement to the other party to disclose such Proprietary Information, each party covenants and agrees that it will not, except with the prior written consent of the other party, at any time directly by itself or indirectly through any agent or employee: (i) reproduce, distribute, transmit, publicly display, modify, create derivative works based upon, or disclose, deliver, display, divulge, reveal, report, publish or transfer to any person or entity, for any purpose whatsoever, any Proprietary

Information of the other party or (ii) use Proprietary Information of the other party for any purpose other than in connection with the performance of its obligations or the exercise of its rights hereunder. Each party further covenants and agrees to handle the Proprietary Information of the other party in the same manner that the party handles its own most confidential information and, in any event, to take all steps reasonably necessary to preserve the confidentiality of Proprietary Information, including without limitation adopting appropriate confidentiality policies, inserting appropriate confidentiality terms in agreements with all employees and subcontractors, and maintaining Proprietary Information in a manner designed to assure that it will not be used or disclosed improperly.

8.3      Remedying Unauthorized Use:  A party will promptly notify the other party if it becomes aware of any unauthorized use or disclosure of any Proprietary Information of the other party and, at the other party's request, will take such action as may be reasonably necessary and legally permissible to terminate or remedy any unauthorized use or disclosure that results from any act or omission of the party or any of its employees, subcontractors or agents.

8.4      Injunctive Relief:  Each party stipulates and agrees that the disclosing party will suffer irreparable harm in the event of any breach of the provisions of this Section 8 and that monetary damages will be inadequate to compensate the disclosing party for such breach.  Accordingly, each party stipulates and agrees that, in the event of a breach or threatened breach of any of the provisions of this Section 8, in addition to and not in limitation of any other rights, remedies or damages available at law or in equity, the disclosing party will be entitled to a temporary restraining order, preliminary injunction and permanent injunction in order to prevent or restrain any such breach or threatened breach.

9.        **Warranties and Representations.**

9.1      Mutual Representations and Warranties: Each party represents and warrants that (a) it has the right to enter into this Agreement, and (b) all necessary actions, corporate or otherwise, have been taken to authorize the execution and delivery of this Agreement, which constitutes a valid and binding obligation of the party.

9.2      ASP Environment; Support Services:  Notwithstanding any provisions herein to the contrary, Company does not warrant that:  (i) Customer will at all times be able to gain access to the Hosted Environment; (ii) Customer's access to the Hosted Environment will at all times be uninterrupted or error-free; (iii) Hosted Equipment will at all times operate at stated maximum data transmission speeds; or (iv) Company will be able to resolve all problems related to the Software, Hosted Environment, Hosted Equipment, Hosted Technical Support or Software Support Services.  Customer stipulates and agrees that data processing and use of the Internet and World Wide Web entail the likelihood of some human and machine errors, omissions, delays and losses and represents and covenants that Customer will adopt reasonable measures to limit its exposure to such potential losses.

9.3      Title and Non-Infringement Warranty: Company warrants that it has the authority to grant the rights and licenses granted by this Agreement to Customer.  Company warrants that the use of the Software by Customer according to the terms of this Agreement will not infringe any United States patent or United States copyright of any third party.  In the event that any portion of the Software is held to infringe a United States patent or United States copyright of any third party, or a third party alleges that any portion of the Software infringes its United States patent or United States copyright, then Company, at its sole option, will either (i) procure for the Customer the right to continue use of the Software, (ii) replace or modify the Software so that it is non-infringing without substantially diminishing its capability, or (iii) if Company determines in its sole discretion that neither (i) nor (ii) are economically feasible, terminate this Agreement in its entirety and refund to Customer a pro rata portion of the License Fee paid by Customer based upon a five (5) year earning of such fee by Company.

9.4     Limited Warranty:  Customer assumes all responsibility for the selection of the Software and its use in an application service provider environment as appropriate to achieve the results intended by Customer.  Company warrants that, for a period of ninety (90) days after the Effective Date, the Software will materially conform to the technical specifications as published or as amended by the Developer from time to time ("Limited Warranty").  Any unauthorized changes to the Software will render null and void the Limited Warranty.  If, at any time during the warranty period, Customer discovers a material defect in the Software, Company will use its best efforts to correct such material defect and restore the Software to conformity with the Limited Warranty.

