UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| $M^2$ CONSULTING, INC., <br><br> Plaintiff, <br><br> v. <br><br> MRO SOFTWARE, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 03-12589-GAO <br> ) <br> ) <br> ) <br> ) <br> ) |

### PLAINTIFF'S OPPOSITION TO MRO SOFTWARE, INC.'S MOTION FOR PRELIMINARY INJUNCTION

#### I. INTRODUCTION

In its latest attempt to intimidate Plaintiff M2 Consulting, Inc. ("M2") into settling this case, Defendant MRO Software, Inc. ("MRO") has filed a Motion for Preliminary Injunction ("MRO's Motion"), requesting that this Court enter an order which would destroy M2's business by enjoining it from continuing to service 18 Maximo internet hosting customers, notwithstanding the fact that M2 is permitted to do so under the operative agreements and licenses between the parties.

MRO's Motion should be denied because: (1) MRO cannot establish likelihood of success on the merits of its copyright claim, as M2 has the right to use Maximo in the manner it is currently being used; (2) the balance of harms favors denial of M2's motion because the injunction MRO seeks would destroy M2's business; and (3) the public interest would be ill-

served by suddenly depriving M2's current customers of valuable Maximo hosting services. In further support of this Opposition, M2 relies upon and incorporates herein by reference the Affidavits of Rick Bevington, Jeffrey Foley, and Mark S. Resnick, filed simultaneously herewith.

## II. BACKGROUND

*Factual Background*

M2 initiated this action in December, 2003, for breach of agreements between MRO and M2, pursuant to which both parties agreed to cooperate in the promotion of application hosting for MRO's Maximo software by M2. In essence, the parties agreed that MRO would license use of its Maximo software to M2 so that M2 could provide application hosting over the Internet to Maximo customers who chose not to install the software directly on their own computer systems. At the time the parties entered into these agreements, M2 was desperately in need of the competitive edge offered by M2's application hosting capabilities because it was experiencing significant market pressures from competing application hosted products.

*The Agreements*

An agreement dated March 23, 2000 (the "2000 Agreement") first memorialized the application hosting and software licensing aspects of the parties' relationship. A true copy of the 2000 Agreement is attached to the Affidavit of Rick Bevington ("Bevington Aff."). MRO and M2 also entered into a subsequent oral agreement regarding the promotion of M2's hosting capabilities (the "Marketing Agreement"). Under the terms of Marketing Agreement, M2 agreed

to hire a small sales staff to coordinate promotional efforts, but the bulk of marketing for Maximo hosting was to be aggressively conducted by MRO's North American sales force. Bevington Aff., ¶ 2.  The Marketing Agreement was an integral part of the parties' relationship because M2's hardware and personnel investment required to host Maximo exceeded $1.8 million.  The parties recognized that the only way M2 could hope to recover that investment would be if MRO agreed to use its massive nationwide sales force to aggressively promote M2's capabilities.  Pursuant to the Marketing Agreement, MRO agreed to do so.  Bevington Aff., ¶ 3.

Throughout 2000 and 2001, M2's small sales team pursued and closed leads for Maximo customers.  MRO, however, failed to educate its sales force regarding M2's capabilities as it had promised and, as a result, generated disappointingly few leads.  Bevington Aff., ¶ 4.  In addition, MRO appears to have sent leads, which under the 2000 Agreement it was required to direct to M2, to other application service providers of Maximo.  Bevington Aff., ¶¶ 5, 6.

M2's Maximo hosting proficiency so impressed MRO that in 2001 it began to develop its own plan to web host Maximo "in house."  As part of this plan, MRO obtained competitive intelligence regarding M2's Maximo hosting capabilities, its business processes, pricing, and other competitive information, in order to use that information to develop its own hosting protocol for Maximo.  Bevington Aff., ¶ 7.  At no time did MRO advise M2 that these plans were under way, and for a period of two years MRO hid from M2 the fact that once its own in house hosting operation was operational, MRO would no longer provide hosting opportunities to M2, but would instead either delegate M2 to a minor support role, or terminate the relationship in its entirety.  Bevington Aff., ¶ 8.

