UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| M² CONSULTING, INC., <br><br> Plaintiff, <br><br> v. <br><br> MRO SOFTWARE, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 03-12589-GAO <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

### AFFIDAVIT OF RICK BEVINGTON

I, Rick Bevington, do hereby depose and state as follows:

1. I am the Chief Executive Officer of M2 Consulting, Inc. ("M2"). I have personal knowledge of the facts set forth herein.

2. A true copy of the 2000 Agreement is attached hereto as Exhibit "A". MRO and M2 also entered into a subsequent oral agreement regarding the promotion of M2's hosting capabilities (the "Marketing Agreement"). Under the terms of Marketing Agreement, M2 agreed to hire a small sales staff to coordinate promotional efforts, but the bulk of marketing for Maximo hosting was to be aggressively conducted by MRO's North American sales force.

3. The Marketing Agreement was an integral part of the parties' relationship because M2's hardware and personnel investment required to host Maximo exceeded $1.8 million. The

1

parties recognized that the only way M2 could hope to recover that investment would be if MRO agreed to use its massive nationwide sales force to aggressively promote M2's capabilities. Pursuant to the Marketing Agreement, MRO agreed to do so.

4. Throughout 2000 and 2001, M2's small sales team pursued and closed leads for Maximo customers. MRO, however, failed to educate and compensate its sales force regarding M2's capabilities as it had promised and, as a result, generated disappointingly few leads.

5. In addition, MRO appears to have sent leads, which under the 2000 Agreement it was required to direct to M2, to other application service providers of Maximo.

6. The parties did engage in some cooperative promotional efforts, including a joint effort to obtain Maximo hosting business from a public works project for the City of St. Paul Minnesota in 2001 (the "Minnesota Project").

7. M2's Maximo hosting proficiency so impressed MRO that in 2001 it began to develop its own plan to web host Maximo "in house." As part of this plan, it appears to M2 that MRO obtained competitive intelligence regarding M2's Maximo hosting capabilities, its business processes, pricing, and other competitive information, in order to use that information to develop its own hosting protocol for Maximo.

8. At no time did MRO advise M2 that these plans were under way, and for a period of two years MRO hid from M2 the fact that once its own in house hosting operation was operational, MRO would no longer provide hosting opportunities to M2, but would instead either delegate M2 to a minor support role, or terminate the relationship in its entirety.

9. During this period M2 believed MRO's executives consistent pleas for patience, and representations that certain internal accounting and commission issues needed to be worked out before MRO's North American sales force could receive a full "rollout" of M2's hosting capabilities.

10. In reasonable reliance upon these statements, M2 continued to work with MRO to address the purported accounting and commission issues, and to encourage the few MRO salespeople who had received some notice of M2's capabilities to aggressively promote those capabilities in the marketplace.

11. In April 2002 MRO began to request that M2 sign a new agreement which was significantly more favorable to MRO, and significantly less favorable to M2, than the 2000 Agreement. Among other things, the new agreement proposed to increase the commission which MRO would receive on Maximo sales from 20% to 50%. It also contained other provisions which, in retrospect, were clearly designed to minimize MRO's contractual commitment to M2, and make it easier for MRO to terminate the relationship when the time was right.

12. During these negotiations, M2's executives again sought assurances that MRO would complete its extensive rollout to its North American sales force, and require that sales force to aggressively promote M2's capabilities, if M2 agreed to sign the new, significantly less advantageous agreement. MRO executives repeatedly provided the requested assurances. M2 relied upon the statements, and on November 23, 2002, signed a new agreement with MRO (the "2002 Agreement").

13. The 2000 Agreement does not provide for a termination of M2's rights to continue to provide Maximo hosting services to customers being serviced at the time of the agreement's expiration or termination. In fact, under the 2000 Agreement M2 is permitted to continue to service Maximo hosting customers after expiration without any continuing obligation to pay royalties.

