## Page 1

Volume I
Pages 1 to 258
Exhibits 2 to 52

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

M2 CONSULTING, INC.,          :
         Plaintiff,           :
vs.                           : Civil Action
                              : No. 03-12589-GAO
MRO SOFTWARE, INC., and CRAIG :
NEWFIELD,                     :
         Defendants.          :

DEPOSITION OF THOMAS RICKEY BEVINGTON, a witness called on behalf of the Defendants, taken pursuant to the Federal Rules of Civil Procedure, before Linda A. Walsh, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Gesmer Updegrove LLP, 40 Broad Street, Boston, Massachusetts, on Tuesday, July 26, 2005, commencing at 10:02 a.m.

PRESENT:
  Fee, Rosse & Lanz, P.C.
    (By Mark S. Resnick, Esq.)
  321 Boston Post Road, Sudbury, MA 01776,
    for the Plaintiff.
  Gesmer Updegrove LLP
    (By Lee T. Gesmer, Esq.,
     and Kurt Bratten, Esq.)
  40 Broad Street, Boston, MA 02109,
    for the Defendants.

## Page 2

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| THOMAS RICKEY BEVINGTON | | | | |
| BY MR. GESMER | 7 | | | |

EXHIBITS

MRO
NO.   DESCRIPTION                                   PAGE
 2    Document entitled "MRO Software,              7
      Inc. Maximo Hosting Affiliate
      Agreement between MRO Software, Inc.
      and M2 Consulting, Inc."
 3    Document entitled "Agreement between          7
      M2 Consulting, Inc. and PSDI for
      Maximo Application between M2
      Consulting, Inc. And Project
      Software & Development, Inc."
 4    Document entitled "Amended                    7
      Complaint"
 5    Document entitled "Business Plan              7
      PSDI Maximo and M2 Application
      Hosting Services, 9/1/99," Bates
      Nos. M2C000273-290
 6    E-mail thread re software hosting             7
      agreement, Bates No. MRO02628
 7    E-mail thread re update                       7

## Page 3

EXHIBITS, Continued

MRO
NO.   DESCRIPTION                                   PAGE
 8    Document entitled "Presentation to            7
      MRO Software by Rick Bevington, Tony
      Prelec on 1/25/01," Bates Nos.
      M2C000013-29
 9    E-mail dated March 14, 2001, to Rick          7
      Bevington from Tom Schulte
10    E-mail dated June 7, 2001, to Rick            7
      Bevington from Tom Schulte with
      attachment
11    E-mail dated November 1, 2001, to             7
      Bob Parker from Ray Miciek
12    E-mail dated November 20, 2001, to            7
      Ray Miciek from Rick Bevington
13    E-mail thread regarding sale and              7
      rental model
14    E-mail thread regarding new                   7
      spreadsheet
15    E-mail dated November 27, 2001, to            7
      Bob Parker from Rick Bevington,
      Bates Nos. MRO00825-826
16    E-mail dated December 17, 2001, to            7
      Ray Miciek from Iris Martin, Bates
      Nos. MRO00483, MRO00491-497
17    E-mail dated January 30, 2002, to             7
      Bob Parker from Ray Miciek, Bates
      Nos. MRO00827-837
18    E-mail with attached agreement                7
19    E-mail regarding MRO Software                 7
      Agreement and Exhibit A dated May
      17, 2002

EXHIBIT A

Page 147

[1] they were going to do, raise the amount of money I'm
[2] going to pay, sign the damn document. Let's get
[3] going. Nobody seemed to object to being called the
[4] sales channel. I think there is two agreements
[5] here, right?
[6]     Q: There are two agreements. One was the
[7] agreement that was being negotiated in writing and
[8] the other an oral agreement; is that what you mean?
[9]     A: Yes, one covering the sales rollout, so
[10] sales aspect, and the other one covering, you know,
[11] payment terms and how much I pay and stuff like
[12] that.
[13]    Q: And the agreement on the sales rollout had
[14] been reached at the meeting in October 2001, October
[15] 11th, 2001?
[16]    A: No. It had been reconfirmed. The
[17] agreement goes back to the outset of our
[18] relationship with MRO. The meeting in October
[19] 10th, '01, was trying to get that agreement going,
[20] instituted.
[21]    Q: So the actual agreement, the fundamental
[22] agreement, was the one that was reached back in
[23] September '99?
[24]    A: Yes. The fundamental position of the

