UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| M2 CONSULTING, INC.<br><br>            Plaintiff,<br><br>v.<br><br>MRO SOFTWARE, INC.<br><br>            Defendant. | C.A. No. 03-12589-GAO |

**MRO SOFTWARE, INC.'S REPLY BRIEF IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION**

MRO Software, Inc. ("MRO") respectfully submits this reply to M2 Consulting, Inc.'s ("M2") Opposition to MRO's motion for a preliminary injunction ("MRO's Motion").

**INTRODUCTION**

In its Opposition, M2 does not deny that it has continued hosting MRO's MAXIMO software for its customers, or that each time MAXIMO is accessed by M2 or one of its customers it creates a copy of the software that gives rise to infringement under the Copyright Act, 17 U.S.C. §§ 101 et seq.  Instead, M2's opposition is based solely on the argument that it was fraudulently induced to sign the 2002 Agreement by MRO's promise that it would promote -- or "roll out" -- M2's hosting service to MRO's sales force.  Therefore, M2 argues, the termination provisions of the 2002 Agreement are unenforceable.

M2's fraud defense fails as a matter of law for several reasons.  First, M2 has not stated with specificity the nature of the promise allegedly made by MRO, as required to support a claim of fraud.  The alleged promise is vague and does not contain essential terms such as MRO's obligations, and it is impossible to determine what would constitute satisfactory performance, or breach, under this promise.  Consequently, even if M2's claims are assumed to be true, the alleged

435424.6

promise is too vague and indefinite to support a fraud claim. Second, discovery does not support M2's assertion that MRO made this promise. Most notably, M2's CEO, Rick Bevington, sent an email to MRO in which he confirms that no such agreement or promise was made. Third, M2 cannot meet the high burden of proof applied to misrepresentations regarding acts to be performed in the future. Not only has M2 offered no evidence to support the required element that MRO had no intent to perform its alleged promise, but the undisputed evidence shows that, although it had no obligation to do so, MRO promoted M2's hosting service to its sales force. Fourth, M2 cannot demonstrate that its reliance on MRO's alleged promise was reasonable. In fact, M2's purported reliance was unreasonable as a matter of law because the 2002 Agreement was terminable at will. Lastly, M2's fraud claim fails because M2 ratified the 2002 Agreement by failing to repudiate it for more than two and one half years – to date, M2 has not given notice that the 2002 Agreement is void, and M2 has by its conduct ratified the 2002 Agreement.

Accordingly, the likelihood of success factor strongly favors MRO and, as set forth in MRO's Memorandum in Support of its Motion ("MRO's Memo"), the remaining factors in the preliminary injunction standard also weigh in MRO's favor.

## M2'S MISCHARACTERIZATION OF THE EVIDENCE

M2's Opposition grossly ignores the factual record that has been developed during discovery in this case. Rather than limit itself to the issues of copyright infringement and its fraud defense, M2 attempts to prop up its feeble fraud claim by attempting to paint a canvas of "bad acts" by MRO, apparently in an attempt to lead the Court to the conclusion that if MRO engaged in these acts it also engaged in fraud. While most of these allegations have nothing to do with the issue of copyright infringement or M2's fraudulent inducement, they cannot be left unaddressed. Though not comprehensive, the following are selected examples:

- *M2 implies that MRO violated the 2000 Agreement by sending sales leads to application service providers other than M2.* (Opposition, p. 3). Apart from the fact that M2 has never raised this as an allegation in its original or Amended Complaints, the 2000 Agreement expressly states that it "does not preclude [MRO] from providing Application Hosting of MAXIMO itself, or through other third parties." (Affidavit of Rick Bevington ("Bevington Aff."), Ex. A, par. 4).

- *M2 alleges that MRO's hosting efficiency so impressed MAXIMO that MRO began to develop its own plan to web host MAXIMO "in house."* (Opposition, p. 3). As MRO's President, Norman Drapeau testified, MRO began to consider web hosting MAXIMO in-house before 1999, and long before authorizing M2 to host MAXIMO, based on pronounced and predicted trends in the software industry. (Deposition Transcript for Norman Drapeau ("Drapeau Tr."), at 19, Ex. 5). M2 has been unable to present any evidence suggesting that MRO misappropriated any confidential or proprietary information from M2. As noted above, under the 2000 Agreement MRO was expressly permitted to provide application hosting.

- *At no time did MRO advise M2 that MRO's plans to web host MAXIMO were underway.* (Opposition, p. 3). This assertion is flatly contradicted by multiple sources, including an email from an MRO executive sent to Mr. Bevington (Ex. 4), dated February 15, 2000, a week before the 2000 Agreement was executed. In this email Mr. Williams, MRO's Executive Vice President of Worldwide Sales and the person who negotiated the 2000 Agreement with M2, stated: "I should reset your expectations in areas like restrictions on other 3rd parties…..we'll generally never restrict anything that will mean expanded business. **And we will develop our own ASP initiative aggressively..….just so you know.**" (Ex. 4) (emphasis added, the acronym "ASP" stands for "application service provider," another term for someone who "hosts" software over the Internet).

