1

Volume I
Pages 1 to 258
Exhibits 2 to 52

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

- - - - - - - - - - - - - - - - -x
                                  :
M2 CONSULTING, INC.,              :
        Plaintiff,                :
                                  :
    vs.                           :   Civil Action
                                  :   No. 03-12589-GAO
MRO SOFTWARE, INC., and CRAIG     :
NEWFIELD,                         :
        Defendants.               :
                                  :
- - - - - - - - - - - - - - - - -x

    DEPOSITION OF THOMAS RICKEY BEVINGTON, a witness called on behalf of the Defendants, taken pursuant to the Federal Rules of Civil Procedure, before Linda A. Walsh, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Gesmer Updegrove LLP, 40 Broad Street, Boston, Massachusetts, on Tuesday, July 26, 2005, commencing at 10:02 a.m.

PRESENT:

    Fee, Rosse & Lanz, P.C.
        (By Mark S. Resnick, Esq.)
        321 Boston Post Road, Sudbury, MA 01776,
        for the Plaintiff.

    Gesmer Updegrove LLP
        (By Lee T. Gesmer, Esq.,
        and Kurt Bratten, Esq.)
        40 Broad Street, Boston, MA 02109,
        for the Defendants.


                * * * * *


DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813

Page 39

[1] A: I felt I already had it.
[2] Q: Explain what you mean by that.
[3] A: The only piece of the proposed business
[4] plan that MRO indicated was not really their cup of
[5] tea was the forming of a separate business entity
[6] with M2 — partnership, legal partnership with M2,
[7] you know, and making cash investment into it. They
[8] just don't have those types of relationships
[9] apparently. I don't think they do now. The rest of
[10] it looked like a good deal for everybody.
[11] Q: Who wrote the March 2000 agreement?
[12] A: I wrote it. Ted Williams, you know, tuned
[13] it.
[14] Q: Do you have the drafts of this agreement
[15] that preceded the final version?
[16] A: I know I have seen various times the draft
[17] with the knuckle notes on it. I can't guarantee
[18] that I saw it and forwarded it to you fellows or
[19] it's been lost or whatever. But, yeah, I have seen
[20] it.
[21] Q: But if you have them you have provided them
[22] in this case, correct?
[23] A: Yes, I have seen them. If I could find
[24] them, you have got them, yes. No reason to withhold

Page 40

[1] it.
[2] Q: Did drafts of this agreement go back and
[3] forth before the final was arrived at?
[4] A: No. There is really the original version;
[5] then there was Ted's comments; then there was a
[6] discussion with Nancy Gilroy to try to read and
[7] interpret Ted's comments; then there was the final
[8] that she and I signed and I am sure he read.
[9] Q: And at any point did you attempt to put in
[10] this agreement a commitment by MRO to roll out the M2
[11] service to the MRO sales force?
[12] A: Yes.
[13] Q: And where did you express that?
[14] A: In the agreement. It would be in — under
[15] "PSDI agrees to provide Item 3."
[16] Q: Did you write that sentence?
[17] A: Yes.
[18] Q: And did you write the words, "as they deem
[19] appropriate"?
[20] A: That may have been Ted's knuckle note. I
[21] don't remember. I may have done it as an
[22] accommodation on an understanding of their business,
[23] but I don't remember exactly.
[24] Q: What's a knuckle note?

Page 41

[1] A: Writing in the margin. Sorry. I'm an
[2] old-fashioned guy.
[3] Q: So am I. That must be an Atlanta
[4] expression.
[5] A: I don't know.
[6] Q: Did you understand that this Paragraph 3 in
[7] the March 2000 agreement gave MRO the discretion to
[8] provide M2 with leads?
[9] MR. RESNICK: Objection.
[10] A: The — sure.
[11] Q: Now, as the first year of this agreement
[12] began to unfold, late March 2000 through the end of
[13] the year and through to March of the next year, you
[14] observed that MRO was not giving its salespeople an
[15] incentive to sell your service, correct?
[16] A: Correct.
[17] Q: And you were not happy with that — you
[18] were unhappy with that, correct?
[19] A: Well, to back up a little bit, they weren't
[20] doing what they would typically do with a service
[21] product rollout, inform their salespeople that this
[22] solution is available, tell them, you know, how to
[23] describe it to the client and how to price it, tell
[24] them what's in it for them and what are their

