Page 91

[1] **Q:** You mean abandon the relationship?
[2] **A:** Abandon trying to get this done.
[3] **Q:** Where would that leave you — in your mind
[4] at that time where would that have left you with
[5] respect to MRO?
[6] **A:** From a business standpoint I'd have to deal
[7] with it. You'll notice that in these — part of the
[8] year '02 Thayer Stewart is copied.
[9] **Q:** I did notice that, yes.
[10] **A:** He is a significant investor and board
[11] member. So all this foot dragging for almost two
[12] years was — you know, the heat is coming down on
[13] me, and I am a CEO. I have got a deal. The deal is
[14] not happening. What are you doing about it? If
[15] it's never going to happen, what are we going to do,
[16] that kind of thing.
[17] **Q:** You did mention that Thayer Stewart is an
[18] approximately 24 percent shareholder. How much
[19] money has he invested in M2, approximately?
[20] **A:** I think about $500,000.
[21] **Q:** So when you said, "We need to set a target
[22] to get this done (or abandon)," you did not mean
[23] abandon the relationship, terminate the contract
[24] with MRO? That is not what you meant?

Page 92

[1] **A:** I probably meant a lot of things. This
[2] document — I sent him one on November the
[3] 20th — no. Wait — November the 1st. I created on
[4] my own a method for them to evaluate the
[5] remuneration to their people and themselves.
[6] Apparently by November 20th I had gotten some
[7] feedback, the this, the that, the other thing, so,
[8] you know, I gave them a couple of other options.
[9] November 26th I sent them an open
[10] spreadsheet and said, "You fill in whatever
[11] percentage you want, you know, and see how the
[12] numbers come up." I had pretty much run out of
[13] ideas. And between — when the discussion started
[14] it was Maximo 4.X in a Citrex environment. At this
[15] point it's 5.0. 4.X MRO sold concurrent licenses
[16] for approximately, say, $10,000 apiece. When they
[17] went to 5.0 they changed their entire structure to
[18] registered users, had about 23, 25, 27, two thousand
[19] apiece. So we had to, you know, kind of redo this
[20] in light of where they were trying to go. And
[21] frankly, registered users, you know, are identical
[22] to MRO's registered user model — I mean, M2's.
[23] (Discussion off the record)
[24] **Q:** Exhibit 4 is the amended complaint in this

Page 93

[1] case?
[2] **MR. RESNICK:** 14, I believe.
[3] **MR. GESMER:** I'm sorry.
[4] **MR. RESNICK:** Is it 4 or 14?
[5] **A:** Mine says 4.
[6] **MR. RESNICK:** Okay. My mistake. I
[7] apologize.
[8] **MR. GESMER:** I think it's 4.
[9] **MR. RESNICK:** Okay.
[10] **Q:** Did you read this complaint before it was
[11] filed, Mr. Bevington —
[12] **A:** Yes.
[13] **Q:** — this amended complaint?
[14] Did you do an initial draft of this
[15] document?
[16] **A:** No.
[17] **Q:** But you read it and believed that it was
[18] truthful at the time you filed it?
[19] **A:** I believed it was truthful at the time I
[20] filed it, and it went through some iterations before
[21] the final document.
[22] **Q:** Do you still believe it's truthful today?
[23] **A:** I haven't read it in a while, but yes, I
[24] believe I do.

Page 94

[1] **Q:** Let me show you now Exhibit 14. Do you
[2] recall this document?
[3] **A:** Yes, I do remember this document.
[4] **Q:** And this is — now here — before you get
[5] to your communication with Mr. Stewart, which is the
[6] front of the document, there is some communication
[7] on the second page involving —
[8] **MR. GESMER:** Off the record.
[9] (Discussion off the record)
[10] **BY MR. GESMER:**
[11] **Q:** There is some communication involving you,
[12] Mr. Miciek, Robert Parker involving — strike that.
[13] There is some communication in this e-mail
[14] between you, Mr. Parker and Mr. Miciek referring to
[15] a minimum of ten users at $135 per, P-E-R, under any
[16] deal?
[17] **A:** Uh-huh.
[18] **Q:** Can you explain to me what discussions were
[19] going on that are being referred to here?
[20] **A:** This is a follow-up of the sales/rental
[21] model discussions, and Parker is essentially signing
[22] off on something that says, "Okay, let's put
[23] something in writing such as a minimum of ten
[24] regular users at $135 per on any deal so we can get

**Page 95**

[1] this going."
[2] **Q:** Well, explain to me what that means as a
[3] practical matter. A "minimum," how would that — I
[4] don't understand what that means.
[5] **A:** He is talking to Ray, not me. Okay.
[6] **Q:** Okay.
[7] **A:** He's gotten the sales and rental model,
[8] okay?
[9] **Q:** Yes.
[10] **A:** And in the number of seats he would like to
[11] hold Ray to a minimum of ten, and this number over
[12] here being 150, he's looking at a minimum of 135.
[13] So he must have played with the spreadsheet, came up
[14] with something, you know, he wanted to get involved
[15] with.
[16] **Q:** So let me see if I can explain this to you
[17] in a way that you think is accurate. Mr. Parker was
[18] saying that we'll pay our salespeople so long as M2
[19] presents to us a subscription customer which has ten
[20] users at $135 minimum per seat?
[21] **A:** I didn't read that at all.
[22] **Q:** Okay. I am trying to understand what you
[23] guys were discussing at that time.
[24] **A:** We were discussing this sales and rental

**Page 96**

[1] model, and he threw a couple of numbers in to Ray
[2] and said, "Okay, put those numbers in and do it." I
[3] don't know anything beyond that.
[4] **Q:** Did you discuss this issue with Ray, this
[5] formula with Ray?
[6] **A:** Probably. It says I did so here.
[7] **Q:** Was it acceptable to you?
[8] **A:** I'm sure it was.
[9] **Q:** So — I'm sorry. I really have to go back
[10] over this. I don't understand. I want to put this
[11] in simple terms. Mr. Parker was saying — he was
[12] saying, "Let's put something in writing, i.e.,
[13] minimum ten registered users at $135 per on any deal
[14] so you can get this going." What did you understand
[15] in layman's terms him to be saying?
[16] **A:** I can't remember.
[17] **Q:** Okay. Now, you then sent this e-mail
[18] thread to Thayer Stewart, correct?
[19] **A:** Yes.
[20] **Q:** And you said, "What do you think. Let's
[21] talk," right?
[22] **A:** Yes. I was reading it back to front. You
[23] are ahead of me now?
[24] **Q:** Now I'm at the top of the second page.

