UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
M$^2$ CONSULTING, INC.,              )
                                    )
               Plaintiff,           )
                                    )
v.                                  ) Civil Action No. 03-12589-GAO
                                    )
MRO SOFTWARE, INC.,                 )
                                    )
               Defendant.           )
_____)

## RESPONSE TO REPLY BRIEF OF MRO SOFTWARE, INC. TO OPPOSITION TO DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION

### I. Introduction

On January 13, 2006, M2 filed its opposition to MRO's Motion for Preliminary Injunction ("MRO's Motion"). MRO filed a Reply Brief on January 27, 2006, focusing on the enforceability of the agreement upon which its entire copyright infringement argument depends. Because MRO did not brief these issues in its Motion, only in its Reply, M2 submits this sur-reply to fully apprise the court of state of the evidence and the applicable legal authority, both of which strongly support a finding that this agreement cannot now be enforced by MRO.

### II. Procedural Background

Earlier in this case, MRO amended its counterclaims to bring claims against M2 for copyright infringement. Essentially, these claims seek to enjoin M2 from continuing to offer web hosting of Maximo as part of its business, at all. These claims rest on a specious factual and legal foundation. They allege that an agreement which MRO fraudulently

induced M2 to execute in 2002 (the "2002 Agreement") controls the parties' rights. MRO purported to terminate this agreement, and with it M2's rights to continue to use Maximo. Because M2 continues to use Maximo for a small number of pre-existing customers which have been disclosed to MRO, MRO alleges that the copying of Maximo files into the random access memory of M2's computers in the course of their use of the Maximo software, which MRO provided as part of the relationship, is illegal duplication violative of MRO's copyrights for Maximo.[1] In order for MRO to sustain its position on this issue, it must resuscitate the fraudulently induced 2002 Agreement as the controlling agreement between the parties.[2]

### III. Factual Background

The facts associated with the complex commercial relationship between these parties extend back to 1999. Although a complete recitation of the facts obtained by M2 in discovery is more appropriately submitted in the summary judgment context, certain salient facts are relevant. M2 and MRO negotiated an agreement in March of 2000 (the "2000 Agreement") by and through which M2 and MRO would partner to provide web hosting of Maximo. The 2000 Agreement addressed some of the terms and technical aspects of that relationship. At the same time, the parties also negotiated an agreement relating to MRO's sales support for M2's capabilities as the exclusive web hosting partner for Maximo (the "Marketing Agreement"). This agreement was oral, but supported by independent and

---

[1] M2 presently web hosts Maximo for a small number of rental customers. M2 has already voluntarily agreed not to market its Maximo web hosting capabilities, or to accept any new customers for Maximo web hosting. MRO's Motion seeks to enjoin M2's continued servicing of these few Maximo rental customers.

[2] MRO's Motion papers assiduously avoided any reference to M2's position that the 2002 Agreement was fraudulently induced. Instead, MRO asserted the viability of the 2002 Agreement as though it were undisputed. M2 opposed MRO's Motion by referencing some examples of evidence in the record which supported its position that the 2002 Agreement was fraudulently induced. MRO then submitted its Reply.

sufficient consideration.[3] M2 reasonably relied on MRO's promises to provide marketing support, and invested heavily in computer infrastructure and personnel.[4] At the time the 2000 Agreement was executed, MRO was facing significant competition from competing products that could be web hosted, particularly those products that were economical for smaller customers – a category of customer termed "Mid Tier" by MRO - and was very enthusiastic about partnering with M2, since that would provide MRO with instant Web posting presence in the marketplace.[5]

---

[3] Q: What did Mr. Drapeau say to you on this subject?
A (Bevington): I don't know exact words but you know. Good plan. Let's do it. Look forward to a mutually beneficial outcome, You know that kind of stuff…..
Q: But my question to you Mr. Bevington is what did Mr. Williams [MRO Senior Vice President of Worldwide Sales] say to you on this subject?
A: Well, a whole lot of stuff about, you know, got to get the agreement, got to get the agreement, then we can roll it out.  Then we can get started. Then I can have executed what Chip told me to execute.  The is no renegotiation, reevaluation, rethinking, restating of what had already been decided between Ted and I.  The decision had been made.
Deposition of Rick Bevington, July 26, 2005 at 53-55.  A true and accurate copy of relevant portions of this deposition are attached hereto as Exhibit "A".

