**EXHIBIT**

tabbies

A

Page 1

Volume I
Pages 1 to 258
Exhibits 2 to 52
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)
M2 CONSULTING, INC.,          :
      Plaintiff,              :
vs.                          : Civil Action
                             : No. 03-12589-GAO
MRO SOFTWARE, INC., and CRAIG :
NEWFIELD,                     :
      Defendants.            :

DEPOSITION OF THOMAS RICKEY BEVINGTON, a
witness called on behalf of the Defendants, taken
pursuant to the Federal Rules of Civil Procedure,
before Linda A. Walsh, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Gesmer Updegrove LLP, 40 Broad Street, Boston,
Massachusetts, on Tuesday, July 26, 2005, commencing
at 10:02 a.m.
      PRESENT:
      Fee, Rosse & Lanz, P.C.
          (By Mark S. Resnick, Esq.)
      321 Boston Post Road, Sudbury, MA 01776,
          for the Plaintiff.
      Gesmer Updegrove LLP
          (By Lee T. Gesmer, Esq.,
          and Kurt Bratten, Esq.)
      40 Broad Street, Boston, MA 02109,
          for the Defendants.

Page 2

INDEX
WITNESS    DIRECT CROSS REDIRECT RECROSS
THOMAS RICKEY BEVINGTON
BY MR. GESMER        7

EXHIBITS
MRO
NO.        DESCRIPTION        PAGE
2   Document entitled "MRO Software,   7
    Inc. Maximo Hosting Affiliate
    Agreement between MRO Software, Inc.
    and M2 Consulting, Inc."
3   Document entitled "Agreement between   7
    M2 Consulting, Inc. and PSDI for
    Maximo Application between M2
    Consulting, Inc. And Project
    Software & Development, Inc."
4   Document entitled "Amended          7
    Complaint"
5   Document entitled "Business Plan   7
    PSDI Maximo and M2 Application
    Hosting Services, 9/1/99," Bates
    Nos. M2C000273-290
6   E-mail thread re software hosting  7
    agreement, Bates No. MRO02628
7   E-mail thread re update        7

Page 3

EXHIBITS, Continued
MRO
NO.        DESCRIPTION        PAGE
8   Document entitled "Presentation to  7
    MRO Software by Rick Bevington, Tony
    Prelec on 1/25/01," Bates Nos.
    M2C000013-29
9   E-mail dated March 14, 2001, to Rick   7
    Bevington from Tom Schulte
10   E-mail dated June 7, 2001, to Rick 7
    Bevington from Tom Schulte with
    attachment
11   E-mail dated November 1, 2001, to  7
    Bob Parker from Ray Miciek
12   E-mail dated November 20, 2001, to 7
    Ray Miciek from Rick Bevington
13   E-mail thread regarding sale and   7
    rental model
14   E-mail thread regarding new        7
    spreadsheet
15   E-mail dated November 27, 2001, to 7
    Bob Parker from Rick Bevington,
    Bates Nos. MRO00825-826
16   E-mail dated December 17, 2001, to 7
    Ray Miciek from Iris Martin, Bates
    Nos. MRO00483, MRO00491-497
17   E-mail dated January 30, 2002, to  7
    Bob Parker from Ray Miciek, Bates
    Nos. MRO00827-837
18   E-mail with attached agreement     7
19   E-mail regarding MRO Software      7
    Agreement and Exhibit A dated May
    17, 2002

Page 39

[1] **A:** I felt I already had it.
[2] **Q:** Explain what you mean by that.
[3] **A:** The only piece of the proposed business
[4] plan that MRO indicated was not really their cup of
[5] tea was the forming of a separate business entity
[6] with M2 — partnership, legal partnership with M2,
[7] you know, and making cash investment into it. They
[8] just don't have those types of relationships
[9] apparently. I don't think they do now. The rest of
[10] it looked like a good deal for everybody.
[11] **Q:** Who wrote the March 2000 agreement?
[12] **A:** I wrote it. Ted Williams, you know, tuned
[13] it.
[14] **Q:** Do you have the drafts of this agreement
[15] that preceded the final version?
[16] **A:** I know I have seen various times the draft
[17] with the knuckle notes on it. I can't guarantee
[18] that I saw it and forwarded it to you fellows or
[19] it's been lost or whatever. But, yeah, I have seen
[20] it.
[21] **Q:** But if you have them you have provided them
[22] in this case, correct?
[23] **A:** Yes, I have seen them. If I could find
[24] them, you have got them, yes. No reason to withhold

Page 40

[1] it.
[2] **Q:** Did drafts of this agreement go back and
[3] forth before the final was arrived at?
[4] **A:** No. There is really the original version;
[5] then there was Ted's comments; then there was a
[6] discussion with Nancy Gilroy to try to read and
[7] interpret Ted's comments; then there was the final
[8] that she and I signed and I am sure he read.
[9] **Q:** And at any point did you attempt to put in
[10] this agreement a commitment by MRO to roll out the M2
[11] service to the MRO sales force?
[12] **A:** Yes.
[13] **Q:** And where did you express that?
[14] **A:** In the agreement. It would be in — under
[15] "PSDI agrees to provide Item 3."
[16] **Q:** Did you write that sentence?
[17] **A:** Yes.
[18] **Q:** And did you write the words, "as they deem
[19] appropriate"?
[20] **A:** That may have been Ted's knuckle note. I
[21] don't remember. I may have done it as an
[22] accommodation on an understanding of their business,
[23] but I don't remember exactly.
[24] **Q:** What's a knuckle note?

Page 41

[1] **A:** Writing in the margin. Sorry. I'm an
[2] old-fashioned guy.
[3] **Q:** So am I. That must be an Atlanta
[4] expression.
[5] **A:** I don't know.
[6] **Q:** Did you understand that this Paragraph 3 in
[7] the March 2000 agreement gave MRO the discretion to
[8] provide M2 with leads?
[9] **MR. RESNICK:** Objection.
[10] **A:** The — sure.
[11] **Q:** Now, as the first year of this agreement
[12] began to unfold, late March 2000 through the end of
[13] the year and through to March of the next year, you
[14] observed that MRO was not giving its salespeople an
[15] incentive to sell your service, correct?
[16] **A:** Correct.
[17] **Q:** And you were not happy with that — you
[18] were unhappy with that, correct?
[19] **A:** Well, to back up a little bit, they weren't
[20] doing what they would typically do with a service
[21] product rollout, inform their salespeople that this
[22] solution is available, tell them, you know, how to
[23] describe it to the client and how to price it, tell
[24] them what's in it for them and what are their

Page 42

[1] chances of success and other things salespeople want
[2] to know. None of that activity was occurring. And
[3] I want to just back up one other. There is another
[4] line down here that was written with a view to MRO
[5] providing the sales force power on this, and that's
[6] under "General," No. 1.
[7] **Q:** What page? Are you back on Exhibit 3?
[8] **A:** Yes. I'm sorry.
[9] **Q:** Where are you on Exhibit 3?
[10] **A:** Page 2 under "General," Item 1.
[11] **Q:** Yes.
[12] **A:** That was an assurance that the activity
[13] would occur on M2's part when PSDI brought the
[14] prospects to bear. We didn't expect them to finish
[15] the sales cycle. We expected them to take it to a
[16] certain point.
[17] **Q:** Now, again, going back — I understand.
[18] Thank you.
[19]     Going back to the first 12 months of the
[20] relationship, say March 2000 to March 2001, MRO was
[21] not providing the sales force power that you wanted
[22] them to provide, correct?
[23] **A:** Correct.
[24] **Q:** And what is it that they were not doing

Page 51

[1] of this seat versus... All of those things that you
[2] said I expected. I didn't focus very much on
[3] compensation at that time.
[4]    **Q:** What conversation — before the March 2000
[5] agreement was signed what communications did you
[6] have with MRO that caused you to believe that these
[7] activities would occur after the agreement was
[8] signed?
[9]    **A:** Every communication I had. There would be
[10] no other reason for me to have these — to
[11] communicate with MRO. I mean, it was understood
[12] from the outset that, you know, nobody was doing
[13] this. It's an alternate delivery methodology. It
[14] has the prospect of incremental revenue to MRO. We
[15] have got somebody else over here who is going to
[16] invest in it. It's kind of a no brainer. They are
[17] a little ahead of the curve. We don't want to be on
[18] the bleeding edge. Let's go, and that's from
[19] Drapeau on down.
[20]    **Q:** Were you represented by a lawyer when this
[21] 2000 agreement was being negotiated?
[22]    **A:** No. Can't you tell? I wrote it.
[23]    **Q:** I can tell.
[24]    **A:** Yes. I'm sorry.

Page 52

[1]    **Q:** I understand that you are saying that every
[2] communication supported your expectation that this
[3] rollout would occur after the 2000 agreement was
[4] signed, but can you recall for me specific words in
[5] which MRO indicated that to you or expressed that to
[6] you?
[7]    **A:** I doubt I can remember specific words, but
[8] there was a need to get this agreement, the '00
[9] agreement, in place before we could do that, meaning
[10] MRO. I don't want to call it foot dragging, but
[11] there was — it was probably low priority, but there
[12] was some meaningful time frames between the major
[13] mileposts in moving this forward, and in all of
[14] those discussions and all of the encouraging phone
[15] calls and e-mails I would make between here, the '99
[16] presentation and this one (indicating), it was all
[17] about, "Yes, we want to get this going, too. Yes,
[18] we want to get this going, too. We just need to get
[19] the papers in place." It was never a question in my
[20] mind. We selected MRO to be our partner in this.
[21]    **Q:** Let me ask you again, can you recall any
[22] specific communication or conversation with MRO
[23] where MRO — and by "MRO" I mean an employee or
[24] executive — told you that MRO would roll out this

Page 53

[1] service after the agreement was signed?
[2]    **A:** Oh, yeah, yeah. Yes, Ted Williams said
[3] that. Milton Bevington said that. Chip is hard to
[4] get ahold of, but you know, he's the one that gets
[5] the ball rolling after the '99 meeting and then
[6] delegates. It was delegated to Ted, and my brother
[7] worked for Ted. And at the time Ted was sales and
[8] marketing so he had a lot on his plate.
[9]    **Q:** So the statements I have asked you about
[10] were said to you by Mr. Williams, by your brother
[11] Milton Bevington, and by the president of MRO,
[12] Norman Drapeau?
[13]    **A:** Yes.
[14]    **Q:** What did Mr. Drapeau say to you on this
[15] subject?
[16]    **A:** I don't know the exact words, but you know,
[17] "Good plan. Let's do it." You know, "Look forward
[18] to the mutually beneficial outcome," you know, that
[19] kind of stuff. You don't see Chip all the time. It
[20] was subsequent to the '99 meeting. I have seen Chip
[21] in a couple — three times during this whole process
[22] of getting it done, but he'd try not to have to go
[23] back to the well.
[24]    **Q:** Have you told me everything that

Page 54

[1] Mr. Drapeau said to you on the subject of the
[2] rollout after the March 2000 agreement was signed —
[3] strike that. That was not a good question.
[4]    Have you told me now everything that
[5] Mr. Drapeau said to you on the subject of the
[6] rollout prior to, before the March 2000 agreement
[7] was signed?
[8]    **A:** I believe so.
[9]    **Q:** And you mentioned your brother Milton
[10] Bevington. Are you close to him as siblings?
[11]    **A:** Not like other siblings are probably.
[12]    **Q:** Do you have any agreement or understanding
[13] with him regarding sharing the proceeds of any
[14] judgment or settlement in this case?
[15]    **A:** No.
[16]    **Q:** What did Mr. Williams say to you regarding
[17] the rollout of your service before the March 2000
[18] agreement was signed?
[19]    **A:** He essentially delegated the execution
[20] road. When the CEO says, "We are going to do this.
[21] Ted, you take the lead," Ted's job is to execute.
[22]    **Q:** But my question to you, Mr. Bevington, is
[23] what did Mr. Williams say to you on this subject?
[24]    **A:** Well, a whole lot of stuff about, you know,

**M2 Consulting, Inc.   v.**
**MRO Software, Inc., et al.**

Page 55

[1] got to get the agreement, got to get the agreement,
[2] then we can roll it out. Then we can get started.
[3] Then I can have executed what Chip told me to
[4] execute. There is no renegotiation, reevaluation,
[5] rethinking, restating of what had already been
[6] decided between Ted and I. The decision had been
[7] made.
[8]    **Q:** And the decision was made at the meeting
[9] where the September 1st, 1999, business plan was
[10] discussed?
[11]    **A:** Yes. That's typically —
[12]    **A:** And —
[13]    **A:** I'm sorry.
[14]    **Q:** End of question.
[15]    **A:** Yes.
[16]    **Q:** So did you talk to Mr. Drapeau between that
[17] meeting and the March — and March 23rd, 2000?
[18]    **A:** I don't recall, but I more than likely did
[19] either by voice or e-mail.
[20]    **Q:** So the — at that meeting, the September
[21] '99 meeting, Mr. Drapeau — you presented the
[22] business plan, and Mr. Drapeau said, "Sounds good.
[23] Let's go forward" — subject to there not being an
[24] investment, but he said, "Let's go forward with

Page 56

[1] using M2 as a company that will provide hosting
[2] services for Maximo"?
[3]    **A:** Yes.
[4]    **Q:** In essence?
[5]    **A:** Yes.
[6]    **Q:** And what did he say at that meeting about
[7] rolling out the product to the MRO sales force?
[8]    **A:** He delegated it to Ted, Ted on the sales
[9] force.
[10]    **Q:** What did he say?
[11]    **A:** Ted will take the lead on getting this done
[12] or something to that effect.
[13]    **Q:** Do you recall more specifically what he
[14] said about the rollout?
[15]    **A:** Well, the "it" in getting it done is, you
[16] know, get the relationship documented, you know, and
[17] then, you know, introduce and roll this out to the
[18] sales force, what we had discussed in the business
[19] plan, net of the partnership.
[20]    **Q:** Is that in effect what Mr. Drapeau said to
[21] Mr. Williams at or just after this meeting?
[22]    **A:** Yeah, because that's why Mr. Williams
[23] became my contact. Before that I brought — you
[24] know, I went to Chip to make this presentation. I

Page 57

[1] didn't go to Ted.
[2]    **MR. GESMER:** Why don't we take a short
[3] break.
[4]    (Recess taken from 11:25 to 11:30 a.m.)
[5]    **BY MR. GESMER:**
[6]    **Q:** Have you told me about every conversation
[7] you had with MRO before the March agreement was
[8] signed, the March 2000 agreement was signed, where
[9] the rollout was discussed, details of the rollout
[10] was discussed?
[11]    **A:** From September '99 to March?
[12]    **A:** 2000.
[13]    **A:** Have I told you about every communication?
[14]    **A:** Yes.
[15]    **A:** No.
[16]    **Q:** What else — what have you not told me
[17] about? What else is there?
[18]    **A:** Well, you know, on your Exhibit 6 here, you
[19] know, I wouldn't have remembered that communication
[20] to Ted for which I got a response from Ted, and
[21] there is similar ones communication-wise.
[22]    **Q:** What you just pointed to on Exhibit 6, what
[23] is it about Exhibit 6 that is responsive to my
[24] question?

Page 58

[1]    **A:** Could you repeat the question, please.
[2]    **Q:** Well, the previous question — let me try
[3] it again. What I'm trying to do here is exhaust
[4] your memory, which is a term that lawyers use a lot,
[5] about communications you had with MRO before the
[6] March 2000 agreement was signed where this rollout
[7] was discussed, the rollout by MRO of your service
[8] was discussed?
[9]    **A:** I probably told you all that I can
[10] remember. The focus — you know, these things go in
[11] steps. Prior to any rollout or rollout — major
[12] rollout discussion a document had to be in place.
[13] So once that's in place and you go to the next, the
[14] next. I may have had several conversations with my
[15] brother to try to learn about the MRO sales force,
[16] its structure, its organization, you know, how many,
[17] you know, how they are organized, da-ta-ta-ta.
[18]    **Q:** Now, after the agreement was signed, as the
[19] first year or so following the agreement unfolded,
[20] you realized, firstly, that MRO was not rolling out
[21] the product — should we call your company's
[22] hosting — your Mantis for Maximo, should we call
[23] that a service or a product?
[24]    **A:** I call it a service.

M2 Consulting, Inc.   v.

MRO Software, Inc., et al.

Thomas R. Bevington

Vol. 1, July 26, 2005

---

Page 151

[1] North America. You could tell.

[2] **Q:** Well, after Mark asked Mr. Williams about

[3] that I couldn't help but get some clarification of

[4] that critical point.

[5] **A:** I thought it might joggle a couple of

[6] memories there.

[7] **Q:** No, afraid not.

[8] **A:** Maybe not.

[9] **MR. RESNICK:** No, we tried.

[10] **Q:** Now, during this meeting — this golf

[11] meeting with Mr. Williams and Mr. Parker, was

[12] business discussed?

[13] **A:** Yes.

[14] **Q:** What business was discussed?

[15] **A:** If we sign this new agreement will

[16] we — will you in fact do what you have always said

[17] you are going to do, roll it out to North American

[18] sales or roll it out to sales I think I said. And

[19] the both of them replied, "We'll roll it out

[20] immediately to North American sales" with Thayer

[21] Stewart and I. I can run the video in my head but

[22] unfortunately you can't see it. And that was the

[23] commitment we wanted to hear on the, you know, MRO

[24] side, and then we had to weight that with the Indus

---

Page 152

[1] discussions.

[2] **Q:** And did you at that point say to

[3] Mr. Williams and Mr. Parker, "Well, you know, we

[4] have been talking about this for two and a half

[5] years. You never did the rollout after we discussed

[6] it in '99. Let's put this in the agreement that we

[7] are negotiating"?

[8] **A:** No.

[9] **Q:** What other business was discussed at this

[10] golf day?

[11] **A:** I can't remember any. It was probably just

[12] chitchat. The purpose of the event was to lock them

[13] in on we have got the 50 percent now. Now Chip is

[14] waiting. Everybody is waiting. You know, we have

[15] been doing this forever. Is this in fact the last

[16] thing I have got to do in order to have you roll

[17] this out, sign this new agreement, get me on new

[18] paper. He wrote, "Yes, sir."

[19] **MR. GESMER:** Let's take a short break, five

[20] minutes.

[21]    (Recess taken from 2:43 to 2:51 p.m.)

[22]        **BY MR. GESMER:**

[23] **Q:** Going back to Exhibit 28 for a moment.

[24] **A:** Yes, sir.

---

Page 153

[1] **Q:** You wrote — at the top e-mail to

[2] Mr. Parker you wrote, "I shared one" — you said,

[3] "There are only a couple of issues I'm trying to get

[4] with Ray on. I shared one with Nancy but I think

[5] it's out of her domain (sales quotas for M2)." Did

[6] you mean by that that this was a business issue that

[7] she didn't have the authority to resolve?

[8] **A:** No, no. I meant that she didn't

[9] understand. She'd started a negotiation on an item

[10] by using the VAR agreement giving me a quota that,

[11] you know, had had too much going back and forth.

[12] She obviously didn't understand. Maybe not — yes,

[13] she just didn't get it.

[14] **Q:** After this meeting at the Abbey, this golf

[15] day at the Abbey with Mr. Williams and Mr. Parker,

[16] you did not write to either of them and say in

[17] effect, "I want to confirm the agreement that we

[18] reached yesterday, that if we sign this new

[19] agreement with a 50 percent commission you will roll

[20] out our service to your sales force"?

[21] **A:** No, I didn't.

[22] **Q:** Look at Exhibit 29, please. Do you

[23] recognize this e-mail, first page?

[24] **A:** Yes.

---

Page 154

[1] **Q:** You wrote — before — if you look at Page

[2] 2 you'll see that this is a response to her July

[3] 11th e-mail which we have already looked at that was

[4] Exhibit 26 where she says, "It doesn't make sense

[5] that MRO has a sales quota for M2, therefore, I put

[6] the original back in"?

[7] **A:** Uh-huh.