9.5     Disclaimer of Warranties:  THE EXPRESS WARRANTIES CONTAINED IN SECTIONS 9.1 THROUGH 9.4 HEREOF ARE THE ONLY WARRANTIES MADE BY COMPANY CONCERNING THE SOFTWARE, ASP ENVIRONMENT, ASP TECHNICAL SUPPORT, SOFTWARE SUPPORT SERVICES, AND THE LICENSES GRANTED HEREUNDER.  COMPANY HEREBY DISCLAIMS ALL OTHER WARRANTIES OF ANY KIND (WHETHER EXPRESS, IMPLIED, STATUTORY OR ARISING BY CUSTOM OR TRADE USAGE), INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY, DESIGN AND FITNESS FOR A PARTICULAR PURPOSE.  NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY COMPANY IN PERFORMING ITS OBLIGATIONS HEREUNDER WILL CREATE ANY WARRANTY OR IN ANY WAY INCREASE THE SCOPE OF THE WARRANTIES MADE BY COMPANY.


10.     **Indemnification.**

Company agrees to indemnify and hold harmless Customer, its corporate affiliates and any employee, director, officer or agent thereof, against all liability to third parties (including reasonable attorney's fees) arising from any breach of the express warranty contained in Section 9.3 hereof, provided, however, that Customer promptly notifies Company in writing of any such third party claim.  Company, at its sole option, may elect to conduct the defense of any such third party claim, including without limitation any settlement thereof, and Customer agrees to cooperate fully with such defense.


11.     **Limited Liability.**

COMPANY SHALL NOT BE LIABLE FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES OF ANY KIND WHATSOEVER, INCLUDING WITHOUT LIMITATION DAMAGES RESULTING FROM INTERRUPTION OF BUSINESS OR LOSS OF ANTICIPATED PROFITS, REVENUES, DATA OR BENEFITS, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF THE FORM (E.G., CONTRACT, TORT, WARRANTY OR OTHERWISE) OF ANY LEGAL OR EQUITABLE ACTION BROUGHT AGAINST COMPANY.  IN NO EVENT WILL COMPANY'S LIABILITY FOR ANY DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY DEFAULT OF COMPANY HEREUNDER, REGARDLESS OF THE FORM OF THE ACTION, EXCEED THE AMOUNT OF FEES ACTUALLY PAID TO COMPANY BY CUSTOMER HEREUNDER.

12.     **Rights and Liabilities of Developer(s).**

Customer and Company each agree that each Developer (including without limitation MRO Software, Inc., the Developer of MAXIMO) and its respective subsidiaries, affiliates and licensors (a) shall be third party beneficiaries of this Agreement and shall be entitled to directly enforce Customer's obligations hereunder, and (b) shall not be liable or responsible for any of Company's covenants or obligations under this Agreement (including without limitation Company's obligations reagarding warranty, services, support, or infringement), and Customer's sole rights or remedies with respect to this Agreement shall be against Company.

October 19, 2001

13.    **Publicity.**

Customer will not use the name or any trademarks, trade names and service marks of Company or its licensors, or the name of any person associated with Company or its licensors, for any purpose, including without limitation advertising and marketing, without the prior written consent of Company.

13.     **General Provisions.**

13.1     <u>Notices</u>:  All notices permitted or required by this Agreement will be personally delivered, sent by reputable private overnight courier with established tracking capability (such as FedEx, UPS, DHL or Airborne) postage pre-paid and marked for next business day delivery, or sent via certified mail postage prepaid to the address first set forth above marked to the attention of the signatory of this Agreement for the party, or to such other address or person as a party may designate in writing from time to time above.  Any notice sent in conformity with the preceding sentence will be deemed to have been received when (i) delivered in person, (ii) one (1) day after being sent by overnight courier, or (iii) five (5) days after being sent by certified mail.

13.2     <u>Entire Agreement</u>:  This Agreement, together with the attached Exhibits, which are incorporated by this reference as though fully set forth herein, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous written or oral understandings, agreements and communications with respect to such subject matter. This Agreement may be modified or amended only by a writing signed by both parties.

13.3     <u>Non-Waiver</u>:  The failure of either party to demand any performance when due, or to pursue any right or remedy arising from the other party's non-performance of any obligation, will not waive such party's right to demand such performance at a later time or estop or otherwise bar such party from asserting any claims, allegations or causes of actions, or seeking any remedies that arise from or relate to the other party's failure to perform.