During this period M2 believed MRO's executives consistent pleas for patience, and representations that certain internal accounting and commission issues needed to be worked out

before MRO's North American sales force could receive a full "rollout" of M2's hosting capabilities. In reasonable reliance upon these statements, M2 continued to work with MRO to address the purported accounting and commission issues, and to encourage the few MRO salespeople who had received some notice of M2's capabilities to aggressively promote those capabilities in the marketplace. Bevington Aff., ¶¶ 9-10.

*Fraudulent Inducement of the 2002 Agreement*

In April 2002 MRO began to request that M2 sign a new agreement which was significantly more favorable to MRO, and significantly less favorable to M2, than the 2000 Agreement. Among other things, the new agreement proposed to increase the commission which MRO would receive on Maximo sales from 20% to 50%. It also contained other provisions which, in retrospect, were clearly designed to minimize MRO's contractual commitment to M2, and make it easier for MRO to terminate the relationship when the time was right. Bevington Aff., ¶ 11.

During these negotiations, M2's executives again sought assurances that MRO would complete its extensive rollout to its North American sales force, and require that sales force to aggressively promote M2's capabilities, if M2 agreed to sign the new, significantly less advantageous agreement. MRO executives repeatedly provided the requested assurances. At the time, however MRO knew that it had no intention of ever rolling out M2's capabilities to the North American sales force. MRO also knew that it intended to enter the web hosting business on its own within a year, remove any Maximo web hosting opportunities for M2, and radically alter the commercial profile of the partnership. In short, the representations made by MRO

executives to M2 executives were fraudulent: they were false at the time they were made, MRO executives were aware that there were false at the time, and they were made with the intention of inducing M2 to rely on those statements and execute the new agreement. M2 did in fact rely upon the statements, and on November 23, 2002, signed a new agreement with MRO (the "2002 Agreement"). Bevington Aff., ¶¶ 12-13.

After this action was filed, MRO counterclaimed initially only for certain monies it claimed it was owed. It then sought to rely upon and enforce the provisions of the 2002 Agreement as part of its defensive case against M2. M2 has from the outset argued that the 2002 Agreement was voidable because it was fraudulently induced and has consistently contended that the operative agreement between the parties is, in fact, the 2000 Agreement.

The 2000 Agreement does not provide for a termination of M2's rights to continue to provide Maximo hosting services to customers being serviced at the time of the agreement's expiration or termination. In fact, under the 2000 Agreement MRO is permitted to continue to service Maximo hosting customers after expiration without any continuing obligation to pay royalties. The operative agreement between the parties, therefore, specifically permits M2 to continue providing web hosting services to the 18 existing Maximo customers, without limitation, that were under contract at the time of the agreement's expiration. Affidavit of Jeff Foley, ¶ 4.

*Procedural posture*

MRO has known from the outset of this litigation that M2 contests the validity of the 2002 Agreement. It has also learned through discovery that M2 has, in light of the pending

litigation, voluntarily ceased promoting and marketing Maximo, and that it now refuses to accept any web hosting customers for Maximo. In the Fall of 2005, the parties engaged in significant discussions regarding stipulated injunctive relief whereby M2 would agree not to add any new Maximo customers, and would continue to provide Maximo hosting services only for current customers. M2 agreed to do so, but was eventually informed that MRO intended to attempt to prohibit it from continuing to web host Maximo at all by invoking its rights under the 2002 Agreement. Resnick Affidavit, ¶ 4.

On December 7, 2005, counsel engaged in a Rule 7 conference in an attempt to determine whether MRO's Motion was necessary. During those discussions, M2, through its counsel, specifically offered, again, to voluntarily stipulate to the injunctive relief that the parties had previously discussed. M2's counsel reminded MRO's counsel that the validity of the 2002 Agreement was contested, and was therefore a central issue in the case. M2's counsel also informed MRO's counsel that the injunctive relief which MRO sought would destroy M2's business. Nonetheless, MRO elected to proceed with this motion. Resnick Affidavit, ¶ 5.