14. M2 a small company. Its' Maximo hosting business represents the critical portion of its monthly cash flow. If the court were to enjoin M2 from continuing to provide web hosting to its 18 existing Maximo customers all of which were acquired solely through M2's efforts, that cash flow would be terminated. The resulting economic impact on M2's business would cause us to become insolvent. Without a viable business, M2's very ability to proceed in this case would be seriously compromised.

4

15. Entry of the requested injunctive relief would not only destroy M2's business, it would also render M2's employees unemployed, and compromise M2's ability to pay other innocent non-parties, including vendors, lease holders investors.

Signed under the pains and penalties of perjury this 13th day of January, 2006.

*Rick Bevington*

M2:Aff rick bevington.doc

5

**M² Consulting**
Facility Operations & Maintenance

Newnan, GA 30263-5813
Phone: (770) 253-1183
FAX: (770) 253-2788
Email: m2c@m2consulting.com

## Agreement Between M² Consulting, Inc. and PSDI for MAXIMO® Application
### Between
### M² Consulting, Inc.
### and
### Project Software & Development, Inc.

**Overview:**

M² Consulting, Inc. is a pioneer Application Service Provider (ASP). M² Consulting offers Maximo® in a Citrix® MetaFrame environment, over the Internet and provides turnkey implementation and on-going support for hosted users.

**M² Consulting Agrees to Provide:**

1) Maximo® in standard configuration only, to end-users who choose "Hosting" versus "Property Based". We will offer the Maximo® Solution exclusively as our Hosted CMMS service offering.

2) Front-line Support to all users including – technical support, database administration, database backups, unlimited connect time, etc.

3) All user IDs and Passwords will be documented by M² Consulting. User security and Citrix® profiles will be established and maintained by M² Consulting.

4) M² Consulting will indemnify and hold harmless all employees, agents, directors, officers, etc. of PSDI for any and all claims occurring directly or indirectly from the use by M² Consulting or our clients of the Maximo® software.

5) Subject to client confidentiality agreements, M² Consulting will report, in any agreeable fashion, information regarding end-users. Supporting information will be made available including Hosting fees, Proposals, Contracts, and Agreements for audit by PSDI upon sufficient notice.

M² Consulting, Inc.                    1                    March 14, 2000


EXHIBIT A

6) PSDI will be provided a Tracking Report monthly, using Citrix® Resource Manager. This report will minimally include the tracking of concurrent and casual users.

7) Except where the customer has bought a Maximo® License(s) from PSDI and has a paid-up ACSP, $M^2$ Consulting will remit to PSDI 20 percent (20%) of the hosting revenue derived from this activity. Hosting revenue is defined as all monthly service fees charged to end-users not owning software, for all hosting services provided by $M^2$ Consulting. Payment will be made on a monthly basis no later than 60 days after issuance of our invoice to the end-user.

**PSDI Agrees to Provide:**

1) A Maximo® license to $M^2$ Consulting to provide the various modules and groupings of Maximo® for use in a hosted-only environment. (The license will include all upgrades as issued to PSDI customers.)

2) Escalation Technical Support to $M^2$ consulting to rectify Maximo® software related issues only.

3) Leads for prospective hosting clients through their MSR's and/or Direct Sales Channel, as they deem appropriate.

4) Agreement to not promote Application Hosting through other third party ASP's for a period of twenty-four (24) months. This does not preclude PSDI from providing Application Hosting of Maximo® itself, or through other third parties.

**General:**

1) $M^2$ Consulting will actively pursue all leads provided by PSDI to "Closure" or "Abandonment". If a hosting prospect chooses or reverts to standard end-user licensing, we will involve a PSDI sales person to execute the sale.

Any and all leads for CMMS Solutions received or generated by $M^2$ Consulting will be conveyed to the appropriate individuals at PSDI.

$M^2$ Consulting.   2   March 14, 2000



Should a hosted client want to purchase and install Maximo® at their location, we will notify PSDI Sales for follow-up. We will coordinate the transference of the customer's database to a standard licensed system.