Page 148

[1] parties? Yes.
[2]     Q: The fundamental agreement.
[3]     A: Yes, on the position of the parties. Sales
[4] versus fulfillment.
[5]     Q: Was reached in September '99?
[6]     A: It was begun, I would say, or reached. I
[7] don't know. I don't understand the word.
[8]     Q: Well, when I use the word "reached," if I
[9] say to you I'll paint your house for $5,000 and you
[10] say, "Great. We have a deal," we have reached an
[11] agreement. An agreement is where one party offers
[12] consideration, meaning some value, in exchange for
[13] the other party's offer of some value or
[14] consideration.
[15]    A: Okay.
[16]    Q: So the agreement that was reconfirmed on
[17] October 10th, 2001, was the agreement that was
[18] reached in early September 1999; is that right?
[19]    A: Correct.
[20]    Q: Let's look at Exhibit 28. Do you remember
[21] this document?
[22]    A: Yes.
[23]    Q: Now, the Abbey is a golf course associated
[24] with a school that you went to, a preparatory

Page 149

[1] school?
[2]     A: Yes, sir.
[3]     Q: It's in, what, Rhode Island?
[4]     A: Portsmouth, Rhode Island; Carnegie Abbey.
[5]     Q: Was that a one-day outing?
[6]     A: Yes.
[7]     Q: Was it the day before you sent this first
[8] e-mail on July 10th — strike that.
[9]        When was it? Do you recall when it was?
[10]    A: It was around this time because we already
[11] finished. I usually e-mail by the time I get back.
[12] So "Friday the 12th, golf, 11:04," so it would have
[13] to have been the 11th or the 10th because he
[14] couldn't have been sending an e-mail.
[15]    Q: So it was wan couple of days one way or the
[16] other within these dates?
[17]    A: Yes. It wouldn't have been the 12th or
[18] later. It was before the 12th.
[19]    Q: I am just wondering a day or two before the
[20] 12th?
[21]    A: Yes.
[22]    Q: So you wrote to Mr. Parker, "Thanks for
[23] making the trip to the Abbey. It was a great course
[24] and great fun." He wrote back to you, "Thanks,

Page 150

[1] again Rick. I had a great time and very much
[2] enjoyed the course. I spoke to Nancy and she
[3] promised to have contract to you by today. Let me
[4] know if that does not happen." And then you wrote
[5] to him a short while later, same day, "Hi Bob, it
[6] was a great time. I got Nancy's doc. yesterday.
[7] There are only a couple of issues that I am trying
[8] to get with Ray on. I shared one with Nancy but I
[9] think it is out of her domain (sales quotas for M2)."
[10] Now, who was present at this golf match?
[11]    A: Ted Williams, Bob Parker, myself, Thayer
[12] Stewart.
[13]    Q: Is this the golf match at which someone
[14] mispronounced the name of a foreign country?
[15]    A: Sri Lanka, yes.
[16]    Q: Who was the —
[17]    A: The offender?
[18]    Q: The offender.
[19]    A: Parker. Who was the sensitive one?
[20] Williams.
[21]    Q: How did he pronounce it?
[22]    A: Sri Lanka or something. Well, Williams has
[23] sales going on in Sri Lanka. He didn't want it
[24] misplaced. Williams is Worldwide sales, Parker's

## Page 151

[1] North America. You could tell.
[2] Q: Well, after Mark asked Mr. Williams about
[3] that I couldn't help but get some clarification of
[4] that critical point.
[5] A: I thought it might joggle a couple of
[6] memories there.
[7] Q: No, afraid not.
[8] A: Maybe not.
[9] MR. RESNICK: No, we tried.
[10] Q: Now, during this meeting — this golf
[11] meeting with Mr. Williams and Mr. Parker, was
[12] business discussed?
[13] A: Yes.
[14] Q: What business was discussed?
[15] A: If we sign this new agreement will
[16] we — will you in fact do what you have always said
[17] you are going to do, roll it out to North American
[18] sales or roll it out to sales I think I said. And
[19] the both of them replied, "We'll roll it out
[20] immediately to North American sales" with Thayer
[21] Stewart and I. I can run the video in my head but
[22] unfortunately you can't see it. And that was the
[23] commitment we wanted to hear on the, you know, MRO
[24] side, and then we had to weight that with the Indus