- *M2 asserts that MRO manipulated the second agreement in order to make it easier to terminate the agreement.* (Opposition, p. 4). This is blatantly false since the 2000 Agreement and the 2002 Agreement were the same in this regard. Both agreements were "at will," terminable on 90 days notice. Moreover, in response to the question: "Did you attempt to negotiate that [termination at will] term with [MRO]?", Mr. Bevington answered, "it's my belief and my business experience that that termination for convenience has become almost boilerplate, standard language." (Deposition Transcript of Thomas Rickey Bevington ("Bevington Tr."), at 59-60, Ex. 1).

M2's mischaracterizations of the factual record in this case, particularly those instances where its assertions are not supported by any citation or evidentiary authority, should be ignored.

**FACTS RELATING TO THE ALLEGED FRAUD**

The events underlying M2's claims of fraudulent inducement stretch for a period of over three years. This time period begins with the negotiation and execution of the March 22, 2000

Hosting Agreement ("2000 Agreement"), continues during two and a half years of performance under that Agreement, and includes the six months of negotiations culminating in the November 4, 2002 Hosting Agreement ("2002 Agreement"). Although hundreds of emails were exchanged between the parties during this time there is not a single piece of written evidence supporting M2's claim that MRO promised to promote, or "roll out," M2's hosting service through MRO's sales force. Indeed, the documented negotiations between MRO and M2 culminating in the 2002 Agreement show unequivocally that, despite M2's urging, MRO refused to act as the "sales channel" for M2's hosting service.

In discovery, M2 admitted that its CEO, Rick Bevington, negotiated the 2002 Agreement on behalf of M2. Mr. Bevington's deposition testimony in support of M2's fraud defense establishes, as a matter of law, that the alleged promises, even if taken as true, are far too vague and indefinite to support M2's claim that it was fraudulently induced to enter into the 2002 Agreement. The only direct evidence of the promise allegedly made by MRO is testimony as to informal conversations between Mr. Bevington and several MRO officers, which occurred in restaurants and a parking lot after playing golf and were wholly unrelated to the negotiation of the 2002 Agreement. This evidence is in the form of selected pages from the deposition testimony of Mr. Bevington and one of M2's Directors, Seth Stewart. (Opposition, p. 7, Exs. A and B). M2 also submits the Affidavit of Mr. Bevington which describes the alleged fraudulent promise by MRO, however, it does so in vague generalities and fails to provide any specificity. Mr. Bevington refers to unidentified MRO executives and fails to identify their alleged statements or when they were made. (Bevington Aff.).

As a matter of law this evidence fails to establish fraud.

### A.   The Negotiation of the 2000 Agreement

M2 has provided eight pages from Mr. Bevington's deposition transcript to support its proposition that "[f]acts obtained in discovery clearly establish that MRO lied to and to [sic]

435424.6                                         4

fraudulently induced M2 to execute the 2002 Agreement." (Opposition, p. 7, Ex. A).  Mr. Bevington testifies that there were two agreements already in place – the written 2000 Agreement and an oral agreement reached in September 1999 – when the parties first began discussions regarding the 2002 Agreement.  He goes on to state that the oral agreement reached in September 1999 was "reconfirmed" on two golf outings several years later, in October 2001 and July 2002.  (Bevington Tr., at 42-43, 48-51, 107-108, 147, 151-152, Ex. 1).  In the excerpt from his deposition, Mr. Bevington testifies that he was told by MRO, at the July 2002 golf outing, that if M2 signed a new agreement (the 2002 Agreement), MRO would "roll it out immediately to North American sales".  (Opposition, Ex. A, Bevington Tr., at 151).

M2 has also provided an excerpt from the deposition testimony of Mr. Stewart, who was present at the October 2001 and July 2002 golf outings.  Mr. Stewart testified to the following exchange that he overheard in a restaurant parking lot between Mr. Bevington and MRO's Vice President of North American Sales, Robert Parker:

> Rick asked Bob, "Bob, is this a done deal?" And Bob said, "Absolutely this is a done deal."  And Rick said, "Are we going to roll this out to the" -- "just to the middle market sales organization or is it going to be large and middle," and Bob said, "Large and middle."  But he emphatically reiterated that this was a done deal . . .

(Opposition, Ex. B, Deposition Transcript of Seth Stewart ("Stewart Tr."), at 95, Ex. 2).

These two deposition excerpts and Mr. Bevington's Affidavit are the only evidence of fraud that M2 relies upon in its Opposition to MRO's Motion.

This evidence cannot support a claim of fraud in the inducement.  Mr. Bevington was questioned extensively about the alleged oral agreement, supposedly first reached in September 1999 and "reconfirmed" in October 2001 and July 2002, that MRO would "roll it out to sales." When asked about this alleged promise, Mr. Bevington testified as follows:

Q. Let me ask you again, can you recall any specific communication or conversation with MRO where MRO -- and by "MRO" I mean an employee or executive -- told you that MRO would roll out this service after the agreement was signed?