Page 42

[1] chances of success and other things salespeople want
[2] to know. None of that activity was occurring. And
[3] I want to just back up one other. There is another
[4] line down here that was written with a view to MRO
[5] providing the sales force power on this, and that's
[6] under "General," No. 1.
[7] Q: What page? Are you back on Exhibit 3?
[8] A: Yes. I'm sorry.
[9] Q: Where are you on Exhibit 3?
[10] A: Page 2 under "General," Item 1.
[11] Q: Yes.
[12] A: That was an assurance that the activity
[13] would occur on M2's part when PSDI brought the
[14] prospects to bear. We didn't expect them to finish
[15] the sales cycle. We expected them to take it to a
[16] certain point.
[17] Q: Now, again, going back — I understand.
[18] Thank you.
[19] Going back to the first 12 months of the
[20] relationship, say March 2000 to March 2001, MRO was
[21] not providing the sales force power that you wanted
[22] them to provide, correct?
[23] A: Correct.
[24] Q: And what is it that they were not doing

Page 43

[1] that you wanted them to do to strengthen your
[2] company's ability to sell this service?
[3]     A: They needed to essentially do what we
[4] agreed they would do, is introduce this as an
[5] additional product or service sale to their sales
[6] force and the sales force has it in their sales kit.
[7] I think MRO calls it their sales briefcase. And
[8] nothing happens if it's not in the briefcase.
[9]     Q: So that's what you expected them to do or
[10] that's what you hoped they would do during the first
[11] year?
[12]     A: Uh-huh.
[13]     Q: Yes?
[14]     A: Yes, sir.
[15]     Q: And when you say that they agreed to do
[16] this, when did MRO agree to introduce the service in
[17] this manner?
[18]     A: From the result of the September '99
[19] meeting forward. There was never any doubt
[20] expressed to me that this would happen. There was
[21] never any doubt in my mind what should happen or
[22] that they knew what should happen. It was just a
[23] matter of getting it to happen.
[24]     Q: What is the sales briefcase? Is that a

Page 44

[1] physical object, a book, software program?
[2]     A: I have never seen it, but I have heard it
[3] referred to at MRO. And it's really just, you know,
[4] their — you know, like you are the Fuller Brush
[5] Man. You know, you have got these 18 products, and
[6] they have these features and benefits and these
[7] prices. They're the product line that MRO sales
[8] force carries to market.
[9]     Q: Now, at this point heading into the first
[10] year of this contract did M2 have any salespeople?
[11] Let's just take the first year of the contract,
[12] March 2000 to March 2001.
[13]     A: Yes. Well, besides myself we have brought
[14] in Tom Schulte during the — towards the end
[15] of — middle to the end — middle 2000. He was a
[16] former MRO sales rep. And Tony Prelec towards the
[17] end of 2000 who in the past, you know, been employed
[18] two or three times by me as a sales manager at
[19] various companies.
[20]     Q: Does Tony Prelec live in Harmony,
[21] Pennsylvania, today?
[22]     A: Yes.
[23]     Q: Have you been in touch with him about this
[24] case?

Page 45

[1]     A: Only to the extent we tied to get him
[2] scheduled for a deposition.
[3]     Q: Has he indicated that he will travel to
[4] Atlanta for a deposition in this case — strike
[5] that.
[6]        Has he told you that he will travel to
[7] Atlanta for a deposition in this case?
[8]     A: I believe he told me he's flexible. So
[9] some people have an opinion, the other group has no
[10] opinion. He was of the group that didn't care
[11] where. So we probably threw him into Atlanta or
[12] whatever. You do this a lot more than me. But to
[13] reach out to people and say maybe could you or would
[14] have or should have in this time frame is kind of a
[15] difficult thing. As a matter of fact, I have turned
[16] it over to my secretary now. She will be much
[17] better at it than me. After the second or third go
[18] around I tend to get a little embarrassed.
[19]     Q: Now, during this first 12 months — and I
[20] understand that we are talking approximations here
[21] because I am assuming nobody here has a photographic
[22] memory.
[23]     A: No.
[24]     Q: I have only had one client in 26 years who