**Page 97**

[1] **A:** Okay.
[2] **MR. RESNICK:** Second page.
[3] **A:** Oh.
[4] **Q:** I'm at the top of the second page.
[5] **A:** Yes.
[6] **Q:** You said, "What do you think?" He wrote
[7] back, "This looks good"?
[8] **A:** Yes.
[9] **Q:** And then on the first page you wrote back,
[10] "The reality is that they are saying that they will
[11] only offer hosting with a minimum of ten registered
[12] users at $270 per month each." What caused you to
[13] say that?
[14] **A:** It was probably what I understood at the
[15] time what they meant.
[16] **Q:** How did you get from the $135 per seat —
[17] $135 per seat to $270 per seat or am I
[18] misunderstanding what you were saying?
[19] **A:** Because they wanted — when is this?
[20] December '01.
[21] **Q:** Uh-huh.
[22] **A:** Because in October of '01 they went to a 50
[23] percent commission. $135 is half of $270.
[24] **Q:** I see. The $135 is the payment —

**Page 98**

[1] **A:** To MRO.
[2] **Q:** — to MRO?
[3] **A:** Yes, sir.
[4] **Q:** Okay. Now, the 50 percent commission
[5] hadn't been implemented at the end of 2001, right?
[6] **A:** No. It had been agreed to.
[7] **Q:** But it had been discussed to?
[8] **A:** Been agreed to.
[9] **Q:** And you saw it coming?
[10] **A:** Well, it was Drapeau and Parker and me and
[11] Stewart. So when you agree at that level...
[12] **Q:** All right. All right. And Mr. Stewart
[13] responds to you — you know — what you are saying
[14] is you are going to have — so what you are saying
[15] is you are going to have to charge your end users
[16] $270 per seat?
[17] **A:** Uh-huh.
[18] **Q:** In order to come up with the $135 per seat
[19] to pay to MRO, correct?
[20] **A:** Uh-huh.
[21] **Q:** Is that a yes?
[22] **A:** Yes, sir. Sorry.
[23] **Q:** And that was a substantially — or that was
[24] a higher rate than you preferred to charge, correct?

Page 99

[1] A: No. Our price was $300.
[2] Q: At that time your price was $300?
[3] A: Yes, for a dedicated seat.
[4] Q: Okay. In that case was this — since you
[5] could have charged more and based on your regular
[6] rates at that time you could have afforded the $135
[7] per seat, did you see a problem with this?
[8] A: No, no. But my comment down here is
[9] not — I'm just talking to Thayer that I didn't
[10] quite understand what — I understand the numbers,
[11] the money. I didn't understand the minimum in light
[12] of, you know, what I said here. Are they telling us
[13] the minimum we can offer? You know, M2 can't go sign
[14] up a customer five seats, $300 a seat and give MRO
[15] 150 bucks. That's what I didn't understand.
[16] Q: Okay. So then Mr. Stewart responds to you,
[17] "Get the deal then fix it," and at the end of that
[18] e-mail message he says, "Without this deal, we're
[19] fucked. With it you have a fighting chance to make
[20] us both a lot of money." Why did he say to you —
[21] do you understand why he said to you "Without this
[22] deal we are fucked"?
[23] A: Well, sure. We had entered into an
[24] agreement with them back in '99. It's almost '02.

Page 100

[1] They haven't done what they said they were going to
[2] do, and we have been pushing it and pushing it and
[3] pushing it. And unless we got it done we are going
[4] to have to go back and find a new business to go
[5] into or find a new partner or do something. We
[6] spent the money.
[7] Q: At this point, December '01, you are
[8] spending a fair amount of time working up these
[9] spreadsheets that will help MRO come up with a
[10] commission schedule for its salespeople, correct?
[11] A: I would do anything to help MRO get the
[12] deal done.
[13] Q: At this point in time you are spending some
[14] of your time helping Mr. Miciek —
[15] A: Sure.
[16] Q: — and partner come up with a sales
[17] schedule — with a sales schedule that will help
[18] them incentivize their salespeople to offer M2's
[19] service; is that right?
[20] A: Yes. I was charged with coming up with the
[21] ideas.
[22] Q: Now, did MRO's — did anyone at MRO ever
[23] say to you in effect, you know, in substance, "This
[24] service is just not attractive to our salespeople.

Page 101

[1] They can make a lot of money if they sell a
[2] traditional license, and they get paid for it, you
[3] know, when the license fee is paid, but this
[4] subscription model, because it doesn't result in a
[5] significant commission to them at the time of the
[6] agreement, is not as attractive to them"?
[7] A: Uh-uh.
[8] Q: That's a no?
[9] A: No.
[10] Q: Mr. Miciek never said that to you?
[11] A: Not that way. The real comparison is,
[12] "They get paid to sell this, Rick, and they don't
[13] get paid at all to sell this, Rick." So what do you
[14] think they are going to do? This program made the
[15] compensation equal regardless of the delivery
[16] methodology the customer chose. And I didn't need
[17] to be told that they weren't going to sell something
[18] if they weren't going to get paid for it.
[19] Q: Now, going back to the negotiation leading
[20] up to the March 2000 agreement, just moving back in
[21] the timeline to that again, was this issue of
[22] compensation to MRO salespeople in connection with
[23] the sale of M2 service discussed between anyone at
[24] M2, to your knowledge, and anyone at MRO?

Page 102

[1] A: Yes.
[2] Q: What was said on that subject?
[3] A: It wasn't as focused a discussion because,
[4] rightly or wrongly, you assume that if you are going
[5] to sell something that you'll create a collateral,
[6] you'll do some training, you'll price it.
[7] Q: Please don't tell me what you assume. Just
[8] tell me — I am interested in what you recall in
[9] substance was said on this commission schedule for
[10] MRO salespeople who sold your service before the
[11] first agreement was entered into.
[12] A: They were going to roll out a new product
[13] to their sales force to sell. Inherent in that is
[14] everything that's inherent in that. Like paying
[15] them. They have never rolled out a product they
[16] didn't pay anybody for.
[17] Q: But there was no specific discussion of
[18] what they would be paid?
[19] A: No. This is the CEO we are talking to. He
[20] gave it to Ted. He gave it to Bob. He gave it to
[21] Ray.
[22] Q: But there was no specific discussion of
[23] what the salespeople would be paid?
[24] A: Not with me.