[4] Q: Did Mr. Bevington tell you that he was also going to hire personnel to support the MAXIMO web hosting?"
A: "He did tell me that he was going to hire a salesperson."
Deposition of Robert Parker, November 17, 2005 at 62. A true and accurate copy of relevant portions of this deposition are attached hereto as Exhibit "B".

[5] Q: "What did he [Ray Miciek MRO Regional Sales Executive] say when you [Parker] said that to him [discussing competitive pressure faced by MRO]?
A: That he had a need for that particular solution to deal with DataStream on the occasion where they [customers] brought up that option [hosting].
Q: Did you give him permission to continue to explore a possible relationship with M2?"
A: "Yes, I did."
Exh. B at 45.

Q: What was you initial response when Mr. Bevington began discussing these two models?
A: Positive.
Q: Why was it positive?
A: We had a competitor at the time that was beginning to offer hosting service. It seemed like a good fit, that we were running into that competitor, and they were offering hosting.  We didn't offer hosting.  We had to find some sort of fit.  Rather than turn the clients over to that competitor, we wanted to fight and do our best to win the deal.
Deposition of Ray Miciek, November 30 2005 at 28-29. A true and accurate copy of relevant portions of this deposition are attached hereto as Exhibit "C".

Through its relationship with M2, MRO came to realize the opportunities that web hosting of Maximo would present, and decided that the opportunity was lucrative enough to justify the development of its own in-house Web hosting capabilities.[6] MRO's pre-existing partnership with M2 for the Web hosting of Maximo presented a problem however, since MRO had already committed to use M2 for that purpose, and it was under a contractual obligation to perform under the 2000 Agreement. It was also under certain common-law obligations to act in good faith and to deal fairly with M2. Facts obtained in discovery clearly indicate that MRO made a determination that its relationship with M2 would have to be altered in order to permit it to obtain the business of web hosting Maximo for itself. MRO developed a plan to achieve this objective.

*MRO's Fraudulent Scheme*

MRO's plan was simple. It had decided that it would not use M2 to web host Maximo once it began web hosting Maximo itself. It knew that it would have its internal web hosting operation up and running within a relatively short time.[7] By the spring of 2002,

---

[6] Q: And as part of Cisternelli's assignment, was he asked to look at the market for a MAXIMO hosted solution?"
A (William Sawyer, MRO's Senior Vice President of Operations): I think he was probably asked to look at the market for a hosted solution in general.
Q: And do you recall what he reported back about the market in 2000 for hosted solutions?
A: "I think generally there's been a …a sort of collective wisdom that applied to us. I think there's been a general belief amongst me and the rest of the management team that ultimately there would be a market for hosted offerings."
William Sawyer Deposition November 28, 2005 at 34. A true and accurate copy of relevant portions of this deposition are attached hereto as Exhibit "D".

Q: What did the report [by outside consultants] conclude about EAM revenues and the form they might take in the future?
A (Kathleen Doyle, MRO's Product Manager, charged with getting its internal web hosting capabilities up and running): Generally, that hosting was the wave of the future.
Deposition of Kathleen Doyle, December 1, 2005 at 48. A true and accurate copy of relevant portions of this deposition are attached hereto as Exhibit "E".

[7] Many MRO executives testified that the decision to take hosting in-house was made definitively. For example, Katie Doyle testified about a business plan for hosting that she had been working on in 2001. She stated that "It was a planning document. I believe the decision had already been made. I wasn't under the

4

the internal planning for that eventuality was well under way.[8] Once it was in the web hosting business, MRO did not intend that M2 would continue to web host Maximo, or that it would retain any Maximo web hosting customers that it had developed on its own. Assuming M2 could be managed, MRO intended to shift M2 from a web hosting partner to a minor role as an implementation contractor, helping MRO web hosting customers install and implement the Maximo program.[9] It was important that MRO have the option to completely terminate its relationship with M2 in the event that M2 did go willingly into this new minor role. The vehicle for dealing with M2 would be a new contract. That contract would have to have new features not present in the 2000 Agreement. First, it would eliminate the exclusivity of M2's status as the web hosting partner for Maximo.[10] Second, it would have to carefully avoid any reference to a marketing, sales or promotional commitment on MRO's part. Third, MRO would more than double the royalty rate payable by M2 on

---

impression that my job was to convince anybody that we should be doing this [hosting], that it was, put it in place and execute it." Exh. E at 53 – 54.