[8] **Q:** And there are a couple of e-mails between

[9] you and Iris Martin in between but then eventually

[10] you send her a response in which you say, "We have

[11] accepted your changes except as noted. I believe

[12] the real issues are in the area of quota/sales

[13] responsibility and termination obligations. We need

[14] to see MRO take some position vis-a-vis the sales

[15] channel. I assume that there will be other hosting

[16] affiliates. How will we fare 'sales lead' wise with

[17] these others. Termination for convenience still

[18] does not give us the business/investment protection

[19] we need. What will happen to those customers who

[20] want to renew 'post termination'? Will MRO want to

[21] assume that business or another 'hosting affiliate'?

[22] Do we buy seats to continue? Would we be given that

[23] opportunity on a fair basis? I just don't know.

[24] These may not be questions that you can answer, but

Page 191

[1] I said, "I didn't say a word. I don't know where
[2] they are coming from." But I have worked in
[3] corporate America at bigger companies for a long
[4] time. I was figuring that Rich Caplow was laying
[5] one on me. So I wanted to clear the deck with my
[6] buddies that I'm not a person that's putting down
[7] their big deal with IBM, because I usually don't
[8] write Chip little notes about what he's been up to.
[9]     Q: Now, on the top message on this e-mail
[10] thread, 11/19/2002, still on Exhibit 37, you thank
[11] Bob for the reply and you say, "Ray and I talked
[12] about getting a proposed rollout plan to you." What
[13] did you have in mind when you wrote that sentence?
[14]     A: Well, now that we had the agreement signed
[15] we would go back into the rollout mode. I knew it
[16] was Ray's job. So I was going to help Ray help Bob
[17] do what they had always said we needed to do.
[18]     Q: In your mind at that point what did the
[19] proposed rollout plan consist of?
[20]     *A. It would have consisted of, you know, an
[21] announcement to sales, announcement to the
[22] marketplace, you know, put — you know, announce the
[23] compensation plan to the sales force, put the whole
[24] thing in their sales briefcase, if they needed

Page 192

[1] training or seminars or whatever, you know, as it
[2] had always been.
[3]     Q: What did you understand the compensation
[4] plan to the MRO sales force was at that point or was
[5] going to be under this plan?
[6]     A: I didn't know anything more than I had
[7] funded it. I had made arrangements to fund it 50
[8] percent as opposed to 20. I signed that document.
[9] We are really going to go this time. The document
[10] is signed, and I'm going, okay, we are really going
[11] to go this time. Crank it up and do it.
[12]     MR. GESMER: Could you read the answer to
[13] two questions back to me, please.
[14]     *(Answer read)
[15]     Q: Do you know what the — did you have an
[16] understanding with MRO at this point — at this
[17] point in time when you wrote this November 2002
[18] e-mail, November 19, 2002, e-mail, did you have an
[19] understanding with MRO as to what the announcement
[20] would consist of?
[21]     A: Well, I assumed we'd just go back to some
[22] of the work we had done in the past when it was on
[23] the verge of being rolled out. We had written a
[24] document I think you produced here that was a press

Page 193

[1] release, a document informing sales, question and
[2] answer document how you deal with your customer. I
[3] think we produced that there. The compensation
[4] apparently had been agreed to. Bob said okay, had
[5] his little deal. It was just a matter of putting it
[6] all together again. By this time the world was into
[7] Webcast so Ray put that into the thing. When we
[8] first started this there weren't very many Webcasts.
[9]     Q: When you say "Ray put into the thing,"
[10] what does that mean?
[11]     A: Well, he committed to Webcast in the spring
[12] of '03. That's well documented. That's a noun that
[13] probably wasn't in any of our previous discussions
[14] because it really didn't exist as a viable method of
[15] communicating to internal audiences or external
[16] audiences. But, yes, it was just bring it back up
[17] together, roll it out. That's why I signed the
[18] agreement.
[19]     Q: Have you ever been to MRO World?
[20]     A: Yes.
[21]     Q: How many times?
[22]     A: I think twice.
[23]     Q: Did you have a booth on either occasion?
[24]     A: On one occasion.

Page 194

[1]     Q: July 2002?
[2]     A: That would be correct.
[3]     Q: Did MRO cooperate with you in that respect?
[4]     A: Yes, sure. I paid them the $25,000, and I
[5] got what you get for it.
[6]     Q: Do you remember MRO introducing M2 to the
[7] Geography Aviation Public Sector Region?
[8]     A: Geography Aviation Public Sector Region,
[9] would that be at that particular conference?
[10]     Q: Yes.
[11]     A: Well, what I remember is that the Collier
[12] Mosquito Control District, who runs a fleet of DC-3s
[13] and other type aircraft to spray the Naples area for
[14] mosquitoes, that we had implemented Maximo there,
[15] and that Stacey Welsh, the customer's
[16] representative, was presenting at that particular
[17] session. And we were there because we had done
[18] something that MRO had never done before, and they
[19] wanted to use it as reference. It wasn't a hosting
[20] job.
[21]     Q: Look at Exhibit 38, please.
[22]     A: Yes.
[23]     Q: Did you sign this document?
[24]     A: Yes.

Page 199

[1] pushing this ball forward. If Ray gets — you know,
[2] there is a lot of little impediments that have been
[3] thrown up over the previous three years. We don't
[4] want Ray's inability to construct the message to be
[5] the next one. And this had been, you know,
[6] circulated, what, a couple of months before anyway.
[7]   Q: What did you mean when you said — when you
[8] asked, "Did you guys release QuickStart to sales?"
[9] What did that mean?
[10]   A: This agreement for professional services.
[11] This one. It's Exhibit 38. This agreement which I
[12] signed on January 3rd is the provision for them
[13] buying QuickStart services from me and reselling
[14] them to their end users. We would be their back
[15] room, back office. So I negotiated and signed an
[16] agreement. I was following up to see whether or not
[17] the salespeople were selling it, separate deal from
[18] hosting.
[19]   Q: How would the sale of QuickStart by MRO's
[20] sales force work?
[21]   A: Our implementation methodology is hugely
[22] more efficient than most software vendors. So, you
[23] know, the description that we went through earlier
[24] about what QuickStart is, that we can do all that

Page 200

[1] stuff, put it up in a matter of days, do an
[2] iteration with the customer and boom, let's go, that
[3] could be anywhere from a $10,000 to a $100,000 job.
[4] Any job below 50, 60, 75, 80, $100,000 is of no
[5] interest to MRO's professional services group. So
[6] it benefited Ray to use our implementation services
[7] which were inexpensive enough that if he marked them
[8] up to what we sold them for in the marketplace they
[9] would be making their run rate gross margin as they
[10] would in regular professional services.
[11]   Q: So the idea was that MRO would sell your
[12] services, your consultant services, in the form of
[13] QuickStart?
[14]   A: No. They would sell software and
[15] implementation, okay, for a price, and they turn
[16] around and have us do the work and then they deliver
[17] that to the customer. They bill the customer. The
[18] customer pays them. We bill MRO, and MRO would pay
[19] us.
[20]   Q: Did that ever happen?
[21]   A: No. Well, not per this signed agreement,
[22] but we have — we have done professional services
[23] for MRO that were sold by MRO, delivered by us, paid
[24] to MRO and MRO paid us, but not as formal as — I

Page 201

[1] think that's why this came about.
[2]   Q: Okay. That happened before that
[3] professional services agreement was signed?
[4]   A: Yes.
[5]   Q: Before January of 2003?
[6]   A: I believe so, yes. It must have been.
[7]   MR. GESMER: Next exhibit, please.
[8]     (Document marked as MRO
[9] Exhibit 42 for identification)
[10]   Q: Do you recognize these handwritten notes?
[11]   A: Yes.
[12]   Q: Is this your handwriting?
[13]   A: Yes.
[14]   Q: And when did you take these notes?
[15]   A: June 17th, 2003.
[16]   Q: And what — would you read the notes to us,
[17] please.
[18]   A: The first one in quotation marks, "Contrary
[19] to all I have talked to you in the past," end
[20] quotation. Well, at the top it says, "Bob Parker
[21] 6/17/03." The next quotation mark sentence is "I
[22] have learned a lot about this stuff over time,"
[23] close quotations. Circled sentence in the center
[24] "Ten user minimum - out. I apologize" and

Page 202

[1] "Everything he told us was true. He doesn't make
[2] company policy. There won't be an opportunity."
[3]   Q: Now, would you tell me what you said and
[4] what Mr. Parker said during the conversation that
[5] lead to your writing these notes.
[6]   A: I had been informed several days ahead of
[7] this by Miciek that I was going to get a phone call
[8] I didn't like. And that was confidentially. When
[9] Parker called me, which he almost never does, I
[10] wrote down what he said. One of the sentences was
[11] "Contrary to all I have talked to you about in the
[12] past."
[13]   Q: You have already read this.
[14]   A: I'm sorry.
[15]   Q: I don't want you to reread it.
[16]   A: Okay.
[17]   Q: Reading this once is fine. What I am
[18] asking you to do is to tell me what you remember
[19] about the conversation. And if you don't remember
[20] anything more than is written here, that's fine, but
[21] I would like your independent recollection of the
[22] conversation.
[23]   A: Essentially what's written here is what was
[24] said. I tried to write down everything Parker said.

---

Page 203

[1] He did say that they are going to go into the
[2] hosting business, and I said, "Does that mean you
[3] are not going to roll our service out to your sales
[4] force?" And he paused and he said, "Well, yeah. I
[5] guess that's what it means." And the rest is
[6] essentially on this paper.

[7] **Q:** These are his words?

[8] **A:** Yes.

[9] **Q:** What did you say?

[10] **A:** The bulk of what I said was, "Does this
[11] mean you are not going to roll out our program to
[12] the sales force?" Because I wasn't willing to make
[13] the connection between them going into the business
[14] and them breaking their agreement with me.
[15] Apparently there is a very tight connection in some
[16] people's minds. And I am sure I said, you know, our
[17] good-byes. I didn't burn any bridges or anything.

[18] **Q:** Have you told me now everything you
[19] remember about this conversation?

[20] **A:** Yes, everything I remember as of this
[21] second.

[22] **MR. GESMER:** Now, let's mark Exhibit 43,
[23] please.

[24]

---

Page 204

[1]    (Document marked as MRO
[2] Exhibit 43 for identification)

[3] **Q:** Now, after you had the conversation with
[4] Bob Parker on June 17th you sent him this e-mail
[5] about ten days later?

[6] **A:** Uh-huh.

[7] **Q:** Is that right?

[8] **A:** Yes, sir.

[9] **Q:** You described MRO's decision to become a
[10] first party hoster, meaning they would host
[11] themselves, right?

[12] **A:** Yes.

[13] **Q:** You were a third-party hoster?

[14] **A:** Yes.

[15] **Q:** They would be a first-party hoster, right?

[16] **A:** Yes.

[17] **Q:** "We view this as a very positive step for
[18] MRO and a potential opportunity for M2 Consulting.
[19] We will bring a tabletop discussion presentation on
[20] our perspective. We look forward to a productive
[21] and exciting discussion. See you there." Now,
[22] what — and it refers to a meeting on July 1st, 2
[23] p.m.?

[24] **A:** Yes.

---

Page 205

[1] **Q:** Did that meeting take place?

[2] **A:** Yes, sir.

[3] **Q:** Where?

[4] **A:** Naples, Florida.

[5] **Q:** Who attended?

[6] **A:** Chip Drapeau, Bill Sawyer, Ray Miciek,
[7] Thayer Stewart, myself; that's all I remember. If
[8] there was more there was only one more or so.
[9] Parker may have been there. I don't know.

[10] **Q:** And what was the — what did you understand
[11] the purpose of this meeting to be — well, strike
[12] that.

[13]    Who called the meeting?

[14] **A:** We did, M2, I did.

[15] **Q:** And was it as a result or a response to
[16] Mr. Parker's call to you on June 17th?

[17] **A:** Yes.

[18] **Q:** And what did you say to MRO would be the
[19] purpose of this meeting?

[20] **A:** That's all I said.

[21] **Q:** So Mr. Drapeau and Mr. Sawyer traveled down
[22] from Massachusetts?

[23] **A:** No. They had a professional services
[24] meeting in conjunction, you know, in Naples. So

---

Page 206

[1] like I flew in and I think Jeff Foley was there and
[2] then Thayer flew in from someplace he was at. But I
[3] think the MRO guys were in doing business already
[4] there.

[5] **Q:** And did you tell anyone at MRO either in
[6] another writing or by voice what you viewed the
[7] purpose of the meeting to be?

[8] **A:** I may have talked to Ray Miciek, you know,
[9] and told him.

[10] **Q:** What was the purpose of the meeting, in
[11] your mind?

[12] **A:** To sell them our Maximo hosting business.

[13] **Q:** To sell your company to them?

[14] **A:** No. To sell our Maximo hosting business.

[15] **Q:** To do an asset sale to them?

[16] **A:** Essentially, yes.

[17] **Q:** You presented this to them at this meeting?

[18] **A:** Yes, and I believe that July 1 presentation
[19] you have, which outlines all the business, all the
[20] financials, all the customers.

[21] **Q:** There is a PowerPoint presentation you are
[22] referring to?

[23] **A:** Yes, sir.

[24] **Q:** Was there any discussion of MRO's decision

---

EXHIBIT

B

**Page 1**

1

2     Volume: 1

Pages: 1 to 209

3     Exhibits: 60 to 73

4     UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

5     C.A. No. 03-12589-GAO

6

7     M2 CONSULTING, INC., )

Plaintiff )

8     )

)

9     vs. )

)

10     MRO SOFTWARE, INC., )

Defendant )

11

12     DEPOSITION of ROBERT K. PARKER,

a witness called on behalf of the

13     Plaintiff, pursuant to the applicable

provisions of the Massachusetts Rules of

14     Civil Procedure, before Judith R. Sidel,

Professional Court Reporter and Notary

15     Public, in and for the Commonwealth of

Massachusetts, at the Office of Gesmer

16     Updegrove, LLP, 40 Broad Street, Boston,

Massachusetts 02109, on Thursday,

17     November 17, 2005, commencing at 10:00

a.m.

18

19

20     * * * *

21

22

23     SHEA COURT REPORTING SERVICES

ONE UNION STREET, SECOND FLOOR

24     BOSTON, MASSACHUSETTS 02108-2408

---

**Page 3**

1     I N D E X

WITNESS    DIRECT CROSS REDIRECT RECROSS

2     Robert K. Parker

(By Mr. Resnick)   5

3

4     E X H I B I T S

NO    DESCRIPTION     PAGE

5     60 E-Mail dated 3/6/02,

Bates No. MRO 00135     161

6

61 E-Mail Chain dated 7/15/02,

7     Bates Nos. MRO 00175 to MRO 00177 161

8     62 E-Mail Chain dated 3/01/02,

Bates No. MRO 00133     161

9

63 Letter dated October 21, 2002    161

10

64 Handwritten Notes dated June 3   161

11

65 E-Mail Chain dated 5/30/03,

12     Bates Nos. MRO 03467 to MRO 03469 161

13     66 E-Mail Chain dated 11/4/01,

Bates Nos. MRO 00075 to MRO 00077 161

14

67 E-Mail Chain dated 9/26/02,

15     Bates No. MRO 00191     161

16     68 E-Mail Chain dated 9/28/02,

Bates No. MRO 00194     161

17

69 E-Mail Chain dated 4/4/02,

18     Bates No. MRO 00149     161

19     70 E-Mail Chain dated 4/27/2002,

Bates No. MRO 00154     161

20

71 E-Mail Chain dated 4/16/02,

21     Bates No. MRO 00152     161

22     72 E-Mail Chain dated 5/2/02,

Bates No. MRO 00155     161

23

73 E-Mail Chain dated 11/16/01,

24     Bates Nos. MRO 00078 to MRO 00082 161

---

**Page 2**

1     APPEARANCES (Continued):

2     MARK S. RESNICK, ESQUIRE

FEE, ROSSE & LANZ, P.C.

3     321 Boston Post Road

Sudbury, Massachusetts 01776

4     On behalf of the Plaintiff

5     KURT E. BRATTEN, ESQUIRE

6     GESMER UPDEGROVE, LLP

40 Broad Street,

7     Boston, Massachusetts 02109

8     On behalf of the Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

**Page 4**

1     S T I P U L A T I O N S

2     It is hereby stipulated and

3 agreed by and between counsel for the

4 respective parties that the deposition

5 will be read and signed under the pains

6 and penalties of perjury. It is also

7 stipulated that the notarization will be

8 waived.

9     Failure to sign transcript

10 within thirty (30) days will deem the

11 signature waived.

12     It is further stipulated and

13 agreed that all objections, except as to

14 form, and motions to strike are reserved

15 until the time of trial.

16     * * *

17     ROBERT K. PARKER, a witness

18 called by counsel for the Plaintiff, upon

19 production of driver's license, being

20 first duly sworn, was examined and

21 testified as follows:

22     MR. RESNICK: My name is Mark

23 Resnick. I represent the plaintiff in

24 this action. Before we start, Counsel, I

NOVEMBER 17, 2005                    CondenseIt™                    ROBERT K. PARKER 11/17/05

Page 45

1      MR. RESNICK: Strike that.
2   Q. What did he say when you said that to
3      him?
4   A. That he had a need for that particular
5      solution to deal with Datastream on the
6      occasion where they brought up that
7      option.
8   Q. Did you give him permission to continue
9      to explore a possible relationship with
10     M2?
11  A. Yes, I did.
12  Q. What was the next thing you heard after
13     that about M2?
14  A. I can't recall exactly what I heard
15     next.
16  Q. When did you hear back from Ray about
17     anything else having to do with M2 after
18     you had that first discussion?
19  A. He came back at some point in time, and,
20     again, I'm not certain when, indicating
21     that it was somebody he wanted to work
22     with, and something he wanted to do.
23     I know I made a trip to Atlanta to
24     investigate, because I wanted to see

Page 46

1      the company, physically see it, see if
2      they had an infrastructure in place,
3      physically check out this company to make
4      sure it was even real. It wasn't two
5      guys in a garage.
6   Q. Do you remember what year you took that
7      trip?
8   A. No, I do not.
9   Q. Tell me about the trip? Did you meet
10     Miciek in Atlanta?
11  A. No, I did not go with Ray.
12  Q. Did you go with anyone?
13  A. No, I did not.
14  Q. When you got to Atlanta, did you meet
15     somebody from M2?
16  A. Yes, I did.
17  Q. Who?
18  A. Rick.
19  Q. Mr. Bevington?
20  A. Mr. Bevington.
21  Q. I want to make sure we got the same Rick
22     here. You can call him Rick. Can you
23     describe for me what happened during that
24     trip?

Page 47

1   A. Met in his office. He presented his
2      proposition, or what he felt his company
3      could do for us. We toured the facility,
4      and looked at the infrastructure he had
5      in place. He explained how they dealt
6      with the products and such.
7   Q. Did he give you any business plan or
8      paperwork at that point?
9   A. I can't recall whether he did or didn't.
10  Q. How many days was this trip?
11  A. One.
12  Q. Back and forth the same day?
13  A. Correct.
14  Q. And how much time did you spend with
15     Mr. Bevington?
16  A. Approximately two hours.
17  Q. What was your impression?
18  A. A little company, it was providing a
19     service to a small market.
20  Q. Did you request any additional
21     information or material from M2 at that
22     point?
23  A. No, I did not.
24  Q. And after your trip to Atlanta, did you

Page 48

1      have further discussions with Miciek
2      about M2?
3   A. Sure.
4   Q. Can you summarize what was said during
5      those discussions, to the best of your
6      memory?
7   A. I continued my concern about the size
8      of the company, and the viability of
9      a company that size, whether it was
10     really a market that warranted the
11     amount of energy and effort, the cycles
12     we were putting into it. I was never
13     enthusiastic about the market.
14  Q. When you say "the market", you mean North
15     American mid-tier?
16  A. No, I meant hosted requirements. In
17     other words, how many customers really
18     wanted to host their services.
19  Q. And when you say was it really worth the
20     amount of energy that MRO was putting
21     into it, what exactly was required on
22     MRO's side? Strike that. What were you
23     referring to when you just said the
24     amount of energy and effort required to

Page 61

1  of that.
2  Q. Are you aware that M2 invested in the
3     hardware to develop the web hosting
4     capability for MAXIMO?
5  A. Yes, I am.
6  Q. And are you aware that the amount of that
7     investment was approximately $1 million?
8  A. I believe I saw a document to that effect
9     since we started this process.
10 Q. Let's put a time frame on that then.
11    When did you first become aware that
12    MRO was buying the hardware in order
13    to set up this capability?
14 A. I don't believe MRO ever bought the
15    hardware.
16 Q. I'm sorry, I misspoke. When did you
17    first become aware that M2 bought the
18    hardware to develop this capability?
19 A. Early on. I already stated I made a
20    visit there, and saw the hardware they
21    had in place.
22 Q. Did Mr. Bevington, during that visit,
23    tell you that if this relationship went
24    forward, he would also add personnel?