13.4     <u>Force Majeure</u>:  Company will not be liable for any failure of or delay in performance directly or indirectly caused by acts of Customer, its agents, employees, or subcontractors, causes beyond the control of the Company, including but not limited to acts of God, acts of the public enemy, acts of the United States, any state or territory of the United States, or any political subdivision of the foregoing or the District of Columbia, fire, floods, epidemics, quarantine restrictions, strikes, civil commotions, freight embargoes, any unusually severe weather conditions, or defaults of or delays by Customer's employees, sub-contractors and suppliers.

13.5     <u>Governmental Laws and Regulations</u>:  To the extent that the Software is used for the purpose of complying with governmental laws, regulations or reporting, Customer will assume all responsibility for determining that the Software and any output from the Software is accurate and complete and satisfies any governmental requirements.  Any Software provided to or used by any governmental agency will be provided with "Restricted Rights," and Customer will place an appropriate Restricted Rights legend, in addition to all applicable copyright notices, on the Software prior to providing any governmental agency access to the Software.

13.6     <u>Choice of Law, Venue</u>:  This Agreement will be governed by the law of The State of Georgia without regard to its principles of conflicts of laws.  The parties stipulate and agree that any litigation arising from or relating to this Agreement will be filed and prosecuted before a court of competent subject matter jurisdiction in Georgia. The parties consent to the jurisdiction of such courts over them, stipulate to the convenience, efficiency and fairness of proceeding in such courts, and covenant not to assert any objection to proceeding in such courts based on the alleged inconvenience, inefficiency or unfairness of such courts.

13.7     <u>Independent Contractors</u>:  Each party and its respective employees are independent contractors in relation to one another with respect to all matters arising under this Agreement.  Nothing herein will be deemed to establish a partnership, joint venture, association or employment relationship between the parties.

Mantis<sup>SM</sup> for MAXIMO® Application Hosting Agreement                          October 19, 2001

13.8      <u>Severability</u>:  If any provision of this Agreement is unenforceable, the remaining provisions will remain in effect, to be construed as if the unenforceable provisions were originally deleted.


IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date by their duly authorized representatives.

**FOR CUSTOMER:**                                    **FOR COMPANY:**

By:      _____          By:      _____

Title:   _____          Title:   _____

Name:  _____          Name: _____

Date:   _____          Date:   _____

# EXHIBIT A

# Mantis<sup>SM</sup> for Maximo® Services

| | |
|---|---|
| **Customer Name:** | **NSTAR Services Company** |
| Term of Software License and Hosting Services Agreement: | **24 Months** |
| Number of Concurrent Users: | **Concurrent users six (6)** |
| Monthly Hosting Fee: | **$340/concurrent user/month** |

**Product Functionality: Maximo® Enterprise**

| PROGRAMS LICENSED | Hosting Service |
|---|---|
| Equipment | Included |
| Work Orders | Included |
| Preventive Maintenance | Included |
| Job Plans | Included |
| Resources | Included |
| Labor | Included |
| Calendars | Included |
| Purchase Requisitions | Included |
| Purchase Orders | Included |
| Inventory | Included |
| Safety | Included |
| Work Manager – Dispatch | Included |
| Work Manager - Planning | Included |
| Sqr Integration | Included |
| Crystal Integration | Included |
| Purchase Quotations | Included |
| Invoice Matching | Included |
| Hyperlink (App. Launching) | Included |
| Custom Applications | Included |
| Asset Catalog | Included |
| GI Account Configuration | Included |

| | |
|---|---|
| Database S/W: | **SQL Server 7.0** |
| Thin Client S/W: | **Citrix® XP** |
| Operating System: | **Windows 2000 Advanced Server** |

## Implementation Services (One-time Fees)

1. Migrate exiting Database to Hosting Platform ................................................................ N/C

2. Register and Administer Named Users ................................................................ $75/each

---

Mantis<sup>SM</sup> for MAXIMO® Application Hosting Agreement                                    October 19, 2001

# EXHIBIT B

## Client Workstation Requirements

1. Client machines shall meet the following minimum hardware/software specifications:

   - Any Internet-enabled workstation
   - If client printing is required, workstation must be Microsoft Windows based

2. Outbound TCP/IP Port used by Citrix® ICA Protocol: 1494 (for initial connection)

Mantis<sup>SM</sup> for MAXIMO® Application Hosting Agreement                    October 19, 2001

**EXHIBIT C**

**Application Hosting
Support & Services**

M² Consulting will provide Maintenance Service to our Application Hosting customers as described below, for all supported products.