### III. ARGUMENT

*MRO cannot establish likelihood of success on the merits*

M2 is permitted to use Maximo to service existing customers under the 2000 Agreement. Under the 2000 Agreement, MRO specifically provided M2 with "[A] Maximo license … to provide the various modules and groupings of Maximo for use in a hosted-only environment. (The license [includes] all upgrades as issued to [MRO] customers." *See* Bevington Aff., Exh.

A, at 2. The Agreement also states that "[MRO] grants to M2, a royalty free, nonexclusive license to install the MAXIMO Application on the Hardware for the sole purpose of permitting M2 to outsource the MAXIMO Application to M2 Customers. … M2 may make copies of the MAXIMO Application for the sole purpose of maintaining an archival copy and or supporting M2's outsourcing business as permitted by this Agreement. *Id* at Addendum No. 1. The 2000 Agreement also specifically states that "M2 Consulting's license to provide Maximo to the users being hosted at the time of termination will continue under the terms of the agreement." *Id.* at 3.

*The validity of the 2002 Agreement is vigorously contested, and cannot form the basis for injunctive relief*

Facts obtained in discovery clearly establish that MRO lied to and to fraudulently induced M2 to execute the 2002 Agreement. Deposition of Rick Bevington July 26, 2005, at 151; Deposition of Seth T. Stewart, October 4, 2005 at 97.[1] It is well settled that when one party fraudulently induces the other party to sign an agreement, that agreement is voidable. *See, e.g., Southwest Airlines Inc., v. Rozay's Transfer,* 791 F.2d 769, 774 (9th Cir. 1986). The validity of the 2002 Agreement is a central issue in the case. If found to be controlling, the rights and responsibilities of the parties, and their liability for alleged breaches of the 2002 Agreement would have dispositive implications for each side. Thus, the question of whether MRO did what M2 executives have testified it did in inducing M2 to execute the 2002 Agreement is a disputed issue and therefore a question of fact for the jury. By seeking injunctive relief now, MRO essentially asks this Court to essentially grant summary judgment on the validity of the 2002 Agreement.

---

[1] True and accurate copies of the relevant excerpts from the depositions of Rick Bevington and Seth T. Stewart are attached hereto as Exhibits "A" and "B", respectively.

MRO acknowledges that the 2000 Agreement includes the licensing of M2 to service Maximo customers by hosting, yet it is precisely that conduct which MRO now seeks to enjoin. MRO's only ground for asserting a copyright violation, and the concomitant request for injunctive relief, is that M2's contractual right to web host Maximo terminated when MRO purported to terminate the 2002 Agreement. If the 2002 Agreement does not control, however, there is no set of circumstances under which the Court could find a likelihood of success on the merits because, by definition, M2 remains entitled to continue the conduct which MRO now seeks to enjoin, pursuant to the explicit terms of the 2000 Agreement.

In order for this Court to grant MRO's Motion it must conclude that the 2002 Agreement is the controlling agreement between the parties. MRO's Motion, however does nothing more than attach that contract as an exhibit. In fact, there is no proof offered, or even argument made in any of MRO's materials or affidavits that even addresses the validity of the 2002 Agreement, much less establishes a likelihood of success on the merits. Therefore, there is no ground to conclude that MRO is likely to succeed in proving that the 2002 Agreement is the operative agreement in this case, and MRO has failed entirely to establish a likelihood of success on the merits. MRO's Motion must therefore be denied.

*The balance of the harm strongly favors denial of MRO's Motion*

M2 is a small company. Its' Maximo hosting business represents the critical portion of its monthly cash flow. If this court were to enjoin M2 from continuing to provide web hosting to its 18 existing Maximo customers, that cash flow would be terminated. The resulting economic impact on M2's business would be fatal. Here, entry of the requested relief would not simply

deprive M2 of profits, it would destroy M2's business, and cause M2's employees to become unemployed. Without a viable business, M2's very ability to proceed in this case would be seriously compromised. Bevington Affidavit, ¶ 14.