This agreement can be terminated by either party with the terminating party providing three- (3) months notice in writing. M² Consulting's license to provide Maximo® to the users being hosted at the time of the termination will continue under the terms of the agreement. Termination by PSDI can be immediate for any violation of standard PSDI or Maximo® licensing issues.

o agreed between the parties signing below.

'ROJECT SOFTWARE & DEVELOPMENT, INC.        M2 CONSULTING, INC.

BY: *Nancy M Gilroy*                         BY: *[signature]*

NAME: Nancy M Gilroy                         NAME: T.R. BEVINGTON

TITLE: VP, Contracts                         TITLE: President

DATE: 3/16/00                                DATE: 3/22/00

Addendum No. 1 to
Agreement between M2 Consulting, Inc. and PSDI for MAXIMO Application
Between
M2 Consulting, Inc.
And
PROJECT SOFTWARE & DEVELOPMENT, INC.

The Agreement between M2 Consulting, Inc. ("M2") and PSDI for MAXIMO Application shall be enforced with the following additions incorporated herein:

Add the following clauses:

**Rights Granted**
PSDI grants to M2, a royalty-free, nonexclusive license to install the MAXIMO Application on the Hardware for the sole purpose of permitting M2 to outsource the MAXIMO Application to M2 Customers. PSDI also grants to M2 a nonexclusive right to use the MAXIMO Application for internal training. M2 may make copies of the MAXIMO Application for the sole purpose of maintaining an archival copy and or supporting M2's outsourcing business as permitted by this Agreement.

**Ownership**
PSDI and/or its vendors and licensors own all right, title, and interest in the Global Network, Hardware, Third Party software, and other components of the MAXIMO Application provided by PSDI. The foregoing contain trade secrets and other valuable proprietary information of the parties and/or their Third Party vendors and/or customers.

**Effective Date**
This Agreement is effective on the date it is executed by both parties, and remains in effect for the Term unless terminated as set forth in this Agreement.

**Restrictions**
M2 will not: (a) alter the MAXIMO Application; (b) reverse engineers, decompile, disassemble or otherwise attempt to derive source code from the MAXIMO Application. The MAXIMO Application that will be placed on the Hardware is the MAXIMO Application specified in this Agreement. M2 will not make any representations or warranties on behalf PSDI or inconsistent with the terms of the Agreement. M2 will not reverse engineer, decompile, disassemble, or otherwise attempt to derive source code from the Third Party vendor operating systems software and other software provided by PSDI.

**Confidentiality**
Each party will retain in confidence all proprietary information transmitted to the receiving party which the receiving party should know from marking or the nature of the material is proprietary, and will make no use of such information except as permitted by this Agreement. M2 will not disclose the MAXIMO Application to any person other than as provided in this Agreement. Neither party will have an obligation to maintain the confidentiality of information that (a) it has rightfully received from another party prior to its receipt from the disclosing party or (b) enters the public domain by some action other than breach of this Agreement by the receiving party; or (c) is independently developed by the receiving party. Each party will safeguard confidential information disclosed by the other using the same degree of care it uses to safeguard its own confidential information and, in no event, less than a reasonable degree of care. Each party's obligation under this paragraph will extend for a period of three (3) years following termination of this Agreement.

EXCEPT AS EXPRESSLY MODIFIED BY THIS ADDENDUM, THE AGREEMENT SHALL REMAIN IN FULL FORCE AND EFFECT IN ACCORDANCE WITH ITS TERMS.

PROJECT SOFTWARE & DEVELOPMENT, INC.

BY: _Nancy M Gilroy_
NAME: _Nancy M Gilroy_
TITLE: _VP, Contracts_
DATE: _3/16/00_

M2 CONSULTING, INC.

BY: _[signature]_
NAME: _T.R. Bevington_
TITLE: _President_
DATE: _3/22/00_