## Page 152

[1] discussions.
[2] Q: And did you at that point say to
[3] Mr. Williams and Mr. Parker, "Well, you know, we
[4] have been talking about this for two and a half
[5] years. You never did the rollout after we discussed
[6] it in '99. Let's put this in the agreement that we
[7] are negotiating"?
[8] A: No.
[9] Q: What other business was discussed at this
[10] golf day?
[11] A: I can't remember any. It was probably just
[12] chitchat. The purpose of the event was to lock them
[13] in on we have got the 50 percent now. Now Chip is
[14] waiting. Everybody is waiting. You know, we have
[15] been doing this forever. Is this in fact the last
[16] thing I have got to do in order to have you roll
[17] this out, sign this new agreement, get me on new
[18] paper. He wrote, "Yes, sir."
[19] MR. GESMER: Let's take a short break, five
[20] minutes.
[21] (Recess taken from 2:43 to 2:51 p.m.)
[22] BY MR. GESMER:
[23] Q: Going back to Exhibit 28 for a moment.
[24] A: Yes, sir.

## Page 153

[1] Q: You wrote — at the top e-mail to
[2] Mr. Parker you wrote, "I shared one" — you said,
[3] "There are only a couple of issues I'm trying to get
[4] with Ray on. I shared one with Nancy but I think
[5] it's out of her domain (sales quotas for M2)." Did
[6] you mean by that that this was a business issue that
[7] she didn't have the authority to resolve?
[8] A: No, no. I meant that she didn't
[9] understand. She'd started a negotiation on an item
[10] by using the VAR agreement giving me a quota that,
[11] you know, had had too much going back and forth.
[12] She obviously didn't understand. Maybe not — yes,
[13] she just didn't get it.
[14] Q: After this meeting at the Abbey, this golf
[15] day at the Abbey with Mr. Williams and Mr. Parker,
[16] you did not write to either of them and say in
[17] effect, "I want to confirm the agreement that we
[18] reached yesterday, that if we sign this new
[19] agreement with a 50 percent commission you will roll
[20] out our service to your sales force"?
[21] A: No, I didn't.
[22] Q: Look at Exhibit 29, please. Do you
[23] recognize this e-mail, first page?
[24] A: Yes.

## Page 154

[1] Q: You wrote — before — if you look at Page
[2] 2 you'll see that this is a response to her July
[3] 11th e-mail which we have already looked at that was
[4] Exhibit 26 where she says, "It doesn't make sense
[5] that MRO has a sales quota for M2, therefore, I put
[6] the original back in"?
[7] A: Uh-huh.
[8] Q: And there are a couple of e-mails between
[9] you and Iris Martin in between but then eventually
[10] you send her a response in which you say, "We have
[11] accepted your changes except as noted. I believe
[12] the real issues are in the area of quota/sales
[13] responsibility and termination obligations. We need
[14] to see MRO take some position vis-a-vis the sales
[15] channel. I assume that there will be other hosting
[16] affiliates. How will we fare 'sales lead' wise with
[17] these others. Termination for convenience still
[18] does not give us the business/investment protection
[19] we need. What will happen to those customers who
[20] want to renew 'post termination'? Will MRO want to
[21] assume that business or another 'hosting affiliate'?
[22] Do we buy seats to continue? Would we be given that
[23] opportunity on a fair basis? I just don't know.
[24] These may not be questions that you can answer, but

**Page 1**

Volume I  
Pages 1 to 117  
Exhibits: None  
UNITED STATES DISTRICT COURT  
DISTRICT OF MASSACHUSETTS  
(EASTERN DIVISION)

M2 CONSULTING, INC.,  
    Plaintiff,  
vs.      : Civil Action  
     : No. 03-12589-GAO  
MRO SOFTWARE, INC., and CRAIG  
NEWFIELD,  
    Defendants.