A. Oh, yeah, yeah. Yes, Ted Williams said that. Milton Bevington said that. Chip is hard to get ahold of, but you know, he's the one that gets the ball rolling after the '99 meeting and then delegates. It was delegated to Ted, and my brother worked for Ted. And at the time Ted was sales and marketing so he had a lot on his plate.

Q. So the statements I have asked you about were said to you by Mr. Williams, by your brother Milton Bevington, and by the president of MRO, Norman Drapeau?

A. Yes.

Q. What did Mr. Drapeau say to you on this subject?

A. I don't know the exact words, but you know, "Good plan. Let's do it." You know, "Look forward to the mutually beneficial outcome," you know, that kind of stuff. You don't see Chip all the time. It was subsequent to the '99 meeting. I have seen Chip in a couple -- three times during this whole process of getting it done, but he'd try not to have to go back to the well.

Q. . . . Have you told me now everything that Mr. Drapeau said to you on the subject of the rollout prior to, before the March 2000 agreement was signed?

A. I believe so. . . .

Q. Now, going back to the negotiation leading up to the March 2000 agreement, just moving back in the timeline to that again, was this issue of compensation to MRO salespeople in connection with the sale of M2 service discussed between anyone at M2, to your knowledge, and anyone at MRO?

A. Yes.

Q. What was said on that subject?

A. It wasn't as focused a discussion because, **rightly or wrongly, you assume that if you are going to sell something that you'll create a collateral, you'll do some training, you'll price it.**

Q. Please don't tell me what you assume. Just tell me -- I am interested in what you recall in substance was said on this commission schedule for MRO salespeople who sold your service before the first agreement was entered into.

A. **They were going to roll out a new product to their sales force to sell. Inherent in that is everything that's inherent in that. Like paying them. They have never rolled out a product they didn't pay anybody for.**

Q. **But there was no specific discussion of what they would be paid?**

A. No. This is the CEO we are talking to. He gave it to Ted. He gave it to Bob. He gave it to Ray.

Q. But there was no specific discussion of what the salespeople would be paid?

A. Not with me.

Q. Or anyone else at M2 to your knowledge?

A. No. (Bevington Tr., at 52-54, 101-103, Ex. 1) (emphasis added).

M2's Director Seth Stewart, testifying concerning the same conversation during the October 2001 golf outing, stated:

> Q. Tell me what you recall Bob Parker and Chip Drapeau saying on this topic.
> A. They told us -- they reiterated to us that the sales -- in order for this campaign to be successful or that MRO salespeople would promote the M2 service it had to be what they referred to as revenue neutral to the salesperson. So the commission they got for selling a piece of software would be the same that they would get for selling a hosted service which is the classic question any software company has when they get into the hosting business.
> Q. What I would like you to do is just tell me as best you can recall the gist of what the MRO executives said and what M2 said on this topic.
> A. I think they agreed with -- Rick was the one who said, "Look, in order for your people to actively promote this thing it has to" -- you know, "They have got to be paid for it, and it has got to be attractive for them. There is demand in the market, but they are ignoring these opportunities." Chip and Bob agreed, "Yes, you are right. **The compensation structure is going to have to change, and we will take a look at how we are going to do that.**"
>
> (Stewart Tr., at 51-52, Ex. 2) (emphasis added).[1]

---

[1] Mr. Bevington and Mr. Stewart testified further regarding the second golf outing with MRO executives in July of 2002, however, their description of the statements made during this meeting are just as vague and indefinite as those allegedly made in October 2001. Specifically, Mr. Bevington testified as follows:

> Q. What business was discussed [during this meeting -- this golf meeting with Mr. Williams and Mr. Parker]?
> A. If we sign this new agreement will we -- will you in fact do what you have always said you are going to do, roll it out to North American sales or roll it out to sales I think I said. And the both of them replied, "We'll roll it out immediately to North American sales" with Thayer Stewart and I.
> (Bevington Tr., at 151, Ex. 1).

Likewise, Mr. Stewart was also unable to provide any details concerning the statements allegedly made by MRO during the July 2002 golf outing:

> A. During the golf round frankly there wasn't a lot of -- you know, there was a lot of casual conversation, not so much about business. Then we had lunch, and we were talking about the particulars of how this rollout would occur. And then, you know, as we are walking Bob in the parking lot, you know, Rick asked Bob, "Bob, is this a done deal?" And Bob said, "Absolutely this is a done deal." (Stewart Tr., at 95, Ex. 2).

As discussed further below, this testimony provides context to M2's allegations and establishes that the promises cited in M2's Opposition are too vague to support M2's claim of fraud in the inducement.