Page 46

[1] did, and it was very impressive. But we here do not
[2] have a photographic — you do not have a
[3] photographic memory, correct?
[4]     A: No.
[5]     Q: So we are talking roughly the first year of
[6] the agreement?
[7]     A: I have a video memory. He laughs.
[8]     Q: That means you never forget a face, right?
[9]     A: And a lot of other things
[10]     Q: You must have some very fond memories?
[11]     A: Yes, fresh.
[12]     Q: You hired Mr. Schulte and Mr. Prelec as
[13] salespeople after M2 entered into the first agreement
[14] with MRO, right?
[15]     A: Yes.
[16]     Q: And they basically did telesales, telephone
[17] sales?
[18]     A: No. Well, they did different roles.
[19] Somewhere in there we hired Suzanne English, and
[20] maybe it was in there or end of '01, but she was
[21] really a telemarketer all the time. That's all she
[22] did similar to a function that MRO set up for
[23] themselves. They have a little — this MSR,
[24] marketing service rep that's referred to in here,

Page 47

[1] that's kind of — boiler room is not a nice name,
[2] but that's kind of the activity. We hired her to do
[3] that activity. Schulte's primary mission was to
[4] interface with the MRO sales force, of whom he knew
[5] them all, to process what they were, you know,
[6] qualifying and bringing in the door. And Tony
[7] Prelec's forte is prospecting.
[8]     Q: Via telephone, correspondence?
[9]     A: He's an absolute consummate professional.
[10] E-mails, certain follow-ups, da-ta-ta-ta. I mean,
[11] he fine tunes it.
[12]     Q: So you also went off — after signing this
[13] agreement with MRO you went off and you invested in
[14] some computer equipment to support this service,
[15] correct?
[16]     A: Yes.
[17]     Q: You bought servers, right?
[18]     A: Yes.
[19]     Q: Software?
[20]     A: Yes, sir.
[21]     Q: You hired technical staff to support this
[22] business, correct?
[23]     A: (No verbal response) Yes, sir.
[24]     Q: All with the expectation that after signing

Page 48

[1] this contract you would have a growing business
[2] hosting Maximo?
[3]     A: Yes.
[4]     Q: It didn't happen as you had expected,
[5] correct?
[6]     A: It didn't happen by when?
[7]     Q: We are talking still the first year.
[8]     A: No. If you look at the chronology,
[9] September '99 to March '00, the agreement was made
[10] in this meeting to go to this document (indicating).
[11]     Q: You believe it was made in September '99 to
[12] go to the March 2000 agreement?
[13]     A: That's right. And that's a five, six-month
[14] lag with a lot of follow-up, a lot of pursuing, a
[15] lot of whatever, but the agreement in principle was
[16] made when we walked out of this meeting. Getting it
[17] on paper, which had to be done, which was Ted's
[18] responsibility and mine, you know, just drug on and
[19] as it's wont to do in some organizations.
[20]     Subsequent to this my expectation was,
[21] well, all right, I have got the paper in place, but
[22] then it drug on. A lot of dragging on in this deal.
[23]     Q: Okay.
[24]     A: So it probably took a third or fourth, you

Page 49

[1] know, component of dragging on for me to figure out
[2] that that may be part of the culture or something.
[3] I'm not sure. But we were always ready and raring
[4] to go.
[5]     Q: So during the first 12 months after the
[6] 2000 agreement was signed MRO did not put the M2
[7] offering in its sales kit, correct?
[8]     A: Yes. They just kind of went back to
[9] business as usual after the agreement was signed.
[10]     Q: And you weren't getting the kinds of
[11] referrals from MRO, too, that you had hoped to get?
[12]     A: I wasn't getting an effective sales
[13] activity out of the MRO resource.
[14]     Q: Now, during that first year — well, let me
[15] back up before I ask you that. What was it that MRO
[16] employees or executives said to you that caused you
[17] to believe that MRO would roll out your service
[18] after the 2000 agreement was signed?
[19]     Let me just ask you, are you comfortable
[20] with — establishing terminology in a deposition is
[21] important, otherwise we are not going to have a
[22] meeting of minds. I am talking about birds, and you
[23] are talking about fish. When I use the term "roll
[24] out," you have used that term a lot in this case in