Page 103

[1] **Q:** Or anyone else at M2 to your knowledge?
[2] **A:** No.
[3] **Q:** In other words, did Mr. Foley come to you
[4] and tell you that he had a discussion?
[5] **A:** No, no.
[6] **MR. GESMER:** All right. I said we'll take
[7] a lunch break when we finish with this document.
[8] Why don't we do that.
[9]     (Luncheon recess taken
[10] at 12:46 to 1:12 p.m.)

Page 104

[1]     **AFTERNOON SESSION**
[2]     **BY MR. GESMER:**
[3] **Q:** Mr. Bevington, I just want to go back for a
[4] moment to that page that we were looking at that
[5] listed confidential information and trade secret,
[6] proprietary information, the QuickStart page. Do
[7] you have any reason to believe that MRO has
[8] misappropriated any of that confidential
[9] information?
[10] **A:** I don't know.
[11] **Q:** Do you have —
[12] **A:** I mean —
[13] **Q:** Do you have any evidence? For example,
[14] things that you have seen or things you have been
[15] told or things that people in your company have seen
[16] or been told?
[17] **A:** I have seen press releases on some
[18] implementation programs that have — you know, have
[19] package implementation that have looked remarkably
[20] similar, but I don't have access to MRO's work
[21] product.
[22] **Q:** Okay. Let's look at Exhibit 15. Before
[23] the break we were looking at spreadsheets you were
[24] sending to MRO in this time frame, November,

Page 105

[1] December 2001.
[2] **A:** Uh-huh.
[3] **Q:** This is another spreadsheet you sent in
[4] that time frame; is that correct?
[5] **A:** Uh-huh.
[6] **Q:** Is that a yes?
[7] **A:** Yes. Sorry.
[8] **Q:** Let's look now at Exhibit 16. Now, do you
[9] recognize this document, Mr. Bevington?
[10] **A:** Yes.
[11] **Q:** This is an e-mail that — Iris Martin was
[12] at the time an employee of M2, correct?
[13] **A:** She still is. She is an ex. secretary.
[14] **Q:** She is forwarding this document to
[15] Mr. Miciek at your request?
[16] **A:** Uh-huh.
[17] **Q:** Correct?
[18] **A:** Yes, sir.
[19] **Q:** And why did you prepare this document?
[20] **A:** I believe it was a document that I had
[21] prepared a lot earlier. I think it says down here
[22] "September 2000." And it was — Ray needed the
[23] information to create his rollout, you know, his
[24] rollout information, whatever. Now it's gone from

Page 106

[1] Bob Parker down to Ray's job.
[2] **Q:** Okay. Take a look, please, at Exhibit 17.
[3] **A:** (Witness reviews document) Okay.
[4] **Q:** This is an e-mail from Mr. Miciek to
[5] Mr. Parker?
[6] **A:** Uh-huh.
[7] **Q:** Did you see this — do you recall if you
[8] saw this at about the time it was sent, January
[9] 2002?
[10] **A:** No. I rarely see communications from
[11] Miciek to Parker.
[12] **Q:** Okay. But he's forwarding — is it correct
[13] to say he's forwarding to Mr. Parker some materials
[14] that you had prepared?
[15] **A:** Yes, sir.
[16] **Q:** Now, at this point in time — and in fact
[17] let me show you a document so we can book in what
[18] point in time — what points in time we are talking
[19] about. I show you Exhibit 18. Do you remember this
[20] document?
[21] **A:** Yes.
[22] **Q:** It says, "Rick, attached is a long overdue
[23] hosting agreement," May 1st, 2002?
[24] **A:** Uh-huh. Yes.

Page 107

[1] **Q:** What were the events that led up to what
[2] Nancy Gilroy characterized as a long overdue hosting
[3] agreement?
[4] **A:** It was agreed in October of '01 that we
[5] would pay a 50 percent commission of hosting revenue
[6] to MRO, and in order to facilitate and fund and
[7] whatever, whatever, the rollout, the agreement was
[8] made with Drapeau and Parker in October '01. So
[9] "long overdue" I would say had to do with that.
[10] **Q:** Now, at some later date — and I'll show
[11] you this eventually, but if I don't need to show you
[12] now I'd rather not. Later on in 2003 you wrote to
[13] Mr. Sawyer. You wrote, "It was October 10, 2001,
[14] when Chip and Bob agreed to roll out hosting to the
[15] MRO sales force with compensation." Is that the
[16] conversation you were talking about?
[17] **A:** That's the conversation, yes.
[18] **Q:** It was approximately October 10th, 2001?
[19] **A:** It was exactly October 10, 2001.
[20] **Q:** So you are talking about the October 10
[21] conversation?
[22] **A:** Yes.
[23] **Q:** Where did that take place?
[24] **A:** The restaurant in Easthampton, Long Island.

Page 108

[1] **Q:** Now, is this related to a golf outing?
[2] **A:** Yes. It's at the end of one.
[3] **Q:** Where was that golf outing?
[4] **A:** Shinnecock Hills.
[5] **Q:** Who was present?
[6] **A:** Thayer Stewart, myself, Bob Parker, Chip
[7] Drapeau.
[8] **Q:** And what was the restaurant that you had
[9] this conversation at?
[10] **A:** I can't recall.
[11] **Q:** And this was at the end of the day?
[12] **A:** Yes, sir.
[13] **Q:** After playing golf?
[14] **A:** Evening.
[15] **Q:** In the evening?
[16] **A:** Yes, sir.
[17] **Q:** Was this golf outing at your invitation?
[18] **A:** Yes, sir.
[19] **Q:** Are you an avid golfer?
[20] **A:** I'm a hacker. Chip and Bob are avid
[21] golfers.
[22] **Q:** Tell me first generally what was said on
[23] business subjects during this — did this encounter
[24] with Mr. Parker and Mr. Drapeau take place in one

Page 109

[1] day?
[2] **A:** I flew in the night before.
[3] **Q:** Did you see them the night before?
[4] **A:** I don't remember. But — I don't remember.
[5] **Q:** So you flew in the night before. But did
[6] it end after the meal?
[7] **A:** Yes.
[8] **Q:** What business topics were discussed during
[9] this one- or two-day period, October 2001?
[10] **A:** Getting the rollout of the ASP program in
[11] effect and out to the sales force, get it done. Why
[12] is it taking so long.
[13] **Q:** Were there any other topics discussed,
[14] business topic?
[15] **A:** Unrelated to that?
[16] **Q:** Yes.
[17] **A:** I don't know. Maybe they had just, you
[18] know, finished a quarter so maybe there was some
[19] discussion there. Maybe there was some discussion
[20] about the things we had been doing with regards to
[21] hosting. I don't specifically remember any.
[22] **Q:** But is it fair to say the most — to your
[23] mind the most important topics that was discussed,
[24] business topic, was the rollout, the MRO rollout?