[8] Doyle testified that she met with a market research firm as part of her assignment to create a business plan for MRO's entry into the web hosting business in 2001. She generated her business plan and submitted it to her superiors, and then worked with MRO's OCS site to address the technical aspects of the hosting initiative. Doyle testified that her business plan did not address at all MRO's contractual commitment to M2. Exh. E at 50, 54-55, 125.

[9] This role had an entirely different economic profile, and was far less lucrative for M2.

[10] Q: "Do you recall what the changes were that you referred to as having listed?"
A (Jason Kasper, MRO's Alliance Specialist, charged with managing MRO's relationship with M2): "No, I do remember maybe one of them and that was probably, that was the exclusivity clause within the agreement.
A: Coming in or going out?
A: Take it out. ……
Q: Did you ever hear anyone say prior to 2001 that an exclusivity provision in M2's contract was in any way inconsistent with corporate policy?
A: Yes.…….
A: ….In the M2 agreement that stuck out, the exclusivity as it shouldn't be there.

Deposition of Jason Kasper, November 22, 2005 at 63-65. A true and accurate copy of relevant portions of this deposition are attached hereto as Exhibit "F".

revenue generated from web hosted Maximo customers from 20% to 50%.[11]  Finally and most importantly, because MRO realized that it would have to lie to Bevington in order to get M2 to execute this agreement, the new agreement would have to have an integration clause that would exclude extrinsic evidence of oral representations, and supersede the prior 2000 Agreement.

MRO had committed earlier under the Marketing Agreement to provide sales support for M2's Maximo web hosting role, and had utterly failed to do so.  MRO realized that M2's President, Rick Bevington ("Bevington") considered aggressive sales support by MRO's sales force a key to the success of the web hosting venture, and that promises to implement this effort would be the key to getting him to sign any new agreement.  The facts developed in discovery evidences the deliberate implementation of a plan by MRO to convince M2 to execute the 2002 Agreement by promising M2 the aggressive sales support MRO had been supposed to provide under the 2000 Agreement and which M2 had been demanding.

The promised MRO sales support consisted of two primary components.  First, MRO would have to publicize M2's role as the exclusive web hosted solution for Maximo to its sales force internally, and instruct that sales force to aggressively market that capability.  This effort was known and understood by both sides to be a "roll out" (the "Roll Out").  Second, the MRO sales force would have to actually go into the marketplace and sell M2's services to the appropriate customers, and generate leads.  M2 would assist in closing the

---

[11] Ted Williams testified that he was aware that Parker was "attempting to negotiate or sign a new agreement with M2." He also admitted that the "primary reason was related the discount schedule." *See*, Deposition of Ted Williams, June 22, 2005 at 66. A true and accurate copy of relevant portions of this deposition are attached hereto as Exhibit "G". Robert parker also testified that he had the idea to increase the royalty percentage to 50%. "It didn't make any sense for 20%. There just wasn't any revenue in it. That's why I said if we don't make it more, I'm not going to deal with it any more. Exh. B at 141.

leads.[12]  From the outset, MRO had failed to implement the Roll Out, and had provided M2 with a series of excuses for why it had not done so.  MRO also failed to honor the exclusivity provisions in the 2000 Agreement and passed hosting leads to other entities that were web hosting Maximo.  MRO induced M2 to defer declaring MRO in default of its obligations by continuously promising that its compliance would be remedied within a short time.  *See* Fn. 24, *infra*.  By the time MRO conceived of its plan to change its relationship with M2, the promised MRO Roll Out had been overdue for almost two years.