Page 62

1  A. I couldn't say if it was at that visit or
2     not, no.
3  Q. Sometime early in the relationship did
4     Mr. Bevington tell you that he was also
5     going to hire personnel to support the
6     MAXIMO web hosting?
7  A. He did tell me he was going to hire a
8     salesperson.
9  Q. What about other personnel for technical
10    support, and other administrative support
11    necessary to put the web hosting on
12    MAXIMO in place?
13 A. I don't believe I would have discussed
14    that. I was only concerned about how
15    they were going to support the sales
16    force in selling the services or the
17    software. The technical aspect was
18    somebody else's business.
19 Q. When you made that first trip to Atlanta,
20    were there any discussions about how M2
21    was going to support the sales effort on
22    the hosting side?
23 A. Sure. I had a definite concern.
24 Q. And you and Mr. Bevington discussed that

Page 63

1  issue specifically during the trip?
2  A. I believe so, yes.
3  Q. Can you tell me what you said to
4     Mr. Bevington on that topic?
5  A. I had a concern that they were a very
6     small company, and we had a large number
7     of salespeople. And how would they
8     support that effort?
9  Q. And when you say, "How would they support
10    that effort", what specifically were you
11    referring to?
12 A. Well, I always see a relationship with
13    a company like this as they're going to
14    create incremental revenue. I already
15    paid for 30 some odd salespeople, who can
16    go out and sell directly. I was trying
17    to find out and figure out how he was
18    going to create incremental revenue with
19    me without any staff.
20 Q. And what did he say to you about that?
21 A. That he would bring staff on to help
22    support the sales force as the
23    relationship grew.
24 Q. And what did you understand him to mean

Page 64

1  when he said he would bring staff on to
2     help support, and when you say "the sales
3     force", you mean MRO's sales force?
4  A. Correct.
5  Q. What did you understand him to mean when
6     he said he was going to do that?
7  A. That he would hire people to find
8     opportunities as well as to support any
9     opportunities our sales force found that
10    would require them to come in and talk
11    about their services, because incremental
12    to me means something that we can't do on
13    our own.
14 Q. And there were then two possible ways
15    that a web hosting sale might happen.
16    Either your sales force would pick it up
17    and direct it to M2, or M2's to-be-added
18    staff would go out and find it, and do it
19    on its own; is that fair to say?
20 A. Correct.
21 Q. Were there any other ways discussed about
22    how leads might be developed and divided
23    out?
24 A. I don't know of any other.

Page 133

1  that?
2  A. No.
3  Q. What exactly did he tell you that M2 was
4    looking for?
5  A. He told me that M2 was looking for more
6    leads from the sales force.
7  Q. And did he have any suggestion or
8    recommendation as to what MRO ought to do
9    in light of this request that was coming
10   out of M2?
11 A. You're asking --
12 Q. Did Ray have any suggestions about what
13   to do about the fact that M2 was looking
14   for this level of support?
15 A. He may have. Again, our conversations
16   went a lot like, Why do I keep spinning
17   cycles on this? I don't even think we
18   generated $100,000 in its entire period
19   of time we're talking about. During
20   that period of time I was responsible
21   for about $90 million in business; so
22   I'm trying to -- I usually would push
23   back very strongly every time the subject
24   was brought up of why we need to do all

Page 134

1    this. It's not really worth it. He
2    would indicate that they expected more.
3    We still needed a tool, and he wanted
4    to try to work with them. I would say,
5    Okay, then do something. What are we
6    going to do?
7  Q. I don't know.
8  A. No. That was rhetoric to say to Ray.
9  Q. Did Ray have any ideas?
10 A. I'm sure Ray had some ideas about working
11   with the sales force. Again, it was
12   limited to -- as far as I was concerned,
13   this was a mid-market. We had five
14   salespeople working in a mid-market,
15   responsible for maybe a million dollars
16   worth of revenue. They were needed
17   in rare instances where one of our
18   competitors made an offer that we
19   couldn't provide. So it was not -- you
20   know, I said, Work with him and do what
21   you can. But, I mean, what are we going
22   to do? Tell the salespeople, your sales
23   guys, and, you know, let them know what
24   we're doing, but I don't expect -- I

Page 135

1    don't know why he expects so much out
2    of that arrangement.
3  Q. Did Miciek ever tell you that Mr.
4    Bevington was looking for a roll out
5    to North American sales that contained
6    a certain set of steps?
7  A. He may have, but I would have been
8    resistant to that. North American sales,
9    I had -- specifically one of my regional
10   managers was totally opposed to that. I
11   probably would have told him that's not
12   very practical.
13 Q. Which regional manager was that?
14 A. Ted Davis.
15 Q. Why?
16 A. He felt it was counterproductive to
17   direct sales within his market, which
18   was the utilities marketplace.
19 Q. Did you have any discussions with Mr.
20   Bevington, prior to June of 2003, about
21   his request MRO undertake some type
22   of specific roll out to North American
23   sales?
24 A. I believe I did, yes.

Page 136

1  Q. Do you remember when you had the
2    discussion with him?
3  A. No.
4  Q. Can you tell me, to the best of your
5    memory, what you said to him, and what
6    he said to you?
7  A. Well, I know he wanted to do a roll out
8    to the entire sales force. I remember
9    trying to be diplomatic respective to how
10   much efforts and time we would spend on
11   this effort, keeping in mind that I was
12   always concerned about the amount of
13   time and energy to be spent, and
14   also deflecting the attention of our
15   salespeople into something that wasn't
16   perceived as something that we would
17   get a large market out of. I probably
18   indicated that we might consider it if
19   we had the right parameters, and we get a
20   compensation plan together, and that kind
21   of thing. In my attempt to try to be
22   diplomatic and say, "We might do it if
23   we get the right circumstances in place."
24 Q. At the time that you said that to Mr.

Page 141

1    money in it to make good business sense.
2  Q. Can you think of any other terms that
3    you're aware of that were different?
4  A. No.
5  Q. Now, the increase in the percentage
6    of revenue, whose idea was that?
7  A. Mine.
8  Q. And was that simply to address the fact
9    that there wasn't enough -- strike that.
10   Under the 2000 agreement, and I'll
11   represent for you that the percentage
12   that MRO was entitled to was 20 percent,
13   and then under the 2002 agreement it rose
14   to 50 percent.
15 A. Uh-huh.
16 Q. Was that increase simply so that MRO
17   could try to get more incremental revenue
18   out of the deal, or was that increase
19   necessary to incentivize MRO sales force
20   in selling the service?
21 A. It didn't make any sense for 20 percent.
22   There just wasn't any revenue in it.
23   That's why I said if we don't make it
24   more, I'm not going to deal with it

Page 142

1    anymore.
2  Q. Did you ever say to Rick Bevington, If
3    you want us to roll out to North American
4    sales, we have to have 50 percent instead
5    of 20 percent?
6  A. No, I don't remember saying that. We
7    did have -- those are two disjointed
8    conversations. In other words, we did
9    have a conversation about we have to
10   increase the sales to 50 percent, and in
11   an entirely different conversation we
12   may have discussed that we need to do
13   something with the sales program, but
14   they wouldn't be joined together.
15 Q. So do you recall any conversations with
16   Rick Bevington where he said, We can do a
17   new agreement with a 50 percent payout to
18   MRO but I have to have a more aggressive
19   roll out to North American sales?
20 A. Not to me, no.
21 Q. Let me just discuss a couple of other
22   provisions. I'll represent to you that
23   the 2002 agreement has a clause in there
24   that allows MRO to terminate at its

Page 143

1    convenience. Were you involved in the
2    negotiation of that?
3  A. That's standard language in all of our
4    partner agreements.
5  Q. And do you believe then that that
6    language would have been included in the
7    2000 agreement?
8  A. No, I'm talking about now. At that time
9    we didn't have really an alliance
10   program. Now we do; so it's a standard
11   practice in our new agreements.
12 Q. So that came in after the 2000 agreement
13   was signed?
14 A. Right.
15 Q. After the 2002 agreement was signed
16   in November of 2002, did you have any
17   discussions with Rick Bevington in which
18   he expressed his belief that MRO had
19   committed to roll out M2 to North
20   American sales in a way that it had not
21   done prior to that time?
22 A. You use the word "roll out". A partner
23   relationship of this size, I never would
24   perceive a roll out. Again, standard you

Page 144

1    send out an e-mail. Even in our program
2    internally all we sent out is an e-mail.
3    That's why I said roll out is a relative
4    term. To me a roll out would be just
5    informing our team of the existence of
6    the partner, and what the partner did.
7    We have plenty of examples of that with
8    partners that we actually do more with.
9  Q. And did Mr. Bevington ever communicate
10   to you, after signing the 2002 agreement,
11   that he believed that MRO had agreed to
12   do anything specific over and above the
13   e-mail it had already sent out to North
14   American sales to promote M2 internally?
15 A. I believe that Mr. Bevington felt that we
16   should do more. I don't believe he ever
17   told me that that was an understanding
18   of the agreement. It was just, as a
19   businessman, he wanted to see more take
20   place.
21 Q. I just want to understand the source of
22   your belief that Mr. Bevington felt that
23   way. Did he say something to you? Did
24   Miciek report that to you?

**EXHIBIT**

C

Page 1

```
                                          Page 1

              UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS

    .................................
    Mr. SOGHLIAN, INC.,
         Plaintiff,

         vs.                     CIVIL ACTION
                              No. 03-12589-GAO
    NMS SOFTWARE, INC.,
         Defendant.
    .................................

         DEPOSITION OF RAYMOND MICIEK, JR., a witness
    called on behalf of the Plaintiff, taken pursuant to
    Notice under the applicable provisions of the Federal
    Rules of Civil Procedure, before Barbara J. Simon, a
    Professional Shorthand Reporter and Notary Public, in
    and for the Commonwealth of Massachusetts, at the
    offices of Gesmer Updegrove, 40 Broad Street, Boston,
    Massachusetts, on Wednesday, November 30, 2005,
    commencing at 10:15 a.m.



              SHEA COURT REPORTING SERVICES
                     (617) 227-3097
```

Page 3

```
                    I N D E X

WITNESS        DIRECT  CROSS  REDIRECT  RECROSS

RAYMOND MICIEK, JR.

(By Mr. Resnick)          4
```

                    E X H I B I T S

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 110 | e-mail | 121 |
| 111 | e-mail | 127 |
| 112 | e-mail | 131 |
| 113,114 | e-mail | 136 |
| 115 | e-mail | 140 |
| 116 | e-mail | 142 |
| 117 | e-mail | 144 |
| 118 | e-mail | 147 |
| 119 | e-mail | 149 |
| 120 | e-mail | 151 |
| 121 | e-mail | 152 |
| 122 | e-mail | 152 |
| 123 | e-mail | 155 |

(The exhibits were retained by Attorney Resnick.)

Page 2

A P P E A R A N C E S

MARK S RESNICK, ESQ
Fee, Rosse & Lanz, P.C
321 Boston Post Road
Sudbury, MA 01776
(978) 440-7000
     Counsel for the Plaintiff

LEE T GESMER, ESQ
Gesmer Updegrove LLP
40 Broad Street
Boston, MA 02109
(617) 350-6800
     Counsel for the Defendant

Page 4

                S T I P U L A T I O N S

     It is hereby stipulated and agreed by and
between counsel for the respective parties that all
objections, except objections as to the form of the
question, and all motions to strike, shall be
reserved to the time of trial.

     It is further stipulated and agreed that the
deponent shall have thirty (30) days in which to read
and sign the transcript, under the pains and
penalties of perjury, after which time it shall be
deemed to have been signed, and that the
certification, filing and sealing of the deposition
transcript are waived.

     RAYMOND MICIEK, JR., first having been
satisfactorily identified and duly sworn, on oath,
deposes and says as follows:

                DIRECT EXAMINATION

     BY MR. RESNICK:

Q  Good morning, Mr. Miciek.

A  Good morning.

Page 25

1    a company?
2    A. The only investigation that I did was with
3        discussions with Milton Bevington.
4    Q. Did you visit M2's facility?
5    A. I've been to their facilities. Again, the time frame
6        of when I went there I can't recall.
7    Q. Do you know whether Bob Parker visited the M2
8        facility in Georgia?
9    A. I do.
10   Q. Did he visit that facility because you had suggested
11       M2 as a possible implementation services provider?
12   A. No.
13   Q. Do you have any understanding as to why Mr. Parker
14       chose to visit M2?
15   A. Because we were looking at them at the time Bob
16       visited them as a hosting partner.
17   Q. So after you received the lukewarm response from the
18       Services group, did you do anything else to try to
19       get a relationship between MRO and M2?
20   A. Specifically for the implementation services?
21   Q. Yes.
22   A. I would say that I would work with the Services
23       manager, present them potential opportunities where I
24       thought they would be a good fit. I don't recall the

Page 26

1    specifics on those.
2    Q. So do you mean that after getting this lukewarm
3        response, if you got some feedback from Sales that
4        "Here's a place where we could use an implementation
5        provider like M2," you would contact the manager of
6        the Services group and say, "I think these guys might
7        work there?"
8    A. That's correct
9    Q. Did M2 actually do any implementation services work
10       for anyone that you suggested to the Services manager
11       that they might be a good fit for, in this period of
12       time?
13   A. They did.
14   Q. Do you remember who?
15   A. CA. Computer Associates comes to mind.
16   Q. And do you recall how that worked out?
17   A. I do; not well
18   Q. Why didn't it work out well?
19   A. I would say partly because the customer was not the
20       easiest to work with
21   Q. Do you know if M2 did any other implementation work
22       at this point, other than for Computer Associates,
23       that you were aware of?
24   A. I'm sure they did, but I don't have the specific

Page 27

1    company names.
2    Q. At some point, did you stop using M2 as an
3        implementation services provider and begin discussing
4        the possibility of M2 hosting MAXIMO?
5    A. No, because they're independent offerings.
6    Q. So from 1999 through 2003, is it your recollection
7        that M2 was providing implementation services for
8        certain customers in the mid-tier, separate and apart
9        from any MAXIMO hosting services?
10   A. Yes.
11   Q. Do you remember what year you began speaking with M
12       about the possibility of hosting MAXIMO?
13   A. Not specifically.
14   Q. Okay. Do you recall anything about preliminary
15       discussions with Rick Bevington or anyone else at M2
16       about the possibility of hosting MAXIMO?
17   A. Yes.
18   Q. Can you tell me what you remember about those initial
19       discussions with M2?
20   A. It's tough because, again, there's a lot of
21       conversations that get jumbled up. I can't recall
22       specific commentary on that.
23   Q. How about just general understanding that you
24       obtained from those conversations?

Page 28

1    A. The general understanding is the model which they
2        were proposing which is a rental model or an ASP
3        model where they merely hosted the software; they
4        didn't purchase it.
5        The client brought the software to them and they
6        provided the hardware infrastructure for the
7        customers to access them.
8    Q. How does that differ from the rental model?
9    A. The rental model would be one in which M2 purchases
10       or rents the software out to the customer The
11       customer pays a fee both for the hardware
12       infrastructure as well as for the software.
13   Q. But the hardware infrastructure and software would
14       still be on M2's central software?
15   A. That's correct
16   Q. What was your initial response when Mr Bevington
17       began discussing these two models?
18   A. Positive.
19   Q. Why was it positive?
20   A. We had a competitor at the time that was beginning to
21       offer hosting services.
22       It seemed like a good fit, that we were running
23       into that competitor, and they were offering hosting
24       We didn't really offer hosting

Page 29

1    We had to find some sort of fit. Rather than
2    turn the clients over to that competitor, we wanted
3    to fight and do our best to win the deal.
4    Q. Who was the competitor?
5    A. Datastream.
6    Q. At some point, did you begin the process of
7    presenting M2 to either the Services group or the
8    Alliances group as a possible hosting partner?
9    A. Again, I was not the one that introduced them, from
10   what I recall. So my answer would be no.
11   Q. Who did?
12   A. I don't recall who it was.
13   Q. How did you first begin interacting with M2 as a
14   possible applications hosting provider for MAXIMO at
15   all, if you remember?
16   A. My best recollection is that I had been talking to
17   Rick about implementation services.
18        There was an agreement signed somewhere in
19   between the end of '99 to the middle of 2000 that
20   said that they were going to host, and then we
21   started discussions about possible opportunities.
22        It was not uncommon once a partner was signed
23   that the Alliances team would present that and say
24   here's an option for you.

Page 30

1    Q. Let me then ask you, did the Alliances team at some
2    point present M2 to you as a hosting option for the
3    mid-tier?
4    A. I'm sure they did.
5    Q. Now, let's talk about the agreement that was signed,
6    and I'll represent for the record that it was signed
7    in March of 2000 between M2 and MRO.
8        Were you involved in the negotiation of that
9    agreement in any way?
10   A. Not with the negotiation.
11   Q. Were you involved in any discussions with M2
12   regarding the possibility of signing such an
13   agreement with MRO?
14   A. Can you repeat the question?
15   Q. Did you have any discussions with Rick Bevington or
16   anyone else at M2 about the possibility that they
17   would sign an agreement with MRO which would include
18   M2 as a possible hosting partner?
19   A. It's possible that I had those conversations with
20   Rick prior to the agreement, as it was part of our
21   nature of talking about services. He may have
22   mentioned it prior to the agreement.
23   Q. What is your understanding of how it was that this
24   agreement got negotiated between the two parties?

Page 31

1    Do you have any understanding as to who
2    interacted with M2 to get that agreement finalized
3    and signed?
4    A. I don't.
5    Q. Did anyone at MRO tell you that they were in the
6    process of negotiating an agreement with M2 which
7    would have meant M2 web hosting MAXIMO in 2000?
8    A. I can't pinpoint a specific person or time frame. I
9    was aware of that agreement; it was coming.
10       Again, whether that conversation came from Rick
11   Bevington or internal, I can't recall specifically.
12   Q. But you have a general memory of becoming aware that
13   such an agreement would be in place?
14   A. That's a fair statement.
15   Q. Did you suggest to MRO at any time that MRO sign the
16   agreement with M2 in March of 2000, permitting M2 to
17   web host MAXIMO?
18   A. No, not to my recollection.
19   Q. And so I'm clear, in 2000 you were working with M2 as
20   an implementation services provider?
21   A. Yes.
22   Q. At some point, you just became aware that MRO had
23   signed a contract with M2 for application posting?
24   A. That's correct, to the best of my recollection.