**Hours of Operation:**

M² provides telephone and email support from 6:00 am to 6:00 pm Monday through Friday. This does not include U.S Holidays.  After-hours support is provided with two (2) hour response.



| Technical Support can be reached by: | Telephone FAX E-Mail | 866-262-6847 771-253-6628 Support@m2.com |
| --- | --- | --- |

**Support Access Methods:**

Clients may access M² support in any of the ways listed above. M² encourages clients to use telephone support for all Priority 1 issues.

**Scope of Service Provided:**

Customer support includes the provision of information and assistance on technical issues related to the administration and operation of the services and software, as well as assistance in determining why the product may not be performing.

- Assigned Account Manager
- Support of all MAXIMO Applications as installed
- Support all Reports as Installed: SQR & Crystal
- Support Limited Screen Customizations
- Priority Escalation on all Priority 1 reported issues.
- Provide patches; both Hot fixes and standard patches as necessary
- Provide 24 hour Application Server availability
- Remote "Shadow" Troubleshooting
- Remedial "Shadow" Training
- Software Upgrades when released
- Backup and Monitor databases on a predetermined schedule.
- Act as the liaison to all software vendors in Hosted environment.
- Provide Administrator-level support

**Services not covered:**

- Training – Customer support does not cover in-depth training over the phone. If instruction time will exceed 30 minutes then the customer will be provided a quotation for training
- Assistance in Product Customization – Customers requesting customization that was not part of the original implementation will be provided a quotation for services
- Assistance in the identification of defects in user environment or enabling technologies – If $M^2$ support personnel suspect that the problems a customer is encountering are due to a defect in the user environment or the enabling technologies, $M^2$ personnel will notify the Customer and will inform the Customer that $M^2$ can continue providing billable assistance with the problem resolution. These services will be bill at $M^2$'s then current time and materials rates. If it ultimately determined that the defect is in the $M^2$ product, then the work will not be billed to the customer.

## Problem Severity and Resolution Criteria

Problem severity is determined by the impact on the client's ability to continue business activities and will be mutually agreed upon between the customer and $M^2$. The target response for Technical Support is determined by the severity of the problem reported.  Target resolution for non-application or OS-related issues is one (1) call.

## Problem Escalation

If the source of the problem is determined to be software developer related, $M^2$ will escalate these problems for resolution through our preferred agreement with each developer.  We will keep the Customer informed of all such actions and activities.

## Product Upgrade Policy

During the hosting period and as part of the service provided, $M^2$ will, from time to time, provide upgrades to the application and database at its sole discretion with 30 days notice to the customer.  This service covers upgrades that can be executed without error using the standard, commercially available upgrade routines offered with the products.  $M^2$ is not responsible for any problems encountered during the upgrade due to erroneous data that may have been input into the system through user errors.  Any additional assistance with such upgrades that is required by the client will be offered under separate contract on a time and materials basis. Client is responsible to acquire the necessary training as it relates to any updated version placed in the hosted environment during the hosting period.



**EXHIBIT C**
**REFERRAL REGISTRATION**

Date Submitted: 

*Description:*

<u>*5% or $5,000 whichever is the lesser amount:*</u> *Hosting Affiliate will provide MROI with a qualified lead where the customer has indicated interest and budget in purchasing a maintenance management application. The client information should, at a minimum, consist of customer name, phone number and customer contact. This opportunity must close within __180__ days of the referral acceptance date.*

## ASSUMPTIONS/FACTS:

- *Registration acceptance by MROI within 5 days of receipt.*
- *Both parties must verify Opportunity.*

Hosting Affiliate
Representative:            Phone #:
MROI Representative:            Phone #:
Accepted by MROI:            Date:

**Prospect Data:**
Company:
Contact Name:
Address:
City, State, Zip:
Phone #:
Fax #:
Email:

**Hosting Affiliate Relationship with Prospect (Describe):**

Revised 8/01