MRO is well aware of these consequences, in no small measure because M2's counsel specifically informed him of such facts as recently as last month. MRO's election to seek this type of injunctive relief, with a dubious likelihood of success on the merits, and knowledge of the devastating impact the requested relief would have, is clearly a calculated attempt to destroy its adversary before M2's case can be presented to a jury. Even ignoring the legal infirmities of MRO's position, this type of tactic should not be condoned by the court.

It is equally clear that MRO's business would experience no significant impact if MRO's Motion were denied. MRO does not allege that M2 is doing anything with its software that negatively impacts perception of Maximo in the market, that M2's existing Maximo customers are in any way ill-served, or that any other significant harm would come to MRO as a result of M2's continuing to service a limited customer base. On the other hand, entry of the requested relief will destroy M2. The balance of harm clearly weighs in favor of M2, and that alone is a sufficient basis to deny MRO's motion.

*The public interest is also served by denial of MRO's motion*

In assessing this prong, the court must balance two competing factors. The public interest is clearly served by enforcing the rights of copyright holders. Yet, on the other hand, the public interest is also served by avoiding injury to innocent non-parties to the litigation. *Weinberger v. Romero-Barcello*, 456 U.S. 305, 312 (1990). Here, if M2 is enjoined, its 18

existing Maximo customers will face the immediate prospect of losing their Maximo application service provider, and the resulting functionality of that program. They will incur inconvenience, expense and delay in evaluating the situation, and determining what other products or services to utilize to compensate for the sudden loss of the Maximo hosting provided by M2. There is no question at entry of the requested injunctive relief will hurt these innocent non-parties, while denial of the requested injunctive relief would not injure MRO, and would also avoid injuring these innocent nonparties.

Moreover, because entry of the requested injunctive relief would destroy M2's business, it would also render M2's employees unemployed, and compromise M2's ability to pay other innocent non-parties, including vendors, lease holders and investors. The public interest in not injuring the innocent non-parties would undoubtedly suffer as a result of entry of MRO's requested injunctive relief and weighs heavily in favor of denial of MRO's motion. *See e.g. Yakus v. Stales*, 321 U.S. 414, 440 (1944); *Converse Construction Company, Inc. v. Massachusetts Bay Transportation Authority* 899 F.Supp. 753, 760 (D.Mass. 1995). This is especially true in this circumstance, where M2 has testified under oath that it is not continuing to web host Maximo for any new customers, but only for the existing 18 customers that it serviced at the time MRO terminated the 2002 Agreement. This is not a case where a unrepentant copyright infringer is exploiting a copyright in the marketplace. On the contrary, MRO knows exactly what M2 is doing with its Maximo software, and is well aware that M2 is not engaging in any objectionable activity toward any new Maximo hosting customers. This is therefore not a situation where enjoining the alleged copyright infringement serves the public interest by shutting down an uncontrolled infringing activity. On balance, therefore, the public interest is clearly served by denial of MRO's Motion.

## IV. CONCLUSION

For the reasons set forth above, MRO's Motion for the Preliminary Injunction should be denied.

>M2 Consulting, Inc.
>By its Attorneys
>Fee, Rosse & Lanz, P.C.
>
>
>By:  /s/ Mark S. Resnick
>Michael C. Fee, Esq. (BBO NO. 552796)
>Mark S. Resnick, Esq. (BBO NO. 559885)
>Fee, Rosse & Lanz, P.C.
>321 Boston Post Road
>Sudbury, MA  01776
>(978) 440-7000

## **CERTIFICATE OF SERVICE**

     I, Mark S. Resnick, hereby certify that Plaintiff's Opposition to Defendant's Motion for Preliminary Injunction was served upon the Defendant, by mailing this opposition, first class mail and by telecopier to Lee Gesmer, Esq., Gesmer Updegrove LLC, 40 Broad Street, Boston, MA 02109, on January 13, 2006.

                                                /s/ Mark S. Resnick_____
                                                Mark S. Resnick

*M2:Opp M2 Mot Prelim Inj Final Version.doc*