DEPOSITION OF SETH T. STEWART, a witness called on behalf of the Defendants, taken pursuant to the Federal Rules of Civil Procedure, before Linda A. Walsh, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Gesmer Updegrove LLP, 40 Broad Street, Boston, Massachusetts, on Tuesday, October 4, 2005, commencing at 10:08 a.m.

PRESENT:  
    Fee, Rosse & Lanz, P.C.  
    (By Mark S. Resnick, Esq.)  
    321 Boston Post Road, Sudbury, MA 01776,  
    for the Plaintiff.

    Gesmer Updegrove LLP  
    (By Lee T. Gesmer, Esq.)  
    40 Broad Street, Boston, MA 02109, for the Defendants.

**Page 2**

INDEX  
WITNESS    DIRECT   CROSS   REDIRECT   RECROSS  
SETH T. STEWART  
  BY MR. GESMER    3

EXHIBITS  
  None

**Page 3**

[1] PROCEEDINGS  
[2]     SETH T. STEWART  
[3] a witness called for examination by counsel for the  
[4] Defendants, having been satisfactorily identified by  
[5] the production of his driver's license and being  
[6] first duly sworn by the Notary Public, was examined  
[7] and testified as follows:  
[8]     DIRECT EXAMINATION  
[9]     BY MR. GESMER:  
[10]   Q: Mr. Stewart, I am Lee Gesmer. You are  
[11] testifying here today in the case of M2 versus MRO,  
[12] correct?  
[13]   A: Correct.  
[14]   Q: Where do you live?  
[15]   A: New Canaan, Connecticut.  
[16]   Q: What's your address?  
[17]   A: 96 Cross Ridge Road.  
[18]   Q: Where are you employed?  
[19]   A: I work for a company called Open Business  
[20] Exchange.  
[21]   Q: Where is that company located?  
[22]   A: It's headquartered in London, England.  
[23]   Q: Do you refer to it as OBI?  
[24]   A: It's OBE.

**Page 4**

[1]   Q: OBE. Sorry.  
[2] And what's your position with OBE?  
[3]   A: I am — my exact title is vice-president,  
[4] corporate accounts. I am responsible for sales and  
[5] business development.  
[6]   Q: Is that a full-time job?  
[7]   A: Yes.  
[8]   Q: Does OBE have an office in the United  
[9] States?  
[10]   A: Yes. Its U.S. headquarters is in San  
[11] Francisco, and we have satellite and virtual offices  
[12] around the country.  
[13]   Q: Will you summarize your educational  
[14] background post high school?  
[15]   A: Yes. I graduated — I have a B.A. from  
[16] Princeton University and then I took advanced course  
[17] work in accounting from NYU.  
[18]   Q: So your only degree is the undergraduate  
[19] degree from Princeton?  
[20]   A: That's correct.  
[21]   Q: When did you graduate from Princeton?  
[22]   A: 1985.  
[23]   Q: And would you summarize for us your  
[24] employment history post graduation from Princeton.

EXHIBIT B

Seth T. Stewart
Vol. 1, October 4, 2005
Case 1:03-cv-12589-GAO    Document 84    Filed 01/17/2006    Page 5 of 6
M2 Consulting, Inc. v.
MRO Software, Inc., et al.

Page 93

[1] agreement with MRO Software," and it goes on to say,
[2] "MRO may sue to protect this market from penetration
[3] by Indus." Do you remember discussing that issue
[4] with Mr. Bevington?
[5]    A: Yes.
[6]    Q: What was the nature of your discussion?
[7]    A: I remember — I don't remember specifically
[8] talking about lawsuits, but I do remember that Indus
[9] was moving very quickly. They had a need to get
[10] into this business, and Rick had to put them — push
[11] them off really. I mean, they were moving very
[12] quickly, and Rick was postponing those discussions
[13] because he wanted to — didn't want to screw up the
[14] Maximo relationship. And you know, I think there
[15] was concern on Rick's part that if he just all of a
[16] sudden did something with Indus that there would be
[17] repercussions from MRO because there had been all
[18] these sort of referable or written agreements. So I
[19] do remember having those conversations. I do not
[20] remember the particulars.
[21]    Q: Look at the next exhibit, No. 28. Now, if
[22] you look down at the bottom of the first page,
[23] Mr. Bevington writes to Mr. Parker, "Thanks for
[24] making the trip to the abbey. It was a great course