### B. The Negotiation of the 2002 Agreement Shows that MRO Had No Obligation to Promote M2's Services

The 2002 Agreement went through extensive negotiation and nine drafts before being signed by the parties. M2 repeatedly raised the issue of MRO promoting M2's hosting service, and this request was continually and explicitly rejected by MRO. M2's attempt to convince MRO to take responsibility for marketing M2's service took many forms, including M2's attempt to impose a sales quota on MRO, suggestions of compensation and "quota" (sales quota) credits being given to the MRO sales force based on successful sales of M2's service, and a debate about which company was the "sales channel" and which the "fulfillment channel."

The negotiations over these issues were conducted by Mr. Bevington, on behalf of M2, with the advice of M2's outside counsel, and MRO's Vice President of Contracts, Nancy Gilroy. The negotiation of the 2002 Agreement tells a clear story: MRO would not accept responsibility for promoting M2's service.

In the first draft dated May 1, 2002, MRO proposed that M2 agree to an annual sales quota, reflecting MRO's expectation that M2 would be the sales channel. (Ex. 6). In the second draft, dated May 17, 2002, M2 reversed MRO's proposal, and attempted instead to impose a monthly sales quota on MRO, in effect making MRO the sales arm under the contract. (Ex. 7).

In the fourth draft of the 2002 Agreement, dated May 22, 2002, Mr. Bevington again insisted that MRO assume a sales quota, and stated in his accompanying email to Ms. Gilroy, that M2 was "trying to capture what we believe is part of the intent, that being to have an arrangement that allows MRO sales to offer Hosting to prospects who fit the profile or who request it, and still be

recognized with quota and comp." (Ex. 8). Compensation and quota credit to MRO sales staff was a critical element of what M2 considered to be a "roll out" to sales. (Bevington Tr., at 107, 191-193, Ex. 1; Stewart Tr., at 48, 51-52, Ex. 2; Deposition Transcript of David Bigler ("Bigler Tr."), at 41, 45, Ex. 3). This communication shows that M2 proposed what it considered to be an essential element of MRO's promise to "roll out" its hosting service, for inclusion in the 2002 Agreement.

In the email accompanying the sixth draft, dated June 27, 2002, M2 admits that, as of that date, any agreement regarding the promotion of M2's service to MRO's sales force did not exist, and would have to be worked out in the future. Mr. Bevington wrote: "The issue of releasing App. Hosting to the sales [force] will have to be agreed to amongst the parties [in the future], but I do not believe it needs, or can be, in this doc." (Ex. 9).

Following the sixth draft, the debate over who would promote the M2 hosting service -- M2 or MRO -- continued. On July 10, 2002, Mr. Bevington wrote to Ms. Gilroy, "Our position on the 'Quota' is that MRO is the Sales Channel and M2 is the fulfillment channel and as such MRO, should have the quota." (Ex. 10). The next day, Ms. Gilroy sent another draft of the 2002 Agreement and wrote, "It does not make sense that MRO has a sales quota for M2; therefore, I put the original language back in." Mr. Bevington responded the same day, writing "we may be missing each other on the sales quota issue. MRO IS the sales channel, M2 is the fulfillment channel. We don't do the selling, you do, therefore the reason for the quota." (Ex. 10).

On July 16, 2002, Mr. Bevington sent the eighth draft of the 2002 Agreement to Ms. Gilroy. Again, he inserted the requirement that MRO meet a sales quota and wrote, "we need to see MRO take some position vis a vis the sales channel." (Ex. 11).

This tug of war over which company was the sales channel was finally resolved when M2 acquiesced and accepted the ninth version of the 2002 Agreement, which was transmitted by MRO

to M2 on July 22, 2002. This draft excluded the sales quota that M2 had demanded and placed no sales responsibilities on MRO. On September 15, 2002, M2 accepted MRO's terms, and signed the ninth draft of the 2002 Agreement on November 4, 2002. (Ex. 12).

During this extended dialogue, M2 repeatedly attempted to impose a sales quota on MRO, raised the issues of compensation and quota credit for the MRO sales force, and argued with MRO over who would be the "sales channel." Ultimately, M2 acknowledged that the issue of releasing application hosting to MRO's sales force (in other words, the "roll out") would "have to be agreed to amongst the parties" (and therefore had not been agreed to previously). These documented communications between the parties show that this was a topic of active negotiation that MRO considered and rejected. M2 has offered no documentation or communications to support its allegation that MRO made such promises, and the course of negotiations shows that MRO refused to assume any responsibility for promoting M2's service.