Page 50

[1] your complaint and some of your documents, is that a
[2] term you are comfortable with?
[3]     A: Sure.
[4]     Q: Can you define it for me? Maybe you did.
[5] Is it introducing your product as a service, put it
[6] in the sales kit, encourage the salespeople to offer
[7] it?
[8]     A: Price it, compensate them, yes. Every
[9] company adds a product to their product line, and
[10] they roll it out, just, I guess — maybe it's an old
[11] expression, but it's conveyance of information,
[12] giving them the tools that they need to be
[13] successful, you know, da-ta-ta-ta.
[14]     Q: So what you expected to happen after the
[15] 2000 agreement was signed was it would be priced for
[16] the MRO salespeople. They would be compensated so
[17] they would have an incentive to offer it. It would
[18] go into the sales kit, and there would be other,
[19] what I'll call soft, soft sales activities, meaning
[20] meetings of the sales group people would be
[21] reminded —
[22]     A: Yes, train them to identify prospects for
[23] hosting versus traditional implementations, normal
[24] sales training on a new product line, the benefits

Page 51

[1] of this seat versus...All of those things that you
[2] said I expected. I didn't focus very much on
[3] compensation at that time.
[4]  Q: What conversation — before the March 2000
[5] agreement was signed what communications did you
[6] have with MRO that caused you to believe that these
[7] activities would occur after the agreement was
[8] signed?
[9]  A: Every communication I had. There would be
[10] no other reason for me to have these — to
[11] communicate with MRO. I mean, it was understood
[12] from the outset that, you know, nobody was doing
[13] this. It's an alternate delivery methodology. It
[14] has the prospect of incremental revenue to MRO. We
[15] have got somebody else over here who is going to
[16] invest in it. It's kind of a no brainer. They are
[17] a little ahead of the curve. We don't want to be on
[18] the bleeding edge. Let's go, and that's from
[19] Drapeau on down.
[20]  Q: Were you represented by a lawyer when this
[21] 2000 agreement was being negotiated?
[22]  A: No. Can't you tell? I wrote it.
[23]  Q: I can tell.
[24]  A: Yes. I'm sorry.

Page 52

[1]  Q: I understand that you are saying that every
[2] communication supported your expectation that this
[3] rollout would occur after the 2000 agreement was
[4] signed, but can you recall for me specific words in
[5] which MRO indicated that to you or expressed that to
[6] you?
[7]  A: I doubt I can remember specific words, but
[8] there was a need to get this agreement, the '00
[9] agreement, in place before we could do that, meaning
[10] MRO. I don't want to call it foot dragging, but
[11] there was — it was probably low priority, but there
[12] was some meaningful time frames between the major
[13] mileposts in moving this forward, and in all of
[14] those discussions and all of the encouraging phone
[15] calls and e-mails I would make between here, the '99
[16] presentation and this one (indicating), it was all
[17] about, "Yes, we want to get this going, too. Yes,
[18] we want to get this going, too. We just need to get
[19] the papers in place." It was never a question in my
[20] mind. We selected MRO to be our partner in this.
[21]  Q: Let me ask you again, can you recall any
[22] specific communication or conversation with MRO
[23] where MRO — and by "MRO" I mean an employee or
[24] executive — told you that MRO would roll out this

Page 53

[1] service after the agreement was signed?
[2]  A: Oh, yeah, yeah. Yes, Ted Williams said
[3] that. Milton Bevington said that. Chip is hard to
[4] get ahold of, but you know, he's the one that gets
[5] the ball rolling after the '99 meeting and then
[6] delegates. It was delegated to Ted, and my brother
[7] worked for Ted. And at the time Ted was sales and
[8] marketing so he had a lot on his plate.
[9]  Q: So the statements I have asked you about
[10] were said to you by Mr. Williams, by your brother
[11] Milton Bevington, and by the president of MRO,
[12] Norman Drapeau?
[13]  A: Yes.
[14]  Q: What did Mr. Drapeau say to you on this
[15] subject?
[16]  A: I don't know the exact words, but you know,
[17] "Good plan. Let's do it." You know, "Look forward
[18] to the mutually beneficial outcome," you know, that
[19] kind of stuff. You don't see Chip all the time. It
[20] was subsequent to the '99 meeting. I have seen Chip
[21] in a couple — three times during this whole process
[22] of getting it done, but he'd try not to have to go
[23] back to the well.
[24]  Q: Have you told me everything that