Page 110

[1] **A:** It was the purpose of the meeting.
[2] **Q:** It was the purpose of the meeting?
[3] **A:** To bring Chip back into the loop and then
[4] see if that would get it done. Go to the CEO and
[5] get him back in the loop because it had been
[6] delegated, it had been delegated and been delegated
[7] and nothing was happening.
[8] **Q:** Would you tell me what you recall the
[9] various participants, the four people including
[10] yourself who were present at this meeting, saying on
[11] the subject, the gist of what each person said.
[12] **A:** Chip was always very nice and apologetic
[13] about why everything always took so long. They
[14] wanted to raise the percentage in order to fund
[15] salesmen's compensation. They figured that would —
[16] you know, that was appropriate. I think Chip also
[17] pointed out that — you know, he turned to Bob and
[18] said, you know, "Correct me if I'm wrong, Bob,
[19] because you are the one who is going to be
[20] responsible for this." You know, he didn't want to
[21] usurp Bob's position. Bob said something to the
[22] effect of "Whatever you say, boss."
[23] **Q:** What did you and Mr. Stewart say during
[24] this conversation?

### Page 147

[1] they were going to do, raise the amount of money I'm
[2] going to pay, sign the damn document. Let's get
[3] going. Nobody seemed to object to being called the
[4] sales channel. I think there is two agreements
[5] here, right?
[6]     Q: There are two agreements. One was the
[7] agreement that was being negotiated in writing and
[8] the other an oral agreement; is that what you mean?
[9]     A: Yes, one covering the sales rollout, so
[10] sales aspect, and the other one covering, you know,
[11] payment terms and how much I pay and stuff like
[12] that.
[13]     Q: And the agreement on the sales rollout had
[14] been reached at the meeting in October 2001, October
[15] 11th, 2001?
[16]     A: No. It had been reconfirmed. The
[17] agreement goes back to the outset of our
[18] relationship with MRO. The meeting in October
[19] 10th, '01, was trying to get that agreement going,
[20] instituted.
[21]     Q: So the actual agreement, the fundamental
[22] agreement, was the one that was reached back in
[23] September '99?
[24]     A: Yes. The fundamental position of the

### Page 148

[1] parties? Yes.
[2]     Q: The fundamental agreement.
[3]     A: Yes, on the position of the parties. Sales
[4] versus fulfillment.
[5]     Q: Was reached in September '99?
[6]     A: It was begun, I would say, or reached. I
[7] don't know. I don't understand the word.
[8]     Q: Well, when I use the word "reached," if I
[9] say to you I'll paint your house for $5,000 and you
[10] say, "Great. We have a deal," we have reached an
[11] agreement. An agreement is where one party offers
[12] consideration, meaning some value, in exchange for
[13] the other party's offer of some value or
[14] consideration.
[15]     A: Okay.
[16]     Q: So the agreement that was reconfirmed on
[17] October 10th, 2001, was the agreement that was
[18] reached in early September 1999; is that right?
[19]     A: Correct.
[20]     Q: Let's look at Exhibit 28. Do you remember
[21] this document?
[22]     A: Yes.
[23]     Q: Now, the Abbey is a golf course associated
[24] with a school that you went to, a preparatory

### Page 149

[1] school?
[2]     A: Yes, sir.
[3]     Q: It's in, what, Rhode Island?
[4]     A: Portsmouth, Rhode Island, Carnegie Abbey.
[5]     Q: Was that a one-day outing?
[6]     A: Yes.
[7]     Q: Was it the day before you sent this first
[8] e-mail on July 10th — strike that.
[9]        When was it? Do you recall when it was?
[10]     A: It was around this time because we already
[11] finished. I usually e-mail by the time I get back.
[12] So "Friday the 12th, golf, 11:04," so it would have
[13] to have been the 11th or the 10th because he
[14] couldn't have been sending an e-mail.
[15]     Q: So it was wan couple of days one way or the
[16] other within these dates?
[17]     A: Yes. It wouldn't have been the 12th or
[18] later. It was before the 12th.
[19]     Q: I am just wondering a day or two before the
[20] 12th?
[21]     A: Yes.
[22]     Q: So you wrote to Mr. Parker, "Thanks for
[23] making the trip to the Abbey. It was a great course
[24] and great fun." He wrote back to you, "Thanks,

### Page 150

[1] again Rick. I had a great time and very much
[2] enjoyed the course. I spoke to Nancy and she
[3] promised to have contract to you by today. Let me
[4] know if that does not happen." And then you wrote
[5] to him a short while later, same day, "Hi Bob, it
[6] was a great time. I got Nancy's doc. yesterday.
[7] There are only a couple of issues that I am trying
[8] to get with Ray on. I shared one with Nancy but I
[9] think it is out of her domain (sales quotas for M2)."
[10] Now, who was present at this golf match?
[11]     A: Ted Williams, Bob Parker, myself, Thayer
[12] Stewart.
[13]     Q: Is this the golf match at which someone
[14] mispronounced the name of a foreign country?
[15]     A: Sri Lanka, yes.
[16]     Q: Who was the —
[17]     A: The offender?
[18]     Q: The offender.
[19]     A: Parker. Who was the sensitive one?
[20] Williams.
[21]     Q: How did he pronounce it?
[22]     A: Sri Lanka or something. Well, Williams has
[23] sales going on in Sri Lanka. He didn't want it
[24] misplaced. Williams is Worldwide sales, Parker's

Page 151

[1] North America. You could tell.
[2]　Q: Well, after Mark asked Mr. Williams about
[3] that I couldn't help but get some clarification of
[4] that critical point.
[5]　A: I thought it might joggle a couple of
[6] memories there.
[7]　Q: No, afraid not.
[8]　A: Maybe not.
[9]　**MR. RESNICK:** No, we tried.
[10]　Q: Now, during this meeting — this golf
[11] meeting with Mr. Williams and Mr. Parker, was
[12] business discussed?
[13]　A: Yes.
[14]　Q: What business was discussed?
[15]　A: If we sign this new agreement will
[16] we — will you in fact do what you have always said
[17] you are going to do, roll it out to North American
[18] sales or roll it out to sales I think I said. And
[19] the both of them replied, "We'll roll it out
[20] immediately to North American sales" with Thayer
[21] Stewart and I. I can run the video in my head but
[22] unfortunately you can't see it. And that was the
[23] commitment we wanted to hear on the, you know, MRO
[24] side, and then we had to weight that with the Indus