    The first step in MRO's plan to subvert its relationship with M2 was for MRO to introduce the subject of a new contract in the context of being on the verge of implementing the Roll Out.  Relying on MRO's promises to address all the MRO marketing deficiencies and implement the Roll Out if M2 agreed to a new contract, Bevington agreed to negotiate a new agreement with MRO.

    MRO soon sent drafts to Bevington for his review.  The negotiations took months, and throughout these negotiations, Bevington made it clear that M2 expected MRO to implement the Roll Out.[13]  He also made it clear that he believed that M2 already had an existing agreement which obligated MRO to do the Roll Out.  Although the negotiations included discussions of the Roll Out and MRO sales and marketing support for M2's capabilities, MRO discussed that commitment with Bevington in the context of an existing agreement between the parties.  Throughout these negotiations, MRO executives told Bevington that the reason MRO had not honored its obligations under the 2000 Agreement

---

[12] The 2000 Agreement contained provisions which discussed MRO's requirement to develop leads and pass them to M2.

[13] Bevington testified that he trusted MRO and did not insist that MRO incorporate the promise to roll out. Exh. A at 135-137.  Jeff Foley stated that "……But as a global rollout it never happened and in my mind *almost all the meetings were about when can we get this globally rolled out*.  Exh. H at 44. (emphasis supplied)

7

and Marketing Agreement was that the existing 20% commission structure did not give them enough revenue with which to incentivize their sales force, and that if the percentage was increased, that problem would be solved. They told Bevington that most of the new provisions in the new agreement were "standard" provisions that MRO used with all its partners. They told Bevington that the implementation of the Roll Out had been stymied by the fact that the 2000 Agreement did not comport with MRO's new "updated" contract form, and that once M2 was in conformity with these internal MRO contract formalities, MRO would deliver on its obligations as promised.[14]

By July of 2002, MRO forwarded to Bevington what it considered to be a final version of the 2002 Agreement for his signature. Bevington did not sign it at first. In August, Bevington and Thayer Stewart, an M2 Board member, played Golf with MRO's Ted Williams and Robert Parker in Rhode Island. At the conclusion of the outing, Bevington approached Parker and specifically asked whether, if M2 signed the 2002 Agreement, MRO would roll out M2's capabilities to its North American Sales force.[15] Parker told him that MRO would definitely do so. Bevington asked if the Roll Out would be only for Mid-Tier customers or for all potential hoisting customers regardless of size, and Parker told him the Roll Out would be for all customers.[16] The conversation was overheard

---

[14] Miciek testified that "[T]he general discussions around were that the original contract was fairly loose and not in line with our current contracts that we have with our partners, and typically, we will go back to our older contracts and redo them." Exh. C at 88.

[15] When Bevington was asked what was discussed, he stated "[I]f we sign this new agreement will … you in fact to what you have always said you are going to do, roll it out to North American Sales or roll it out to sales I think I said. And the both of them [Williams and Parker] replied 'we'll roll it out immediately to North American sales' …and that was the commitment we wanted to hear on the.. MRO side …" Exh. A at 151-152.

[16] Stewart testified that he and Bevington were talking to the MRO attendees "about the particulars of how this rollout would occur. And then, you know, we are walking Bob in the parking lot , you know, Rick asks Bob, Bob is this a done deal? And Bob said absolutely this is a done deal and Rick said are we going to roll this out … just to the middle market sales organization or is it going to be large and middle, and Bob said large and

8

and witnessed by Thayer Stewart. *Id.* In reliance on those representations, Bevington signed the 2002 Agreement.

MRO completed its preparations to enter the hosting business in early 2003. Internal MRO documents refer to these preparations as being in "stealth mode". Exh. E at 130 – 131. MRO's OCS center was up and running and ready to host customers by 2003.[17] MRO did not mention a word about these preparations to M2. In fact, M2 remained completely unaware that MRO was on the verge of entering the web hosting business. Doyle testified to having a concern that that MRO design its add-on Web hosting capabilities so it would have capabilities which would be competitive with M2. Exh. E at 108-109. When asked whether this concern was based on a view that once MRO went into Web hosting M2 would be a competitor, she answered "possibly". *Id.* She also testified that MRO was concerned that its pricing be competitive to pricing offered by M2. *Id.*