Page 32

1    Q. Do you know whether anyone else at MRO was working
2    with M2 during that same time frame, other than you
3    and your group?
4    A. Only the Alliances people.
5    Q. Who in Alliances would have been working with M2 at
6    that time?
7    A. At that time, it was either Jason Casper or Joe
8    Leone.
9    Q. Did either Mr. Casper or Mr. Leone tell you that they
10   were negotiating an agreement with M2 in 2000
11   regarding web hosting?
12   A. It's very possible that they did.
13   Q. You just don't have any specific memory?
14   A. That's correct
15   Q. So were you surprised when you learned that MRO and
16   M2 had executed an agreement for web hosting?
17   A. I can't recall whether I was surprised.
18   Q. Had anyone asked you whether that was a service that
19   you needed in the mid-tier?
20   A. Again, there were many conversations that took place
21   It's very possible that that occurred.
22   Q. I understand it's possible. I need to know whether
23   you remember having any such conversations.
24   A. I don't remember

Page 45

1  for those leads that it provided?
2  A. Sure.
3  Q. And what was your conclusion about how that would be
4  handled?
5  A. There never was a conclusion. We never could come to
6  grips on how they would pay. That was a very
7  challenging part from when we signed the first
8  agreement to when we signed the second agreement.
9  Q. Okay, and is it fair to say that you understood that
10  the sales force would be less interested in promoting
11  a service where there was no clear understanding of
12  how they got paid as opposed to promoting a service
13  where there was a clear commission structure in
14  place?
15  A. Yes.
16  Q. Why then did your sales group proceed with directing
17  hosting leads to M2 before the sales-commission issue
18  was figured out?
19  A. One of the reasons was that the type of leads that we
20  were passing over to Rick were ones that we probably
21  would not pursue ourselves anyway, but it's important
22  to keep in mind there were not a huge amount of leads
23  that were coming in. It was not like hundreds of
24  leads that we said what do we do with these.

Page 46

1  They would trickle in, in ones and twos, based
2  on market demand. We were seeing some interest, but
3  it was not huge.
4  Q. Was Rick Bevington talking to you about being more
5  aggressively selling M2's capabilities in the
6  marketplace?
7  A. Sure. Rick always talked about being more aggressive
8  and selling his services.
9  Q. Do you have any specific recollection of any specific
10  conversation with him on that point?
11  A. Not specifically. It was a continual thing.
12  Q. Generally, what was your response when he asked you
13  to have your team promote his services more
14  aggressively?
15  A. Polite, placating would be the right term. Rick
16  represented a very small piece. The potential of
17  what he could produce was very small to me. I had
18  quotas to meet.
19    I would agree, "Rick, we'll do whatever we can.
20  When the time and the market dictates to promote it,
21  we'll promote it."
22  Q. Do you remember anything specific that you said to
23  Mr. Bevington about we'll do whatever we can?
24  A. Not specifically.

Page 47

1  Q. And in this time frame between March of 2000 and
2  November of 2002, was M2 also in the mid-tier trying
3  to sell its service directly to potential prospects?
4  A. That was my understanding. They had lots of
5  relationships in the industry, and if they came
6  across an opportunity that they uncovered themselves,
7  they would pursue it.
8  Q. Did they uncover any opportunities that ultimately
9  resulted in software sales of MAXIMO which they
10  provided back to MRO?
11  A. Yes.
12  Q. Do you know how many?
13  A. No.
14  Q. Did Mr. Bevington, in any of his discussions with you
15  about more aggressively promoting M2's MAXIMO web
16  hosting capabilities, indicate to you that he
17  believed that MRO had an obligation to aggressively
18  promote that service in the marketplace?
19  A. In conversations, Rick would often say that we were
20  the sales channel, but that's not something that I
21  necessarily agreed with.
22  Q. Did you ever tell him in any of those conversations
23  that you didn't agree with his assertion that MRO was
24  the sales channel?

Page 48

1  A. To the best of my recollection, I did.
2  Q. Do you remember when, specifically, you told him
3  that?
4  A. No, I don't.
5  Q. Do you remember what his reaction was when you told
6  him that?
7  A. No, I don't.
8  Q. Did he continue after you had this discussion,
9  whenever it was, to assert that MRO had an obligation
10  to actively promote M2 in the marketplace?
11  A. I would say that's correct.
12  Q. When he continued to make those assertions, did you
13  ever say to him words to the effect of, "Look, I
14  don't agree with your claim that we're the sales
15  channel and you're the fulfillment channel"?
16  A. At some point during that time between 2000 and 2002,
17  my recollection is I did have that conversation with
18  him.
19  Q. Do you remember anything specific about that
20  conversation?
21  A. No, I don't.
22  Q. Do you remember what his reaction was when you told
23  it to him the second time?
24  A. Rick was one that you could tell him something, and

Page 73

1    host for supplier catalogs and things like that.
2         So we were gaining expertise there. So the
3    technology would be better for hosting a better scale
4    process than we had initially with the NStar
5    agreement.
6         So in general, conversations were always around
7    when Release 5 comes out, that's when we'll jump back
8    into this game.
9    Q. Did you participate in some of those conversations?
10   A. From a periphery.
11   Q. At some point, did you ever inform Mr Bevington of
12   the substance of those conversations?
13        By that I mean, in particular, the idea that
14   once MAXIMO 5 came out, MRO would revisit the hosting
15   issue in some way.
16   A. Sure, we did.
17   Q. Do you have any specific memory as to what you said
18   to Mr. Bevington in those conversations where you
19   talked about MAXIMO 5 is going to come out and that's
20   an Internet-based architect product?
21   A. No, not specifically.
22   Q. Do you have any general recollection as to what was
23   said in those conversations, either you to him or him
24   to you?

Page 74

1    A. Generally, the conversations were surrounded, "Rick,
2    you know we're going to be doing our own hosting,"
3    and Rick would say, "Why would you want to do that?
4    You have us." I would say, "The architecture allows
5    for it."
6         They were just general conversations. We had
7    many, many conversations.
8    Q. Can you tell me anything more that you remember
9    generally about the content of those conversations,
10   or have you told me everything you can remember?
11   A. Everything I can remember
12   Q. Do you remember what you said when Mr Bevington
13   said, "Why would you do that? You have us"?
14   A. My conversations were generally supportive of Rick,
15   saying, "Look, you offer a different niche than what
16   we would. That's things that I think that you can
17   do that we could still leverage you for So it's not
18   that you go away You're kind of like another
19   offering."
20   Q. Did you ever discuss with him specifically what the
21   different offering that M2 might provide in that
22   event would be?
23   A The offering was no different than what he had been
24   previously offering.

Page 75

1    Q. Implementation services?
2    A. No, a complete, quick solution for smaller customers.
3    Q. To get up and running in a hosting environment?
4    A. That's right.
5    Q. In your dealings with Mr Bevington, did he ever talk
6    to you about something known as Quick Start for
7    MAXIMO?
8    A. Yes.
9    Q. What is your understanding of what Quick Start was?
10   A. That's the implementation services that we discussed
11   earlier. That was really the foundation of our
12   original conversations with him was around the Quick
13   Start package back in 1999, pre '99, that it's a
14   prepackaged services to get someone up and running.
15        My view of Quick Start was always more from a
16   customer buys the software, we package that with
17   Quick Start which contains all the information that
18   helps the customer get up and running faster, and
19   then it gets implemented by M2.
20   Q. Was Quick Start in existence before M2 started
21   hosting MAXIMO?
22   A. I believe it was, but I can't remember if they had
23   planned it at that time.
24   Q. Is it your understanding that Quick Start or the

Page 76

1    components of Quick Start were customized in some way
2    for MAXIMO to make it a MAXIMO-specific offering in
3    the market?
4    A. My understanding was that they could apply it to any
5    package.
6    Q. Did MRO promote Quick Start for MAXIMO as a service
7    offering before it entered into its relationship with
8    M2, to the best of your knowledge?
9    A. I can't recall.
10   Q. And after it entered into its relationship with M2,
11   did MRO promote Quick Start for MAXIMO through its
12   sales force as an offering?
13   A. Through my sales force, it was an alternative. It
14   was not necessarily promoted Again, based on market
15   needs, customer requirements, we would engage Rick if
16   it made sense.
17   Q. So if you identified a prospect where it might be
18   applicable, then it would be an offering that you
19   presented to the prospect?
20   A. Right
21   Q. Do you remember anything in these discussions about
22   MRO web hosting MAXIMO after MAXIMO 5 came out where
23   Rick indicated that that would be inconsistent in
24   some way of his understanding of the relationship

Page 85

1    A. No.
2    Q. Do you know whether anyone else at MRO ever
3        investigated the way in which M2 delivered rapid
4        implementation services for MAXIMO in connection with
5        MRO's preparation to web host MAXIMO?
6    A. No.
7    Q. This conversation with Katie Doyle, do you remember
8        when it occurred?
9    A. No, I don't
10   Q. Do you remember the year it occurred?
11   A. I really don't.
12   Q. Did she say anything to you about the time frame
13       within which MRO's internally hosted MAXIMO offering
14       would be presented to Sales?
15   A. Not that I recall.
16   Q. Did you have a general understanding at the time you
17       spoke to Katie Doyle about how soon it would be
18       before that offering would be available?
19   A. That would be an assumption on my part. I don't
20       recall.
21           (Lunch recess.)
22
23
24

Page 86

1           AFTERNOON SESSION
2
3    Q. I'd like to show you what we previously marked in
4        this case as Exhibit Number 2 and ask you if you have
5        ever seen that document before.
6    A. I have.
7    Q. Does that document appear to you to be the second
8        agreement signed between MRO and M2?
9    A. It does.
10   Q. In the signature block -- I think it's in the
11       front -- it says "November 4, 2002."
12   A. Yes, it does.
13   Q. Is it your recollection that the second agreement
14       was, in fact, signed in November 2002?
15   A. Yes.
16   Q. Did you have any discussions with Mr Bevington or
17       anyone else at M2 regarding the negotiation of the
18       second agreement?
19   A. I did.
20   Q. Do you remember whether you had those discussions
21       with Mr Bevington or someone else?
22   A. At M2?
23   Q. At M2
24   A. It was with Buck Bevington.

Page 87

1    Q. Do you remember, approximately, the time when you
2        first began discussing that with Mr Bevington?
3    A. Sometime in 2001 to throughout 2002, to until it was
4        signed.
5    Q. What caused you to begin discussing with
6        Mr Bevington the signing of the new agreement
7        between M2 and MRO?
8    A. My recollection is that we wanted to reconstruct the
9        old contract.
10   Q. Why?
11   A. My recollection was that it was going to expire.
12   Q. Who at MRO, if anyone, told you to discuss the
13       execution of a new agreement with Mr. Bevington?
14   A. No one specifically told me to do the new agreement.
15       It was one of those evolutionary kinds of things
16       where I thought the contract was expiring. Rick
17       appeared motivated to redo the contract.
18           It had come up in several conversations, both
19       with myself and Rick, and from what I recall, others,
20       like Bob Parker, and discussions, and with Nancy
21       Gilroy who was our VP of Contracts that it needed to
22       be redone, which is not uncommon for us on many of
23       our contracts with our partners.
24   Q. And what did Mr. Bevington say or do to lead you to

Page 88

1        believe that he was motivated to redo the contract?
2    A. I can't recall.
3    Q. What did Mr Parker tell you about the need to
4        execute a new contract?
5    A. I don't recall any specifics.
6    Q. What about Ms. Gilroy? Did she say anything to you
7        about the need to negotiate a new contract?
8    A. I don't recall the specific nature of that.
9    Q. Do you recall the general nature of your discussions
10       either with Mr Parker or Ms. Gilroy?
11   A. The general discussions around were that the original
12       contract was fairly loose and not in line with our
13       current contracts that we have with our partners, and
14       typically, we will go back to our older contracts and
15       redo them.
16   Q. And was there some type of established template or
17       model contract in 2002 that MRO was trying to get in
18       place with its partners?
19   A. I don't have the expertise to testify to that
20   Q. So when you were told that the old M2 contract was
21       not in line with the current MRO contract with its
22       partners, did you have any understanding of what that
23       meant?
24   A. Not particularly

NOVEMBER 30, 2005     Condenselt™     RAYMOND MICIEK, JR.

Page 97

1   person making sure that this agreement supported your
2   needs, you were primarily concerned with territory?
3   A. Primarily
4   Q. Can you recall anything else in there that you might
5   have been concerned with, other than territory?
6   MR. GESMER: Can he look at the document to
7   refresh his memory?
8   MR. RESNICK: Sure. Take your time.
9   (Witness reviews document.)
10   A. The fees were of interest to me simply because that
11   was how I would get revenue distributed to my team,
12   the products that he could introduce into the market
13   and host, and referral fees.
14   Lead registration was an issue because I wanted
15   to make sure that there was no channel conflict that
16   he was trying to get credit for an opportunity that
17   we were already working.
18   Q. Do you recall Mr. Bevington trying to talk to you
19   specifically about any contract terms that Nancy
20   Gilroy or anyone else at MRO was asking him to
21   include in the document?
22   A. Not terms to be included from our side, no.
23   Q. Did you have an understanding of why MRO was seeking
24   to increase the royalty percentage from twenty to

Page 98

1   fifty percent in the agreement?
2   A. I do.
3   Q. What is your understanding as to why they were
4   looking to do that?
5   A. Two-fold. One, at twenty percent the revenue stream
6   would be almost meaningless to us, and we needed to
7   increase that so that it became more attractive for
8   us to support the relationship.
9   Two, we felt that it was necessary to recover
10   the commission fees that would be paid out, and
11   third, so that we could justify the rental
12   relationship versus a direct purchase.
13   Q. Do you recall looking at drafts of Exhibit 2 before
14   the contract was actually signed, at any point in
15   time?
16   A. I do.
17   Q. At some point, were you shown the final executed
18   contract?
19   A. I don't recall that I was.
20   Q. Did anybody at MRO inform you that a new contract
21   with M2 had been signed?
22   A. Yes.
23   Q. Who informed you of that?
24   A. Nancy Gilroy.

Page 99

1   Q. And did you have any discussions with Mr. Bevington
2   about we have a new contract and what would happen
3   now that the new contract had been signed?
4   A. I did not inform Rick. I don't think so. I don't
5   think I was the first one to inform him that the
6   contract had been signed. That probably came from
7   Nancy
8   Again, I'm not sure of the time frame, and we
9   had many conversations about the contract itself and
10   reiterations in regards to specific next steps, what
11   happens now, when can we do a web cast for the
12   product.
13   Q. Let's talk about the discussions about when to do a
14   web cast.
15   Do you have any memory of any specific
16   conversations with Mr. Bevington after the 2002
17   agreement was signed about when to do the web cast?
18   A. Not specific conversations, no.
19   Q. Do you have a general recollection of discussing that
20   topic with Mr. Bevington?
21   A. Yes.
22   Q. What do you generally recall about the substance of
23   those discussions?
24   A. Generally, it was, "Well, okay let's do a web cast."

Page 100

1   That's basically it. I was not even sure of the
2   content of what the web cast would contain.
3   One piece might be we did discuss commissions --
4   how someone would get paid, but other than that,
5   there was not much to introduce.
6   The field had pretty much known about the
7   offering. They knew about M2. So I was not sure
8   about what the agenda would entail, other than
9   commissions.
10   Q. Did you tell Rick Bevington that MRO would do a web
11   cast?
12   A. I did say that we were working towards doing a web
13   cast.
14   Q. Was the time frame discussed?
15   A. You know, in those situations we did discuss time
16   frames. It seemed like it was always next week or
17   next month because of schedules and getting marketing
18   support and assistance to get that pushed out
19   Q. All right Where does Marketing come into this whole
20   issue of doing a web cast?
21   What types of role would Marketing have in
22   getting that done?
23   A. One, they would be the one that kind of publishes the
24   event to the field.

**EXHIBIT**

D

**WILLIAM J. SAWYER  -  NOVEMBER 28, 2005**

---

```
                                                    1

 1                              VOL. I
                                Pp. 1 - 163
 2                              Exhibits 98 - 106

 3
            UNITED STATES DISTRICT COURT
 4            DISTRICT OF MASSACHUSETTS

 5
                                C.A. NO. 03-12589-GAO
 6

 7   . . . . . . . . . . . .

 8   M2 CONSULTING, INC.,

 9                    Plaintiff

10   VS.

11   MRO SOFTWARE, INC.,

12                    Defendant

13   . . . . . . . . . . . .

14

15        Deposition of WILLIAM J. SAWYER, a witness

16   called by counsel for the Plaintiff, pursuant to the

17   applicable rules, before Kristin Ricci, a Certified

18   Shorthand Reporter and Notary Public in and for the

19   Commonwealth of Massachusetts, at the Law Offices of

20   Fee, Rosse & Lanz, P.C., 321 Boston Post Road,

21   Sudbury, Massachusetts, on Monday, November 28, 2005,

22   at 10:12 a.m.

23

24
```

---

```
                                                    3

 1                       I N D E X
 2

 3   Deposition of:                         Direct

 4   WILLIAM J. SAWYER
 5   (by Mr. Resnick)                          5
 6
 7
 8                     E X H I B I T S
 9
10   No.                             For Ident.
11    98  The six-page document Bates Numbered
         MRO 05327 through MRO 05332
12         containing an e-mail chain and
13         PowerPoint slides
12                                             119
14

15    99  The document Bates Numbered MRO 00872
         containing an e-mail to Bob Parker
         from Rick Bevington dated 1/14/03
16                                             122
15

17   100  The six-page document Bates Numbered
         MRO 00754 through MRO 00759
         containing an e-mail chain
18                                             123
17

19   101  The document Bates Numbered MRO 03521
         containing an e-mail chain
                                               136
19
20   102  The document Bates Numbered MRO 00995
         containing an e-mail chain
20                                             144
21

22   103  The document Bates Numbered MRO 00980
         containing a letter from Norman E.
23         Drapeau, Jr., to Rick Bevington dated
         9/3/03
                                               151
22
24
```

---

```
                                                    2

 1   APPEARANCES:

 2

 3   MARK S. RESNICK, ESQUIRE
        Fee, Rosse & Lanz, P.C.
 4      321 Boston Post Road
        Sudbury, Massachusetts 01776
 5      On behalf of the Plaintiff

 6

 7   KURT BRATTEN, ESQUIRE
        Gesmer Updegrove, LLP
 7      40 Broad Street
 8      Boston, Massachusetts 02109
        On behalf of the Defendant
 9

10

11

12

13
14
15
16
17
18
19
20
21
22
23
24
```

---

```
                                                    4

 1                     E X H I B I T S
 2
 3   No.                             For Ident.
 4   104  The document Bates Numbered MRO 00753
         containing two e-mails dated 5/28/03
 5         with the subject: Per our discussion
 4                                             153


 6   105  The document Bates Numbered MRO 00772
         containing an e-mail from Bill Sawyer
 7         to Ray Miciek and Nancy Gilroy dated
         7/7/03
 6                                             155
 8

     106  The three-page document Bates
 9         Numbered MRO 00665 through MRO 00667
         containing three e-mails with the
10         subject: Grubb & Ellis
                                               158
 9
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

WILLIAM J. SAWYER - NOVEMBER 28, 2005

33

1    A    I'm not sure that I understand.

2    Q    Sure. Was there anything special or

3         anything in particular that MRO had to do

4         before it could host MAXIMO through a

5         Citrix server -- client server for a

6         customer in 2000?

7    A    I don't believe there was anything special,

8         other than the addition of Citrix to the

9         equation.

10   Q    And what was required to add Citrix to the

11        equation?

12   A    It was just another purchase. It was a

13        third-party product that had to be bought

14        and installed. And I believe it had to be

15        installed on both our end and at each

16        individual customer's end.

17   Q    And was installing Citrix so that it worked

18        with MAXIMO -- did that require any

19        alterations to the version of MAXIMO that

20        was --

21   A    No. I'm pretty sure no.

22   Q    As part of Mr. Cisternelli's assignment,

23        was he asked to look at the market for a

24        MAXIMO hosted solution?

34

1    A    I think he was probably asked to look at

2         the market for hosted solutions in general.

3    Q    And do you recall what he reported back

4         about the market in 2000 for hosted

5         solutions?

6    A    I think generally there's been a -- and,

7         again, I don't know if I could say this

8         specifically came from Paul or a sort of

9         collective wisdom that applied to us. I

10        think there's been a general belief amongst

11        me and the rest of the management team that

12        ultimately there would be a market for

13        hosted offerings.

14             And I don't think that we ever

15        could confirm that that meant there

16        could -- that there would be a market for

17        specifically our product or our application

18        in that environment, specifically

19        maintenance management or the things that

20        we do.

21             So I guess what I'm saying is

22        that we believe that some products would

23        definitely be more successful in a hosted

24        environment than ours.

35

1    Q    Okay. And if MRO could not confirm that

2         there would be a market for hosted MAXIMO,

3         why then did it attempt to offer in 2000 a

4         client server based hosted solution for

5         MAXIMO?

6    A    I think there's a -- there's a belief that

7         existed then and there's a belief that

8         existed today that software as a service or

9         software on demand -- they're called

10        different things -- ultimately could change

11        the way that software is delivered by

12        companies.

13   Q    And how was that different in 2000?

14   A    In 2000, I think the same thing. I think

15        if you went back to 2000, you would find

16        that we as a management team believed that

17        somewhere in the future, software as a

18        service is going to be an important

19        happening, and we should be a part of it.

20        And I would say that we feel the same way

21        today.

22   Q    And just so I'm clear, even though you

23        weren't sure if there was a market for

24        hosted MAXIMO, you decided to get into it

36

1         anyway in 2000?

2    A    Right.

3    Q    So you would be there if it became suddenly

4         in demand?

5    A    That's correct.

6    Q    Okay. Who was responsible for getting

7         NSTAR to host with MAXIMO in 2000?

8    A    You know, I don't know whether Paul did

9         that directly or he worked with someone

10        from sales. I don't recall, frankly, if

11        NSTAR might have been a customer, and they

12        were just looking for another -- I don't

13        know the complete circumstances.

14   Q    Was it NSTAR nationwide, or was it a

15        particular region?

16   A    I think it was NSTAR local to Boston.

17   Q    And --

18   A    And my guess, it would have been some small

19        department within NSTAR in Boston that was

20        looking for an application like ours.

21   Q    Do you know when NSTAR first began using

22        the hosted application?

23   A    It was in the middle -- it was roughly June

24        of 2000.

**EXHIBIT**

tabbies®

E

_____

Deposition of Kathleen M. Doyle                    December 1, 2005

```
 1              Volume: 1
                Pages: 1-140
 2              Exhibits: 123-126

 3      UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS
 4          C.A. No. 03-12589-GAO

 5

 6     * * * * * * * * * * * * *

 7     M2 CONSULTING, INC.,

 8            Plaintiff,

 9     vs.