Page 94

[1] and great fun"?
[2]    A: Yes.
[3]    Q: Now, is this the Rhode Island golf game you
[4] referred to?
[5]    A: Yes, yes.
[6]    Q: Who attended this golf game?
[7]    A: My recollection is it was myself, Rick
[8] Bevington, Bob Parker and Ted Williams.
[9]    Q: Drapeau was not there?
[10]   A: No.
[11]   Q: Was this the first time you met
[12] Mr. Williams?
[13]   A: Yes.
[14]   Q: What were the logistics for this meeting?
[15] When did you arrive? When did you leave? When did
[16] others arrive? When did they leave?
[17]   A: I spent the night in Newport the night
[18] before. Rick and I stayed at the same hotel. He
[19] and I drove to the golf course together. We arrived
[20] there around 9:30, and I believe we had a 10:00
[21] tee-off time. And we played golf till about 1:30
[22] and then we had a lunch meeting afterwards, and
[23] after the lunch meeting we walked Bob Parker to his
[24] car. So that's basically the day, the logistics,

Page 95

[1] and then I drove home after that.
[2]    Q: What business between M2 and MRO was
[3] discussed at this meeting or during this day?
[4]    A: During the golf round frankly there wasn't
[5] a lot of — you know, there was a lot of casual
[6] conversation, not so much about business. Then we
[7] had lunch, and we were talking about the particulars
[8] of how this rollout would occur. And then, you
[9] know, as we are walking Bob in the parking lot, you
[10] know, Rick asked Bob, "Bob, is this a done deal?"
[11] And Bob said, "Absolutely this is a done deal." And
[12] Rick said, "Are we going to roll this out to
[13] the" — "just to the middle market sales
[14] organization or is it going to be large and middle,"
[15] and Bob said, "Large and middle." But he
[16] emphatically reiterated that this was a done deal,
[17] that it had been approved by Chip. It had been
[18] approved by the powers at be, MRO, and, you know, it
[19] was done.
[20]   Q: Let's back up a little bit. What business
[21] was discussed over lunch?
[22]   A: Again, I think we were talking a lot about
[23] Rick's financials. You know, how many customers,
[24] what is the volume, how much do you get per customer

Page 96

[1] per seat, blah-blah-blah, a lot of that type of
[2] conversation, and it was really to bring Ted up to
[3] speed, not for Bob's benefit. I think it was Ted
[4] wanting to — if I understood correctly, Bob
[5] reported to Ted who reported to Chip, and so this
[6] was Ted's opportunity to ask directly, you know,
[7] kind of what the business was all about. So it was
[8] a bit of an education for Ted, but I specifically
[9] remember kind of going through — for some reason I
[10] think there was a spreadsheet there or something
[11] where Ted was going through the numbers, you know,
[12] all the customers that M2 had, how much the recurring
[13] billing rate was.
[14]   Q: So Mr. Williams was being educated —
[15]   A: Correct —
[16]   Q: — by M2 business?
[17]   A: — on the specifics of the economics of his
[18] business.
[19]   Q: On the economics of the business?
[20]   A: Yes.
[21]   Q: And there was no discussion about, you
[22] know, this done deal, you know, rollout, those
[23] topics, during the four of you at lunch? It was
[24] later when you walked Mr. Parker to his car?