## LEGAL ARGUMENT

**I.   M2'S UNSUPPORTED FRAUD IN THE INDUCEMENT ARGUMENT DOES NOT ALTER MRO'S EXTRAORDINARILY HIGH LIKELIHOOD OF SUCCESS ON THE MERITS**

In its Opposition, M2 does not contest, and thereby concedes, that M2 is currently making copies of MRO's MAXIMO software in violation of the Copyright Act every time that it is accessed by M2 or one of its customers. Instead, M2 relies exclusively on its fraud in the inducement defense in response to MRO's contention that it has a likelihood of success on its copyright infringement claim. (Opposition, pp. 6-8). M2 also asserts that "there is no proof offered, or even argument made in any of MRO's materials or affidavits that even addresses the validity of the 2002 Agreement, much less establishes a likelihood of success on the merits." (Opposition, p. 8). M2 is mistaken. However, it is a basic rule of construction that contracts are presumed to be valid. *Walsh v. Schlecht*, 429 U.S. 401, 408 (1977) ("a general rule of construction

presumes the legality and enforceability of contracts"). Further, M2 admits that it signed the 2002 Agreement and its fraud claim is M2's sole defense to its validity. (Bevington Aff., par. 12; Opposition, pp. 6-8). M2 does not challenge and therefore admits that MRO properly terminated the 2002 Agreement, and the consequences of termination under the 2002 Agreement are clear: M2 must cease all activities under the 2002 Agreement within two years following the date of termination. Thus, the only question remaining is whether MRO has a likelihood of success on its copyright infringement claim despite M2's fraud in the inducement defense.

MRO has demonstrated an extraordinarily high likelihood of success on its copyright infringement claim. M2 claims that by raising its fraud in the inducement claim, the validity of the 2002 Agreement "is a disputed issue and [is] therefore a question of fact for the jury." (Opposition, p. 7). As explained below, neither the facts, nor the law, support M2's fraud in the inducement claim. The 2002 Agreement is therefore binding on M2, and M2 has no right to continue to use MRO's MAXIMO software for its hosting business. Since M2 advances no defense other than its fraud claim to rebut MRO's likelihood of success argument, M2 is guilty of copyright infringement.

    A.    **The Alleged Promise Upon Which M2 Relies is Too Vague and Indefinite to be Enforceable**

It is well established that a promise or agreement is not enforceable and cannot form the basis of a fraud claim if the essential terms are not agreed upon by the parties.

> In order to create an enforceable contract, "[i]t is a necessary requirement that [the] agreement ... be sufficiently definite to enable the courts to give it an exact meaning." Williston on Contracts § 4:18 (4th ed.1990). While it is not required that parties specify all terms of an agreement, they must have "progressed beyond the stage of imperfect negotiation." *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 878 [] (2000) (internal quotations omitted) . . . Whether an alleged contract is legally enforceable in light of indefinite terms is a question of law for the court.
>
> *A lack of definiteness in an agreement might be based on a lack of specificity regarding the time of performance, price to be paid, work to be done, or property to be transferred.* See Williston at § 4:18. In determining whether

> such an agreement is nonetheless enforceable, courts should ask whether the parties intended to contract with one another and there is a reasonably certain basis for providing an appropriate remedy. . . .
>
> There is considerable overlap between the case law addressing enforceability of vague agreements as a matter of contract law and that addressing whether statements were too vague to induce reasonable reliance for purposes of proving fraud.

*Armstrong v. Rohm and Haas Co., Inc.*, 349 F.Supp.2d 71, 78, 82, n.15 (D.Mass. 2004) (emphasis added); *Held v. Zamparelli*, 13 Mass.App.Ct. 957, 958 (1982) (Where an alleged agreement is silent on essential terms, "[c]onstruction and enforcement of the agreement without these essential terms would be futile [] and we cannot supply these provisions without writing a contract for the parties which they themselves did not make."). Here, it is apparent that most, if not all, of the essential terms of the alleged promise are undefined.

In their depositions, the M2 representatives who claim to have heard MRO's promise prior to the execution of the 2002 Agreement were questioned extensively about the statements that form the basis for this allegation. According to this deposition testimony, it was MRO's promise to "roll out" M2's hosting services to its North American sales force that induced M2 to sign the 2002 Agreement. (Bevington Tr., at 42-43, 48-51, 107-108, 151-152, Ex. 1; Stewart Tr., at 41, 48-53, 95-97, 104-105, Ex. 2; Bigler Tr., at 38-44, 45, Ex. 3).[2] Although M2's Amended Complaint and Opposition allege that MRO's promise was stated with greater specificity and that the parties discussed and agreed upon some of MRO's underlying obligations, M2 is bound by the deposition testimony of its officers and directors regarding the alleged promise and cannot rely on unsupported allegations to prove its fraud claim.

---

[2] The various recitations of this alleged promise, as described by M2's representatives during their depositions, include: "introduce this as an additional product or service sale to [MRO's] sales force," "introduce and roll this out to the sales force," "roll it out immediately to North American sales" (Bevington Tr., at 43, 56, 151, Ex. 1), the roll out "was a done deal" (Stewart Tr., at 95, Ex. 2), and "The sales force of MRO selling hosted solutions of Maximo." (Bigler Tr., at 38, Ex. 3).