Page 54

[1] Mr. Drapeau said to you on the subject of the
[2] rollout after the March 2000 agreement was signed —
[3] strike that. That was not a good question.
[4]   Have you told me now everything that
[5] Mr. Drapeau said to you on the subject of the
[6] rollout prior to, before the March 2000 agreement
[7] was signed?
[8]  A: I believe so.
[9]  Q: And you mentioned your brother Milton
[10] Bevington. Are you close to him as siblings?
[11]  A: Not like other siblings are probably.
[12]  Q: Do you have any agreement or understanding
[13] with him regarding sharing the proceeds of any
[14] judgment or settlement in this case?
[15]  A: No.
[16]  Q: What did Mr. Williams say to you regarding
[17] the rollout of your service before the March 2000
[18] agreement was signed?
[19]  A: He essentially delegated the execution
[20] road. When the CEO says, "We are going to do this.
[21] Ted, you take the lead," Ted's job is to execute.
[22]  Q: But my question to you, Mr. Bevington, is
[23] what did Mr. Williams say to you on this subject?
[24]  A: Well, a whole lot of stuff about, you know,

Page 55

[1] got to get the agreement, got to get the agreement,
[2] then we can roll it out. Then we can get started.
[3] Then I can have executed what Chip told me to
[4] execute. There is no renegotiation, reevaluation,
[5] rethinking, restating of what had already been
[6] decided between Ted and I. The decision had been
[7] made.
[8]  Q: And the decision was made at the meeting
[9] where the September 1st, 1999, business plan was
[10] discussed?
[11]  A: Yes. That's typically —
[12]  Q: And —
[13]  A: I'm sorry.
[14]  Q: End of question.
[15]  A: Yes.
[16]  Q: So did you talk to Mr. Drapeau between that
[17] meeting and the March — and March 23rd, 2000?
[18]  A: I don't recall, but I more than likely did
[19] either by voice or e-mail.
[20]  Q: So the — at that meeting, the September
[21] '99 meeting, Mr. Drapeau — you presented the
[22] business plan, and Mr. Drapeau said, "Sounds good.
[23] Let's go forward" — subject to there not being an
[24] investment, but he said, "Let's go forward with

Page 56

[1] using M2 as a company that will provide hosting
[2] services for Maximo"?
[3]  A: Yes.
[4]  Q: In essence?
[5]  A: Yes.
[6]  Q: And what did he say at that meeting about
[7] rolling out the product to the MRO sales force?
[8]  A: He delegated it to Ted, Ted on the sales
[9] force.
[10]  Q: What did he say?
[11]  A: Ted will take the lead on getting this done
[12] or something to that effect.
[13]  Q: Do you recall more specifically what he
[14] said about the rollout?
[15]  A: Well, the "it" in getting it done is, you
[16] know, get the relationship documented, you know, and
[17] then, you know, introduce and roll this out to the
[18] sales force, what we had discussed in the business
[19] plan, net of the partnership.
[20]  Q: Is that in effect what Mr. Drapeau said to
[21] Mr. Williams at or just after this meeting?
[22]  A: Yeah, because that's why Mr. Williams
[23] became my contact. Before that I brought — you
[24] know, I went to Chip to make this presentation. I

Page 57

[1] didn't go to Ted.
[2]  MR. GESMER: Why don't we take a short
[3] break.
[4]  (Recess taken from 11:25 to 11:30 a.m.)
[5]  BY MR. GESMER:
[6]  Q: Have you told me about every conversation
[7] you had with MRO before the March agreement was
[8] signed, the March 2000 agreement was signed, where
[9] the rollout was discussed, details of the rollout
[10] was discussed.
[11]  A: From September '99 to March?
[12]  Q: 2000.
[13]  A: Have I told you about every communication?
[14]  Q: Yes.
[15]  A: No.
[16]  Q: What else — what have you not told me
[17] about? What else is there?
[18]  A: Well, you know, on your Exhibit 6 here, you
[19] know, I wouldn't have remembered that communication
[20] to Ted for which I got a response from Ted, and
[21] there is similar ones communication-wise.
[22]  Q: What you just pointed to on Exhibit 6, what
[23] is it about Exhibit 6 that is responsive to my
[24] question?

Page 58

[1]  A: Could you repeat the question, please.
[2]  Q: Well, the previous question — let me try
[3] it again. What I'm trying to do here is exhaust
[4] your memory, which is a term that lawyers use a lot,
[5] about communications you had with MRO before the
[6] March 2000 agreement was signed where this rollout
[7] was discussed, the rollout by MRO of your service
[8] was discussed?
[9]  A: I probably told you all that I can
[10] remember. The focus — you know, these things go in
[11] steps. Prior to any rollout or rollout — major
[12] rollout discussion a document had to be in place.
[13] So once that's in place and you go to the next, the
[14] next. I may have had several conversations with my
[15] brother to try to learn about the MRO sales force,
[16] its structure, its organization, you know, how many,
[17] you know, how they are organized, da-ta-ta-ta.
[18]  Q: Now, after the agreement was signed, as the
[19] first year or so following the agreement unfolded,
[20] you realized, firstly, that MRO was not rolling out
[21] the product — should we call your company's
[22] hosting — your Mantis for Maximo, should we call
[23] that a service or a product?
[24]  A: I call it a service.