Page 153

[1]　Q: You wrote — at the top e-mail to
[2] Mr. Parker you wrote, "I shared one" — you said,
[3] "There are only a couple of issues I'm trying to get
[4] with Ray on. I shared one with Nancy but I think
[5] it's out of her domain (sales quotas for M2)." Did
[6] you mean by that that this was a business issue that
[7] she didn't have the authority to resolve?
[8]　A: No, no. I meant that she didn't
[9] understand. She'd started a negotiation on an item
[10] by using the VAR agreement giving me a quota that,
[11] you know, had had too much going back and forth.
[12] She obviously didn't understand. Maybe not — yes,
[13] she just didn't get it.
[14]　Q: After this meeting at the Abbey, this golf
[15] day at the Abbey with Mr. Williams and Mr. Parker,
[16] you did not write to either of them and say in
[17] effect, "I want to confirm the agreement that we
[18] reached yesterday, that if we sign this new
[19] agreement with a 50 percent commission you will roll
[20] out our service to your sales force"?
[21]　A: No, I didn't.
[22]　Q: Look at Exhibit 29, please. Do you
[23] recognize this e-mail, first page?
[24]　A: Yes.

Page 152

[1] discussions.
[2]　Q: And did you at that point say to
[3] Mr. Williams and Mr. Parker, "Well, you know, we
[4] have been talking about this for two and a half
[5] years. You never did the rollout after we discussed
[6] it in '99. Let's put this in the agreement that we
[7] are negotiating"?
[8]　A: No.
[9]　Q: What other business was discussed at this
[10] golf day?
[11]　A: I can't remember any. It was probably just
[12] chitchat. The purpose of the event was to lock them
[13] in on we have got the 50 percent now. Now Chip is
[14] waiting. Everybody is waiting. You know, we have
[15] been doing this forever. Is this in fact the last
[16] thing I have got to do in order to have you roll
[17] this out, sign this new agreement, get me on new
[18] paper. He wrote, "Yes, sir."
[19]　**MR. GESMER:** Let's take a short break, five
[20] minutes.
[21]　(Recess taken from 2:43 to 2:51 p.m.)
[22]　　　　**BY MR. GESMER:**
[23]　Q: Going back to Exhibit 28 for a moment.
[24]　A: Yes, sir.

Page 154

[1]　Q: You wrote — before — if you look at Page
[2] 2 you'll see that this is a response to her July
[3] 11th e-mail which we have already looked at that was
[4] Exhibit 26 where she says, "It doesn't make sense
[5] that MRO has a sales quota for M2, therefore, I put
[6] the original back in"?
[7]　A: Uh-huh.
[8]　Q: And there are a couple of e-mails between
[9] you and Iris Martin in between but then eventually
[10] you send her a response in which you say, "We have
[11] accepted your changes except as noted. I believe
[12] the real issues are in the area of quota/sales
[13] responsibility and termination obligations. We need
[14] to see MRO take some position vis-a-vis the sales
[15] channel. I assume that there will be other hosting
[16] affiliates. How will we fare 'sales lead' wise with
[17] these others. Termination for convenience still
[18] does not give us the business/investment protection
[19] we need. What will happen to those customers who
[20] want to renew 'post termination'? Will MRO want to
[21] assume that business or another 'hosting affiliate'?
[22] Do we buy seats to continue? Would we be given that
[23] opportunity on a fair basis? I just don't know.
[24] These may not be questions that you can answer, but

Page 183

[1] had — it was — is it — had the conversation with
[2] Mr. Williams regarding forgiveness of the monies
[3] owed under the previous agreement, had that occurred
[4] before or after November 4th, 2002?
[5]   A: Before, one or two days before.
[6]   Q: Okay. And when did this language regarding
[7] agreement to pay all fees due on Exhibit A that's
[8] scratched out —
[9]   A: Yes.
[10]  Q: — when did that get scratched out?
[11]  A: November 4th.
[12]  Q: Where? What were the circumstances?
[13]  A: I did it.
[14]  Q: You did that?
[15]  A: Yes.
[16]  Q: When did Ms. Gilroy initial it?
[17]  A: I assume when she received the signed
[18] document back.
[19]  Q: So this all happened by mail?
[20]  A: Yes, sir.
[21]  Q: And if I were to tell you that Ms. Gilroy
[22] remembers doing this with you face to face, that
[23] would be inconsistent with your memory?
[24]  A: It would be inconsistent with my memory.

Page 184

[1]   Q: Okay. So you crossed out the "pay all
[2] fees" sentence in Exhibit A?
[3]   A: Yes, I believe so.
[4]   Q: And you sent it back to her. Why didn't
[5] you — did you consider adding a sentence that would
[6] reflect your agreement with Mr. Williams that would
[7] forgive all fees due?
[8]   A: I don't remember considering that.
[9]   Q: Okay.
[10]  A: At this point in time I really wasn't
[11] looking for throwing impediments in the way of a
[12] deal trying to get rolling for three years.
[13]  Q: All right.
[14]  A: And frankly, the money didn't exist if they
[15] didn't invoice me. I would have all kinds of
[16] problems giving them back money that was never
[17] recognized.
[18]  Q: All right. Look at Exhibit 36, please. Do
[19] you recognize this document?
[20]  A: Yes.
[21]  Q: Now, you came up to Boston for an annual,
[22] what, annual national sales meeting that MRO held
[23] here; is that right?
[24]  A: Yes.