MRO did however continue to stall on its promise implement the Roll Out. It told Bevington that the Roll Out would include a web cast, that this would have to be planned and scheduled, and that it was being planned. Exh. A at 193.[18] MRO then told Bevington that the date for this web cast had to be postponed. *See* Fn. 24, *infra*. Finally, without warning, Parker called Bevington on June 17, 2003, and informed him that there would be

---

middle. But he emphatically reiterated that this was a done deal, that it had been approved by Chip [Drapeau, MRO's CEO] … and you know, it was done.
Deposition of Thayer Stewart, October 4, 2005 at 95. A true and accurate copy of the relevant portions of this deposition are attached hereto as Exhibit "I".

[17] MRO's OCS center provided online customer support. It was chosen as the vehicle through which MRO would install and operate its internal web hosting of Maximo.
[18] A (Bevington): Well, he committed to web cast in the Spring of 03."

9

no ongoing Maximo web hosting opportunities for M2.  Exh. A at 201-203.  This news came as a complete shock. *Id.*[19]

### IV.  Argument

In a desperate attempt to avoid the consequences of its own fraud and to hold M2 to the advantageous terms of the 2002 Agreement, MRO urges the Court to find that it is likely to succeed in proving that the 2002 Agreement is enforceable.  It also argues that the promise was too indefinite and that M2 ratified the fraudulently induced agreement through its conduct.  None of those arguments are supported by either the facts or the law, rendering inescapable the conclusion that MRO is not likely to succeed on the merits of its copyright infringement claims because the very contract on which those claims depend is unenforceable.

A. *The Evidence Establishes That The 2002 Agreement Was Fraudulently Induced.*

MRO executives lied to M2 in order to induce it to execute the 2002 Agreement. The most direct evidence of these misrepresentations is the conversation between MRO's Parker and M2's Bevington in the parking lot of the Rhode Island country club following the conclusion of an afternoon of golfing in August, 2002.  Bevington was attending that outing with Thayer Stewart, then a member of M2's Board.  Stewart and Bevington had discussed the necessity of obtaining MRO's promise to roll out M2's capabilities to its North American Sales Force prior to the execution of the 2002 Agreement.  At the conclusion of the afternoon, Stewart suggested that Bevington have that conversation directly with Parker, and this conversation occurred in the parking lot.  As Bevington has testified, he asked Parker that if M2 signed the 2002 Agreement, would MRO implement the Roll Out immediately,

---

[19] Bevington stated that Miciek had told him a few days prior only that he would be receiving a phone call that he would not like.

and Parker said that it would. *See* Fns. 14, 17, *supra.* M2's Stewart overheard this conversation and has corroborated Bevington's testimony. *See* Fn.17, *supra.*[20]

The facts are clear. Parker promised Bevington that MRO would roll out M2's Web hosting capabilities to its sales force once M2 signed the 2002 Agreement. He stated that execution of the 2002 Agreement was the only thing standing in the way of the long promised Roll Out. He made those statements knowing that Bevington would rely on them, and he either knew or should have known that those statements were not true at the time they were made. The facts support the inference that Parker made those representations intending that Bevington would rely on them to his detriment, and Bevington did just that. He has testified that Parker's representations were instrumental in his decision to sign a 2002 Agreement.

The record is replete with examples of MRO officers intentionally misleading Bevington into believing that MRO was prepared to roll out M2's capabilities to its sales force, when in fact MRO never intended to do so. MRO witnesses have admitted that MRO was aware that Bevington was unhappy with the level of sales support that MRO was providing. They were aware that Bevington was acting as though M2 and MRO had an agreement regarding the provision of sales support, and that MRO was not living up to its