10     MRO SOFTWARE, INC.,

11            Defendant.

12     * * * * * * * * * * * * *

13          DEPOSITION of KATHLEEN M. DOYLE, a

14     witness called by counsel for the Plaintiff,

15     taken pursuant to Rule 30 of the Massachusetts

16     Rules of Civil Procedure before Alene M.

17     Jennette, Certified Shorthand Reporter and

18     Notary Public in and for the Commonwealth of

19     Massachusetts, at the offices of Gesmer

20     Updegrove, LLP, 40 Broad Street, Boston,

21     Massachusetts on Thursday, December 1, 2005,

22     commencing at 10:00 a.m.

23
24
```

```
 1                 I N D E X

 2

 3     WITNESS:          DIRECT      CROSS

 4     KATHLEEN M. DOYLE

 5

 6     By Mr. Resnick         4

 7

 8

 9               E X H I B I T S

10

11     NO.        DESCRIPTION        PAGE

12     123     E-mail dated 3/1/02      99

13     124     E-mail dated 10/28/04    99

14     125     E-mail dated 9/22/03     99

15     126     E-mail dated 3/26/04     99

16

17

18

19

20     Original Exhibits retained by Attorney Resnick.

21     Copies attached hereto.

22

23
24
```

```
 1     APPEARANCES:

 2

 3     FEE, ROSSE & LANZ, P.C.

 4     By Mark S. Resnick, Esq.

 5     321 Boston Post Road

 6     Sudbury, Massachusetts 01776

 7        On Behalf of the Plaintiff

 8

 9     GESMER UPDEGROVE, LLP

10     By Kurt Bratten, Esq.

11     40 Broad Street

12     Boston, Massachusetts 02109

13        On Behalf of the Defendant

14

15
16

17

18

19

20

21

22

23

24
```

```
 1          P R O C E E D I N G S
 2              STIPULATIONS
 3          It is hereby stipulated and agreed by
 4     and between counsel for the respective parties
 5     that the witness will read and sign the
 6     deposition transcript.  The notarization of the
 7     signature and filing of the deposition may be
 8     waived.
 9          It is further stipulated that all
10     objections, except as to the form of the
11     question, and motions to strike will be
12     reserved until the time of trial.
13          KATHLEEN M. DOYLE,
14     a witness called for examination by counsel for
15     the Plaintiff, having been satisfactorily
16     identified by the production of her driver's
17     license and duly sworn by the Notary Public,
18     was examined and testified as follows:
19          DIRECT EXAMINATION
20     BY MR. RESNICK:
21          Q. Good morning.
22          A. Good morning.
23          Q. My name is Mark Resnick.  I represent
24     the plaintiff in this case, M2 Consulting, Inc.
```

**45**

1  the competition who were already successful in
2  that space.
3      Q. Competition that were hosting?
4      A. Mm-hmm, yes.
5      Q. Who did you research?
6      A. Datastream, INDUS. I looked at M2's
7  model as much as I knew about it. And then I
8  spoke with industry analysts who gave a general
9  market overview.
10     Q. Did you consider M2 to be competition
11  for MRO at that point in time?
12     A. No.
13     Q. Datastream was a competitor?
14     A. Yes.
15     Q. And INDUS was a competitor?
16     A. Yes.
17     Q. Why was it that you didn't consider
18  M2 to be a competitor?
19     A. There was already a partnership in
20  place.
21     Q. And what did you -- when you spoke to
22  industry analysts, what was your inquiry there?
23     A. What the size, the potential size of
24  the market might look like one year down the

**46**

1  road, five years down the road, and what they
2  felt the market would bear in the form of price
3  points per seat.
4      Q. How did you -- did MRO retain any
5  analysts to study the industry and provide this
6  information?
7      A. I don't know.
8      Q. Did you ever see any market analysis
9  of potential hosting for facility management
10  software that MRO had commissioned?
11     A. I'm not sure I understand the
12  question.
13     Q. Did you ever see a report which was
14  analysis of the potential market for hosting?
15     A. Yes.
16     Q. You saw it. Was that report prepared
17  by someone from MRO?
18     A. No.
19     Q. Was it prepared by somebody outside?
20     A. Yes.
21     Q. Do you know who prepared it?
22     A. Gartner.
23     Q. Gartner?
24     A. Mm-hmm.

**47**

1      Q. Are they a research firm?
2      A. Yes.
3      Q. And was it your understanding that
4  that had been prepared at MRO's request?
5      A. No.
6      Q. When you looked at the report, what
7  was your understanding about why that report
8  had been created?
9      A. It was a general market study on EAM
10  revenues and the form that those would take
11  into the future.
12     Q. Was this report prepared by Gartner
13  for sale, or was it a publicly available
14  report, you know, on their web site; you could
15  go pull it if you wanted?
16     A. It was for sale, but we were -- we
17  had signed on with Gartner, so we were
18  authorized to read the report.
19     Q. Did you sign on with Gartner in
20  connection with the hosting initiative or in
21  some other more general way?
22     A. Just generally.
23     Q. Did you use this report, reference
24  this report in connection with preparing your

**48**

1  business plan?
2      A. Yes, I did.
3      Q. What did the report conclude about
4  EAM revenues and the form they might take in
5  the future?
6      A. Generally, that hosting was the wave
7  of the future.
8      Q. And that there was significant
9  potential growth in that space?
10     A. Yes.
11     Q. Okay. Was this Gartner report the
12  sole piece of information you looked at in
13  determining what the size of the market might
14  look like down the road?
15     A. No.
16     Q. What else did you look at to make
17  that analysis?
18     A. I believe there was an ARC report, an
19  IDC.
20     Q. ARC and IDC, what do those stand for?
21     A. Um...
22     Q. Are they firms? Are they --
23     A. Yes, they are firms. I don't know
24  what the acronyms mean.

49

1      Q. Are they market analysis firms?
2      A. Yes. I believe IDC is International
3  Data Corporation. I'm not certain about that.
4      Q. Okay. Were those reports, same
5  thing, created by these firms and available for
6  purchase?
7      A. Yes.
8      Q. Did MRO purchase those reports, or
9  did you have -- had you already signed on with
10 those guys, too?
11     A. I believe MRO purchased those
12 reports. I'm not certain.
13     Q. Okay. And do you have any specific
14 recollection of what these reports said?
15     A. Similar. Um, I believe ARC went into
16 defining the types of hosting scenarios that
17 would be most prevalent, if I remember right.
18     Q. Any specific memory of what the IDC
19 report said?
20     A. That one I consulted mostly for --
21 actually, the IDC one may not have been a
22 written report as much as it was a meeting we
23 had with them where I inquired about price
24 points.

50

1      Q. Do you recall when this meeting with
2  IDC occurred?
3      A. I don't.
4      Q. How about the year?
5      A. Approximately 2001.
6      Q. Did it happen at their offices,
7  Bedford, someplace else?
8      A. In Bedford.
9      Q. Was the purpose of the meeting
10 exclusively to talk about analysis of the
11 potential hosting market, or was it a more
12 general meeting where hosting was just an
13 agenda item?
14     A. Both. It was a general opportunity
15 for us to meet with them while they were with
16 us, and then also specifically hosting was one
17 of the topics.
18     Q. Were you asked to make a presentation
19 at this meeting?
20     A. No.
21     Q. And how many people did they bring --
22 or scratch that. Did you attend this meeting?
23     A. Yes.
24     Q. How many people did they bring with

51

1  them?
2      A. I believe one.
3      Q. And how many MRO people?
4      A. I believe there were three of us.
5      Q. Do you remember who besides yourself?
6      A. I believe there was myself, Rich
7  Caplow, and Ed O'Brien.
8      Q. Who is Ed O'Brien?
9      A. He's no longer with MRO. He was the
10 market research analyst within our product
11 marketing group.
12     Q. Do you remember anything about this
13 meeting substantively, what was said, what IDC
14 told you?
15     A. What I came away with specifically
16 was their recommendations that a price point of
17 $1,000 per seat would be acceptable in the
18 market for hosting.
19     Q. Okay. Did you have any further
20 interaction with IDC in connection with
21 preparing this business plan?
22     A. No.
23     Q. In addition to Gartner, ARC, and IDC,
24 did you do anything else to determine the size

52

1  of the market?
2      A. No.
3      Q. What were your ultimate conclusions
4  regarding the size of the market in a year down
5  the road?
6      A. I based my conclusions primarily on
7  Gartner's estimate because they were a very
8  credible analyst. And I believe my conclusion
9  was that there was a sizable market, and it was
10 a logical step for us for a number of reasons
11 and that it made sense to move into that space.
12     Q. How sizeable? Do you remember?
13     A. No.
14     Q. Do you remember your -- the size
15 estimate five years down the road?
16     A. No.
17     Q. And when you said it was a logical
18 step for MRO, could you explain the reasons why
19 you concluded it was a logical step for MRO?
20     A. Our product architecture was at the
21 right point. And the industry analysts said
22 that was where the world was going.
23     Q. Did the business plan make specific
24 predictions about the level of revenue that MRO

53

1    could expect to generate from its hosting
2    initiative in the event that a decision was
3    made to implement it?
4         A. No.
5         Q. There were no spreadsheet projections
6    of what the income looked like?
7         A. I don't recall that, no.
8         Q. After you made your inquiry regarding
9    the size of the market, were there any other
10   components to the business plan that you were
11   working on?
12        A. I don't remember. I don't think so.
13        Q. Was your plan -- in the context of
14   your plan, were you asked to make some type
15   of recommendation as to whether it should
16   proceed -- MRO should proceed with this
17   initiative, or was yours just a planning
18   document to be given to decision-makers higher
19   up in the chain?
20        A. It was a planning document. I
21   believe the decision had already been made.
22        Q. Did Rich Caplow tell you the decision
23   had already been made before he asked you to
24   start working on this plan?

54

1         A. I don't recall.
2         Q. What was the source of your
3    impression that the decision had already been
4    made at the time that you were working on the
5    business plan?
6         A. I wasn't under the impression that my
7    job was to convince anybody that we should be
8    doing this; that it was, Put it in place and
9    execute it.
10        Q. But did anybody actually tell you
11   that that was -- you were going to put it in
12   place and execute it?
13        A. I got that impression from Rich.
14        Q. Do you remember the month when --
15   well, you did complete the business plan?
16        A. Yes.
17        Q. Who did you submit it to?
18        A. Rich.
19        Q. Do you remember when you submitted it
20   to Rich?
21        A. No, no.
22        Q. Do you remember the year you
23   submitted it to Rich?
24        A. No.

55

1         Q. Okay. What was the next thing that
2    happened in connection with this initiative to
3    develop in-house hosting?
4         A. I worked with our -- the site where
5    our internal infrastructure resided in Toronto.
6    I worked with them to understand limitations
7    and the technical side of what that
8    infrastructure looked like.
9         Q. And what did you learn about the
10   limitations -- scratch that. Why did -- and
11   when we're talking about the site you just
12   referred to, we're talking about the OCS site
13   in London, Ontario?
14        A. Yes.
15        Q. Why was it that you began working
16   with them as part of this hosting initiative?
17        A. Our initial intention was to use some
18   capacity that already existed in the OCS
19   infrastructure that we felt we could utilize
20   and profit from as sort of an easing into the
21   market space.
22        Q. And did Rich give you the impression
23   that the hosting initiative was going to be
24   targeted at using up the excess capacity in the

56

1    OCS site through the hosting initiative, or did
2    he convey to you that the hosting initiative
3    was going to be an initiative in its own right
4    that wouldn't be limited by capacity issues up
5    in London, Ontario?
6         A. Both.
7         Q. Okay. And what did you learn in
8    terms of limitations in the OCS facility?
9         A. I believe we sized it so that we had
10   room for about -- depending on the size of the
11   customer -- anywhere between five and ten
12   customer licenses.
13        Q. Any other limitations of a technical
14   nature?
15        A. None that were known. I mean,
16   data -- the size of the database would have
17   been an issue, but we were getting and we felt
18   like we had a good understanding of what that
19   would look like.
20        Q. So what comprised the capacity? Just
21   the personnel and support time that might be
22   available and physical hardware requirements?
23   Or was there something else other than those
24   two components?

Deposition of Kathleen M. Doyle                                    December 1, 2005

57

1    A. Those two components summed it up.
2    Q. After you obtained an understanding
3 from the OCS people about what the limitations
4 would be, what was the next thing you did in
5 terms of getting this hosting initiative up and
6 running?
7    A. Creating a PowerPoint presentation to
8 capture all that information.
9    Q. What was the purpose of capturing
10 that information in a PowerPoint?
11    A. To share it with Rich and the team in
12 terms of how this was taking shape.
13    Q. Did you use this -- did you share
14 this PowerPoint presentation with Mr. Caplow?
15    A. Yes.
16    Q. What was done with it after you
17 showed it to Mr. Caplow?
18    A. I don't know.
19    Q. Did you ever use it in connection
20 with any presentation that you made to anyone
21 else at MRO about this initiative?
22    A. Yes.
23    Q. How else did you use that
24 presentation?

58

1    A. At some point, I don't recall when,
2 we did an internal web cast to share that
3 information with sales management.
4    Q. Other than that web casts, anything
5 else?
6    A. I did a presentation at one of our
7 sales meetings.
8    Q. Was this a regional sales meeting or
9 was that more, you know, a yearly meeting of
10 all the sales personnel or --
11    A. It was our annual global sales
12 meeting.
13    Q. Do you remember for what year?
14    A. No.
15    Q. Was anything else done with this
16 PowerPoint presentation that you can remember?
17    A. I passed it on to my management, so
18 it may have been forwarded and used elsewhere.
19    Q. But you're not specifically aware of
20 that?
21    A. No.
22    Q. After you developed the PowerPoint
23 presentation, what was the next thing you did
24 as part of the effort to develop a hosting

59

1 initiative?
2    A. Part of presentation focused on
3 pricing. That was one element of that
4 presentation. And then communicating that to
5 the sales organization.
6    Q. So what do you remember doing on the
7 issue of pricing for hosting?
8    A. We picked a number. Somewhere
9 between the low, low estimate that we had been
10 given or that we had heard and the high one.
11 And we thought that would be palatable.
12    Q. You're talking about pricing for the
13 end user of the hosting service?
14    A. Yes.
15    Q. Was this all added to the price book
16 at some point?
17    A. Yes.
18    Q. Did your pricing structure differ
19 depending on whether the hosting was occurring
20 in North America versus Europe, for example,
21 other than currency conversion issues?
22    A. No.
23    Q. Were you actually responsible for
24 adding this hosting pricing information to the

60

1 price book?
2    A. Yes.
3    Q. Other than figuring this out, picking
4 the number, and adding it to the price book,
5 did you do anything else in terms of how to
6 price the hosting service that you remember?
7    A. No.
8    Q. Let's turn to communicating the
9 information to the sales organization. Can you
10 tell me the first thing you did in connection
11 with that?
12    A. It was either the sales meeting
13 presentations or a Webex. I believe I did
14 both, but I don't know which came first.
15    Q. Do you remember when you presented
16 this to the sales meeting?
17    A. No.
18    Q. Do you remember when the Webex
19 occurred?
20    A. No.
21    Q. Do you remember the year?
22    A. Approximately 2002.
23    Q. What was involved in -- well, what
24 were the components -- scratch that. Did you

**105**

1   what Pat was there to discuss in the first
2   place.
3        Q. Okay. But if they presented that
4   information in that manner, why in your view in
5   the e-mail would this presentation have been
6   understandable?
7        A. Because at this point, I believe we
8   had already discussed having our own hosting
9   business. And I was probably -- it was likely
10  at that point that M2 was aware of that.
11       Q. And did you have an understanding
12  that M2 would have identified MRO's entry into
13  the hosting business as an adverse development
14  in their relationship?
15       A. I think it would have been
16  questionable. They would have had questions
17  about it. I don't know that adversarial is the
18  right word.
19       Q. Did you also hear in connection with
20  Pat McHale's visit that he was asking M2 about
21  some of this subject information?
22       A. No.
23       Q. So then why did you say, From what I
24  heard, they were evasive with much of that

**106**

1   information, if you didn't think Pat McHale was
2   inquiring about that information during his
3   visit?
4        A. My assumption is, because Pat is the
5   VP of support, that he was there for support
6   related reasons. And support is all part of
7   the marketing relationship. So I would assume
8   that his questions were kind of about how
9   things were done in supporting the product.
10       And there may have been some issues
11  he was addressing. I don't know. If he was
12  asking questions about their model or their
13  support model, then I would expect that they
14  might have been evasive.
15       Q. And was that because there was a
16  general understanding that some of M2's
17  business process information was proprietary to
18  M2?
19       A. No. I would say that it was because
20  our relationship was going to change,
21  obviously, at that point. I would say that
22  people were under the understanding that
23  something was going to happen, that our
24  relationship was going to change and that that

**107**

1   wasn't defined yet.
2        Q. What was the source of your
3   understanding that people recognized that the
4   relationship would change?
5        A. Well, I had been asked to develop a
6   hosting plan into the mid-market. So I had
7   already gone down the path of setting that up
8   and inquiring and trying to piece together an
9   MRO software hosting offering.
10       Q. In addition to the fact that you had
11  been assigned that task, was there anything
12  else that anyone said to you or any document
13  that you saw that lead you to the belief that
14  the relationship with M2 would be changing?
15       A. No.
16       Q. Now, going to the third paragraph of
17  this e-mail where you say, In our conversation
18  yesterday, you mentioned that we might want to
19  discourage customers from buying options
20  through our pricing. I'm not sure this is a
21  good idea. We could end up booking some
22  incremental PS revenue if we find customers
23  willing to go the extra yard.
24       We can price it so it's profitable.

**108**

1   I'm sure M2 does this, or this wouldn't be
2   their core business. But I think we need to be
3   competitive with M2 or this doesn't make sense.
4   You say, I've copied Ray, who also has a lot of
5   experience working with M2 and has a good feel
6   for how they do their business.
7        Does this refresh your recollection
8   as to whether you were interested in how M2
9   made a profit in connection with its
10  web-hosting of MAXIMO?
11       A. No. This was related, this third
12  paragraph, to options, meaning our additional
13  add-on capabilities, which John was -- at first
14  was not interested in getting caught up in the
15  complexities of offering a customer additional
16  capabilities to add on to core MAXIMO.
17       So my point was we need to have -- we
18  need to be able to show a differentiation
19  between us and any competitor by being able to
20  offer more capabilities, and this would be one
21  way of doing it, would be to be able to sell
22  additional capabilities on top of MAXIMO that
23  M2 wasn't currently selling.
24       Q. Then why do you say in the following

109

1   sentence, I think we need to be competitive
2   with M2 or this doesn't make sense, if M2
3   wasn't selling capabilities in the first place?
4        A. Because if we didn't add these
5   capabilities on, then we would be offering the
6   same thing as M2. And I think that at that
7   point, I was trying to find ways for us to,
8   obviously, have a different offering than M2.
9        Q. And your concern with being
10  competitive with M2, that was based on your
11  view that once you went into the hosting, MRO
12  went into the hosting business, M2 would be a
13  competitor?
14       A. Possibly. But I guess I think the
15  other option on the table was that M2 wouldn't
16  be doing a hosting anymore if we could pick up
17  that area of the business, and this would be a
18  partnership, a different partnership, in place
19  with M2.
20       Q. Okay. But at least as to hosting,
21  there was at least some concern that your
22  pricing had to be competitive with M2?
23       A. Yes, yes.
24       Q. And did Ray respond to this e-mail by

110

1   providing any additional information as to how
2   M2 did their business?
3        A. Not that I recall, no.
4        Q. Do you know whether John Smit
5   contacted Pat McHale to find out what he'd been
6   able to learn about M2's pricing offer or how
7   they did their business?
8        A. I don't know.
9        Q. Did he ever report to you that he had
10  made any additional inquiry on this?
11       A. Not that I recall, no.
12       Q. Did the document template for
13  detailed safety of work that you ultimately
14  developed contain any information that you
15  obtained about or from M2?
16       A. No.
17       Q. Let me show you what we've marked as
18  Document 123.
19       (Pause.)
20       Q. Do you know whether you saw any of
21  the e-mails in this chain at any point?
22       A. This does not look familiar, no.
23       Q. Okay. In discussions that you had
24  with Ray Miciek at any point, did Mr. Miciek

111

1   say to you that figuring out where ACSPs fit
2   into the hosting model was an error or an
3   omission in the model that MRO had with M2?
4        A. He didn't say that, no.
5        Q. Okay. Let me show you what we've
6   marked as Exhibit 124 and ask you if you've
7   seen this document before.
8        (Pause.)
9        A. Yes, I believe I was copied on this.
10       Q. Okay. In the subject line for this
11  calendar entry that says, MAXIMO hosting
12  progress update, are these the monthly meetings
13  you were talking about earlier?
14       A. No. I had my own, sort of, local
15  monthly meetings with my team. This one was to
16  a much broader audience, including executives,
17  it looks like. And it was chaired by Terry, so
18  this was Terry's meeting.
19       Q. Who was Holly Jaaouani?
20       A. She works for legal.
21       Q. And did you attend this meeting?
22       A. I don't know.
23       Q. Who is James Dunmore-Smith?
24       A. A consultant.

112

1        Q. What was he retained to do?
2        A. He is an MRO software consultant who
3   gets sent to customer sites for various
4   projects.
5        Q. If we look down here, it appears
6   under the calendar item that there is a list of
7   things. And do you see that list of things
8   under your name?
9        A. Mm-hmm.
10       Q. Do you have any understanding as to
11  what was meant by the bullet point, Send out a
12  packaging and pricing document?
13       A. No.
14       Q. Going to the second page of this
15  exhibit, where it says, Work with Mike Dziekan
16  and define base set-up included in subscription
17  fee and add-on services available on time and
18  materials basis. Do you have any understanding
19  as to what that bullet point was talking about?
20       A. Yes.
21       Q. Who is Mike Dziekan?
22       A. He is the director of professional
23  services, now vice president of one of the arms
24  of professional services. And he at one time

125

1   your memory, prior to November 4, 2002?
2       A. Probably the initial stages, yes.
3       Q. Did you have any further discussions
4   with anyone at MRO regarding the contract
5   between MRO and M2?
6       A. No.
7       Q. In developing your business plan, did
8   you address at all MRO's contractual commitment
9   to M2 as a web-hosting partner as part of the
10  overall business plan that you were preparing?
11      A. No.
12      Q. In connection with the developing of
13  MRO's internal hosting initiative, was any
14  thought given to whether MRO would continue to
15  use external hosting partners in conjunction
16  with its own internal program or whether
17  alternatively relationships with those partners
18  were supposed to be phased out or terminated?
19      MR. BRATTEN: Objection.
20      A. I don't remember specific discussions
21  about that.
22      Q. Do you remember any general
23  discussions that were -- that concerned that
24  subject?

126

1       A. No. But I assumed that if we were
2   going to be creating a program, at some point
3   it would alter those kinds of partnerships. So
4   I just assumed that something would be taken
5   care of and handled at that level.
6       Q. I'd like to show you what we've
7   marked previously as Exhibit No. 8 and ask you
8   if you've ever seen that before.
9       A. No, I haven't.
10      Q. In preparation -- and once again,
11  this is just a yes or no question -- in
12  preparation for the MRO hosting initiative, did
13  you receive any input whatsoever from MRO
14  legal?
15      A. Can you repeat the question?
16      Q. In preparation of the MRO hosting
17  initiative, did you receive any input
18  whatsoever from MRO legal? And I'm only
19  looking for a yes or no answer.
20      A. No.
21      Q. Did you learn subsequently that MRO
22  had terminated its relationship with M2?
23      A. No.
24      Q. After the Webex where M2 -- where

127

1   MRO's internal hosting application was
2   presented to the sales force, did Mr. Miciek
3   tell you that his problems with M2 were worse
4   or had become worse in some way?
5       A. No.
6       Q. I'd like to show you what we've
7   previously marked as Exhibit 59 and ask you if
8   you've ever seen that before.
9       A. No, I haven't.
10      Q. Did you have any interaction when you
11  were focused on MAXIMO mid-tier with Jason
12  Kasper?
13      A. Yes.
14      Q. Did any of that interaction concern
15  M2 at all?
16      A. Not that I recall.
17      Q. What about any interaction with Joe
18  Leoni?
19      A. Yes.
20      Q. Did any of that interaction concern
21  M2?
22      A. No, not that I recall.
23      Q. I'd like to show you what we've
24  marked as Exhibit 64 and ask you if those are

128

1   your notes.
2       A. No, those are not mine.
3       Q. I'd like to show you what we've
4   marked as Exhibit 65 previously in this case.
5   It's another e-mail chain. And I'd like to
6   direct your attention to the e-mail that's cut
7   off on the bottom of the first page, which is
8   Chip Drapeau. It says, Let me echo Bill's
9   comments so there is no misunderstanding.
10      A. Mm-hmm.
11      Q. If you would read the, sort of,
12  e-mails on that second page, I have a quick
13  question.
14      (Pause.)
15      Q. Do you remember any controversy
16  within MRO about how and when the MRO internal
17  hosting capabilities should be used versus when
18  a lead should go to M2?
19      A. No.
20      Q. Did Mr. Miciek ever tell you that he
21  was being pressured by MRO senior executives to
22  steer hosting leads to MRO's internal hosting
23  program rather than to M2?
24      A. No.

129

1     Q. Did you ever do any work with Patty
2   Foye?
3     A. Very little, but yes.
4     Q. Did you ever do any work with her in
5   connection with the preparation of the hosting
6   initiative?
7     A. No.
8     Q. Did you ever review any documents as
9   part of your development of the hosting
10  initiative from Tom Shulte to anyone at MRO
11  regarding how to price hosting in the
12  marketplace?
13    A. No.
14    Q. Did you, in your work as providing
15  sales support for MAXIMO, form any opinion as
16  to whether the hosting service provided by M2,
17  when they were an MRO hosting partner, was a
18  quality offering in the marketplace?
19    A. No opinion.
20    Q. So you didn't form an opinion as to
21  whether M2 was doing a particularly good job or
22  particularly bad job?
23    A. No.
24    Q. Did Mr. Miciek ever give you any

130

1   input into whether M2 was good at hosting
2   MAXIMO or not?
3     A. No.
4     Q. I'd like to show you what we've
5   marked as Exhibit 96 and ask you if you've ever
6   seen that document.
7     A. No.
8     Q. Just so we're clear, you didn't
9   consult this in preparing your business plan or
10  any portion of the MRO hosting initiative?
11    A. No.
12    Q. I'd like to show you what we've
13  marked as Exhibit 101 and just direct your
14  attention to the e-mail that's cut off at the
15  very top of the page. It's from Rich. Can't
16  really tell from this exhibit exactly who it's
17  to.
18        I just ask you if the reference to
19  being in stealth mode refreshes your
20  recollection as to what specifically stealth
21  mode was supposed to be relative to the release
22  of the MRO internal hosting capabilities?
23    A. I don't know.
24    Q. You don't know what the author of

131

1   that e-mail is talking about when he's talking
2   about stealth mode?
3     A. No.
4     Q. I'd like to show you what we've
5   marked previously as Exhibit 112. I direct
6   your attention to the e-mail at the top of the
7   page, which is Bill Sawyer to Ted Williams. I
8   just ask you if you've ever seen that before.
9     A. Yes, I have.
10    Q. The reference in there to you and a
11  complete product launch, can you tell me what
12  your understanding is of what a complete
13  product launch for MAXIMO hosting services
14  would consist of?
15    A. In this case, it would have been an
16  internal product launch. And the word "launch"
17  is a little bit dramatic for this, but it would
18  have been probably a presentation in the form,
19  given in the form of a webinar to the sales
20  organization that covered everything they
21  needed to know about this offering, pricing,
22  positioning, any kind of data sheets or
23  collateral. And it would probably be provided
24  to them later in a zipped-up file with some

132

1   documents that they could have, like a price
2   book and things like that, which could be part
3   of the deliverable for this kind of an internal
4   launch.
5     Q. Did you develop all of that and put
6   it in the appropriate channels?
7     A. Yes.
8        MR. RESNICK: Off the record.
9        (Discussion off the record.)
10    Q. Were you involved in any way in the
11  negotiation of either the agreement between M2
12  and MRO that was signed in 2000 or the
13  agreement between M2 and MRO that was signed in
14  2002?
15    A. No.
16    Q. Did anyone at MRO ever tell you that
17  Mr. Bevington was told that if he signed the
18  2002 agreement, which was the agreement that
19  Mr. Miciek faxed to you, M2's web-hosting
20  capabilities would be rolled out to the North
21  American sales force?
22    A. No.
23    Q. Do you have any understanding as to
24  what the term "roll-out to North American

**EXHIBIT**

tabbies®

F
_____

M2 CONSULTING, INC. VS. MRO SOFTWARE, INC.                         November 22, 2005

VOL. I
PAGES 1-87
EXHIBITS 83-97

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No 03-12589-GAO

M2 CONSULTING, INC
                Plaintiff

vs.

MRO SOFTWARE, INC
                Defendant

DEPOSITION OF **JASON SCOTT KASPER**, taken on
behalf of the plaintiff, pursuant to the Federal
Rules of Civil Procedure, before Irma Widomski,
Registered Merit Reporter, Certified Shorthand
Reporter, No. 016512 and Notary Public, in and
for the Commonwealth of Massachusetts, at Gesmer
UpdeGrove, LLP, 40 Broad Street, Boston,
Massachusetts, on Tuesday, November 22, 2005,
commencing at 10:00 a.m.

SHEA COURT REPORTING SERVICES
ONE UNION STREET, SECOND FLOOR
BOSTON, MA 02108-2408
(617) 227-3057

---

**Page 2**

APPEARANCES:

MARK S. RESNICK, ESQUIRE
    Fee, Rosse & Lanz, P.C.
    321 Boston Post Road
    Sudbury, Massachusetts 01776
    For the plaintiff

KURT BRATTEN, ESQUIRE
    Gesmer, UpdeGrove, LLP
    40 Broad Street
    Boston, Massachusetts 02109
    For the defendant

---

**Page 3**

I N D E X

WITNESS:    DIRECT CROSS REDIRECT RECROSS

Jason Scott Kasper

BY Mr. Resnick   5

E X H I B I T S

NO.  PAGE  DESCRIPTION

83   30   E-mail, 5/16/01, Bates No. MRO 00025
          to 00027

84   54   E-mail 3/1/02, Bates No. MRO No. 00523

85   54   E-mail 11/1/01, Bates No. MRO 00072

86   54   E-mail, 10/31/01, Bates No. MRO 00067

87   54   E-mail 8/15/01, Bates No. MRO 00036

88   54   E-mail chain, 8/24/01, Bates No. MRO
          00038

89   54   E-mail, 8/29/01, Bates No. MRO 00041
          to 00042

90   54   E-mail 6/7/01, Bates No. MRO 00028 to
          00034

91   54   E-mail, 11/1/01, Bates No. MRO 00072

92   54   E-mail 9/20/01, Bates No. MRO 01361

93   54   E-mail 9/20/01, Bates No. MRO 01362

94   79   MRO Software, Announcing Application
          Hosting for MAXIMO, Bates No. MRO
          01384 to 01385

95   79   Mantis Application Hosting from M2
          Consulting, Bates No. MRO 01529

96   79   Mantis QuickStart for MAXIMO, Bates
          No. MRO 01530

---

**Page 4**

97   79   M2 Consulting/MRO Software

          Proposed contract changes, Bates No.

          MRO 01391

61

1   A.   I don't recall.

2   Q    I would like to show you what we've marked as

3        Exhibit 88.  This is an e-mail chain and I would

4        like to direct your attention to the first part

5        of the chain which is on the bottom.  Jason

6        Kasper to Rick Bevington, August 24, 2001.

7        Where you say, "I am not sure how you would like

8        to proceed with the contract but I have listed a

9        few changes I would like to use as a starting

10       point."  What contract are you talking about in

11       that e-mail?

12  A.   It's the partner agreement between M2 and MRO

13       Software.

14  Q.   Well, now, were you aware in August of 2001 that

15       MRO and M2 had already executed an agreement?

16  A.   Can you clarify that?

17  Q    Sure.  I would like to show you what we've

18       previously marked in this case as Exhibit No. 3.

19       And if you turn to the back, I think you'll see

20       a date there.

21  A.   Yes.

22  Q.   Of March 2000.  And that I'll represent for the

23       record is an agreement between M2 and MRO, were

24       you aware that that agreement was in existence

62

1        at the time you sent this e-mail to Rick

2        Bevington in August of 2001?

3   A.   Yes.

4   Q.   And what was the partner agreement supposed to

5        do?

6   A.   This agreement?

7   Q.   No.  Okay, let me back up.  I think you said

8        that when I asked you what contract you were

9        talking about in Exhibit 88, you said a partner

10       agreement.  And I guess my question is why were

11       you talking to Mr. Bevington about negotiating a

12       partner agreement in August of 2001?

13  A.   My recollection is that this agreement from

14       March 2000 was expiring or we had a requirement

15       to renegotiate the contract.

16  Q.   Do you know which of those two it was, expires

17       or a requirement to renegotiate the contract?

18  A.   No.

19  Q.   And why is it that you were talking to

20       Mr. Bevington about changes to the agreement as

21       a starting point in August of 2001?

22  A.   Because it was either the agreement expired or

23       we had to renew the agreement for some reason.

24  Q.   Were you in charge of negotiating agreements

63

1        with the alliance partners that you were in

2        charge of?

3   A.   Yes.

4   Q.   Well, on the second part of this e-mail says,

5        "Have you had an opportunity to speak with Chip

6        about the credit enhancement," what do you mean

7        by the credit enhancement?

8   A.   I do not know.

9   Q.   And at what point would Nancy Gilroy get

10       involved in the process when you were

11       renegotiating or negotiating an agreement with

12       as alliance partner?

13  A.   She would work with me simultaneously on the

14       agreement.

15  Q.   And did you talk to her before you suggested

16       changes to the agreement that are referenced in

17       this e-mail?

18  A.   I don't recall.

19  Q.   Do you recall what the changes were that you

20       referred to as having listed?

21  A.   No.  I do remember maybe one of them and that

22       was probably, that was the exclusivity clause

23       within the agreement.

24  Q.   Coming in or going out?

64

1   A.   I'm sorry.

2   Q.   Was the change to put it in or to take it out?

3   A.   To take it out.

4   Q.   Had you talked with Nancy Gilroy about removing

5        exclusivity from a new agreement?

6   A.   Yes.

7   Q.   What did she tell you about that?

8   A.   That that was acceptable to negotiate that out

9        of the agreement.

10  Q.   And did she suggest that exclusivity should come

11       out of the new agreement, did she suggest that

12       to you?

13  A.   I don't recall.

14  Q.   Was removing exclusivity from the new agreement

15       your idea?

16  A.   No.

17  Q.   Well, do you have any understanding as to the

18       reason why exclusivity was one of the changes

19       that MRO was suggesting for the new agreement?

20  A.   We had a corporate policy at that time to not

21       have -- we do not offer exclusivity to any

22       partner agreement.

23  Q    Was that also a corporate policy that was in

24       effect in 2000?

65

```
 1   A.   I do not know.
 2   Q.   Did you ever hear anyone say prior to 2001 that
 3        an exclusivity provision in M2's contract was in
 4        any way inconsistent with corporate policy?
 5   A.   Yes.
 6   Q.   Who said that?
 7   A.   I don't recall who but within our group, that
 8        was mentioned.  In the M2 agreement that stuck
 9        out, the exclusivity as it shouldn't be there.
10   Q.   And that was just a conversation you overheard
11        in the alliance group at some point in time?
12   A.   Yes.
13   Q.   But you don't remember who made that statement?
14   A.   No.
15   Q.   Do you remember when that statement was made?
16   A.   No.
17   Q.   Do you remember whether it was in 2000 or 2001?
18   A.   2001.
19   Q.   Do you remember anything else that was said at
20        that point in time when that statement was made?
21   A.   No.
22   Q.   How -- after this e-mail exchange in August,
23        late August of 2001 -- how frequently did you
24        communicate with Mr. Bevington regarding the
```

66

```
 1        negotiation of a new agreement?
 2   A.   I don't recall.
 3   Q.   Do you recall any other specific terms that you
 4        discussed with Mr. Bevington regarding the
 5        negotiation of a new agreement?
 6   A.   No.
 7   Q.   Now I would like to show you what we have marked
 8        as Exhibit 89 and the very first piece of this
 9        e-mail chain which is at the bottom of the
10        second page is you to Mr. Bevington on August
11        28, 2001, you were asking him whether he pays
12        ACSP, was it Patty Foye who asked you to or Pat
13        McHale who asked you to find out that
14        information?
15   A.   I don't recall.  Looking at this, it says
16        maintenance renewals group, so that's who asked
17        me.  I do not know specifically who.
18   Q.   Now the second e-mail in this chain which starts
19        at the bottom of the first page, it goes over
20        onto the second from Rick Bevington to you on
21        August 28, when he says, "We pay what we pay.
22        It is not broken out by seats and ACSP."  Then
23        the next sentence he says, "We do in fact by
```

67

```
 1        What is your understanding of whether
 2        frontline support has anything to do with
 3        whether somebody has to pay ACSP?
 4             MR. BRATTEN:  Objection.
 5   A.   Can you repeat that question?
 6   Q.   Sure.  Do you have any understanding as to
 7        whether ACSP, the obligation to pay ACSP by an
 8        alliance partner is different if a partner is
 9        providing frontline support?
10   A.   Yes.
11   Q.   And what's your understanding of that?
12   A.   Typically, if a partner handles front-line
13        support, there may be negotiated in the contract
14        a different requirement in terms of payment to
15        us for what is expected in terms of revenue for
16        the support portion of whatever sale they sell.
17   Q.   So does front-line support mean if the customer
18        has a problem, they call the partner first?
19   A.   Yes.
20   Q.   As opposed to they call the MRO help desk first?
21   A.   Yes.
22   Q.   And did M2 provide front-line support in 2001 as
23        part of its service?
24             MR. BRATTEN:  Objection.
```

68