M2 Consulting, Case 1:03-cv-12589-GAO    Document 84    Filed 01/17/2006    Page 6 of 6
MRO Software, Inc., et al.                                                Seth T. Stewart
                                                                Vol. 1, October 4, 2005

Page 97

[1] A: No. The gist of the conversation was,
[2] "This is great. We are excited about this." You
[3] know, it was in the context of, you know, "This is
[4] going to be a great relationship. We are very
[5] excited about it. Tell me again, Rick. How much do
[6] you charge," blah-blah-blah. "Okay. Good. Good.
[7] Interesting. Great."
[8] Q: Have you described for me now or told me
[9] everything you remember about what was said during
[10] this meeting? I would really like your full memory.
[11] A: Yes. My vivid memory is just Bob, Rick and
[12] I standing in the parking lot, and Rick staring him
[13] in the eye and saying, "Bob, is this a done deal?"
[14] And him looking back and saying, "Rick, this is
[15] done. This is a done deal. We are completely
[16] committed to this." Rick saying, "Bob, is this just
[17] a mid-market or is it the large market?" He said,
[18] "No. It's everything."
[19] Q: Did you discuss with Mr. Bevington over the
[20] course of this summer obtaining exclusive rights to
[21] Maximo from MRO?
[22] A: You mean to be the exclusive host?
[23] Q: To be the exclusive ASP provider.
[24] A: I think from the beginning that was off the

Page 98

[1] table, that there was never any discussion about an
[2] exclusive. It was my understanding that this would
[3] be done in concert with other things, and MRO did
[4] not want to tie their hands.
[5] Q: Do you remember at either this July 2002
[6] meeting or the meeting the previous fall
[7] Messrs. Drapeau, Parker or Williams saying to you
[8] and Mr. Bevington, "We are going to be entering this
[9] market. We, MRO, are going to be entering this
[10] market"?
[11] A: I don't recall them ever being that direct
[12] and specific. I think throughout these
[13] conversations, though, they were very clear that
[14] this was not going to be exclusive, and I don't
[15] think Rick had any expectation that it would be an
[16] exclusive.
[17] Q: So you as a member of the board of
[18] directors of M2 understood that at any time MRO might
[19] itself start offering Maximo on a hosted basis?
[20] MR. RESNICK: Objection. Go ahead.
[21] A: I knew that the potential existed, but I
[22] didn't think it would — it was likely to happen
[23] because they had already tried to do it and failed.
[24] Q: Look at Exhibit 29, please. Now, I know

Page 99

[1] you are not copied on this, but that doesn't exclude
[2] the possibility that Mr. Bevington might have sent
[3] it to you separately. So if you can look at this
[4] exchange or this note from Mr. Bevington to
[5] Ms. Gilroy and tell me if you have seen that before.
[6] A: No, I am certain I have not.
[7] Q: Notice he says in the third paragraph at
[8] the top part of the page, the first — the topmost
[9] message, "Termination for convenience still does not
[10] give us the business investment protection that we
[11] need." Do you remember discussing with
[12] Mr. Bevington the term or the guaranteed term of the
[13] agreement that was being negotiated between MRO and
[14] M2?
[15] A: No, I don't recall having any specific
[16] conversations around that.
[17] Q: Do you remember that issue passing through
[18] your mind that summer?
[19] A: No. No, I don't remember, and I don't
[20] think it did.
[21] Q: So you were not concerned that M2 might
[22] enter into this agreement that was being negotiated
[23] and that MRO might then turn around and terminate it
[24] shortly after it was entered into?

Page 100

[1] A: No. I trusted that Rick — that's not an
[2] accurate statement. I trusted that Rick had the
[3] judgment and experience to negotiate a contract like
[4] this, and I didn't get involved in the particulars.
[5] So, again, I didn't see any — you know, I don't
[6] recall really reading any of these drafts. I wasn't
[7] providing comment into these drafts and wasn't that
[8] close to the details.
[9] Q: So you didn't know that the agreement that
[10] ultimately was signed allowed MRO to terminate for
[11] convenience on 90 days notice?
[12] A: I specifically was not aware of that, no,
[13] as I wasn't aware of the other particulars.
[14] Q: Now, was there investment being made within
[15] M2 in anticipation of this contract being signed?
[16] A: Yes.
[17] Q: And what was the nature of that investment?
[18] What did that investment consist of?
[19] A: It was money. Is that what you mean, like
[20] what was being invested?
[21] Q: No. What was money being spent on?
[22] A: To be used for?
[23] Q: To be used.
[24] A: It was to build up the infrastructure of