As described by M2, this alleged "promise" is so vague and ill-defined that it is impossible to determine MRO's obligations, what would constitute a breach, or what would be an adequate remedy in the event of breach. Essential terms left undefined include the nature and scope of MRO's obligations (including the content, frequency or manner of MRO's communication to its sales force), the timing or deadline for the "roll out", or any other means for the Court to determine whether or not MRO has performed.[3] In addition, the evidence clearly shows that M2 understood that it was essential for the success of the "roll out" that MRO's sales force be adequately compensated for selling M2's services by means of commissions and sales quota credit. (Bevington Tr., at 191-193, Ex. 1; Stewart Tr., at 48, 51-52, Ex. 2; Bigler Tr., at 41, 45, Ex. 3). However, M2 failed to negotiate or attempt to reach agreement on this term prior to signing the 2002 Agreement and it knew that MRO would not address this issue until some indeterminate future time. *Id.*[4] Indeed, even the term "roll out" is not defined and is so vague that it is susceptible to multiple interpretations. Discovery revealed that the term "roll out" means something different to nearly every person questioned, including some of the MRO representatives who allegedly made this promise. (Deposition Transcript of Robert Parker ("Parker Tr."), at 80-81, Ex. 13; Deposition Transcript of Ted Williams ("Williams Tr."), Vol. I, at 83, Ex. 14).

---

[3] The uncertainty of this alleged promise is highlighted by Mr. Stewart's recollection, and direct quote, from a conversation between Mr. Bevington and Mr. Parker. During his deposition, Mr. Stewart testified as follows: "Rick [Bevington] said, "*Are we going to roll this out* to the" -- "just to the middle market sales organization or is it going to be large and middle," and Bob [Parker] said, "Large and middle." (Stewart Tr., at 95, Ex. 2) (emphasis added). This description of the alleged promise is inconsistent with M2's assertion that MRO was required to perform the "roll out" because it suggests that the "roll out" entailed obligations on the part of both MRO and M2 – obligations that were never defined or discussed.

[4] On this topic, Mr. Bevington testified as follows:

> Q. What did you understand the compensation plan to the MRO sales force was [when you signed the 2002 Agreement] or was going to be under this plan?
> A. I didn't know anything more than I had funded it. (Bevington Tr., at 192, Ex. 1).

Therefore, even if MRO did promise to "roll out" M2's services to its sales force, as a matter of law, this promise cannot form a viable basis for M2's fraud defense because it leaves too many essential terms undefined. *Armstrong*, 349 F.Supp.2d at 81-82 ("Reliance is not reasonable where the alleged representations are vague or indefinite." . . . Therefore, plaintiffs' "claims of fraud and fraud in the inducement must be dismissed" because the defendant's alleged promises "are too vague and indefinite to induce reasonable reliance because they fail to include *any* essential terms of an agreement for services."); *Saxon Theatre Corp. of Boston v. Sage*, 347 Mass. 662, 666-667 (1964) (Plaintiff's fraud claim fails as a matter of law because the alleged representations were too vague and indefinite to warranty reasonable reliance); *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 100 F.Supp.2d 1086, 1096, 1101 (C.D.Cal. 1999) (The "alleged misrepresentations … that Tektronix 'implemented an aggressive program' that included 'vastly increasing' corporate resources to promote the Lightworks system … do not amount to actionable assertions of fraud" because they are "puffery" and too vague to be enforceable).

### B. The Evidence that MRO Did Not Make the Promise Alleged by M2 is Overwhelming

Discovery does not support M2's allegation that MRO promised to "roll out", or promote M2's hosting service to its sales force. First, as discussed above, during the negotiation of the 2002 Agreement MRO rejected M2's attempt to impose a sales quota on MRO and M2's assertion that "MRO is the Sales Channel and M2 is the fulfillment channel." (Ex. 10). If the promise alleged by M2 had been made, it should have been incorporated into the 2002 Agreement. The fact that it was not shows either that it was never made, or that it was "negotiated away" during the six months the 2002 Agreement was in negotiations.

Second, each and every MRO executive who allegedly made this promise, has denied doing so. (Drapeau Tr., at 69-71, Ex. 5; Parker Tr., at 145, 153-154, Ex. 13; Williams Tr., Vol. I, at 82-

83, Ex. 14). Most damning to M2's fraud claim, however, is M2's CEO, Mr. Bevington's written admission which unequivocally states that the parties had not yet agreed to promote M2's hosting service through MRO's sales force. (Ex. 9). Where M2 offers no documentary support for its fraud defense, a written admission by M2's CEO so clearly at odds with its allegations must be given considerable weight in assessing MRO's likelihood of success argument.