Page 59

[1] **Q:** So you realized that your service was not
[2] being promoted by MRO aggressively?
[3] **A:** At which point?
[4] **Q:** In the first year after this 2000 agreement
[5] was signed.
[6] **A:** Yes. It was my observation that after we
[7] got the agreement in place then things went back
[8] into another lull.
[9] **Q:** Did you invest in your company in reliance
[10] on this 2000 agreement?
[11] **A:** Yes.
[12] **Q:** And by that, maybe you made capital
[13] expenditures?
[14] **A:** We made considerable expenditures that was
[15] primarily funded by the bank through a loan. We
[16] sold stock to the Taggarts in order to have enough
[17] capital for the soft expenses you can't
[18] collateralize in finance. Yes, the ball was to be
[19] rolling downhill.
[20] **Q:** Yet the agreement that you signed allowed
[21] either party to terminate on three months notice in
[22] writing. Do you recall that?
[23] **A:** Yes.
[24] **Q:** Did you attempt to negotiate that term with

Page 60

[1] Mr. Williams or anyone at MRO before the March 2000
[2] agreement was signed?
[3] **A:** Now, it's my belief and my business
[4] experience that that termination for convenience has
[5] become almost boilerplate, standard language.
[6] **Q:** But you were investing — you were making
[7] these investments knowing that MRO, if it wished,
[8] could terminate for convenience on 90 days notice,
[9] correct?
[10] **A:** I didn't focus on it, but yeah, I knew it.
[11] And I could terminate them, right, too?
[12] **Q:** Correct.
[13] **A:** So whatever investment they would make they
[14] would have to take that into account.
[15] **Q:** Now, during the first year after the 2000
[16] agreement was signed did you realize at some point
[17] that the MRO sales force had to be given a financial
[18] incentive to sell your service?
[19] **A:** Yes.
[20] **Q:** And that became an issue that you focused
[21] on quite a bit, correct?
[22] **A:** Actually, I didn't become really focused on
[23] that until '01.
[24] **Q:** But in early '01 you did become focused on

Page 61

[1] that, correct?
[2] **A:** Well, actually, it was middle '01. There
[3] was one other step. You know, we signed the
[4] agreement, then we follow up, follow up, follow up.
[5] We got assigned to the, quote, the alliance group,
[6] follow up, follow up, follow up, follow up, got a
[7] meeting, and you know, an apology and a substantial
[8] additional commitment that we are going to introduce
[9] this. We are going to do all the proper things that
[10] one would do if they introduced the product. And
[11] that that introduction happened in January of '01
[12] where compensation was promised to the salespeople,
[13] but it was in development.
[14] **Q:** What do you mean by "in development"?
[15] **A:** They couldn't tell the salespeople at that
[16] meeting what their compensation was going to be when
[17] asked.
[18] **Q:** So is it correct to say that by early 2001
[19] the MRO salespeople were told if you sell the empty
[20] service you will be compensated, but what that
[21] compensation will be is in development?
[22] **A:** Correct. And if I can just clarify that,
[23] that meeting was a subset of the entire sales force.
[24] **Q:** Where did that meeting take place?

Page 62

[1] **A:** At MRO's offices in Atlanta.
[2] **Q:** You were present?
[3] **A:** Yes.
[4] **Q:** Who made the statement you just described?
[5] **A:** Joe Leone.
[6] **Q:** Who was present on the part of MRO?
[7] **A:** Jason Kasper from Bedford, Massachusetts,
[8] in the alliance group, Ray Miciek who was manager of
[9] the group that operated out of Atlanta, and several
[10] of the salespeople that operated out of Atlanta,
[11] maybe six or seven or eight.
[12] **Q:** Did you make any kind of statement to these
[13] people —
[14] **A:** Yes.
[15] **Q:** — to the salespeople? What did you say?
[16] **A:** Well, Tony Prelec made a PowerPoint
[17] presentation, and I made the, you know — said the
[18] things that you might expect at a sale, what's in it
[19] for you and what's your chances of success.
[20] **Q:** Do you recall being — if I use the term
[21] "MRO's mid-tier sales team," does that mean anything
[22] to you?
[23] **A:** Yes.
[24] **Q:** Is that the people who were present at the