Page 185

[1]   Q: And they held it, what, across the street?
[2]   A: At the Marriott.
[3]   Q: At the Marriott here —
[4]   A: Uh-huh.
[5]   Q: — on the waterfront?
[6]   A: Yes.
[7]   Q: And did you see this before that meeting?
[8]   A: No.
[9]   Q: When did you see this?
[10]  A: There's another one of these that was
[11] issued in the summer of '02 that people tell me I
[12] must have seen, but I don't remember seeing it and I
[13] don't necessarily remember seeing this. I mean, I
[14] know about — I was told at the meeting about this
[15] deal, and that was the first time I remember ever
[16] knowing about it.
[17]  Q: Okay. So at the meeting here in Boston in
[18] early November 2002 —
[19]  A: I believe so.
[20]  Q: — you learned from conversations about IBM
[21] becoming a hosting partner of MRO?
[22]  A: Well, not exactly.
[23]  Q: What did you learn?
[24]  A: David Roth — what's his name, Rothberg

Page 186

[1] came up to me during a breakout session and
[2] introduced himself and said, "Before you go into the
[3] session on application hosting I need to tell you
[4] something." He said that Bob Parker and somebody
[5] else had suggested — you know, told him that Rick
[6] didn't know, and that it would be best to let him
[7] know before he hears about it in the presentation.
[8] So he said they had this deal, da-ta-ta-ta, and I
[9] went into, you know, an hour-long presentation, you
[10] know, about what the deal was about and how the MRO
[11] people were going to benefit by it and this and that
[12] and the other thing.
[13]  Q: So you were told about it by Rothberg
[14] outside and then you went into a meeting and heard
[15] about it in detail?
[16]  A: Yes. Sorry.
[17]  Q: Now, did you believe that this was a
[18] violation of any agreement you had with MRO? And by
[19] "this" I mean the hosting — IBM becoming a hosting
[20] partner of MRO.
[21]  A: I didn't — I wasn't thinking about things
[22] in those terms.
[23]  Q: Do you believe that to be the case today?
[24]  A: I'd almost have to defer as to whether or

M2 Consulting, Inc. v.　　　　　　　　　　　　　　　　　　　　　　Thomas R. Bevington
MRO Software, Inc., et al.　　　　　　　　　　　　　　　　　　　　Vol. 1, July 26, 2005

Case 1:05-cv-12589-GAO   Document 86-3   Filed 01/27/2006   Page 9 of 12

Page 191

[1] I said, "I didn't say a word. I don't know where
[2] they are coming from." But I have worked in
[3] corporate America at bigger companies for a long
[4] time. I was figuring that Rich Caplow was laying
[5] one on me. So I wanted to clear the deck with my
[6] buddies that I'm not a person that's putting down
[7] their big deal with IBM, because I usually don't
[8] write Chip little notes about what he's been up to.
[9]   Q: Now, on the top message on this e-mail
[10] thread, 11/19/2002, still on Exhibit 37, you thank
[11] Bob for the reply and you say, "Ray and I talked
[12] about getting a proposed rollout plan to you." What
[13] did you have in mind when you wrote that sentence?
[14]   A: Well, now that we had the agreement signed
[15] we would go back into the rollout mode. I knew it
[16] was Ray's job. So I was going to help Ray help Bob
[17] do what they had always said we needed to do.
[18]   Q: In your mind at that point what did the
[19] proposed rollout plan consist of?
[20]   *A: It would have consisted of, you know, an
[21] announcement to sales, announcement to the
[22] marketplace, you know, put — you know, announce the
[23] compensation plan to the sales force, put the whole
[24] thing in their sales briefcase, if they needed

Page 192

[1] training or seminars or whatever, you know, as it
[2] had always been.
[3]   Q: What did you understand the compensation
[4] plan to the MRO sales force was at that point or was
[5] going to be under this plan?
[6]   A: I didn't know anything more than I had
[7] funded it. I had made arrangements to fund it 50
[8] percent as opposed to 20. I signed that document.
[9] We are really going to go this time. The document
[10] is signed, and I'm going, okay, we are really going
[11] to go this time. Crank it up and do it.
[12]   MR. GESMER: Could you read the answer to
[13] two questions back to me, please.
[14]   *(Answer read)
[15]   Q: Do you know what the — did you have an
[16] understanding with MRO at this point — at this
[17] point in time when you wrote this November 2002
[18] e-mail, November 19, 2002, e-mail, did you have an
[19] understanding with MRO as to what the announcement
[20] would consist of?
[21]   A: Well, I assumed we'd just go back to some
[22] of the work we had done in the past when it was on
[23] the verge of being rolled out. We had written a
[24] document I think you produced here that was a press

Page 193

[1] release, a document informing sales, question and
[2] answer document how you deal with your customer. I
[3] think we produced that there. The compensation
[4] apparently had been agreed to. Bob said okay, had
[5] his little deal. It was just a matter of putting it
[6] all together again. By this time the world was into
[7] Webcast so Ray put that into the thing. When we
[8] first started this there weren't very many Webcasts.
[9]   Q: When you say "Ray put that into the thing,"
[10] what does that mean?
[11]   A: Well, he committed to Webcast in the spring
[12] of '03. That's well documented. That's a noun that
[13] probably wasn't in any of our previous discussions
[14] because it really didn't exist as a viable method of
[15] communicating to internal audiences or external
[16] audiences. But, yes, it was just bring it back up
[17] together, roll it out. That's why I signed the
[18] agreement.
[19]   Q: Have you ever been to MRO World?
[20]   A: Yes.
[21]   Q: How many times?
[22]   A: I think twice.
[23]   Q: Did you have a booth on either occasion?
[24]   A: On one occasion.

Page 194

[1]   Q: July 2002?
[2]   A: That would be correct.
[3]   Q: Did MRO cooperate with you in that respect?
[4]   A: Yes, sure. I paid them the $25,000, and I
[5] got what you get for it.
[6]   Q: Do you remember MRO introducing M2 to the
[7] Geography Aviation Public Sector Region?
[8]   A: Geography Aviation Public Sector Region,
[9] would that be at that particular conference?
[10]   Q: Yes.
[11]   A: Well, what I remember is that the Collier
[12] Mosquito Control District, who runs a fleet of DC-3s
[13] and other type aircraft to spray the Naples area for
[14] mosquitoes, that we had implemented Maximo there,
[15] and that Stacey Welsh, the customer's
[16] representative, was presenting at that particular
[17] session. And we were there because we had done
[18] something that MRO had never done before, and they
[19] wanted to use it as reference. It wasn't a hosting
[20] job.
[21]   Q: Look at Exhibit 38, please.
[22]   A: Yes.
[23]   Q: Did you sign this document?
[24]   A: Yes.