---

[20] It is worth noting that when Parker was asked about this conversation at his deposition, he testified that he had no memory of it. This is but one of the many glaring examples of a striking trend in the deposition testimony of virtually every MRO deposition witness. Almost without exception, MRO's witnesses appear to have been extremely well prepared. They were consistently able to testify at length and in detail regarding facts which favor MRO's position. When asked about facts which might be less favorable to MRO, virtually all of MRO's witnesses have become suddenly unable to remember conversations, key facts, documents, or to otherwise testify in ways which might be less favorable to their employer. Although the obvious preparation and coaching of MRO's witnesses to provide one sided testimony in MRO's favor can and will be demonstrated in detail in the summary judgment phase of this case it is worth noting here because it goes directly the credibility of much of the testimony MRO relies upon in its papers. With respect to the fraudulent promise at issue here, Bevington's first-hand testimony regarding what he was told by Parker is corroborated by a percipient witness. Neither Parker nor any other MRO witness has testified that either this conversation did

promises. They admit to "placating" Bevington when M2 raised those issues, or to responding "diplomatically".[21] Bevington testified that at or about the time he signed the 2002 Agreement, his state of mind was that "[I] signed that document [the 2002 Agreement]. We are really going to go this time [meaning the Roll Out]. The document is signed, and I'm going okay, we are really going to go this time". Exh. A at 192.

> B. *The Statements Of MRO Executives Upon Which M2 Relied In Executing The 2002 Agreement Are Sufficiently Definite.*
>
> > (i) *MRO's own witnesses have defined the term in the same way that M2's have defined it, and both sides were in agreement as to what the term" Roll Out" meant.*

There was nothing indefinite about MRO's promise to roll out M2's capabilities to its sales force. There is little question as to how M2 defined the term Roll Out. Bevington testified that a service product roll out consisted of informing salespeople that the solution is available, provide information regarding how to describe it to a customer and how to price it, and incentivize the salespeople. It would include an internal announcement to the MRO sales force, and announcement to the marketplace, the providing of compensation information to the sales force, and provide training or seminars in how offering worked. Exh. A at 41-42, 191-192. There is also a little question as to how MRO defined the term. Doyle testified that it would have consisted of a presentation internally at MRO in the form

---

not take place, or that it was substantively different from what Bevington described. Parker's testimony on this point should therefore be afforded little weight.

[21] Q: Can you tell me … what you said to him [Bevington] and what he said to you?
A (Parker): Well, I know he wanted to do a roll out to the entire sales force. *I remember trying to be diplomatic respective to how much efforts and time we would spend on this effort*, keeping in mind that I was always concerned about the amount of time and energy to be spent …"
Exh. B at 136. (emphasis supplied)

Q: Generally what was your response when he [Bevington] asked you to have your team promote his services more aggressively?
A (Miciek): Polite, *placating would be the right term*.
Exh. C at 46 (emphasis supplied)

of a "'webinar' to the sales organization that covered everything they needed to know about this offering, pricing, positioning, any kind of data sheets or collateral. And it would probably be provided to them later in a zipped up file with some documents that they could have, like a price book and things like that which could be part of their deliverable …" Exh. E at 131-132.  MRO's Kasper testified that the term meant "to inform sales of what a partner is, what they do, and how to contact them for information. … Possibly could include sales presentations but not always, marketing information sheets that are for external use, website listing on MRO .com in the partner sections of our web site.  Exh. F at 77-78.

MRO's view as to what constituted an appropriate roll out for Maximo Web hosting capabilities, is best demonstrated by what its own witnesses have described it did when it rolled out its own internal Web hosting expertise, after illegally and improperly terminating its relationship with M2.  As MRO's Doyle described  "[A]t some point … we did an internal web cast to share that information [regarding MRO's newly operative web hosting capabilities] with seals management. …  I did a presentation at one of our annual global sales meeting. … I passed it [a power point presentation on the capability] on to my management, so it may have been forwarded and used elsewhere. [There] was either the sales meeting presentations or a Webex.  I believe I did both …"  Exh. E at 57-60.[22]

The notion that MRO did not understand what it was promising to do when its executives promised M2 that it would roll out M2's Web hosting of Maximo to its North American Sales Force is simply unsupported by the factual record in this case.  MRO knew exactly what roll out meant in the context of introducing a new software product or service;

---

[22] MRO did substantially none of the things described by Doyle to promote M2 as its web hosting partner, at any time during its relationship with M2.