```
 1   A.   I don't recall.
 2   Q.   Is it that if an alliance partner is providing
 3        front-line support, then they have to pay less
 4        of an ACSP fee, a lower percentage?
 5   A.   Typically, yes.
 6   Q.   Was there any talk at MRO in 2001 about
 7        abandoning the M2 relationship because payment
 8        of ACSP's had not been negotiated into the
 9        original agreement that you are aware of?
10   A.   No.
11   Q.   Now I would like to show you what we've marked
12        as Exhibit 90.  This is an e-mail with some
13        attachments.  Can you just turn to the back page
14        and tell me if it says MRO 00034?
15   A.   Yes.
16   Q.   So, for the record, it's a series of documents
17        bearing the Bates Numbers MRO 28 through MRO 34.
18        Looking on the first page, it's Tom Schulte to
19        Mr. Leone and you dated May 1, 2001, where he
20        says, "Finally, M2 Mantis M-A-N-T-I-S,
21        application hosting activity report 2001.xls."
22        It appears to be an attachment.  Is this the
23        sales reporting report we were talking about
```

Case 1:03-cv-12589-GAO   Document 91-2   Filed 03/15/2006   Page 41 of 54

November 22, 2005                                    M2 CONSULTING, INC. VS. MRO SOFTWARE, INC.

77

1     specifically, what did you learn about that?
2   A.  That it wasn't worth their time based on the
3       pricing model and their compensation plan.
4   Q   Who told you that?
5   A   Sales person.
6   Q   Do you remember the name of the sales person?
7   A   Bill King.
8   Q   Did you have any other discussions about that
9       subject with anyone other than Bill King?
10  A.  No.
11  Q   Did anybody at MRO -- scratch that. Did you
12      ever hear anyone at MRO saying that M2 was a
13      difficult alliance partner in any way?
14  A   No.
15  Q.  Did you ever have any discussions with M2
16      regarding a web cast to the entire North
17      American sales force of MRO about M2's
18      capabilities?
19  A.  No.
20  Q.  Did Mr. Bevington ever use the term roll out to
21      North American sales in any conversation or
22      communication with you that you remember?
23  A.  I don't recall.
24  Q.  What's your understanding as to what it means to

78

1       roll a product out to the MRO sales force?
2   A   My understanding is to inform sales of what a
3       partner is, what they do, and how to contact
4       them for more information.
5   Q.  Anything else that's part of that general?
6   A   Possibly could include sales presentations but
7       not always, marketing information sheets that
8       are for external use, website listing on MRO
9       dot-com in the partner sections of our website.
10      That's typically it.
11  Q.  What does marketing do in terms of supporting
12      alliance partners? Strike that. What did
13      marketing do in 2001 in connection with
14      supporting MRO's alliance partners?
15  A   Worked at signing them up for MRO World to
16      exhibit, helped with marketing collateral if it
17      was required, and potentially web casts.
18  Q.  What does marketing collateral mean?
19  A   Typically, there would be a one-page sheet that
20      would talk about who the partner was, had MRO's
21      logo and the partner's logo on it and that was
22      used to give to prospects.
23  Q   When you began negotiating changes for inclusion
24      in a new agreement with M2, was there any

79

1       discussion regarding increasing the percentage
2       that M2 paid to MRO on sales of hosted MAXIMO?
3   A   I don't recall.
4   Q.  Was there any discussion about including in that
5       agreement any provision known as an integration
6       clause?
7            MR. BRATTEN: Objection.
8   A   I don't recall.
9   Q   Was there any discussion when you were involved
10      in the negotiations regarding a clause known as
11      a termination for convenience clause?
12           MR. BRATTEN: Objection.
13  A   I don't recall.
14  Q.  Do you know whether anyone at MRO represented to
15      Mr. Bevington that if he signed the new
16      agreement that was being proposed by MRO, MRO
17      would provide an increased level of sales
18      support for M2's web hosting capability?
19  A.  I don't recall.
20           MR. RESNICK: I would like to take
21      five minutes to check my notes but I think we're
22      just about done.
23  (Exhibits 94-97 marked for identification.)
24           (Recess.)

80

1   BY MR. RESNICK:
2   Q   Now, I would like to show you what we've marked
3       as Exhibit 94. My first question is whether you
4       have ever seen that document before?
5   A.  Yes.
6   Q   Is that the document that was ultimately sent to
7       the entire sales force to inform it about M2's
8       capability?
9   A   North America sales, yes.
10  Q.  North American sales, okay. I would like to
11      show you what we've marked as Exhibit 95, and
12      ask you if you have ever seen that before?
13  A   Yes.
14  Q.  Do you have any understanding as to why that
15      document was created?
16           MR. BRATTEN: Objection.
17  A.  I don't recall.
18  Q.  Do you have any understanding as to what it was
19      used for?
20  A.  I believe it was used for the meeting at -- in
21      Atlanta.
22  Q   I would like to show you what we've marked as
23      Exhibit No. 96 and ask you have you seen that
24      document before?

**EXHIBIT**

G

tabbies'

E

Page 1

```
 1                    VOL. I
                      Pp. 1 - 134
 2                    Exhibits 1 - 10

 3          UNITED STATS DISTRICT COURT
 4          DISTRICT OF MASSACHUSETTS

 5                    C.A. NO: 03-12589-GAO

 6   * * * * * * * * * * * * * * *

 7   M2 CONSULTING, INC.,

 8        Plaintiff

 9   VS.

10   MRO SOFTWARE, INC.,

11        Defendant

12   * * * * * * * * * * * * * * *

13

14       Deposition of TED WILLIAMS, a witness called by

15   counsel for the Plaintiff, pursuant to the Federal

16   Rules of Civil Procedure, before Lorreen

17   Hollingsworth, CSR/RPR, CSR No. 114793, and Notary

18   Public in and for the Commonwealth of Massachusetts,

19   at the Offices of Fee, Rosse & Lanz, P.C., 321 Boston

20   Post Road, Sudbury, Massachusetts, on Wednesday,

21   June 22, 2005, at 10:05 a.m.

22

23

24
```

Page 2

```
 1   APPEARANCES:

 2

 3   MARK S. RESNICK, ESQUIRE
        Fee, Rosse & Lanz, P.C.
 4      321 Boston Post Road
        Sudbury, Massachusetts 01776
 5      On behalf of the Plaintiff

 6

 7   LEE GESMER, ESQUIRE
        Gesmer UpdeGrove, LLP
 8      40 Broad Street
        Boston, Massachusetts 02109
 9      On behalf of the Defendant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 3

```
 1                    I N D E X

 2   Deposition of:        DIRECT      CROSS

 3   TED D. WILLIAMS
 4   (by Mr. Resnick)        6

 5              E X H I B I T S

 6
     No.                                  For Ident.
 7    1   The letter dated 5/1/98 to Rick      22
          Bevington from Ted Williams
 8
      2   The letter dated 5/15/01 to Rick     24
 9        from Ted Williams

10    3   The document entitled, "The          53
          America's Sales Division Monthly
11        Report March FY 2001,"

12    4   The two pages of e-mails, Bates      56
          Nos. MRO 00349 and MRO 00350
13
      5   The document entitled,              58
14        "Announcing Application Hosting
          for MAXIMO," Bates Nos. MRO 01386
15        and MRO 01387

16    6   The four-page document containing    73
          e-mails, Bates MRO 00336 through
17        MRO 00339

18    7   The letter dated 10/21/02 to Chip    77
          Drapeau from Rick Bevington
19
      8   The e-mail dated 3/4/02 to Bob      113
20        Parker from Ray Miciek, Bates
          No. MRO 00134
21
      9   The two pages of e-mails, Bates     117
22        Nos. MRO 00173 and MRO 00174

23   10   The e-mail dated 4/17/03 to Ted     128
          Williams from Walt Vanderlaan,
24        Bates No. MRO 00024
```

Page 4

```
 1            TED WILLIAMS,
 2   a witness called on behalf of the
 3   Plaintiff, having first been duly sworn,
 4   deposes and says as follows:
 5        MR. RESNICK:  Good morning,
 6   Mr. Williams.  My name is Mark Resnick.  I
 7   represent the plaintiffs -- the plaintiff
 8   in this case for which you have been
 9   subpoenaed today.
10        Before we start the
11   deposition, I want to state for the record
12   that the parties have stipulated to the
13   usual stipulations:  All objections, except
14   motions to strike and objections as to
15   form, will be reserved until time of trial.
16        The witness can read and sign
17   within 30 days.  We will waive the notary.
18        I think that's it on
19   stipulations.
20        Mr. Williams, have you ever
21   been deposed before?
22        THE WITNESS:  Many years ago.
23        MR. RESNICK:  Okay.  I'll be
24   asking you a series of questions today.
```

Page 65

1  discussing business opportunities that he
2  was pursuing with MAXIMO with a flow of
3  opportunities from MRO to M2 with how the
4  two sales forces would work together. It
5  all seems to me to be covered in those
6  topics all the time.
7  Q  Okay. So please tell me what you
8  specifically remember being discussed
9  regarding business opportunities that M2
10  was pursuing for MAXIMO at these meetings.
11 A  I don't remember any specifics.
12 Q  Please tell me specifically what you
13  remember discussing with Mr. Bevington
14  regarding the flow of opportunities from
15  MRO to M2.
16 A  I don't have any specifics about that.
17 Q  Do you remember any specifics being
18  discussed at any of these meetings
19  regarding how the two sales forces would
20  work together?
21 A  No.
22 Q  Do you have any specific recollection at
23  all of anything discussed at any meeting
24  where Mr. Bevington was present?

Page 66

1  A  No.
2  Q  Do you remember whether you ever talked
3  about the issue of MRO figuring out how to
4  pay commissions to its sales force for M2
5  web hosting business?
6  A  Yes.
7  Q  Do you remember specifically what was
8  discussed?
9  A  No.
10 Q  Do you recall that in 2002 MRO and M2
11  signed a new agreement?
12 A  Yes.
13 Q  Did Parker inform you that he was
14  attempting to renegotiate or sign a new
15  agreement with M2?
16 A  Yes.
17 Q  Did he tell you why?
18 A  I think the primary reason was related to
19  the discount schedule.
20 Q  MRO wanted the discount to be reduced, is
21  that correct?
22 A  Correct.
23 Q  Why did it want the discount to be reduced?
24 A  I think for two primary reasons.

Page 67

1  One was, there was more effort
2  and expense required on MRO's part to
3  assist than had originally been
4  anticipated; and to make it more attractive
5  for the sales consultants, the MRO's sales
6  consultants.
7  Q  Had a problem been identified that required
8  MRO to make it more attractive for the MRO
9  sales consultants?
10 A  It was a combination of the extra expense
11  required to support M2 and the commission
12  structure.
13 Q  Try to answer the question I asked you?
14     MR. RESNICK: Can you read it
15  back, please.
16     (The question was read back as
17  follows:
18     "QUESTION: Had a problem been
19  identified that required MRO to make it
20  more attractive for the MRO sales
21  consultants?")
22 A  Yes.
23 Q  And what was the problem that had been
24  identified?

Page 68

1  A  The net revenue to MRO was too low to
2  generate commissions for the sales force.
3  Q  Do you have any recollection as to what
4  that net revenue figure was?
5  A  Well, you've referred to the 80 percent
6  discount, so it was 20 percent net to MRO.
7  Q  And the totals were too low to generate
8  commission, or was it based on the
9  percentage?
10 A  It was based on a percentage.
11 Q  Did Mr. Parker report to you on the
12  progress of these negotiations to sign up a
13  new agreement with M2?
14 A  Yes.
15 Q  Do you recall him telling you anything
16  specifically about any issues that were the
17  subject of this negotiation other than the
18  change in the discount rate?
19 A  No.
20 Q  Other than discussing M2's capabilities in
21  these telephone conferences to which we
22  discussed earlier and at the sales
23  meetings, did MRO do anything else to
24  inform its sales force about M2's

**EXHIBIT**

H

_____

M2 Consulting, Inc.    v.
MRO Software, Inc., et al.

Jeffrey A. Foley
Vol. 1, October 5, 2005

---

Page 1

Volume I
Pages 1 to 156
Exhibits 53 to 59
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)
M2 CONSULTING, INC.,                    :
        Plaintiff,                      :
    vs.                                 :  Civil Action
                                        No. 03-12589-GAO

MRO SOFTWARE, INC., and CRAIG
NEWFIELD,
        Defendants.

DEPOSITION OF JEFFREY A. FOLEY, a witness
called on behalf of the Defendants, taken pursuant
to the Federal Rules of Civil Procedure, before
Linda A. Walsh, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Gesmer Updegrove
LLP, 40 Broad Street, Boston, Massachusetts, on
Wednesday, October 5, 2005, commencing at 10:05 a.m.
PRESENT
Fee, Rosse & Lanz, P.C.
(By Mark S. Resnick, Esq.)
321 Boston Post Road, Sudbury, MA 01776,
for the Plaintiff.
Gesmer Updegrove LLP
(By Lee T. Gesmer, Esq.)
40 Broad Street, Boston, MA 02109, for the
Defendants.

---

Page 2

INDEX
WITNESS    DIRECT  CROSS  REDIRECT  RECROSS
JEFFREY A. FOLEY
BY MR. GESMER        3
        EXHIBITS
NO.    DESCRIPTION            PAGE
53    Handwritten diagram by Mr. Gesmer  96
54    E-mail string to Ed Neilan from Jeff    108
      Foley
55    E-mail dated March 29, 2004, to Rick    116
      Bevington from Steve Platt
56    Letter dated March 16, 2005, to Tim      120
      McDonough
57    Letter dated February 10, 2004, to      126
      David Fifer from Stephen Platt
58    E-mail string to Steve from Rick  133
      Bevington
59    Document entitled "M2 Consulting,       135
      Inc., Mantis for Maximo Application
      Hosting Business and Implementation
      Deliverable"

---

Page 3

[1]                    PROCEEDINGS
[2]                  JEFFREY A. FOLEY
[3]  a witness called for examination by counsel for the
[4]  Defendants, having been satisfactorily identified by
[5]  the production of his driver's license and being
[6]  first duly sworn by the Notary Public, was examined
[7]  and testified as follows:
[8]                DIRECT EXAMINATION
[9]                 BY MR. GESMER:
[10]  Q: Will you state your full name, please.
[11]  A: Jeffrey Allen Foley, F-o-l-e-y.
[12]  Q: Where do you live, Mr. Foley?
[13]  A: Newnan, Georgia.
[14]  Q: And your street address?
[15]  A: 25 Heron Point in Newnan, Georgia.
[16]  Q: Will you describe your educational
[17]  background briefly post high school.
[18]  A: Post high school?
[19]  Q: Post high school.
[20]  A: United States Navy.
[21]  Q: And what rank did you rise to in the U.S.
[22]  Navy?
[23]  A: E6.
[24]  Q: You don't have a college degree of any

---

Page 4

[1]  sort?
[2]  A: No.
[3]  Q: Will you describe your work background
[4]  starting with post high school?
[5]  A: United States Navy for nine years. Do you
[6]  want to know what I did in the Navy?
[7]  Q: Not now, no.
[8]  A: United States Navy nine years. Servidyne
[9]  Systems for I don't know how many years, two or
[10]  three, and then M2 Consulting.
[11]  Q: And you began working with Mr. Bevington at
[12]  M2 Consulting in 1999; is that correct?
[13]  A: It sounds right.
[14]  Q: You were a cofounder of M2 Consulting,
[15]  correct?
[16]  A: Correct.
[17]  Q: And you are a shareholder?
[18]  A: Yes.
[19]  Q: What percentage of the company shares do
[20]  you own?
[21]  A: Just under 20 percent.
[22]  Q: Are you a director?
[23]  A: Yes.
[24]  Q: Are you an officer?

---

M2 Consulting, Inc. v.
MRO Software, Inc., et al.
Case 8:03-cv-12589-GAO   Document 91-2   Filed 03/15/2006   Page 47 of 54
Jeffrey A. Foley
Vol. 1, October 5, 2005

Page 41

[1] always summer, at an MRO user conference where
[2] obviously we met with various members of the sales
[3] team for MRO, different people at different levels.
[4] I was introduced to them through either Rick or
[5] Milton or Ray Miciek would walk me around and
[6] introduce me to different people.
[7]     We set up a booth. We paid to have a booth
[8] there. So during that time yes, we talked to as
[9] many salespeople as we could to let them know what
[10] we were doing. At that point, you know, our
[11] relationship was — in my mind M2 was, you know, kind
[12] of an ensemb, but we had some support with Ray
[13] Miciek. He works out of Atlanta, and he would
[14] answer our questions and help us and introduce us to
[15] different people in the sales force. So they were
[16] aware of who we were, and in those tangential
[17] meetings we were always trying to say, "We are here.
[18] We are available."
[19]     So I met with several people, and
[20] specifically we had a sit-down meeting with
[21] Mr. Daniels at the MRO conference. He asked us to
[22] talk about what we were doing, and how we are doing.
[23] And he was talking about ASP — ACSP, because that
[24] was his big concern, where does the — in our model

Page 42

[1] how does MRO get ACSP dollars, and we talked to him
[2] about, "Well, when you rent through us we are paying
[3] you royalties. When they rent through us we pay MRO
[4] royalties. So they get a smaller dollar every
[5] month, but over 12 months they literally recoup just
[6] as if they sold it themselves." He then said, "What
[7] about ACSP," and those conversations happened a few
[8] times. I was in Atlanta when I want to say Ted
[9] Williams came down — it may not have been Ted —
[10] and again, they were concerned about ACSP, how do
[11] they do it. So it became very apparent to us that
[12] there was some resistance, even though we had this
[13] agreement, on the sales side because they just
[14] couldn't see how all the dollars that could be
[15] generated, how they get distributed in MRO. So I
[16] was involved in some of those meetings tangentially
[17] where I get introduced. I sit down, and I listen to
[18] the conversations. Does that help you?
[19]     Q: Yes, yes. That's what I was looking for.
[20] ASCP is another term for maintenance and support; is
[21] that right?
[22]     A: I think it's ACSP.
[23]     Q: ACSP, maintenance and support?
[24]     A: Basically.