      **C.    M2 Cannot Meet the High Burden of Proof Applied to Alleged Misrepresentations Regarding Acts to be Performed in the Future**

The elements of common law fraud are: "(1) that the statement was knowingly false; (2) that [the defendant] made the false statement with the intent to deceive; (3) that the statement was material to the [plaintiff's] decision to sign the contract; (4) that the [plaintiff] reasonably relied on the statement; and (5) that the [plaintiff was] injured as a result of [its] reliance." *Turner v. Johnson & Johnson*, 809 F.2d 90, 95 (1st Cir. 1986). Ordinarily, "false statements of opinion, of conditions to exist in the future, or of matters promissory in nature are not actionable in a claim for misrepresentation." *Rodowicz v. Mass. Mutual Life Ins. Co.*, 192 F.3d 162, 175 (1st Cir. 1999) (citation omitted). However, "statements of present intention as to future conduct may be the basis for a fraud action if ... the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage." *Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 226 (1st Cir. 2003) (citation omitted).

MRO adamantly denies making the promise alleged by M2, but even if it did the evidence adduced in discovery shows that M2 cannot satisfy the fraud standard for two reasons. First, there is no evidence supporting M2's assertion that "MRO knew that it had no intention of ever rolling out M2's capabilities to the North American sales force." (Opposition, p. 4). Indeed, the only evidence bearing directly on MRO's intent are its actions promoting M2's hosting service, and this evidence serves only to disprove M2's contention about MRO's intent.

Under the 2000 and 2002 Agreements, M2 was an MRO hosting affiliate. As such, MRO received a benefit if M2's business was successful since MRO was entitled to a percentage of fees received by M2 under both the 2000 and 2002 Agreements. Therefore, although the Agreements do not obligate it to do so, MRO undertook various actions that promoted M2's services to its sales force. Specifically, (i) MRO sent an announcement to its entire sales force promoting M2's services, (ii) it allowed M2 to make presentations and appear at several MRO events directed toward its sales force, (iii) MRO worked with M2 to develop promotional materials to educate MRO's sales force and (iv) MRO's mid-tier sales force was repeatedly notified and sent promotional messages about M2's services. (Deposition Transcript of Jason Kasper ("Kasper Tr."), at 28-30, Ex. 15; Bevington Tr., at 61-63, 184-185, 193-194, 197-199, Ex. 1; MRO's Interrogatory Answers, No. 2, Ex. 16). MRO also spent a considerable amount of time working with M2 to develop a sales compensation model that would provide an effective incentive for MRO's sales force to sell M2's services. (Bevington Tr., at 88-100, Ex. 1). The fact that MRO's sales force referred numerous leads to M2 is convincing evidence that MRO did indeed promote M2's services. (MRO's Interrogatory Answers, No. 2, Ex. 16). In contrast, in its Opposition M2 offers no evidence to support its claim that MRO's representatives misrepresented their intentions. (Opposition, pp. 4-5). Consequently, M2 cannot satisfy the intent elements of the fraud standard.

Second, M2's fraud claim fails because even if its allegations are true – that MRO made the alleged promise and M2 relied on it – M2's reliance was unreasonable as a matter of law for several reasons. First, as explained above, the alleged promise is too vague and indefinite for any reliance by M2 to have been reasonable. However, even assuming the truth of M2's allegations, it would have been patently unreasonable for it to rely on the reiteration of a promise that, according to M2,

MRO had failed to perform for more than three years and where it is undisputed that MRO's alleged promise was specifically rejected by MRO during negotiation of the 2002 Agreement.

Lastly, the 2002 Agreement was terminable at will upon 90 days notice. Several courts have rejected parties' claims of reasonable reliance where the underlying contract, or relationship, was terminable at will. *See, e.g., Brady v. Calyon Securities (USA)*, No. 05-3470, 2005 WL 3005808 *7 (S.D.N.Y. Nov. 8, 2005) (in a fraudulent inducement action, "reliance on any representations of future intentions" by an at-will employee who may be terminated at any time are unreasonable as a matter of law); *Flight Concepts Ltd. Partnership v. Boeing Co.*, 819 F.Supp. 1535, 1549-1550 (D.Kan. 1993) (the Court granted summary judgment in defendant's favor because it was unreasonable for plaintiff to rely on representations about future events when it signed a contract terminable at will). The logic of these decisions is compelling: it cannot be reasonable for a party to rely on contemporaneous promises allegedly made regarding actions to be taken in the future, in the context of negotiations over a contract that may be terminated by either party for any reason.

### D.    M2 Ratified the 2002 Hosting Agreement

M2 claims that it "has from the outset argued that the 2002 Agreement is voidable". (Opposition, p. 5). Fraud in the inducement renders a contract voidable, not void. *See Nash v. Trustees of Boston University*, 946 F.2d 960, 967 (1st Cir. 1991); Restatement (Second) of Contracts § 164 (1981). However, M2 failed to allege in its original or Amended Complaints, that the 2002 Agreement is void, or to seek the rescission of this agreement as a remedy. (Complaint; Am. Complaint). To date, M2's position has simply been that the 2002 Agreement is *voidable* -- M2 has never attempted to give notice to MRO that the 2002 Agreement is *void* or *rescinded*. Thus, the 2002 Agreement remains in full force and effect.