M2 Consulting, Inc. v.
MRO Software, Inc., et al.
Case 1:03-cv-12589-GAO   Document 86-2   Filed 01/27/2006   Page 8 of 9
Thomas R. Bevington
Vol. 1, July 26, 2005

Page 63

[1] Atlanta meeting you just described?
[2]  A: Part of the people were mid-tier sales.
[3] Part of the people were enterprise sales and part of
[4] the people were MSR's, the telemarketing people,
[5] because they were all physically in Atlanta.
[6]  Q: Do you recall being introduced to MRO's
[7] mid-tiers sales team in June 2000?
[8]  A: I think so. I believe that was a
[9] presentation with regards to market characteristics
[10] for hosting, identifying market needs that hosting
[11] would address better than traditional software
[12] sales. It was more of an educational session.
[13]  Q: Let me ask you to look at Exhibit 7.
[14]  A: Could I give you some of these back or
[15] would you rather I keep them over here?
[16]  Q: I'd rather you keep them. You could line
[17] them up and look at them or spread them out or
[18] whatever.
[19]  A: Okay.
[20]  Q: Please do me a favor and read it from
[21] backward forward. I know the temptation to reading
[22] an e-mail from the top down is hard.
[23]  A: Okay. (Witness reviews document) Okay.
[24]  Q: Now at this point, about a year into the

Page 64

[1] 2000 agreement, did you believe that the MRO sales
[2] force was generally aware of M2's service?
[3]  A: No.
[4]  Q: You believe that there were MRO salespeople
[5] who were unaware of it —
[6]  A: Yes.
[7]  Q: — who didn't even know it existed?
[8]  A: Oh, sure.
[9]  Q: And that — and were the people you believe
[10] were unaware of M2's service also members of the
[11] mid-tier sales group?
[12]  A: I'm sure some of them weren't.
[13]  Q: Now, by this point you — do you remember
[14] seeing this e-mail?
[15]  A: It doesn't look unfamiliar.
[16]  Q: So you vaguely recall seeing it?
[17]  A: Uh-huh. This would be a 60-day — but the
[18] meeting in January, this would be a follow-up with
[19] Tom who was the prior MRO salesperson who knew all
[20] these guys. I'm following up to get the next step
[21] done.
[22]  Q: And the next step was what?
[23]  A: That sounds like compensation still needed
[24] to be ironed out and then the other tactical steps

Page 65

[1] you do in a rollout. You look at a press release,
[2] you look at internal distribution of information,
[3] you know — I mean, he lists some of the things
[4] here.
[5]  Q: So on Page 2 of this document, under the
[6] dotted line Mr. Schulte is writing this, correct?
[7]  A: Yes, I believe so.
[8]  Q: And he says — he refers to a conference
[9] call last week. Do you recall that conference call?
[10]  A: Not specifically.
[11]  Q: He says, "You guys were going to get the
[12] application hosting announcement out to the sales
[13] reps." Do you see that?
[14]  A: Yes.
[15]  Q: Do you know what he meant by that?
[16]  A: Yes. He would have meant that, you
[17] know — Joe Leone was higher up. He was the
[18] supervisor of Jason Kasper. So if — you know, it's
[19] appropriate for me to push Joe and Tom to push
[20] Jason. And it's the same subject, the rollout, the
[21] same subject it has always been.
[22]  Q: Mr. Leone responded — looking at Page 1 of
[23] Exhibit 7 he responded, "We need to review the
[24] compensation our reps will receive," correct?

Page 66

[1]  A: Where is Leone's?
[2]  Q: In the middle of the page.
[3]  A: "Tom," okay. "Need to review the
[4] compensation," yes.
[5]  Q: So as of this date this issue still had not
[6] been resolved, correct?
[7]  A: Correct.
[8]  Q: And you, your company through Mr. Schulte
[9] was pressing for this, right? He says up above,
[10] "That is an important element" — "a very important
[11] element" —
[12]  A: Yes.
[13]  Q: — "that everybody will want to know
[14] about"? So you understood — I'm just reading from
[15] the document, correct?
[16]  A: Uh-huh.
[17]  Q: So you — is that a yes?
[18]  A: Yes.
[19]  Q: So you understood — you understood a year
[20] into the agreement that MRO's compensation to its
[21] sales reps still hadn't been worked out?
[22]  A: Yes.
[23]  Q: And the product still hadn't been rolled
[24] out to the sales force?