**Thomas R. Bevington**  
Vol. 1, July 26, 2005  
Case 1:03-cv-12589-GAO   Document 86-3   Filed 01/27/2006   Page 10 of 12  
**M2 Consulting, Inc. v.**  
**MRO Software, Inc., et al.**

Page 195

[1] **Q:** Did you ever receive a copy — return copy
[2] from MRO?
[3] **A:** Not that I can find.
[4] **Q:** Do you believe that you received a return
[5] copy but you just can't locate it?
[6] **A:** That's possible. The document had been
[7] fully negotiated. It was just a matter of a
[8] signature, and this J. Pearson is just a
[9] functionary. So either, you know, somebody reached
[10] down and pulled it back or I misplaced it. I have
[11] looked for it.
[12] **MR. GESMER:** We are going to skip Exhibit
[13] 39. It was premarked, but I'm not going to use it.
[14] Would you make a note on the record, please.
[15] **THE STENOGRAPHER:** Yes.
[16] **Q:** Look at Exhibit 40, please. Do you
[17] remember writing this e-mail?
[18] **A:** Yes.
[19] **Q:** This is an another golf game?
[20] **A:** Yes, sir.
[21] **Q:** Where is the Hyatt Grand Cypress?
[22] **A:** Orlando.
[23] **Q:** Did this game take place?
[24] **A:** Yes, sir.

Page 196

[1] **Q:** Who attended?
[2] **A:** Bob Parker, Ted Davis, who was the
[3] vice-president, did Bob's sales group, Dave Bigler
[4] and myself.
[5] **Q:** Now, you wrote in Paragraph 2, "Have you
[6] had a chance to get with Bill Sawyer on MRO's
[7] intentions regarding hosting? Let me know when you
[8] do. Hopefully it will be before the 10th so we will
[9] know what we need to do at least by then." Why did
[10] you write that sentence?
[11] **A:** Because Parker had called me in, I don't
[12] know, January, early February, sometime before I
[13] wrote this, and said that there is some talk in
[14] Bedford about doing hosting, and I said, "Oh,
[15] really." You know, "I'll find out if it's talk or
[16] what the deal is and let you know." And he
[17] subsequently got back to me and said, "No, we are
[18] not doing hosting. Don't worry."
[19] **Q:** What was the significance of the 10th?
[20] **A:** That was the day we were playing golf.
[21] **Q:** What would you need to do at least by then
[22] depending on his answer?
[23] **A:** "Hopefully it will be before the 10th so we
[24] know what to do at least by then." Well, what my

Page 197

[1] reaction was going to be. I had nothing to react to
[2] yet, and if they made a decision one way and I had
[3] Parker in front of me, you know, that would be a
[4] good time to react.
[5] **MR. GESMER:** Would you mark the next,
[6] please.
[7] (Document marked as MRO
[8] Exhibit 41 for identification)
[9] **Q:** You can take a look at that. Now, you sent
[10] this to Mr. Miciek February 17th, 2003, right?
[11] **A:** Yes, sir.
[12] **Q:** And what were you — you were proposing
[13] that this two-page attachment be sent to whom —
[14] strike that.
[15] Why did you send this two-page attachment
[16] to Mr. Miciek?
[17] **A:** Because I had agreed to support Ray in
[18] getting all the information back together to roll
[19] this thing out. So I went back in the files, pulled
[20] this out and started sending him stuff because poor
[21] Ray was the one stuck with it.
[22] **Q:** So you viewed this document as a part of
[23] the rollout?
[24] **A:** No, no, no. It was fodder. You know,

Page 198

[1] Ray's job was to do the rollout, manage the rollout,
[2] lead the rollout, I don't know, but it was his job,
[3] not my job, because they were MRO employees. This
[4] was just fodder.
[5] **Q:** How did you expect him to use this two-page
[6] fodder?
[7] **A:** As a part of his communications, part of
[8] MRO's communications to their sales force. MRO was
[9] not in a position to describe my services so I
[10] describe them, put them over to them. They put it
[11] in their language, culture, whatever.
[12] **Q:** So you weren't — so you hoped Mr. Miciek
[13] would take this message to North American sales?
[14] **A:** I was doing him a favor, just giving him
[15] information so I could help him do his job.
[16] **Q:** Did you expect him to do anything
[17] specifically with this document?
[18] **A:** Well, yeah, I had an expectation that he
[19] would use our information and descriptions of what
[20] it was he needed to communicate rather than throw
[21] that out and try to make something up himself.
[22] **Q:** So you hoped he would use this as a
[23] starting point for some communication?
[24] **A:** I didn't hope anything. I mean, I was just

**Page 199**

[1] pushing this ball forward. If Ray gets — you know,
[2] there is a lot of little impediments that have been
[3] thrown up over the previous three years. We don't
[4] want Ray's inability to construct the message to be
[5] the next one. And this had been, you know,
[6] circulated, what, a couple of months before anyway.
[7]   Q: What did you mean when you said — when you
[8] asked, "Did you guys release QuickStart to sales?"
[9] What did that mean?
[10]  A: This agreement for professional services.
[11] This one. It's Exhibit 38. This agreement which I
[12] signed on January 3rd is the provision for them
[13] buying QuickStart services from me and reselling
[14] them to their end users. We would be their back
[15] room, back office. So I negotiated and signed an
[16] agreement. I was following up to see whether or not
[17] the salespeople were selling it, separate deal from
[18] hosting.
[19]  Q: How would the sale of QuickStart by MRO's
[20] sales force work?
[21]  A: Our implementation methodology is hugely
[22] more efficient than most software vendors. So, you
[23] know, the description that we went through earlier
[24] about what QuickStart is, that we can do all that

**Page 200**

[1] stuff, put it up in a matter of days, do an
[2] iteration with the customer and boom, let's go, that
[3] could be anywhere from a $10,000 to a $100,000 job.
[4] Any job below 50, 60, 75, 80, $100,000 is of no
[5] interest to MRO's professional services group. So
[6] it benefited Ray to use our implementation services
[7] which were inexpensive enough that if he marked them
[8] up to what we sold them for in the marketplace they
[9] would be making their run rate gross margin as they
[10] would in regular professional services.
[11]  Q: So the idea was that MRO would sell your
[12] services, your consultant services, in the form of
[13] QuickStart?
[14]  A: No. They would sell software and
[15] implementation, okay, for a price, and they turn
[16] around and have us do the work and then they deliver
[17] that to the customer. They bill the customer. The
[18] customer pays them. We bill MRO, and MRO would pay
[19] us.
[20]  Q: Did that ever happen?
[21]  A: No. Well, not per this signed agreement,
[22] but we have — we have done professional services
[23] for MRO that were sold by MRO, delivered by us, paid
[24] to MRO and MRO paid us, but not as formal as — I