13

it had discussed the Roll Out with Bevington for years prior to the execution of the 2002 Agreement, and never once did an MRO witness communicate to Bevington that there was a divergence of understanding regarding what exactly M2 expected MRO to do. Both parties were in agreement as to what MRO would do in the context of the Roll Out. It is beyond cavil that MRO promised to do so if only M2 would execute the 2002 Agreement, and it is undisputed that once M2 signed the 2002 Agreement, it did nothing.

      B.     *The Burden Of Proof In The Context Of Its Request For Preliminary Injunctive Relief Is MRO's, Not M2's.*

MRO argues in its papers that because M2 has failed to meet its burden of proof on some of the elements of fraudulent inducement, the Court should find that MRO is reasonably likely to succeed on the merits of its claim. That argument distorts the applicable procedural standard. It is MRO, as the moving party, who has the burden of demonstrating to the court it is reasonably likely to succeed on the merits of its copyright infringement claim. The burden of proof is therefore on MRO to establish that it is reasonably likely to succeed on the merits of its position that the 2002 Agreement is valid and controlling. The court therefore may not consider the weight of the evidence to determine who ultimately prevails regarding the proof of the fraudulent inducement. The only analysis properly undertaken in the context of MRO's Motion is whether MRO's position on M2's fraudulent inducement defense is so unassailable as to support a conclusion that is reasonably likely to succeed on the merits. The evidence clearly does not support a finding of reasonable likelihood of success.

The facts before the Court regarding Parker's fraudulent statements to Bevington strongly support an inference that MRO never had any intention of carrying out that

14

promise. The evidence is uncontroverted that MRO made virtually no effort to roll out M2's capabilities to its sales force, at any point in time either before or after the execution of the 2002 Agreement.[23] The evidence is also uncontroverted that MRO Promised M2 that it would implement the Roll Out. MRO made a commitment to implement the Roll Out, and then interposed a series of pretexts for its deliberate refusal to do so.[24] The facts also establish its motive for refusing to do so - its determination that it would enter the web hosting business and take that business for itself, and therefore that the promoting of M2's capabilities would be counterproductive to its ultimate objective. Exh. E ay 108-109.

MRO also argues that any reliance by M2 on MRO statements was unreasonable as a matter of law. This seeks a summary judgment ruling. It also distorts the applicable standard. Whether M2's reliance was unreasonable as a matter of law is a question to be resolved at the summary judgment stage, following the conclusion of discovery and after both sides of been afforded the opportunity to fully brief the court on that issue. The fact that the 2002 Agreement contained a boilerplate provision making it terminable at will upon

---

[23] Q: And after it entered into its relationship with M2, did MRO promote Quick Start for Maximo [M2's offering] through its sales force as an offering?
A (MRO's Miciek): Through my sales force it was an alternative. It was not necessarily promoted."
Exh. C at 76.

[24] Q: Did you tell Rick Bevington that MRO would do a web cast?
A (MRO's Miciek): I did say we were working toward doing a web cast.
Q: Was the time frame discussed?
A: You know, in those situations we did discuss time frames. It seemed like it was always next week or next month because of schedules and getting marketing support and assistance to get that pushed out.
Exh. C at 100/

M2 Board member Bigler testified to having a conversation with Parker in 2003 with respect to implementing the roll out. Parker responded, "We've got the compensation issues. Our accounting people are working on it. We are getting close. We have got the recognition of revenue issue. They are getting close on that. And there are a couple of minor things we want Rick to do; which I don't think will be a problem and then I said……How long is it going to be? 30 days or so? And the [H]e said At the maximum, probably less. Deposition of David Bigler, October 7, 2005, at 45. A true and accurate copy of relevant portions of this deposition is attached hereto as Exhibit "J".

90 days notice is irrelevant, since Bevington's reliance was based in part on MRO's consistent pattern of misrepresentation regarding the Roll Out issue.[25]

MRO essentially argues that M2 was unreasonable in relying on MRO's representations because M2 should have realized that it was being lied to. The argument is logically inconsistent. If M2 had realized it was being lied to, it would not have made the detrimental reliance in the first place, and the 2002 Agreement would never have been signed. The very fact that M2 was duped into signing the 2002 Agreement does not make its reliance on reasonable as matter of law. As the Massachusetts Appeal Court has noted "In the realm of fact it is entirely possible for a party knowingly to agree that no misrepresentations have been made to him, while at the same time believing and relying upon representations which in fact have been made and in fact are false but for which he would not have made the agreement." *Sheehy v. Lipton Industries, Inc.,* 24 Mass.App. Ct. 188, 193 (1987).