Page 43

[1]     Q: So you heard MRO struggling with the
[2] economic model of renting its software through M2's
[3] hosting contract or licensing it directly to
[4] customers?
[5]     A: I heard that?
[6]     Q: Yes.
[7]     A: At some point after we had been involved in
[8] this agreement and worked with their team it became
[9] clear that our product, as we envisioned it, wasn't
[10] being deployed or utilized as we had hoped through
[11] the MRO sales force. And in our mind, based on
[12] those conversations and some I participated in
[13] specifically, that ACSP and compensating the sales
[14] force was something that needed to be worked out.
[15] Unfortunately it took a long time, but I know that
[16] Rick spent a lot of time working that out, creating
[17] models, sending e-mails to Ray, talking to Bob. So
[18] eventually, you know, we thought we would help them
[19] help themselves, and that was our approach, trying
[20] to give them ways and show them financially how they
[21] could pay their sales force with those dollars. And
[22] this is between 2000 and 2002.
[23]     Q: Okay. Were you present at any meet ings
[24] with MRO where MRO committed to roll out the M2

Page 44

[1] service to the MRO sales force?
[2]     A: Between 2000 and 2002?
[3]     Q: Yes, between the two agreements.
[4]     A: At that point I feel like I was in meetings
[5] where everyone knew that there was a problem in
[6] getting it rolled out. So getting it rolled out
[7] obviously was our goal. I actually went to a sales
[8] presentation in Atlanta that Rick did to Ray
[9] Miciek's team in Atlanta to show them what we do,
[10] who we are, present them, because we felt we needed
[11] to take the lead because MRO wasn't. So Rick went
[12] into Atlanta. I went with him. He talked to the
[13] folks, explained our model, explained how to sell
[14] it, gave them cut sheets for us. So, you know, in
[15] my mind it was just inferred. They wanted to. It
[16] just wasn't happening. And Ray Miciek at least
[17] provided some gateways to access his sales team.
[18]     But as a global rollout it never happened,
[19] and in my mind almost all the meetings were about
[20] when can we get this globally rolled out. So I
[21] would have to say it inferred that everyone had the
[22] expectation that it would happen. It just didn't
[23] happen during that period.
[24]     Q: Were you present at any meeting before the

**M2 Consulting, Inc.   v.**
**MRO Software, Inc., et al.**

**Jeffrey A. Foley**
**Vol. 1, October 5, 2005**

Page 57

[1] May 22nd, 2002. First, have you ever spoken to
[2] Nancy Gilroy?
[3]     **A:** I don't believe so.
[4]     **Q:** Now, do you see in this cover e-mail which
[5] is, by the way, sending another draft of the
[6] contract back, it says, "The main area of
[7] enhancement" —
[8]     **A:** Where are we?
[9]     **Q:** I am in the middle of that paragraph where
[10] he says, "Hi, Nancy."
[11]     **A:** Okay.
[12]     **Q:** The third sentence in, maybe the fourth
[13] sentence in — well, first he says, "Attached are
[14] modified agreements for your review and comment" and
[15] then he — jumping ahead two sentences he says, "The
[16] main area of enhancement are in: Term of agreement;
[17] termination events; and trying to capture what we
[18] believe is part of the intent, that being to have an
[19] arrangement that allows MRO sales to offer hosting
[20] to prospects who fit the profile or who request it,
[21] and still be recognized with quota credit and comp."
[22] Do you see those words?
[23]     **A:** Yes, I do.
[24]     **Q:** Do you remember seeing this paragraph

Page 58

[1] before today — have you seen this paragraph in
[2] Exhibit 21 before today?
[3]     **A:** I don't recall it, but Rick very well may
[4] have forwarded it to me. If he did, I would have
[5] given it to you. I don't think I have seen it
[6] specifically given to me.
[7]     **Q:** Do you remember discussing with
[8] Mr. Bevington during the period this contract was
[9] under negotiation — and you remember it was under
[10] negotiation for five or six months?
[11]     **A:** I know that they started it, and I know it
[12] took a very long time to get done. I don't know the
[13] dates.
[14]     **Q:** Let me represent to you it was roughly
[15] April of 2002 to November 2002.
[16]     **A:** Okay.
[17]     **Q:** Do you remember discussing with
[18] Mr. Bevington including in the agreement a provision
[19] that would establish an arrangement that would allow
[20] MRO sales to offer hosting to prospects who fit the
[21] profile or request it and still be recognized
[22] with quota credit and comp?
[23]     **A:** I am going to say not specifically, but
[24] Rick and I both — you know, Rick handled these

Page 59

[1] things. I was there. He'd sound off information to
[2] me. I was a sounding board, maybe a gut check. So
[3] I am sure we had conversations over the time about
[4] this contract here and there and mostly because it
[5] wasn't working with the previous one, and if they
[6] want us to enter another one — it was a financial
[7] thing, and we felt the only way their sales force
[8] would live up to it is if MRO recognized them as a
[9] sales force and quota credits. So it doesn't
[10] surprise me that on a financial basis Rick wanted to
[11] make sure they helped out their own sales force
[12] within this document if they in fact did. But as a
[13] company, that was one of our concerns with that is
[14] that their sales force feels they didn't get
[15] credited. The topic comes up, but I wasn't
[16] specifically involved in it.
[17]     **Q:** So I take it you don't remember saying to
[18] Mr. Bevington in effect, "Make sure that this new
[19] agreement establishes an obligation for MRO to comp.
[20] its sales force so they will have an incentive to
[21] sell our service"?
[22]     **A:** Probably not in those words, no. But
[23] obviously one of our concerns, as him and I would
[24] talk, was that MRO does compensate the sales force

Page 60

[1] somehow. I don't even know how that gets
[2] memorialized at the end of the day, but from my
[3] perspective the only thing that him and I ever
[4] talked about, that was my "must have," is that MRO
[5] releases it to the sales force. That's part of
[6] their tool kit. Rick and I would talk about that,
[7] and he had meetings to get those assurances. Other
[8] than that, to me this was a financial document to
[9] make sure — because they were asking a whole lot
[10] more of us in this document. The other document was
[11] great as far as I was concerned. The requirement,
[12] for me to be happy, was that their sales force gets
[13] this product — our services gets released to their
[14] sales force. That was my primary concern in life.
[15]     **Q:** Did you ever say to Mr. Bevington, during
[16] this spring and summer and fall of 2002 while this
[17] contract was being negotiated, "Gee, Rick, make sure
[18] that this contract requires that MRO roll out our
[19] product to its sales force"?
[20]     **A:** No. No, probably not. Because by the time
[21] we signed this contract we were given assurances
[22] that it was going to go right to sales. It's
[23] something that we strung on for two years. They
[24] gave us assurances that it was going right to sales.

EXHIBIT

I

M2 Consulting, Inc.   v.
MRO Software, Inc., et al.

Seth T. Stewart
Vol. 1, October 4, 2005

Page 1

Volume I
Pages 1 to 117
Exhibits:  None
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)
M2 CONSULTING, INC.,
Plaintiff,
vs.                          Civil Action
No. 03-12589-GAO
MRO SOFTWARE, INC., and CRAIG
NEWFIELD,
Defendants.
DEPOSITION OF SETH T. STEWART, a witness
called on behalf of the Defendants, taken pursuant
to the Federal Rules of Civil Procedure, before
Linda A. Walsh, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Gesmer Updegrove
LLP, 40 Broad Street, Boston, Massachusetts, on
Tuesday, October 4, 2005, commencing at 10:08 a.m.
PRESENT:
Fee, Rosse & Lanz, P.C.
(By Mark S. Resnick, Esq.)
321 Boston Post Road, Sudbury, MA 01776,
for the Plaintiff.
Gesmer Updegrove LLP
(By Lee T. Gesmer, Esq.)
40 Broad Street, Boston, MA 02109, for the
Defendants.

Page 2

INDEX
WITNESS     DIRECT  CROSS  REDIRECT  RECROSS
SETH T. STEWART
BY MR. GESMER        3
EXHIBITS
None

Page 3

[1]                          **PROCEEDINGS**
[2]                          **SETH T. STEWART**
[3] a witness called for examination by counsel for the
[4] Defendants, having been satisfactorily identified by
[5] the production of his driver's license and being
[6] first duly sworn by the Notary Public, was examined
[7] and testified as follows:
[8]                      **DIRECT EXAMINATION**
[9]                      **BY MR. GESMER:**
[10]     **Q:** Mr. Stewart, I am Lee Gesmer. You are
[11] testifying here today in the case of M2 versus MRO,
[12] correct?
[13]     **A:** Correct.
[14]     **Q:** Where do you live?
[15]     **A:** New Canaan, Connecticut.
[16]     **Q:** What's your address?
[17]     **A:** 96 Cross Ridge Road.
[18]     **Q:** Where are you employed?
[19]     **A:** I work for a company called Open Business
[20] Exchange.
[21]     **Q:** Where is that company located?
[22]     **A:** It's headquartered in London, England.
[23]     **Q:** Do you refer to it as OBI?
[24]     **A:** It's OBE.

Page 4

[1]     **Q:** OBE. Sorry.
[2] And what's your position with OBE?
[3]     **A:** I am — my exact title is vice-president,
[4] corporate accounts. I am responsible for sales and
[5] business development.
[6]     **Q:** Is that a full-time job?
[7]     **A:** Yes.
[8]     **Q:** Does OBE have an office in the United
[9] States?
[10]     **A:** Yes. Its U.S. headquarters is in San
[11] Francisco, and we have satellite and virtual offices
[12] around the country.
[13]     **Q:** Will you summarize your educational
[14] background post high school?
[15]     **A:** Yes. I graduated — I have a B.A. from
[16] Princeton University and then I took advanced course
[17] work in accounting from NYU.
[18]     **Q:** So your only degree is the undergraduate
[19] degree from Princeton?
[20]     **A:** That's correct.
[21]     **Q:** When did you graduate from Princeton?
[22]     **A:** 1985.
[23]     **Q:** And would you summarize for us your
[24] employment history post graduation from Princeton.

Page 93

[1] agreement with MRO Software," and it goes on to say,
[2] "MRO may sue to protect this market from penetration
[3] by Indus." Do you remember discussing that issue
[4] with Mr. Bevington?
[5]    A: Yes.
[6]    Q: What was the nature of your discussion?
[7]    A: I remember — I don't remember specifically
[8] talking about lawsuits, but I do remember that Indus
[9] was moving very quickly. They had a need to get
[10] into this business, and Rick had to put them — push
[11] them off really. I mean, they were moving very
[12] quickly, and Rick was postponing those discussions
[13] because he wanted to — didn't want to screw up the
[14] Maximo relationship. And you know, I think there
[15] was concern on Rick's part that if he just all of a
[16] sudden did something with Indus that there would be
[17] repercussions from MRO because there had been all
[18] these sort of referable or written agreements. So I
[19] do remember having those conversations. I do not
[20] remember the particulars.
[21]    Q: Look at the next exhibit, No. 28. Now, if
[22] you look down at the bottom of the first page,
[23] Mr. Bevington writes to Mr. Parker, "Thanks for
[24] making the trip to the abbey. It was a great course

Page 94

[1] and great fun"?
[2]    A: Yes.
[3]    Q: Now, is this the Rhode Island golf game you
[4] referred to?
[5]    A: Yes, yes.
[6]    Q: Who attended this golf game?
[7]    A: My recollection is was myself, Rick
[8] Bevington, Bob Parker and Ted Williams.
[9]    Q: Drapeau was not there?
[10]    A: No.
[11]    Q: Was this the first time you met
[12] Mr. Williams?
[13]    A: Yes.
[14]    Q: What were the logistics for this meeting?
[15] When did you arrive? When did you leave? When did
[16] others arrive? When did they leave?
[17]    A: I spent the night in Newport the night
[18] before. Rick and I stayed at the same hotel. He
[19] and I drove to the golf course together. We arrived
[20] there around 9:30, and I believe we had a 10:00
[21] tee-off time. And we played golf till about 1:30
[22] and then we had a lunch meeting afterwards, and
[23] after the lunch meeting we walked Bob Parker to his
[24] car. So that's basically the day, the logistics,

Page 95

[1] and then I drove home after that.
[2]    Q: What business between M2 and MRO was
[3] discussed at this meeting or during this day?
[4]    A: During the golf round frankly there wasn't
[5] a lot of — you know, there was a lot of casual
[6] conversation, not so much about business. Then we
[7] had lunch, and we were talking about the particulars
[8] of how this rollout would occur. And then, you
[9] know, as we were walking Bob in the parking lot, you
[10] know, Rick asked Bob, "Bob, is this a done deal?"
[11] And Bob said, "Absolutely this is a done deal." And
[12] Rick said, "Are we going to roll this out to
[13] the" — "just to the middle market sales
[14] organization or is it going to be large and middle,"
[15] and Bob said, "Large and middle." But he
[16] emphatically reiterated that this was a done deal,
[17] that it had been approved by Chip. It had been
[18] approved by the powers be, MRO, and, you know, it
[19] was done.
[20]    Q: Let's back up a little bit. What business
[21] was discussed over lunch?
[22]    A: Again, I think we were talking a lot about
[23] Rick's financials. You know, how many customers,
[24] what is the volume, how much do you get per customer

Page 96

[1] per seat, blah-blah-blah, a lot of that type of
[2] conversation, and it was really to bring Ted up to
[3] speed, not for Bob's benefit. I think it was Ted
[4] wanting to — if I understood correctly, Bob
[5] reported to Ted who reported to Chip, and so this
[6] was Ted's opportunity to ask directly, you know,
[7] kind of what the business was about. So it was
[8] a bit of an education for Ted, but I specifically
[9] remember kind of going through — for some reason I
[10] think there was a spreadsheet there or something
[11] where Ted was going through the numbers, you know,
[12] all the customers that M2 had, how much the recurring
[13] billing rate was.
[14]    Q: So Mr. Williams was being educated —
[15]    A: Correct —
[16]    Q: — by M2 business?
[17]    A: — on the specifics of the economics of his
[18] business.
[19]    Q: On the economics of the business?
[20]    A: Yes.
[21]    Q: And there was no discussion about, you
[22] know, this done deal, you know, rollout, those
[23] topics, during the four of you at lunch? It was
[24] later when you walked Mr. Parker to his car?

**EXHIBIT**

**J**

M2 Consulting, Inc.                                                    David A. Bigler
MRO Software, Inc., et al.                                             Vol. 1, October 7, 2005

Case 1:03-cv-12589-GAO    Document 91-2    Filed 03/15/2006    Page 53 of 54

Page 1

Volume I
Pages 1 to 53
Exhibits: None
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)
M2 CONSULTING, INC.,
        Plaintiff,                            .
    vs.                                       . Civil Action
                                              : No. 03-12589-GAO
MRO SOFTWARE, INC., and CRAIG
NEWFIELD,                                     :
        Defendants.                           :
DEPOSITION OF DAVID A. BIGLER, a witness
called on behalf of the Defendants, taken pursuant
to the Federal Rules of Civil Procedure, before
Linda A. Walsh, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Gesmer Updegrove
LLP, 40 Broad Street, Boston, Massachusetts, on
Friday, October 7, 2005, commencing at 10:05 a.m.
PRESENT·
        Fee, Rosse & Lanz, P.C.
            (By Mark S. Resnick, Esq.)
    321 Boston Post Road, Sudbury, MA 01776,
            for the Plaintiff.
        Gesmer Updegrove LLP
            (By Lee T. Gesmer, Esq.)
    40 Broad Street, Boston, MA 02109, for the
            Defendants.

Page 2

INDEX
WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
DAVID A. BIGLER
BY MR. GESMER          3
        EXHIBITS
        None

Page 3

**PROCEEDINGS**

[1]
[2]                    **DAVID A. BIGLER**
[3] a witness called for examination by counsel for the
[4] Defendants, having been satisfactorily identified by
[5] the production of his driver's license and being
[6] first duly sworn by the Notary Public, was examined
[7] and testified as follows:
[8]                    **DIRECT EXAMINATION**
[9]                    **BY MR. GESMER:**
[10]    Q: Will you state your full name, please.
[11]    A: David Alan Bigler.
[12]    Q: Where do you live, Mr. Bigler?
[13]    A: 9550 South Ocean Drive, Apartment 608,
[14] Jensen Beach, J-e-n-s-e-n, Beach, Florida 34957.
[15]    Q: And where are you employed?
[16]    A: I'm not employed.
[17]    Q: Will you summarize your educational
[18] background for us starting with graduation from high
[19] school.
[20]    A: I graduated from Cleveland Heights High
[21] School in January of 1953, went to Purdue University
[22] that fall, graduated in June of 1958 with a Bachelor
[23] of Science in Mechanical Engineering.
[24]    Q: Would you summarize your job history with

Page 4

[1] us starting with graduation from Purdue.
[2]    A: As I say, I graduated from Purdue in June
[3] of 1958. I took a job with Johnson Controls,
[4] Incorporated. At that time it was known as Johnson
[5] Service Company, and I did a short stint in the
[6] Cleveland office which was where my home was; and
[7] then I had to go to ROTC summer camp in Fort
[8] Belvoir, Virginia, for six weeks I think it was.
[9] When I got out of that I took two weeks off and got
[10] married and then went to work the 1st of September,
[11] right after Labor Day, with Johnson Controls in the
[12] Indianapolis, Indiana, branch as a sales engineer.
[13]    In the fall of 1969 I was promoted to
[14] branch manager of the office in Grand Rapids,
[15] Michigan, and then in 1973 I was promoted to branch
[16] manager of the Philadelphia branch. In 1977 I was
[17] promoted to vice-president of sales for the Canadian
[18] company, Johnson Controls Limited. Subsequently,
[19] about two years later, I was promoted to
[20] vice-president and general manager of the Canadian
[21] company.
[22]    In 1981 I was promoted to managing director
[23] of Europe headquartered in Brussels, Belgium, and in
[24] nineteen — did I say '81 or '83?

David A. Bigler
Vol. 1, October 7, 2005

M2 Consulting, Inc.   v.
MRO Software, Inc., et al.

Page 45

[1] I get his voice-mail. I leave a voice-mail saying
[2] who I was and my phone number and what I wanted to
[3] talk about. I hung up. I thought, well, that's
[4] probably the last I'll ever hear from him. He's a
[5] busy guy. He doesn't know me from Adam except for
[6] this one time we played golf. About two weeks later
[7] he calls me back, and that was the telephone call
[8] you are referring to.
[9]    Q: And what was discussed during that call?
[10]    A: I said, "Where are we on" — "What's going
[11] on," and he said, again, "We've got the compensation
[12] issues. Our accounting people are working on it.
[13] We are getting close. We have got the recognition
[14] of revenue issue. They are getting close on that.
[15] And there are a couple of minor things we want Rick
[16] to do, which I don't think will be a problem," and
[17] then I said, "Well, that sounds like we are moving
[18] along. How long is it going to be? 30 days or so?"
[19] He said, "At the maximum, probably less." I said,
[20] "Thanks very much for returning my call. I
[21] appreciate it. Next time you are in Atlanta give me
[22] a call, and we'll tee it up at Atlanta Country
[23] Club." Because this guy is an avid golfer I thought
[24] he would like a chance to do that.

Page 46

[1]    Q: You then called Mr. Bevington and relayed
[2] this to him?
[3]    A: I e-mailed him.
[4]    Q: That's the last time you spoke to anybody
[5] at MRO?
[6]    A: That's correct.
[7]    Q: Now, as time went on in 2003 you learned
[8] that MRO was not going to roll out this service to
[9] its sales force, correct?
[10]    A: Correct.
[11]    Q: Mr. Bevington told you that?
[12]    A: Well, there was a date set for the rollout,
[13] as I understand it. I can't remember what it was.
[14] But that date came and went and nothing happened.
[15] And then, as I recall, Parker called Bevington and
[16] said, "The deal is off," or something like that.
[17]    Q: And you learned that MRO was going to sell
[18] its own hosted service of Maximo?
[19]    A: Yes.
[20]    Q: And because they wanted their salespeople
[21] to sell their own service they weren't going to
[22] promote M2's service?
[23]    A: Correct.
[24]    Q: At that point the M2 board discussed "Where

Page 47

[1] do we go from here," right?
[2]    A: Yes.
[3]    Q: And one possibility was to sell M2 to MRO?
[4]    A: Correct.
[5]    Q: And there were discussions between M2 and
[6] MRO, along those lines, correct?
[7]    A: That's my understanding.
[8]    Q: Did you participate in any of those
[9] discussions?
[10]    A: No.
[11]    Q: You didn't go to any of the meetings that
[12] occurred around those discussions?
[13]    A: No.
[14]    Q: And —
[15]    A: When you say that, you mean meetings with
[16] MRO?
[17]    Q: Meetings with MRO, yes. Yes.
[18]    A: No, that's correct, I did not.
[19]    Q: That's what I mean. In late summer or
[20] early fall of 2003 the M2 board learned that MRO and
[21] M2 couldn't come to an agreement on the price of M2?
[22]    A: I believe that's correct. I can't tell you
[23] that that's for certain what was said, but that's
[24] the kind of gist of it.

Page 48

[1]    Q: Okay. And those discussions broke up?
[2]    A: Yes.
[3]    Q: Now, did you as a board member of M2 at that
[4] point say to the other board members, "Well, maybe
[5] it's time to go back to Indus and see if we can
[6] resume those discussions and have Indus buy M2"?
[7]    A: I don't recall that discussion.
[8]    Q: You don't recall that you suggested that?
[9]    A: I did not suggest it.
[10]    Q: And you don't recall anyone else suggesting
[11] it?
[12]    A: No.
[13]    Q: Did the board of directors vote to file
[14] suit against MRO?
[15]    A: I wouldn't say we voted. We have never
[16] voted on anything. We talked about it and then
[17] agreed that's what we should do.
[18]    Q: Are you paid a fee — a director's fee for
[19] being on the board of M2?
[20]    A: Yes. I get a free lunch after the board
[21] meeting that Rick pays for. That's it. I assume M2
[22] pays it, by the way, but Rick picks up the tab.
[23]    MR. GESMER: I may be done. Let's take a
[24] short break. Let me look over my extensive notes.