Moreover, "[a] voidable contract can, of course, be ratified by subsequent conduct." *American Airlines, Inc. v. Cardoza-Rodriguez*, 133 F.3d 111, 119 (1st Cir. 1998). M2 ratified the

2002 Agreement by failing to repudiate it for at least two and one half years. M2 has alleged that, in June 2003, it was informed of MRO's breach of its promise to roll-out M2's services to its sales force. (Bevington Tr., at 201-203). By failing to repudiate the 2002 Agreement for two and one half years M2 has ratified its terms. *Hills v. Chambers*, No. 96-0072B, 2000 WL 1532335 *9-10 (Mass.Super. Aug 18, 2000) (plaintiff ratified the contract by delaying three years before seeking rescission based on fraud), *citing In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir. 1989) (party ratified agreement by delaying for more than a year and a half before repudiating it – a delay deemed "unreasonable as a matter of law").

## II.    EXISTING FIRST CIRCUIT PRECEDENT ESTABLISHES THAT THE BALANCING OF THE HARDSHIPS WEIGHS STRONGLY IN MRO'S FAVOR

In its Opposition, M2 contends that allowing MRO's Motion "would destroy M2's business" and, on this basis alone, "the balance of the harm clearly weighs in favor of M2." (Opposition, p. 9). MRO relies on its initial Memorandum of Law in Support of Its Motion for Preliminary Injunction in addressing this issue. However, it bears emphasizing that the First Circuit squarely considered this issue in the case of *Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.*, and held that "[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, ***such an argument in defense 'merits little equitable consideration.' . . . Such considerations apply even to a business which is exclusively based on an infringing activity and which would be virtually destroyed by a preliminary injunction*.**" 843 F.2d 600, 612-613 (1st Cir. 1988) (emphasis added, citations omitted). Moreover, it is significant that M2 has been on notice for over two years of MRO's termination of the 2002 Agreement, and that M2's rights to use MAXIMO for existing customers would expire at the end of the two-year "sunset" period. M2 has apparently taken no action, such as obtaining a license to other facilities management software that could satisfy its customers' requirements, and made

absolutely no attempt to mitigate the harm to itself or to others that could be caused by enforcement of MRO's copyrights in MAXIMO.

### III. THE PUBLIC INTEREST CONCERN RAISED BY M2 IS OUTSIDE THE SCOPE OF THE INJUNCTIVE RELIEF SOUGHT BY MRO

M2's argument that the public interest is best served by denying MRO's motion for preliminary injunction is without merit. M2 claims that if the Court allows MRO's Motion, it will result in "injury to innocent non-parties to the litigation" and "its 18 existing Maximo customers will face the immediate prospect of losing their Maximo application service provider, and the resulting functionality of that program." (Opposition, pp. 9-10). This assertion is false, and the presumption is strongly against this argument.

First, as explained in MRO's Memorandum, it is presumed that the public interest will not be adversely impacted by the issuance of a preliminary injunction. (MRO's Memo, p. 16, citing *Concrete Machinery*, 843 F.2d at 612).

Second, MRO does not seek to enjoin M2 from hosting its MAXIMO software for customers with valid licenses.[5] (MRO's Motion, Proposed Injunction, Section II). According to M2, three of its 18 MAXIMO hosting customers own their own license from MRO. (Affidavit of Jeffrey Foley, par. 2). Thus, these three customers would not be subject to the proposed injunction submitted by MRO and there is no risk that they would lose their ability to use MAXIMO.

Third, MRO's Memorandum states clearly that "MRO is uniquely and fully capable (and stands ready, willing and able) to provide MAXIMO to all of M2's customers, without the least disruption in service or injury to these third parties." (MRO's Memo, p. 17). Accordingly, there is no risk that the remaining M2 customers would lose the use of MAXIMO if the Court grants the

---

[5] MRO does not seek to restrict M2 from providing hosted access to MAXIMO, as long as the customer(s) has a valid license and support agreement entitling it to the version being provided, or hosted, by M2.

proposed preliminary injunction. Moreover, it is M2 and not MRO that stands responsible for any injury caused to third parties, since M2 has been on notice for over two years that the 2002 Agreement was terminated, and that M2's rights to use MAXIMO for existing customers would expire at the end of the two year "sunset" period. M2 has apparently made absolutely no effort to mitigate the harm to its customers that it now expresses such concern for. M2 cannot ignore MRO's termination of the Agreement and use the resulting injuries to third parties to support its legal argument that the balance of the harms points in its favor.

## CONCLUSION

For the reasons set forth in this Reply and MRO's Memorandum in Support of Its Motion, the Court should enter the preliminary injunction in the form submitted by MRO.

Respectfully Submitted,

/s/ Kurt Bratten
Lee T. Gesmer (BBO No. 190260)
Kurt Bratten (BBO No. 644730)
Gesmer Updegrove LLP
40 Broad Street
Boston, MA 02109
Kurt.Bratten@gesmer.com
(617) 350-6800

Dated:  January 27, 2006