Page 87

[1] A: If they owned — previously owned or
[2] purchased Maximo licenses from MRO.
[3] Q: But excluding that group, if I came to you
[4] and said, "I have got this airport called Logan
[5] Airport, and we don't want to buy Maximo and install
[6] it. We want to use it from your company"?
[7] A: We would offer you the subscription model.
[8] Q: And the delivery method would be an ASP
[9] delivery method?
[10] A: Yes.
[11] Q: Okay. And you use the term "sales." I'm
[12] just looking at what you called the file. "Sales
[13] and Rental Model" is what you called the
[14] spreadsheet?
[15] A: Yes.
[16] Q: "Sales" means, in your industry here or at
[17] least as how you use it, that means a direct
[18] license?
[19] A: Traditional license.
[20] Q: Traditional license, okay. Now, why did
[21] you create this spreadsheet — strike that.
[22]   Did you create this spreadsheet?
[23] A: Yes.
[24] Q: Why did you do this?

Page 88

[1] A: In the ongoing effort to get MRO to the
[2] point where they can release this and tie up all the
[3] loose ends and get on with the show, I needed to be
[4] able to show MRO's income, okay. I needed to be
[5] able to demonstrate that the salesperson would earn
[6] the same amount of money whether they sold it
[7] license or subscription, and let the customer choose
[8] what's best for them. And it was done at the
[9] request of Ray to help Bob overcome — he didn't
[10] have a vision of how this works.
[11] Q: Okay. So is it correct to say that the
[12] perception within MRO, within the MRO salespeople
[13] who were aware of your service, was they would earn
[14] less money if they sold your service than if they
[15] sold a traditional license?
[16] A: I don't know what they knew.
[17] Q: But you were trying to prove when you
[18] created this spreadsheet that the compensation to an
[19] MRO salesperson would be roughly equivalent?
[20] A: Should be.
[21] Q: Should be roughly equivalent?
[22] A: Yes. When Bob finally — he is North
[23] American sales. So now it's been delegated down to
[24] him from Ted, and so he has his issues. And there

Page 89

[1] is sales and sales quota and sales comp. issues.
[2] Q: When you say "Bob," you mean Bob Parker?
[3] A: Parker, yes. I'm sorry. So it was in
[4] response to his concerns, you know, what's in it for
[5] him, what's in it for his guys.
[6] Q: So at this point — this is November 2001.
[7] The following March would be the two-year
[8] anniversary of the agreement. So at this point,
[9] approximately 19 or 20 months into the agreement,
[10] MRO was still struggling with the compensation to
[11] its salespeople who sold your service?
[12] **MR. RESNICK:** Objection.
[13] A: It had not been resolved, compensation
[14] issue, which was apparently a key to getting the
[15] deal going.
[16] Q: To get the sales going?
[17] A: Yes.
[18] Q: Okay. All right. So by November 2001 the
[19] issue of compensation to MRO salespeople had still
[20] not been resolved?
[21] A: Correct.
[22] Q: And you were trying to help MRO resolve it
[23] by creating this spreadsheet?
[24] A: Yes, sir.

Page 90

[1] Q: Let's look at Exhibit 12. Do you remember
[2] this document?
[3] A: I remember it as part of the back and
[4] forth, yes.
[5] Q: Again, this document follows very shortly
[6] on the heels of Exhibit 11 —
[7] A: Yes, sir.
[8] Q: — only a few weeks later?
[9] So, again, you are saying here, "We need to
[10] get some closure on this," and by "this" you mean
[11] the formula for compensating MRO salespeople who
[12] sell your service?
[13] A: Yes, sir.
[14] Q: Please look at Exhibit 13. Do you recall
[15] this document?
[16] A: Yes, sir.
[17] Q: And, again, this is just a few days later,
[18] a few days after Exhibit 12. Again, you are still
[19] working on this spreadsheet, correct?
[20] A: Yes, sir.
[21] Q: And you say in the last line of this
[22] e-mail, you say, "We need to set a target to get
[23] this done (or abandon)." What do you mean by that?
[24] A: Abandon the program.