**Page 201**

[1] think that's why this came about.
[2]  Q: Okay. That happened before that
[3] professional services agreement was signed?
[4]  A: Yes.
[5]  Q: Before January of 2003?
[6]  A: I believe so, yes. It must have been.
[7]  MR. GESMER: Next exhibit, please.
[8]   (Document marked as MRO
[9] Exhibit 42 for identification)
[10]  Q: Do you recognize these handwritten notes?
[11]  A: Yes.
[12]  Q: Is this your handwriting?
[13]  A: Yes.
[14]  Q: And when did you take these notes?
[15]  A: June 17th, 2003.
[16]  Q: And what — would you read the notes to us,
[17] please.
[18]  A: The first one in quotation marks, "Contrary
[19] to all I have talked to you in the past," end
[20] quotation. Well, at the top it says, "Bob Parker
[21] 6/17/03." The next quotation mark sentence is "I
[22] have learned a lot about this stuff over time,"
[23] close quotations. Circled sentence in the center
[24] "Ten user minimum - out. I apologize" and

**Page 202**

[1] "Everything he told us was true. He doesn't make
[2] company policy. There won't be an opportunity."
[3]  Q: Now, would you tell me what you said and
[4] what Mr. Parker said during the conversation that
[5] lead to your writing these notes.
[6]  A: I had been informed several days ahead of
[7] this by Miciek that I was going to get a phone call
[8] I didn't like. And that was confidentially. When
[9] Parker called me, which he almost never does, I
[10] wrote down what he said. One of the sentences was
[11] "Contrary to all I have talked to you about in the
[12] past."
[13]  Q: You have already read this.
[14]  A: I'm sorry.
[15]  Q: I don't want you to reread it.
[16]  A: Okay.
[17]  Q: Reading this once is fine. What I am
[18] asking you to do is to tell me what you remember
[19] about the conversation. And if you don't remember
[20] anything more than is written here, that's fine, but
[21] I would like your independent recollection of the
[22] conversation.
[23]  A: Essentially what's written here is what was
[24] said. I tried to write down everything Parker said.

Thomas R. Bevington
Vol. 1, July 26, 2005
Case 1:03-cv-12589-GAO    Document 86-3    Filed 01/27/2006    Page 12 of 12
M2 Consulting, Inc. v.
MRO Software, Inc., et al.

Page 203

[1] He did say that they are going to go into the
[2] hosting business, and I said, "Does that mean you
[3] are not going to roll our service out to your sales
[4] force?" And he paused and he said, "Well, yeah. I
[5] guess that's what it means." And the rest is
[6] essentially on this paper.
[7] **Q:** These are his words?
[8] **A:** Yes.
[9] **Q:** What did you say?
[10] **A:** The bulk of what I said was, "Does this
[11] mean you are not going to roll out our program to
[12] the sales force?" Because I wasn't willing to make
[13] the connection between them going into the business
[14] and them breaking their agreement with me.
[15] Apparently there is a very tight connection in some
[16] people's minds. And I am sure I said, you know, our
[17] good-byes. I didn't burn any bridges or anything.
[18] **Q:** Have you told me now everything you
[19] remember about this conversation?
[20] **A:** Yes, everything I remember as of this
[21] second.
[22] **MR. GESMER:** Now, let's mark Exhibit 43,
[23] please.
[24]

Page 204

[1]     (Document marked as MRO
[2] Exhibit 43 for identification)
[3] **Q:** Now, after you had the conversation with
[4] Bob Parker on June 17th you sent him this e-mail
[5] about ten days later?
[6] **A:** Uh-huh.
[7] **Q:** Is that right?
[8] **A:** Yes, sir.
[9] **Q:** You described MRO's decision to become a
[10] first party hoster, meaning they would host
[11] themselves, right?
[12] **A:** Yes.
[13] **Q:** You were a third-party hoster?
[14] **A:** Yes.
[15] **Q:** They would be a first-party hoster, right?
[16] **A:** Yes.
[17] **Q:** "We view this as a very positive step for
[18] MRO and a potential opportunity for M2 Consulting.
[19] We will bring a tabletop discussion presentation on
[20] our perspective. We look forward to a productive
[21] and exciting discussion. See you there." Now,
[22] what — and it refers to a meeting on July 1st, 2
[23] p.m.?
[24] **A:** Yes.

Page 205

[1] **Q:** Did that meeting take place?
[2] **A:** Yes, sir.
[3] **Q:** Where?
[4] **A:** Naples, Florida.
[5] **Q:** Who attended?
[6] **A:** Chip Drapeau, Bill Sawyer, Ray Miciek,
[7] Thayer Stewart, myself; that's all I remember. If
[8] there was more there was only one more or so.
[9] Parker may have been there. I don't know.
[10] **Q:** And what was the — what did you understand
[11] the purpose of this meeting to be — well, strike
[12] that.
[13]    Who called the meeting?
[14] **A:** We did, M2, I did.
[15] **Q:** And was it as a result or a response to
[16] Mr. Parker's call to you on June 17th?
[17] **A:** Yes.
[18] **Q:** And what did you say to MRO would be the
[19] purpose of this meeting?
[20] **A:** That's all I said.
[21] **Q:** So Mr. Drapeau and Mr. Sawyer traveled down
[22] from Massachusetts?
[23] **A:** No. They had a professional services
[24] meeting in conjunction, you know, in Naples. So

Page 206

[1] like I flew in and I think Jeff Foley was there and
[2] then Thayer flew in from someplace he was at. But I
[3] think the MRO guys were in doing business already
[4] there.
[5] **Q:** And did you tell anyone at MRO either in
[6] another writing or by voice what you viewed the
[7] purpose of the meeting to be?
[8] **A:** I may have talked to Ray Miciek, you know,
[9] and told him.
[10] **Q:** What was the purpose of the meeting, in
[11] your mind?
[12] **A:** To sell them our Maximo hosting business.
[13] **Q:** To sell your company to them?
[14] **A:** No. To sell our Maximo hosting business.
[15] **Q:** To do an asset sale to them?
[16] **A:** Essentially, yes.
[17] **Q:** You presented this to them at this meeting?
[18] **A:** Yes, and I believe that July 1 presentation
[19] you have, which outlines all the business, all the
[20] financials, all the customers.
[21] **Q:** There is a PowerPoint presentation you are
[22] referring to?
[23] **A:** Yes, sir.
[24] **Q:** Was there any discussion of MRO's decision