    C.    *M2 Has Not Ratified The 2002 Agreement.*

MRO lied to M2 to induce it to execute the 2002 Agreement. It then continued to promise that it would perform under that agreement, and to interpose a series of pretexts as to why the rollout would have to be delayed. Thus, the conduct which MRO claims constitutes ratification was conduct induced by the very fraud which it perpetrated on M2. M2 had no reason to believe it had been defrauded until June of 2003, by which time the conduct which MRO alleges constitutes ratification had already occurred. M2's innocent

---

[25] Similarly, MRO cannot rely upon the integration clause in the 2002 Agreement to avoid liability for the fraudulent statements of its officers, because it is the "established public policy of this Commonwealth to refuse to enforce a merger clause for the purposes of protecting a party from liability on account of his fraud and deceit." *Sound Techniques, Inc. v. Hoffman*, 50 Mass.App.Ct. 425 (2000).

16

conduct in good faith reliance on MRO's misrepresentations cannot as a matter of law be construed as conduct ratifying the 2002 Agreement. *See, Sheehy, supra.* M2 also filed suit against MRO in December, 2003, and in that action specifically stated that the 2002 Agreement was induced by fraud and unenforceable. That action was a clear repudiation of the Agreement, and MRO has been on notice since then that M2 considers the 2002 Agreement void.

        D.     *MRO Must Be Required to Post A Sufficient Bond In The Amount of $5,000,000.00.*

Fed. R. Civ. Proc. 65(c) specifically states that no restraining order or preliminary injunction shall issue "except upon the giving of a security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." M2 has already submitted evidence to this court that an order enjoining it from using Maximo in order to service its existing customers during the pendency of this litigation would destroy its business. That evidence is uncontroverted on the record before this Court. In light of the immediate destruction of M2's business which will occur in the event this order is issued as MRO requests, only the posting of a bond in access of $5,000,000.00 could adequately secure and M2's damages in the event it is found to have been wrongly restrained. Once destroyed, M2's business cannot be resurrected. It is therefore imperative that the Court consider the magnitude of the damage which the requested relief would inflict upon M2 in determining the amount of inappropriate bond.

17

V. Conclusion

For the reasons set forth above, MRO cannot establish a reasonable likelihood of success on the merits of its copyright infringement counterclaim, and its Motion for Preliminary Injunctive Relief must be denied. In the event the Court determines that MRO is entitled to the relief it seeks, it should award such relief only upon the posting by MRO of a bond in the amount of $5,000,000.00.

> M2 Consulting, Inc.
> By its Attorneys
> Fee, Rosse & Lanz, P.C.
>
> /s/ Michael C. Fee
> Michael C. Fee, Esq. (BBO NO. 552796)
> Mark S. Resnick, Esq. (BBO NO. 559885)
> Fee, Rosse & Lanz, P.C.
> 321 Boston Post Road
> Sudbury, MA  01776
> (978) 440-7000

March 15, 2006

Local Rule 7.1 Certificate of Compliance

Counsel for M2 Consulting, Inc. hereby certify that, in March, 2006, pursuant to Rule 7.1(A)(2) of the Local Rules, they conferred with counsel for MRO Software, Inc. regarding the attached Motion and Response Brief and have attempted in good faith to resolve or narrow the issues presented.

> /s/ Michael C. Fee

CERTIFICATE OF SERVICE

      I, Michael C. Fee, Esq., hereby certify that I have on the 15th day of March, 2006 served, by first class mail, postage pre-paid, and by telecopier, a copy of the foregoing document upon:

    Lee Gesmer, Esquire
    Gesmer Updegrove LLP
    40 Broad Street
    Boston, MA  02109 - 4310

                                                  /s/ Michael C. Fee